**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT**
**IN AND FOR ORANGE COUNTY, FLORIDA**

**CIVIL ACTION**

WALKER MCKNIGHT,
DAVID MCKNIGHT, and
CANDACE MCKNIGHT,                                    CASE NO:

       Plaintiffs,

v.                                                   DEMAND FOR JURY TRIAL

JUUL LABS INC., ALTRIA GROUP,
INC., PHILIP MORRIS USA, INC., and
MEGA SELECT, INC. d/b/a THE HOOK UP, and
XMMS LLC d/b/a CLIMAX or
CLIMAX SMOKE SHOP, and WAWA, INC.,

       Defendants.

_____/

### COMPLAINT AND DEMAND FOR JURY TRIAL

1.     Plaintiffs, Walker McKnight, David McKnight, and Candace McKnight, through

undersigned counsel, bring this action against Defendants JUUL Labs, Inc., Altria Group, Inc.,

and Philip Morris USA, Inc., and Mega Select, Inc. d/b/a The Hook Up, and XMMS LLC d/b/a

Climax or Climax Smoke Shop, and Wawa Inc., and allege as follows:

### INTRODUCTION

2.     Walker McKnight, only 20 years old, is fighting for his life. He is addicted to JUUL,

an e-cigarette.  His JUUL use and addiction caused or substantially contributed to causing severe

and permanent personal injuries, including pulmonary and kidney failure.

3.     Health authorities consider youth e-cigarette use an epidemic.  Defendants are to

blame.  Mimicking Big Tobacco's past marketing practices, Defendants prey on youth to recruit

replacement smokers for financial gain.  Tobacco giant Altria recently acquired a 35% stake in

JUUL, the country's lead e-cigarette seller.  Altria also owns Philip Morris, which sells Marlboro,

the country's most popular cigarette.   Now that JUUL has Altria's infrastructure, progress in

nicotine cessation stands to erode.   Defendants use the very fraudulent and deceptive youth

marketing business practices adjudged to violate federal racketeering laws.   They exploit themes

that resonate with teenagers while falsely denying doing so:



Plaintiffs bring this lawsuit to redress the harm already sustained and to prevent future harm to

others.

## PARTIES, JURISDICTION, AND VENUE

4.      Plaintiff, Walter McKnight, resides in Orlando, Orange County, Florida.  Plaintiff

began using and purchasing JUUL vaping products when he was in high school. Plaintiff did not

know how much nicotine JUUL contained or that JUUL was specifically developed to create and

sustain a nicotine addiction when he began using it.  Plaintiff was attracted to and used JUUL's

Mango flavor. Plaintiff is addicted to the nicotine contained in JUUL.  Plaintiff was directly and

proximately harmed by Defendants' unlawful conduct as alleged in this complaint.  Such harm

includes severe and permanent physical and personal injuries. As a result of Defendant's product,

Plaintiff has suffered and will continue to suffer from these injuries.  Plaintiff resided, sustained injury and has received medical care in Orange County.

5.      Plaintiffs David and Candace McKnight are the parents of Walker McKnight.  They reside in Orange County, Florida.  They too have sustained injuries as described in this complaint.

6.      Plaintiffs are concerned for Walker's health and his future health because of the known complications associated with Walker's bodily injuries and nicotine usage.  Plaintiffs reasonably fear that the Defendants listed below are working in concert to market and advertise JUUL to youth and teenagers and that Defendants' association and marketing efforts increase the likelihood that youth will begin using e-cigarettes and become addicted.  Unless these Defendants are enjoined from their unlawful acts as described below, the harms will continue.

7.      Defendant JUUL Labs, Inc. ("JUUL"), is a Delaware corporation, having its principal place of business in San Francisco, California. JUUL originally operated under the name PAX Labs, Inc. In 2017, it was renamed JUUL Labs, Inc.  JUUL manufactures, designs, sells, markets, promotes and distributes JUUL e-cigarettes.

8.      Defendant, Altria Group, Inc. ("Altria"), is a Virginia corporation, having its principal place of business in Richmond, Virginia.

9.      Defendant, Philip Morris USA, Inc. ("Philip Morris"), is a wholly-owned subsidiary of Altria.  Philip Morris is a Virginia corporation, having its principal place of business in Richmond, Virginia.  Philip Morris is engaged in the manufacture and sale of cigarettes in the United States. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest-selling cigarette brand in the United States for over 40 years.

10.     Altria and Philip Morris are referred to collectively as the Altria Defendants. Altria acquired 35% ownership in JUUL to, among other things, sell, promote, market, and distribute JUUL e-cigarettes.  Pursuant to a services agreement, JUUL has access to Altria Defendants' industry infrastructure.

11.      Defendant Mega Select, Inc. is a Florida corporation and its principal place of business is in Boca Raton, Florida, located in Palm Beach County.  Mega Select, Inc. does business as The Hook Up, which is also located in Boca Raton, Florida.  The Hook Up promotes, distributes, and sells JUUL.  Plaintiff Walker McKnight purchased JUUL from The Hook Up.

12.     Defendant XMMS LLC is a Florida corporation. XMMS LLC does business as Climax or Climax Smoke Shop, which has various locations in Orange County, Florida.  Climax promotes, distributes, and sells JUUL.  Plaintiff Walker McKnight purchased JUUL from Climax.

13.     Defendant Wawa, Inc. is a Pennsylvania corporation headquartered in Pennsylvania.  Wawa promotes, distributes, and sells JUUL.  Wawa has locations in several states including Florida.  Plaintiff Walker McKnight purchased JUUL from Wawa in Florida.

14.     The Court has subject matter jurisdiction over this action because it exceeds fifteen thousand dollars ($15,000.00), exclusive of costs and fees.

15.     The Court has personal jurisdiction over all Defendants because they do business in Florida and have sufficient minimum contacts with the State of Florida and/or Orange County, Florida.  Defendants intentionally avail themselves of the markets in this State through the promotion, marketing, distribution or sale of the products at issue in this lawsuit to render the exercise of jurisdiction by this Court permissible under Florida law and the U.S. Constitution.

16.     Venue is proper in this Court pursuant to Fla. Stat. § 47.011 because part of the events or omissions giving rise to the claims at issue in this Complaint arose in Orange County, Florida and Defendants are subject to the Court's personal jurisdiction with respect to this action.

## GENERAL FACTUAL ALLEGATIONS

**A.  The E-Cigarette Epidemic**

17.     According to the CDC, about 4.9 million middle and high school students were current users of a tobacco product in 2018, meaning that they used such products within the past 30 days.  This represents an increase of 1.3 million users just since 2017.[1]

18.     A surge in e-cigarette use explains this dramatic increase:  There were 1.5 million more youth e-cigarette users in 2018 than 2017, accounting for more than the full increase in youth tobacco usage and erasing past progress in reducing youth tobacco product use.  E-cigarette use among U.S. high school students increased more than 900% from 2011 to 2015.  Frequent use of e-cigarettes increased from 20 percent in 2017 to 28 percent in 2018. E-cigarette use in general increased 78 percent among high school students and 48 percent among middle school students from 2017 to 2018.  An estimated 3.6 million U.S. middle and high school students currently use e-cigarettes.

19.     As CDC Director Dr. Robert R. Redfield explains: "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made reducing tobacco use.  It's putting a new generation at risk for nicotine addiction."

20.     Many youth tobacco product users are also using multiple tobacco products: a combination of e-cigarettes and conventional cigarettes.

---

[1] *See* https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.

21.     The FDA characterizes teen vaping as an epidemic.  And with good reason: Smoking is the leading cause of preventable death. Cigarette smoking causes about one in every five deaths in the United States each year.  This amounts to around 480,000 deaths annually.  If smoking continues at the current rate among U.S. youth, 5.6 million of today's Americans younger than 18 years of age are expected to die prematurely from a smoking-related illness. This represents about one in every 13 Americans aged 17 years or younger who are alive today.

22.     A study done by the American Journal of Medicine found that among young adults who did not smoke cigarettes, those who used e-cigarettes were more than four times as likely than non-vapers to start smoking traditional cigarettes within 18 months.[2]

23.     JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users. Nicotine itself is a carcinogen, as well as a toxic chemical associated with cardiovascular, reproductive, and immunosuppressive problems.

24.     Nicotine adversely affects the heart, eyes, reproductive system, lungs, and kidneys. Exposure to nicotine from sources such as nicotine gum still produces an increased risk of Coronary Vascular Disease by producing acute myocardial ischemia, as well as an increased risk of peripheral arterial disorders. Moreover, because vaping introduces foreign substances into the lungs, prolonged use of vaping products is believed to produce chronic obstructive pulmonary disease, just like traditional cigarette smoke. Vaping also triggers immune responses associated with inflammatory lung diseases.

---

[2] Primack, Brian A. MD, Ph.D., *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, AM. J. OF MED.  November, 2017.

25.     According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[3]  Big Tobacco has long known that nicotine addiction is the reason for tobacco product usage.

26.     In a study performed at UNC and published in the American Journal of Respiratory and Critical Care Medicine, Robert Tarran and his colleagues inserted bronchoscopes into the lungs of 14 e-cigarette users and measured levels of enzymes inside the lungs.[4]  They found high levels of protease, an enzyme that—when too high—causes emphysema by essentially dissolving the lung tissue.  The levels of protease found were as high as those observed in conventional cigarette smokers.  They also studied the effect of nicotine on cultured immune cells from the lungs and found that higher levels of nicotine produced more proteases.

27.     In addition to the harmful effects of nicotine, the Journal of Clinical Investigation published a study titled "Electronic Cigarettes Disrupt Lung Lipid Homeostasis and Innate Immunity of Nicotine."[5]  In that study, mice were exposed to e-cigarette aerosol with and without nicotine and researchers found that the aerosol altered lipid (fat) balance in the lungs in ways that depressed the ability of the lung macrophages to fight infections and disrupted normal production of surfactants—chemicals in lungs that help keep the air sacs from collapsing.  This effect did not depend on nicotine, but was related to the propylene glycol and vegetable glycerin ("PV/VG") that are the primary carriers in e-cigarettes.  This evidence shows that e-cigarettes—in addition to the adverse effects of nicotine—bring their own unique toxic effects.

---

[3] *See* https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92
[4] Ghosh A, Coakley RD, Ghio AJ, Muhlebach MS, Esther CR Jr, Alexis NE, Tarran R., *Chronic E-Cigarette Use Increases Neutrophil Elastase and Matrix Matelloprotease Levels in the Lung*, AM. J. RESPIR. CRITICAL CARE MED. 2019 Aug. 7 doi: 10.1164/rccm.201903-0615OC. [Epub ahead of print].
[5] Madison MC, Landers CT, Gu BH, Chang CY, Yung HY, You R, Hong MJ, Baghaei N, Song LZ, Porter P, Putluri N, Salas R, Gilbert BE, Levental I, Campen MJ, Corry DB, Kheradmand F.  Electronic cigarettes disrupt lung lipid homeostasis and innate immunity independent of nicotine.  J Clin Invest. 2019 Sep. 4 pii: 128531. doi: 10.1172/JCI128531. [Epub ahead of print].

28.     In yet another study, research showed that exposure to nicotine free e-cigarette aerosol immediately inhibits normal function of blood vessels in ways similar to exposure to cigarette smoke or secondhand cigarette smoke.  The study included 31 young adult never-smokers who were in good health who began using a nicotine-free e-cigarette.   The participants experienced flow mediated dilation and stiffer arteries, which are risk factors for long-term development of heart disease.  These effects appeared immediately after using the e-cigarette.  The study concluded that finding these effects in nicotine-free aerosol is more evidence that other elements of the e-cigarette aerosol are causing the problems. [6]

## B.   The JUUL E-Cigarette

29.     Since its launch in 2015, JUUL has become the dominant e-cigarette manufacturer in the United States.  Its revenues grew by 700% in 2017.  According to a recent Wells-Fargo report, JUUL owns three-quarters of the e-cigarette market.[7]

30.     The U.S. Surgeon General, Jerome Adams, and former FDA Commissioner, Scott Gottlieb, single out JUUL as a catalyst of the vaping epidemic.  In fact, youths have barely even heard of other vaping products in comparison to JUUL.  This is not surprising given their targeted marketing to youth, as described further below:[8]

---

[6] Carporale A, Langham MC, Guo W, Johncola A, Chtterjee S, Wehrli FW, *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, Radiology, 2019 Aug. 20: 190562 doi: 10.1148/radiol.2019190562. [Epub ahead of print].

[7] *See* https://www.durbin.senate.gov/imo/media/doc/FINAL%20JUUL%20Letter%204.8.19.pdf

[8] Public Health Emergency that Needs Action Now:  Epidemic Youth Use of Juul; Affidavit of Bonnie Halpern-Felsher, Ph.D., Case 8:19-cv-00884-MSSAAS, Dkt. No. 29-3, at 8.



31.     JUUL is a novel cartridge-based e-cigarette design.  The cartridges are called pods or JUULpods. JUUL devices heat up a cartridge containing oils to create vapor, which quickly dissolves into the air.  JUUL describes the e-cigarettes as an "easy to use vaporizer."

32.     The JUUL e-cigarette is a sleek, high-tech design.  It looks like a USB flash drive, and it can charge in a computer. It is about the size and shape of a pack of chewing gum; it is small enough to fit in a closed hand.  JUUL is easy to conceal from parents and teachers.  The odor emitted from JUUL is a reduced aerosol—unlike the distinct smell of conventional cigarettes.

33.     The thin, rectangular JUUL e-cigarette device consists of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. Each JUULpod is a plastic enclosure containing 0.7 milliliters of JUUL's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUULpod, the battery in the JUUL device activates the heating element, which in turn converts the nicotine solution in the JUULpod into a vapor consisting principally of nicotine, benzoic acid, glycerin, and propylene glycol. A light embedded in the JUUL device serves as a battery level indicator and lights up in a "party mode" display of rainbow of colors when the device is waved around.

34.     The physical design of the JUUL device (including its circuit board) and JUULpod determines the amount of aerosolized nicotine the JUUL emits. By altering the temperature, maximum puff duration, or airflow, among other things, JUUL precisely controls amount of nicotine vapor delivered. Studies show that there is a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."  See Duell, James F. Pankow, and David H. Peyton, *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 431 (2018) ("the Duell study").

35.     JUUL designed its products to replicate the "feel" of traditional cigarettes, and this design makes it easier for e-cigarette users to transition to conventional cigarettes because of the similarity.  Indeed, JUUL says its devices "mirror the simplicity that smokers are accustomed to."[9]

36.     The JUUL e-cigarette is defectively designed and therefore unreasonably dangerous.  JUUL is designed to create and sustain a nicotine addiction.  JUUL appears to deliver nicotine more effectively and at higher doses than other e-cigarettes, increasing users' risk of addiction.  JUUL's patented JUULSalts approach to nicotine delivery is due to compounds called nicotine salts, which develop in heat-dried tobacco leaves much like most cigarettes.  According to the company website, freebase nicotine is mixed with benzoic acid to make the e-liquid, which has a chemical reaction to produce the nicotine salts. JUULPod e-liquid cartridges contain up to twice the amount of nicotine as a pack of cigarettes and are easier to inhale. This design method increases JUUL's inhale-ability. JUUL is engineered to easily deliver more nicotine to the brain, faster, with less harshness. The Duell study concluded that JUUL's use of nicotine salts "may well contribute to the current use prevalence of JUUL products among youth." *Id*. at 433.

---

[9] *See* https://support.juul.com/home/learn/faqs/juul-device-basics (last visited Apr. 9, 2019).

37.     Moreover, the JUUL device does not have a manual or automatic "off" switch. Neither the JUULpod nor the programming of the JUUL device's temperature or puff duration settings limits the amount of nicotine JUUL delivers in each puff to the upper bound of a cigarette.

38.     JUUL e-cigarettes and JUULpods deliver dangerous toxins and carcinogens to users, especially teenage users.

39.     JUUL delivers doses of nicotine that are materially higher than combustible cigarettes.  The United Kingdom Medicines and Healthcare Products Regulatory Agency notes, "an e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in 5 minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine).[10]  JUUL's nicotine concentration is 59 mg/ml, which is in a salt form that increases the rate and efficiency of nicotine delivery.  JUULpods, therefore, exceed the nicotine dose of a traditional cigarette.

40.     Further, one JUULpod is reported to contain 59 mg/ml, but one JUULpod is only 0.7mL per pod.  Thus, simple math of 59 mg/ml x 0.7 mL equals 41.3mg.  Simply put, one JUULpod is equivalent to smoking anywhere from 26 to 40 cigarettes, which is substantially more than 1 pack of cigarettes (20 cigarettes).  This range depends on whether there is an uptake of 1mh or 1.5mg of nicotine per cigarette.  In sum, one JUULpod is equal to 1.5 to 2 pack of cigarettes worth of nicotine.

41.     Comparison of available data regarding per-puff nicotine intake corroborates the other JUUL studies (mentioned above), indicating that JUUL delivers about 30% more nicotine per puff. Specifically, a recent study of JUULpods found that "[t]he nicotine levels delivered by the JUUL are similar to or even higher than those delivered by cigarettes." Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, at 3 (the "Reilly

---

[10] *E-Cigarettes*, https://ec.europa.eu/health//sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (last visited Apr. 9, 2019).

study"). The Reilly study tested JUUL's Tobacco, Crème Brulee, Fruit Punch, and Mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms (µg) of nicotine per puff. Reilly's findings were based on a puff volume of 75/ml. By comparison, a 2014 study using larger, 100 ml puffs found that a Marlboro cigarette delivered 152—193 µg/puff. M.J. Schroeder and A.C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, Tobacco Control 2014; 23:ii30-ii35. Correcting to account for the different puff sizes between the Reilly and Schroeder studies, this suggests that, at 75ml/puff, a Marlboro would deliver between 114 and 144 µg/puff. In other words, empirical data suggests that JUUL delivers up to 36% more nicotine per puff than a Marlboro.

42.     Medical evidence shows significant health issues relating to the transmission of glycerol, propylene glycol, nicotine, benzoic acid, and food-grade flavoring in the vapor itself. The cytotoxic properties of these vaporized chemicals cause cellular damage to pulmonary and vascular cells that is acute and may lead to hypersensitivity pneumonitis and restrictive airway disease. There is growing scientific concern among public-health officials that vaping may cause a much higher rate of COPD in young adults and that vaping may evolve into a national health epidemic because it has become a means to nicotine addiction, rather than an end. Vaping among young people is surpassing all other forms of tobacco use.

43.     Medical evidence also shows that JUUL users may develop significant acute pulmonary inflammation, leading to pneumonitis and pneumonia that will require medical intervention, including hospitalization and potentially mechanical ventilation.

44.     The FDA also recently announced a possible link between seizure and e-cigarette use. See U.S. Food and Drug Administration, Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's ongoing

scientific investigation of potential safety issue related to seizures reported following e-cigarette use, particularly in youth and young adults; April 3, 2019.  JUUL's design for nicotine delivery, nicotine content, nicotine formulation and their effects on creating or sustaining nicotine addiction increases the propensity of abnormal electrical activity in the brain.  JUUL is further defectively designed in that its users may unwittingly swallow the e-liquid.  These defects can cause or substantially contribute to causing mild or major seizures.  The FDA is currently investigating reports of youth and young adults who are experiencing seizures following the use of e-cigarettes.

45.     Dr. Johnathan Winickoff, the former chair of the American Academy of Pediatrics Tobacco Consortium, in March 2018 said that "JUUL is already a massive public-health disaster-and without dramatic action it's going to get much, much worse." Dr. Winickoff, who is also a pediatrician at Massachusetts General Hospital and Professor at Harvard Medical School also noted that: "[i]f you were to design your ideal nicotine-delivery device to addict a large numbers of United States kids, you'd invent JUUL". Of the emerging e-cigs, JUULs have all the necessary elements to take over a substantial portion of the market share. Its batteries can be recharged in an hour, it is flavored, it can often be used without detection, and it contains somewhere around twice the concentration of nicotine as other vape products. For those aged 18 to 24, 40 percent were not smokers before using the device. On September 1, 2018, the Israeli Government instituted a ban on the sale of JUUL e-cigarettes in Israel, citing that JUUL poses "a grave danger to public health".

## C.  JUUL Fraudulently Concealed Important Safety Information On How Addictive It's E-Cigarettes Are

46.     JUUL has fraudulently concealed material information about the addictive nature of its e-cigarettes.  Plaintiff's claims arise out of JUUL's fraudulent concealment of material facts concerning the JUUL e-cigarette and representations about the JUUL e-cigarettes' nicotine content, its addictiveness, and the physiological effects of JUUL e-cigarettes.

47.     At all relevant times, JUUL knew that JUUL e-cigarettes' were not safe for non-smokers, and posed a risk of aggravating nicotine addiction in those already addicted to cigarettes. JUUL was under a duty to disclose this material information based upon its exclusive knowledge of it, and its concealment of it; yet JUUL never disclosed the defect to Plaintiff or the public.

48.     JUUL repeatedly represented that a single JUULpod contains an amount of nicotine equivalent to about a pack of cigarettes. For example, some JUUL advertisements and JUUL's website currently provides that each "JUULpod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately equivalent to 1 pack of cigarettes or 200 puffs."  This falsehood is recast in JUUL advertisements, and on JUUL's website, into the claim that a JUUL delivers about as much nicotine as a cigarette.

49.     This statement is false because, as JUUL knows, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect and risk of addiction. Defendants know that benzoic acid affects pH and "absorption of nicotine across biological membranes."[11]

50.     JUUL's statement in its advertisements that each JUULpod contains about as much nicotine as a pack of cigarettes is false and likely to mislead, because the amount of nicotine *contained* in the JUULpod is perhaps six times less than in a pack of cigarettes, but actual amount of nicotine *consumed* via JUULpod is as much as twice as high as that via cigarettes.

51.     Prior to JUUL, most e-cigarette liquids were 1% to 2% nicotine; the few at 3% were labeled as 'super high' and intended for the 'two packs a day smoker.'[12]  Labeled as 5% nicotine,

---

[11] Neil L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, Handbook of Experimental Pharmacology 1982:   29-60   (Oct.   13,   2010),   available   at:   HYPERLINK "https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/[11]
https://www.fda.gov/TobaccoProducts/NewsEvents/ucm635133.htm
[12] Affidavit of Judith J. Prochaska, Ph.D., MPH, Case 8:19-cv-00884-MSS-AAS, Dkt. No. 29-2, at 4.

which sounds like a low level to a novice user, many youth were unaware of the high potency in the JUULpod.  An online survey of JUUL users 15 to 24 years old found that 63% were unaware that the product even contained nicotine.

52.     Despite making numerous revisions to its packaging since 2015, JUUL did not add nicotine warnings until forced to do so in August of 2018.

53.     In addition, JUUL has both explicitly and implicitly made therapeutic claims about their products in their online marketing and other promotional materials.  JUUL's mission, which is boldly proclaimed on its website, clearly states that JUUL's purpose is to help smokers enjoy healthier lives by quitting smoking: "Improve the lives of the world's one billion smokers by eliminating cigarettes."[13]  In fact, JUUL's website features "testimonials" from customers who are or were smokers about how JUUL has helped them curb or quit smoking:

- Robert: "Every time you want a cigarette just take ten puffs of the JUUL and you will get some satisfaction." [claim: helps relieve nicotine addiction].
- Angela: "No more smoke breaks.  No more chewing endless packs of gum, spraying perfume, sneaking out to smoke, not having to step outside when I am watching tv with my husband." [claim: helps smokers quit].
- Dale: "This is a great alternative to actual tobacco products.  Enjoy!" [claim: not a tobacco product].[14]

54.     Publishing these testimonials on JUUL's website represents promotion of its e-cigarette as a therapeutic device, despite the fact that JUUL's website includes disclaimers that its products are ***not*** intended for smoking cessation.  JUUL fails to inform users that its products have not been found to be safe and effective by the FDA for the purpose of smoking cessation.

---

[13] https://www.juul.com/mission-values; *see also* Lauren Kass Lempert, JD, MPH; Bonnie Halpern-Felsher, Ph.D.; Matthew L. Springer, Ph.D.; Stanton Glantz, Ph.D., *FDA's proposed modifications to its compliance policy for e-cigarettes leaves millions of youth at risk for starting to use e-cigarettes; FDA needs to remove these products from the market now and clamp down on illegal therapeutic and modified risk claims in JUUL and other e-cigarette advertising*, UCSF TCORS, Dkt. No. FDA-2019-D-0661 (Mar. 21, 2019).
[14] https://www.juul.com/community

55.     Further, to the extent that JUUL's advertising and communications state or imply that JUUL is safer or less harmful that conventional cigarettes, such claims are unauthorized modified risk claims under section 911 of the Tobacco Control Act that are illegal absent a prior MRTP order issued by the FDA on the basis of sound scientific evidence.  JUUL has never been approved as a smoking therapy nor has it been approved as a modified risk tobacco product.

### D.  JUUL Copied Big Tobacco's Youth Marketing Playbook To Addict Youth to Nicotine

56.     JUUL adopted the same themes used by Philip Morris and other Big Tobacco companies in the cigarette industry's long-standing, extensive advertising campaign to glamorize cigarette smoking while downplaying its addictiveness and deleterious health effects.

57.     Statements by JUUL's founder and employees make clear JUUL's intent to develop a highly addictive product to sell to a new audience of non-smokers. James Monsees, one of JUUL's founders, described the cigarette as "the most successful consumer product of all time . . . . an amazing product." According to Monsees, JUUL aimed to "deliver[] solutions that refresh the magic and luxury of the tobacco category."

58.     JUUL used the tobacco industry's prior practices as a playbook. Monsees admitted publicly that JUUL began by looking at tobacco industry documents, including board meeting minutes.  "It became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."

59.     JUUL's research included documents about how tobacco companies had chemically manipulated nicotine content to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."

60.     JUUL also used tobacco industry advertisements—which were created to lure non-smoking youth—as a guide to JUUL's own advertising campaigns.  In a 2018 interview, "Monsees indicated that the design of JUUL's advertising had been informed by traditional tobacco advertisements and that [the Stanford Research into Impact of Tobacco Advertising] had been quite useful to them." Robert K. Jackler, M.D. et al, *JUUL Advertising Over Its First Three Years on the Market* (Jan. 21, 2019).

61.     These copycat advertising and marketing practices include: colorful ad campaigns using eye-catching designs and youth-oriented imagery touting themes of being "cool," "carefree," "stylish," "attractive," "sexy," "pleasureful," "popular" and that the JUUL e-cigarettes are "great tasting," etc.

62.     Viral marketing campaigns push JUUL products on children, teens, and young adults. For example, JUUL's Vaporized launch campaign featured models in their 20s in trendy clothing styles engaged in poses and movements more evocative of underage teens than mature adults. JUUL also pays social media stars or social media influencers to flood social media newsfeeds with JUUL promotion—Big Tobacco did the same type of product placement to create viral campaigns of smoking.  Like Big Tobacco before it, JUUL distributed free e-cigarette and packs at live social events.

63.     JUUL's original marketing campaign included billboards, YouTube videos, advertising in magazines, like VICE Magazine, launch parties, and a sampling tour.

64.     One study of JUUL's marketing showed that "the growth of JUUL was accompanied by innovative marketing across a variety of new media platforms . . . JUUL was one of the first major retail e-cigarette brands that relied heavily on social media to market its

products."[15]   The study further found that JUUL's Instagram account reached a quarter million followers, used artsy photographs to display its products and "evoke lifestyle feelings such as relaxation, freedom and sex appeal."

65.     Another study, performed by a group at Stanford University, involved a specific analysis of JUUL's social media presence from inception through November 2018.  A total of 2,691 Twitter, 248 Facebook and 187 Instagram posts, and 171 customer directed marketing emails from JUUL controlled accounts were available for study.  The study concluded JUUL's principle advertising themes were closely aligned with that of traditional tobacco advertising (flavors, pleasure/relaxation, socialization/romance, cost savings and discounts, holiday/seasons, style/identity, and satisfaction).

66.     The Surgeon General's Advisory on E-Cigarette Use Among Youth found that JUUL's Twitter account was being followed by adolescents and that 25% of those retweeting official JUUL tweets were under 18.

67.     JUUL has also played off the ubiquity of Apple products such as iPhones and iPads. JUUL promotes itself with statements like JUUL is "the iPhone of e-cigarettes," which JUUL posted on its website and used as the basis for a social media and email campaign.

68.     JUUL is available in sweet flavors including mango, fruit medley and cool mint. These flavors have been advertised prominently.  According to one survey, 81 percent of current youth e-cigarette users cited the availability of appealing flavors as the primary reason for use.[16]  In another study of California youth and young adults (mean age 17.5), who were shown eight different

---

[15] Huang, J, et al., "Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail, available at https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2018/05/31/tobaccocontrol-2018-054382.full.pdf.

[16] Villanti AC, Johnson AL, Ambrose BK, et al. Use of flavored tobacco products among U.S. youth and adults; findings from the first wave of the PATH Study (2013–14).

advertisements for flavored e-cigarette products, more than half of the participants felt that the advertisements for the sweet and fruity flavors were for someone their age.  "These findings suggest that while the tobacco industry argues that flavored tobacco products . . .  are not meant to attract youth, youth see them as aimed at them."[17]  In 2015, the CDC reported that 7 of 10 students who use tobacco, use a flavored product.

69.     JUUL's viral marketing campaign has been successful.  The National Youth Tobacco Survey has found that 78.2 percent of middle and high-school students—20.5 million youth—had been exposed to e-cigarette advertisements.

70.     JUUL has styled itself as something different than Big Tobacco.  For example, JUUL had a campaign that expressly stated: "FACT: JUUL Labs is not Big Tobacco.  We are an independent vapor company on a mission to eliminate cigarettes."  That has proved false.  As discussed below, Altria acquired 35% of JUUL to partner with the company.

### E.  Philip Morris, An Altria Subsidiary, Has a Long History of Marketing Tobacco Products to Youth

71.     Beginning in the 1950s through the present, Philip Morris intentionally marketed cigarettes to young people under the age of 21 to recruit "replacement smokers" to ensure the economic future of the tobacco industry.  *See U.S. v. Philip Morris, et al.*, No. 99-cv-2496, Amended Final Opinion, at 972 (D.D.C. Aug. 17, 2006) (Kessler, J.).

72.     Philip Morris knew that marketing cigarettes to youth is essential to the company's success and longevity, and for that reason, it created marketing campaigns to increase youth consumption.

---

[17] Public Health Emergency that Needs Action Now:  Epidemic Youth Use of Juul; Affidavit of Bonnie Halpern-Felsher, Ph.D., Case 8:19-cv-00884-MSSAAS, Dkt. No. 29-3, at 17–18.

73.     A 1975 Philip Morris report stated, "Marlboro's phenomenal growth rate in the past has been attributable in large part to our high market penetration among young smokers . . . 15 to 19 years old . . . my own data, which includes younger teenagers, shows even higher Marlboro market penetration among 15-17-year-olds."[18]

74.     An internal memorandum dated March 31, 1981 sent by Myron Johnston, a marketing researcher for Philip Morris, states: "It is important to know as much as possible about teenage smoking patterns and attitudes.  Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens."[19]

75.     To accomplish this sordid goal, Philip Morris tracked youth behavior and preference; employed marketing themes that resonated with youth; and promoted cigarettes to youth through retail promotions, events and sponsorships.  *See U.S. v. Philip Morris, et al.*, at 1006, 1072.

76.     Philip Morris intentionally exploited adolescents' vulnerability to imagery by creating advertising that utilizes the themes of independence, adventurousness, sophistication, glamour, athleticism, social inclusion, sexual attractiveness, thinness, popularity, rebelliousness, and being "cool."  Philip Morris' marketing tactics consistently reached millions of teens.  *Id.* at 990.

77.     Philip Morris' youth brand is Marlboro, which was and remains among the most heavily advertised brands.  *Id.* at 980, 991.

---

[18] Myron E. Johnston, "The Decline in the Rate of Growth of Marlboro Red" May 21, 1975 Bates No. 2022849875-9880.
[19] Myron E. Johnston, Young Smokers Prevalence, Trends, Implications and Related Demographic Trends, March 31, 1981 Bates No. 2077864711-4712, at 6.

78.     Philip Morris was adjudged to have engaged in unlawful coordinated activity to "recruit new, youth smokers through cigarette marketing," and falsely denied that it marketed to youth.

79.     The Racketeering Acts associated with Philip Morris' youth marketing consisted of advertisements that appeal to and target youth, the designs of which are based on its research on teenage behaviors and preferences. *Id.* at 1519.

80.     The Altria Defendants have not abandoned their youth-appealing themes.  Up until it acquired a 35% stake in JUUL, described below, Altria Defendants had their own e-cigarette, the MarkTen products, which Altria conceded was popular among youth.

**F.     The Government Addresses the E-Cigarette Epidemic**

81.     On February 24, 2018, the FDA sent a letter to JUUL expressing concern about the popularity of JUUL products among youth.  The FDA ordered JUUL to submit documents regarding its marketing practices.  The FDA publicized this letter on its website.

82.     On September 12, 2018, the FDA sent letters to five e-cigarette manufacturers that represent more than 97 percent of the current market.  JUUL and Altria were among these manufacturers.  The FDA commissioner, Dr. Gottlieb, stated these companies are "now on notice by the FDA of how their products are being used by youth at disturbing rates."  Further, the FDA requested "the manufacturers of these brands and products to come back to the FDA in 60 days with robust plans on how they'll convincingly address the widespread use of their products by minors."  Dr. Gottlieb ordered the companies to "demonstrate that they're truly committed to keeping these [e-cigarettes] out of the hands of kids and they must find a way to reverse this trend."

83.     On October 4, 2018, JUUL stated it released 50,000 pages of documents to the FDA and that it "want[s] to be part of the solution in preventing underage use."

84.     On October 18, 2018, Altria's CEO met with members of the FDA leadership. During that meeting, Altria acknowledged it had an obligation to address the epidemic of youth use of e-cigarettes.

85.     Publicly, and in response to the FDA's alarm concerning the rise in youth e-cigarette use, Altria's CEO, Howard Willard, stated, in letter to the FDA of October 25, 2018, that the company is "alarmed about the reported rise in youth e-vapor use to epidemic levels." Mr. Willard further wrote that Altria believed that pod-based products significantly contributed to the rise in youth use of e-vapor products and committed to "remove from the market our *MarkTen Elite* and *Apex by MarkTen* pod-based products until we receive a market order from FDA or the youth issue is otherwise addressed." Mr. Willard also wrote: "We are committed to helping reverse the current [vaping] use and trend among youth."

86.     On November 14, 2018, JUUL announced a plan to combat underage use.

87.     A day later, on November 15, the CDC announced that e-cigarette use in general increased 78 percent among high school students and 48 percent among middle school students from 2017 to 2018. The FDA Commissioner called these results "astonishing."

88.     On December 7, 2018, Altria announced it would discontinue production and distribution of all MarkTen products and said it will "refocus its resources on more compelling reduced-risk tobacco product opportunities."

89.     On December 18, 2018, the Secretary of the U.S. Department of Health and Human Services, Alex Azar, stated at a press conference: "We have never seen use of any substance by America's young people rise as rapidly as e-cigarette use is rising."

**G.  Altria Defendants Long-Monitored JUUL's Growth And Recently Purchased a Controlling Stake to Partner With JUUL**

90.     Altria's public stance on e-cigarettes markedly differed from its private undertakings with respect to JUUL.

91.     The Altria Defendants closely and carefully monitored the details of JUUL's business for years prior to its decision to buy into JUUL in December 2018.  In an earnings call of December 2018, Altria Defendants stated that they had been in talks with JUUL's managers for "quite some time."  Altria's chief executive, Howard Willard, stated: "we've been monitoring [JUUL's] growth . . . for three years"—in other words, since JUUL launched back in 2015.

92.     Altria's disclosures to the Securities and Exchange Commission reveal it had been "closely" following JUULs journey to "see if it had staying power."

93.     Weeks after Altria announced it would remove its e-vapor products from the market to address the youth vaping epidemic, on December 20, 2018, Altria made public that it closed a $12.8 billion investment with JUUL, the leader in e-cigarettes, amounting to a 35% stake.  Thus, Altria is continuing to sell flavored e-cigarettes, which it told the FDA it would stop.

94.     Altria agreed to a non-competition obligation with JUUL as long as Altria is providing services to JUUL, which Altria has committed to doing for at least six years.

95.     Altria and JUUL also entered into a services agreement. Among other things, Altria will provide services to JUUL with respect to logistics and distribution, access to retail shelf space, youth vaping prevention, cigarette pack inserts and onserts, regulatory matters and government affairs. Altria has also agreed to grant JUUL a non-exclusive, royalty-free perpetual, irrevocable, sublicensable license to Altria's non-trademark licensable intellectual property rights in the e-vapor field, subject to the terms and conditions set forth in an intellectual property license agreement between the parties.

96.     Pursuant to the agreement Altria has agreed to provide JUUL with certain commercial services on a cost-plus-3% basis for an initial term of six years.

97.     Pursuant to the agreement Altria will provide JUUL access to its prime retail shelf space, which will allow JUUL products to appear alongside Philip Morris combustible cigarettes like Marlboro, the country's most popular cigarette brand.  Altria will also provide JUUL, through the Altria Group Distribution Company, sales and distribution services and thus: access to Altria's near 230,000 retail locations.

98.     Pursuant to the agreement, Philip Morris, which maintains a database of cigarette smokers' mailing and email addresses, will send JUUL advertising and marketing messages to its customers.

99.     Further, pursuant to the agreement, JUUL will benefit from Altria's influence with legislators and regulators and the expertise of Altria's legal team in countering tobacco litigation.

100.    At a conference call on December 20, 2018, Altria's CEO remarked that Altria felt "fortunate to be the tobacco company that's partnered up with JUUL" and that Altria would provide its infrastructure to JUUL in order to accelerate JUUL's growth.  During that call, Altria said it would continue to market conventional cigarettes "vigorously."

101.    According to Robert K. Jackler, MD, Principal Investigator of the Stanford Research into the Impact of Tobacco Advertising: "The joining of JUUL and Marlboro brings together the two dominant players in the teenage nicotine addiction market (e-cigarette & cigarette).  This powerful combination constitutes a clear and present danger to the youth of America as well as those around the world."

102.    Studies demonstrate that e-cigarette use is associated with increased risk for cigarette initiation and use, particularly among low-risk youths. See Berry KM, Fetterman JL, Benjamin EJ,

et al. Association of Electronic Cigarette Use with Subsequent Initiation of Tobacco Cigarettes in US Youths. *JAMA Netw Open.* 2019;2(2):e187794. doi:10.1001/jamanetworkopen.2018.7794.

103.   Recent promotional practices of both companies suggest that they may pursue a strategy by which youth start with JUUL and graduate to Marlboro:

 

 

 

























Original JUUL Design                Recent JUUL Design





**Leading Youth Cigarette Initiation Brand**

**Leading Youth e-Cigarette Initiation Brand**

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Civil Conspiracy
### (Against Defendants JUUL, Altria and Philip Morris)

104.   Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein, and further declare:

105.   Defendants JUUL, Altria and Philip Morris are all "persons" for purposes of this cause of action.

106.   Defendants JUUL, Altria and Philip Morris have been conspiring, to sell and promote JUUL and have engaged in unlawful marketing practices to do so.

107.   Since at least as long as Defendants JUUL, Altria and Philip Morris have entered into an agreement with respect to JUUL e-cigarettes, and continuing up to and including the date of the filing of this complaint, these Defendants have been functioning to achieve shared goals through unlawful means including to deceive consumers, particularly parents and children, by claiming that they did not market to children, while engaging in marketing and advertising with the intent of addicting children into becoming lifetime nicotine users.

108.   As detailed in the General Factual Allegations, these Defendants' know that marketing JUUL e-cigarettes to youth is essential to Defendants' success and longevity, and for that reason, they partnered to create marketing campaigns to increase youth consumption, while fraudulently denying they are doing so.   Defendants have furthered this scheme to profit. Defendants' collaboration, as evidenced by a services agreement, marketing campaign, fraudulent statements, and misrepresentations constitute overt acts in pursuance on the conspiracy.

109.   The Defendants' conduct in furtherance of this scheme was intentional. Plaintiff was directly harmed as a result of the Defendants' intentional conduct.

110.     Defendants' JUUL, Altria and Philip Morris have directly and proximately caused injuries and damages to Plaintiff. Equitable relief is necessary to ensure an end to Defendants' continued effort to deceptively campaign to induce children and minors to become addicted and subject to a high risk of disease.

## SECOND CAUSE OF ACTION

### Fraud
### (Against Defendants JUUL, Altria and Philip Morris)

111.     Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

112.     At all times relevant, Defendants fraudulently and deceptively sold or partnered to sell JUUL products to Plaintiff as non-addictive nicotine delivery systems, or less addictive nicotine products than cigarettes, when Defendants knew it to be untrue.

113.     Defendants also fraudulently and deceptively failed to disclose to Plaintiff that the JUUL nicotine salts he purchased were highly addictive in nature, making it extremely difficult for Plaintiff to cease purchasing JUULpod refills.

114.     Defendants further fraudulently and deceptively failed to disclose to Plaintiff that JUUL is designed to create and sustain an addiction to nicotine.  Defendant also manipulated the formulations of JUUL devices and JUULpods in ways that could and would impact their potency and addictiveness, and Defendant did so without notifying Plaintiff. Defendants actively concealed the nicotine content and nicotine potency of JUUL e-cigarettes.

115.     Each of these misrepresentations and omissions were material at the time they were made. In particular, each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff, as to whether to purchase a JUUL E-cigarette and JUULpod.

116.     Defendants had a duty to accurately provide this information to Plaintiff. In not informing Plaintiff, Defendants breached their duties. Defendants also gained financially from, and as a result of, their breach.

117.     Defendants concealed material information at all times relevant to this Complaint. Defendants have yet to disclose the truth about JUUL e-cigarettes.

118.     Plaintiff relied to his detriment on Defendant's fraudulent omissions. Had Plaintiff been adequately informed and not intentionally deceived by Defendant, he would not have purchased or used JUUL products.

119.     As a direct and proximate result of the conduct of the Defendants as set forth above, Walker McKnight has in the past and will continue to suffer from bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; aggravation of pre-existing conditions; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

120.     Defendants' conduct as described herein was willful and malicious and was designed to maximize Defendants' profits even though Defendant knew that it would cause loss and harm to Plaintiff.

### THIRD CAUSE OF ACTION

### Strict Product Liability – Failure to Warn
### (Against all Defendants)

121.     Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

122.     Defendants manufactured, distributed and sold and promoted JUUL, or have partnered to manufacture, distribute, sell and promote JUUL, or promote, distribute and sell JUUL at retail.

123.     At all times relevant, Defendants were well-aware of the dangers of nicotine addiction as described in this complaint.

124.     At all times relevant, Plaintiff was not aware of and would not have recognized the risks of using a JUUL device with a JUUL pod because Defendant JUUL has intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.  Since the Altria Defendants partnered with JUUL, they too intentionally downplayed, misrepresented, concealed, and failed to warn of the heightened risks of nicotine exposure and addiction.  Defendants The Hook Up, Climax and Wawa also promote, distribute and sell JUUL, which lacks adequate warnings.

125.     In all forms of advertising as well as social media communications, Defendants failed adequately to warn or instruct foreseeable users, including youth and adolescent users, that JUUL products were unreasonably dangerous to them and created a high level of risk of harms caused by nicotine exposure and addiction as explained herein. Defendants failed adequately to warn in their advertising, social media communications, or anywhere on the product label that the product was not safe for minors and should not be used or consumed by them. Instead, as described herein, Defendants marketed their products to minors and made them available in youth-friendly colors and flavors. Defendants also designed their products to be more palatable to youth and nonsmokers by increasing JUUL's inhale-ability and increased the level of nicotine that is absorbed by users, making them even more addictive.

126.     The defects in JUUL Products, including the lack of warnings, existed at the time the JUUL pods and devices were sold and/or when the JUUL pods and devices left JUUL's possession or control.

127.    The JUUL devices and pods were expected to be used by Plaintiff without substantial change in their condition from the time of their manufacture or sale.

128.    Plaintiff was harmed directly and proximately by Defendants' failure to warn.  As a direct and proximate result of the conduct of the Defendants as set forth above, Walker McKnight has in the past and will continue to suffer from bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; aggravation of pre-existing conditions; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

### FOURTH CAUSE OF ACTION

### Strict Product Liability – Design Defect
### (Against all Defendants)

129.    Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

130.    Defendant JUUL designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the JUUL devices and JUUL pods, which were intended by JUUL to be used as a method of ingesting nicotine and the other aerosolized constituents of JUUL's nicotine solution.  Since the Altria Defendants partnered with JUUL, they have assisted with one or more of these activities.  Defendants The Hook Up, Climax and Wawa also promote, distribute and sell JUUL.

131.    Defendants knew or, by the exercise of reasonable care, should have known that JUUL's products under ordinary use were harmful or injurious, particularly to youths and adolescents, including the Plaintiff.

132.     As described in this complaint, Defendants designed and marketed their products to appeal to nonsmokers, youths and adolescents and to encourage them to buy and use the product.

133.     JUUL products are also inherently defective because they contain and deliver significantly more nicotine than JUUL represents.  Moreover, JUUL is unreasonably dangerous and therefore defective in design because it is made to create and sustain addiction.   The JUUL products Plaintiff used were expected to and did reach Plaintiff without substantial change affecting the products.  JUUL products are unreasonably dangers because of its design because the products failed to perform as safely as an ordinary consumer would expect when used as intended or when used in a manner reasonably foreseeable by Defendants, and/or the risks inherent in the design of JUUL outweigh significantly any benefits of such design.

134.     At all relevant times, Defendants could have employed reasonably feasible alternative designs to prevent the harms discussed in the complaint.

135.     At all relevant times, Plaintiff was unaware of the design defects described in the complaint.  Further, Defendants knew or had reason to know that youths and adolescents would not fully realize the dangerous and addictive nature of the JUUL products and the long-term complications nicotine addiction can present, or that, due to their youth, inexperience and/or immaturity of judgment, would recklessly disregard such risks.

136.     Plaintiff was harmed directly and proximately by the defectively designed JUUL e-cigarette.  As a direct and proximate result of the conduct of the Defendants as set forth above, Walker McKnight has in the past and will continue to suffer from bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; aggravation of pre-existing conditions; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

## FIFTH CAUSE OF ACTION

### Negligence
### (Against all Defendants)

137.    Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

138.    Defendants had a duty and owed a duty to Plaintiff to exercise a degree of reasonable care including, but not limited to: ensuring that JUUL marketing does not target minors; ensuring that JUUL devices and JUULpods are not sold and/or distributed to minors and are not designed in a manner that makes them unduly attractive to minors; designing a product that is not defective and unreasonably dangerous; designing a product that will not addict youth or other users to nicotine; adequately warning of any reasonably foreseeable adverse events with respect to using the product.

139.    Defendants knew the risks that minors would be attracted to their electronic cigarette devices and JUULpods and knew or should have known the importance of ensuring that the products were not sold and/or distributed to minors.

140.    Defendants knew or should have known that their marketing, distribution, and sales practices did not adequately safeguard Plaintiff from the sale and/or distribution of electronic cigarette devices and JUULpods and, in fact, induced minors to purchase JUUL products.

141.    Defendants breached the duties they owed to Plaintiff.

142.    But for Defendants' duties and breaches thereof, Plaintiff would not have been harmed as alleged in the Complaint.

143.    As a direct and proximate result of the conduct of the Defendants as set forth above, Walker McKnight has in the past and will continue to suffer from bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; aggravation of pre-existing

conditions; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

## SIXTH CAUSE OF ACTION

**Violation of Florida's Deceptive and Unfair Trade Practices Act,
Fla. Stat. § 501.203
(Against all Defendants)**

144.    Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

145.    The express purpose of FDUTPA is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." § 501.202(2).

146.    FDUPTA §501.204(1) declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

147.    Manufacturing, selling, promoting e-cigarettes in interstate commerce are "consumer transaction[s]" in the scope of FDUPTA, and JUUL is a good within the meaning of that statute.

148.    Plaintiff is a "consumer" as defined by FDUPTA § 501.203.

149.    Defendants' unfair and deceptive practices are likely to mislead – and have misled – reasonable consumers, such as Plaintiff, and therefore, violate Section 500.04, Florida Statutes

150.    Defendants have engaged and continue to engage in unfair, unlawful, and deceptive trade practices in Florida as outlined herein.  In particular, Defendants have knowingly developed, sold, and/or promote a product that contained nicotine levels in excess of cigarettes with the intention of creating and fostering long-term addiction to JUUL products for minors to continue

that addiction into adulthood; selling a product that aggravates nicotine addiction; creating advertising to target youth into using JUUL e-cigarettes, and disseminating that advertising through unregulated social media platforms commonly used by youth.

151.   Plaintiff reasonably relied to his detriment on Defendants' unlawful conduct in that he purchased JUUL not knowing the true propensity of its dangers.

152.   Plaintiff sustained damages as a direct and proximate result of Defendants' tortious conduct.

153.   Plaintiff seeks injunctive relief to prohibit Defendants from continuing to engage in the unfair and deceptive advertising and marketing practices complained of in this complaint. Such misconduct by Defendants, unless and until enjoined and restrained by order of this Court, will continue to cause injury in fact.

154.   Pursuant to FDUPTA §§501.211(2) and 501.2105, Plaintiff makes claims for damages, attorney's fees and costs. The damages suffered by the Plaintiff was directly and proximately caused by the deceptive, misleading and unfair practices of Defendants.

## SEVENTH CAUSE OF ACTION

### Preliminary and Permanent Injunction
### (Against all Defendants)

155.   Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

156.   Defendants' actions – designing, marketing, and/or selling JUUL in ways that it knows will attract youth and deceptively downplaying the potency and danger of the nicotine in JUUL – constitute unlawful acts under Florida Law.

157.   Nicotine addiction constitutes irreparable harm.  Nicotine is a neurotoxin, which means that it is poisonous to the human brain.  Further, the brains of teenagers are particularly vulnerable to nicotine's neurotoxic effects.  Nicotine causes macromolecular alterations of the brain.

158.   Based on the factual allegations above, Plaintiffs established a clear legal right, an inadequate remedy at law and that irreparable harm will arise absent injunctive relief.

159.   Thus, Defendants, officers, directors, employees, agents, and all those acting in concert with them, should be preliminarily and permanently enjoyed from:

    a.   Offering, selling, delivering, or in any manner, providing or facilitating others to provide JUUL products to minors within this State;

    b.   Offering, selling, delivering, or in any manner, providing or facilitating others to provide any flavors other than tobacco through online sales;

    c.   Engaging or participating in any marketing or advertising activities within this State that are intended or are known to likely appeal to minors, and should thus be enjoined from: sending marketing emails to minors within this State; advertising outdoors within 1,000 feet of schools and playgrounds within this State; sponsor any sporting, entertainment, or charity event in this State; providing free or discounted samples, starter kits or e-cigarette products to consumers, including being enjoyed from providing automatic renewals or bulk orders; advertising in any fashion in media or outlets that serve consumers under 30 years;

    d.   Offering, selling, delivering, or in any manner, providing or facilitating others to provide JUUL products within this State unless and until JUUL

obtains Premarket Approval or approved as a Modified Risk Tobacco Product under the Tobacco Control Act.

## EIGHTH CAUSE OF ACTION

### Strict Liability
### (Against The Hook Up, Climax, and Wawa)

160.   Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

161.   The Hook Up, Climax and Wawa engage in the business of selling and distributing JUUL products in Florida.

162.   The Hook Up, Climax, and Wawa directly placed JUUL products on the market with knowledge the products would be used without inspection for defects and dangers.  The Hook Up, Climax and Wawa knew or should have known that the ultimate users and consumers would not and could not know that JUUL products are defective and unreasonably dangerous for Plaintiff.

163.   For the reasons stated above, JUUL products are defective and unreasonably dangerous.  JUUL products failed to be safe for regular consumer application as an ordinary consumer would expect, and the risks of regular use of JUUL products outweighed any benefits. JUUL products lacked adequate warnings or any proper documentation or notice to alert users, particularly youth users, regarding the hazardous conditions, as stated above, involving JUUL products.

164.   The JUUL products purchased by Plaintiff at The Hook Up, Climax, and Wawa were substantially unchanged from their condition when sold and distributed.

165.   As a result of the defects of JUUL products discussed above, and as a result of The Hook Up, Climax, and Wawa's sale of JUUL products, Plaintiff was injured as described in this complaint.  As a direct and proximate result of the conduct as set forth above, Walker McKnight

has in the past and will continue to suffer from bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; aggravation of pre-existing conditions; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

## NINTH CAUSE OF ACTION

### Intentional Infliction of Emotional Distress
### (Against all Defendants)

155.     Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

156.     Defendants had and undertook the duty to provide a safe product to Plaintiff and the rest of its consumers during and in the days in which it marketed its product.

157.     As alleged above, Defendant's conduct described in this complaint was outrageous and reckless, beyond all bounds of decency, as to be regarded as odious and utterly intolerable.

158.     Additionally, Defendants knew or should have known this outrageous and reckless conduct would result in emotional distress to its many consumers and the family members of those consumers, such as David McKnight and Candace McKnight, who did not know the truth concerning JUUL products.  Thus, Defendants acted with reckless disregard of the high probability of causing Plaintiff, David McKnight, and Candace McKnight severe emotional distress.

159.     As a direct and proximate result of the conduct of the Defendants as set forth above, David McKnight and Candace McKnight have in the past and will continue in the future to suffer emotionally from the sight of his son's bodily injury; pain and suffering; disability; disfigurement; loss of the capacity for the enjoyment of life; medical and hospital care and expenses; rehabilitation expenses; and severe emotional distress.

## TENTH CAUSE OF ACTION

### Loss of Consortium
### (Against all Defendants)

165.     Plaintiffs incorporate by reference paragraphs 1-103 above as if fully set forth herein and further declare:

166.     At all times relevant, David McKnight is the father of Walker McKnight.  As such, he is entitled to his son's companionship, affection, and consortium.

167.     At all times relevant, Candace McKnight is the mother of Walter McKnight.  As such, she is entitled to her son's companionship, affection, and consortium.

168.     As a result of the injuries sustained by his son as alleged above, David McKnight has lost the companionship, affection, and consortium of his son, and will continue to lose said companionship, affection, and consortium in the future.

169.     As a result of the injuries sustained by her son as alleged above, Candace McKnight has lost the companionship, affection, and consortium of her son, and will continue to lose said companionship, affection, and consortium in the future.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment as follows:

A.  An order enjoining Defendants from further negligent, deceptive, unfair, and unlawful conduct as alleged herein;

B.  Awarding actual, compensatory, and consequential damages;

C.  Awarding reasonable attorneys' fees, and costs of this case;

D.  Awarding prejudgment and post-judgment interest;

E.  Such other and further relief as the Court deems appropriate under the circumstances.

## JURY TRIAL DEMAND

Plaintiff hereby demands a jury trial on all issues so triable.

Dated: January 30, 2020

Respectfully submitted,

s/Scott P. Schlesinger
Scott P. Schlesinger (FBN: 444952)
Jonathan R. Gdanski (FBN: 0032097)
Jeffrey L. Haberman (FBN: 98522)
SCHLESINGER LAW OFFICES, P.A.
1212 SE Third Avenue
Ft. Lauderdale, FL 3316
Tel: 954-467-8800
scott@schlesingerlaw.com
jgdanski@schlesingerlaw.com
jhaberman@schlesingerlaw.com