# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: JUUL LABS, INC. MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | Case No. 19-md-02913-WHO<br>Case No. 3:20-cv-02600-WHO |
| THIS DOCUMENT RELATES TO:<br><br>David McKnight and Candace McKnight, individually, and as Personal Representatives of the Estate of Walker McKnight, on behalf of the Estate of Walker McKnight,<br><br>Plaintiffs,<br><br>v.<br><br>JUUL Labs, Inc., Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services, Altria Group Distribution Company, Altria Enterprises LLC, James Monsees, Adam Bowen, Nicholas Pritzker, Hoyoung Huh, Riaz Valani, Mega Select, Inc. d/b/a The Hook Up, XMMS LLC d/b/a Climax or Climax Smoke Shop, and Wawa, Inc.<br><br>Defendants. | **[PROPOSED] SECOND AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, David McKnight and Candance McKnight ("Plaintiffs"), individually, and as Personal Representatives of the Estate of Walker McKnight, on behalf of the Estate of Walker McKnight, and pursuant to the United States District Court for the Northern District of California's ("MDL Court") May 31, 2024 Order, hereby submit this Second Amended Complaint and bring claims against Defendants, JUUL Labs, Inc., Altria Group, Inc., Philip Morris USA, Inc., Altria Client Services, Altria Group Distribution Company, Altria Enterprises LLC, James Monsees, Adam Bowen, Nicholas Pritzker, Hoyoung Huh, Riaz Valani, Mega Select,

Inc. d/b/a The Hook Up, XMMS LLC d/b/a Climax or Climax Smoke Shop, and Wawa, Inc. ("Defendants"), and in support thereof allege as follows[1]:

## INTRODUCTION

1.     The battle to end nicotine addiction and its associated diseases and death has consumed our nation's public health resources for more than half a century. After five decades of tireless efforts by public health advocates, litigators, and regulators, the war on tobacco was on the path to victory. By 2014, rates of smoking and nicotine addiction in this country were finally at an all-time low, particularly among teenagers. Until now. The United States, closer than ever to consign the nicotine industry to the dustbin of history, now faces a youth nicotine epidemic of historic proportions. The swift rise in a new generation of nicotine addicts has overwhelmed parents, schools, and the medical community, drawing governmental intervention at nearly every level—but it's too little, too late.

2.     This public health crisis is no accident. What had been lauded as progress in curbing cigarette use, JUUL Labs Inc.'s ("JLI") co-founders Adam Bowen and James Monsees viewed as opportunity. Seizing on the decline in cigarette consumption and the lax regulatory environment for e-cigarettes, Bowen, Monsees, and investors in their company sought to introduce nicotine to a whole new generation, with JLI as the dominant supplier. To achieve that common purpose, they knew they would need to create and market a product that would make nicotine "cool" again, without any of the stigma associated with cigarettes. With help from their early investors and board members, who include Nicolas Pritzker, Hoyoung Huh, and Riaz Valani (collectively referred to as "Management Defendants"), they succeeded in hooking millions of

_____

[1] Plaintiffs originally filed this action on January 30, 2020 in the Ninth Judicial Circuit in and for Orange County, Florida, wherein it was subsequently removed to the United States District Court for the Middle District of Florida on March 26, 2020, and then transferred to this Court ("MDL Court") on April 13, 2020 for consolidated pretrial proceedings. Plaintiffs are filing this Second Amended Complaint pursuant to the MDL Court's May 31, 2024 Order (Doc. 4254). Notwithstanding their compliance with such Order, however, Plaintiffs maintain that this action belongs in state court and shall be remanded for the reasons more fully set forth in their Motion to Remand to State Court.

youth, intercepting millions of adults trying to overcome their nicotine addictions, and, of course, earning billions of dollars in profits.

3. Every step of the way, JLI, by calculated intention, adopted the cigarette industry's playbook, in coordination with one of that industry's innovators, cigarette giant Altria. JLI was created in the image of the iconic American cigarette companies, which JLI founders praised for creating "the most successful consumer product of all time. . . . an amazing product."  The secret to that amazing product?  Nicotine, a chemical that has deleterious effects on the developing brains of youths, and is the fundamental reason that people persist in using tobacco products posing the risk of pulmonary injuries, cardiovascular disease and other serious, often fatal, conditions. Through careful study of decades of cigarette industry documents, JLI knew that the key to developing and sustaining addiction was the amount and the efficiency of the nicotine delivery.

4. Three tactics were central to decades of cigarette industry market dominance: 1) product design to maximize addiction; 2) mass deception; and 3) targeting of youth. JLI and its co-conspirators adopted and mastered them all.

5. *First*, JLI and Bowen designed JUUL Products to create and sustain addiction, not break it. JLI and Bowen were the first to design an e-cigarette that could compete with combustible cigarettes on the speed and strength of nicotine delivery. Indeed, JUUL Products use nicotine formulas and delivery methods much stronger than combustible cigarettes, confirming that what JLI and Bowen designed was a starter product, not a cessation or cigarette replacement product. JLI and Bowen also innovated by making an e-cigarette that was smooth and easy to inhale, practically eliminating the harsh "throat hit," which otherwise deters nicotine consumption, especially among nicotine "learners," as R.J. Reynolds' chemist Claude Teague called new addicts, primarily young people.

6. *Second*, JLI, the Management Defendants, and Altria engaged in a campaign of deceit, through sophisticated mass media and social media communications, advertisements and

[PROPOSED] SECOND AMENDED COMPLAINT - 3

otherwise, about the purpose and dangers of JUUL Products. JUUL Products' packaging and advertising grossly understates the nicotine content in its products. Advertising campaigns featured JUUL paired with food and coffee, positioning JUUL as part of a healthy meal, a normal part of a daily routine, and as safe as caffeine. In partnership with Altria, JLI adopted a "Make the Switch" campaign to mislead consumers into thinking that JLI products were benign smoking cessation devices, even though JUUL was never designed to break addictions. JLI, the Management Defendants, and Altria also concealed the results of studies that revealed that JUUL Products were far more addictive than was disclosed. JLI's deceptive marketing scheme was carried out across the country through broad distribution channels: veteran cigarette industry wholesalers, distributors, and retailers ensured that JUUL Products would become widely available to a new market of nicotine-newcomers, especially youth. JLI and the Management Defendants joined with these veteran cigarette industry marketers to secure premium shelf space for vivid displays at convenience stores, like 7-11, and gas stations, including Chevron, that would lure e-cigarette users, young and old, who would become long-term customers. These marketing efforts have been resounding successes—when JUUL Products were climbing in sales, most adults and youth believed that e-cigarettes did not contain nicotine at all.

7.     *Third*, JLI and the Management Defendants, just like cigarette companies before them, targeted kids as their customer base. One of JLI's "key needs" was the need to "own the 'cool kid' equity." JUUL Products were designed to appear slick and high-tech like a cool gadget, including video-game-like features like "party mode." JLI offered kid-friendly flavors like mango and cool mint, and partnered with Altria to create and preserve the market for mint-flavored products—all because Defendants knew that flavors get young people hooked. Under the guise of youth smoking prevention, JLI sent representatives directly to schools to study teenager e-cigarette preferences.

8.     JLI and the Management Defendants reached their intended demographic through a diabolical pairing of notorious cigarette company advertising techniques (long banned for

[PROPOSED] SECOND AMENDED COMPLAINT - 4

cigarettes because they cause young people to start smoking) with innovative viral marketing campaigns and social media. They hired young models and advertised using bright, "fun" themes, including on media long barred to the cigarette industry, such as billboards, on children's websites such as "Nick Junior" and Cartoon Network, and on websites providing games and educational tools to students in middle school and high school. JLI and the Management Defendants also employed young social media "influencers" and celebrities popular with teenagers. When regulators and Congress caught onto JLI's relentless focus on children, JLI and the Management Defendants simply lied, even though they knew well that they had purposefully targeted youth in their marketing and those efforts had been breathtakingly successful. JUUL Products are rampant in the nation's schools, with the percentage of 12th graders who reported consuming nicotine almost doubling between 2017 and 2018. The Surgeon General has warned that this new "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."

9.      It should come as little surprise that JLI and the Management Defendants' misconduct, expressly patterned after decades of cigarette company practices, could not have been carried out without the involvement and expertise of an actual cigarette company. In December 2018, Altria paid $12.8 billion to acquire a 35% stake in JLI. Altria's agreement to pull its competing e-cigarette product off the market was a non-negotiable condition of the deal demanded by JLI's lead negotiators (and Management Defendants) Nicholas Pritzker and Riaz Valani, as well as CEO Ken Burns. JUUL's market dominance was thus established, positioning Altria and JLI to share the profits. Defendants' conduct prompted the Federal Trade Commission to sue JLI and Altria on April 1, 2020 alleging violations of the antitrust laws and seeking to unwind the JLI/Altria transaction.

10.     But even well before Altria announced its investment in JLI, the connections between the two companies ran deep. JLI and Altria collaborated to grow the e-cigarette market and the number of users addicted to nicotine, including by sharing data and information and

[PROPOSED] SECOND AMENDED COMPLAINT - 5

coordinating marketing activities, including acquisition of key shelf space next to top-selling Marlboro cigarettes. Altria's investment in JLI is not merely a financial proposition, but a key element of Defendants' plan to stave off competition and regulation and keep their most potent and popular products on the market. Aside from profiting from reduced competition, JLI has benefitted from Altria's expertise in designing and marketing addictive products, and in thwarting regulation.

11.     There is no doubt about it—JLI, the Management Defendants, Altria, and their co-Defendants have created this public health crisis. At the heart of this disastrous epidemic are the concerted efforts of JLI, its co-conspirators, and all those in JUUL's supply and distribution chain to continuously expand their market share and profits by preying upon a vulnerable young population and deceiving the public about the true nature of the products they are selling. Nicotine is not benign like coffee, contrary to what many JUUL users believe. Nor is the aerosol as harmless as puffing room air. Worse, the flavors in JUUL Products are themselves toxic and dangerous, and have never been adequately tested to ensure they are safe for inhalation. According to the most recent scientific literature, JUUL Products cause acute and chronic pulmonary injuries, cardiovascular conditions, and seizures. Yet, JUUL Products and advertising contain no health risk warnings at all. Many smokers, believing that JUUL would help them "make the switch," ended up only further trapped in their nicotine addiction. Older adults who switch to JUUL are more susceptible to cardiovascular and pulmonary problems, and CDC data shows that older patients hospitalized due to vaping lung-related conditions had much longer hospital stays than younger patients. And a generation of kids are now hooked, ensuring long-term survival of the nicotine industry because, today, just as in the 1950's, 90% of smokers start as children.

## THE PARTIES

### Plaintiffs

12.     Plaintiffs David McKnight and Candace McKnight reside in Orange County, Florida, and have been duly appointed as the Personal Representatives of the Estate of Walker McKnight by the Ninth Judicial Circuit in and for Orlando County, Florida by Court Order dated February 17, 2025.

13.     Plaintiffs have standing to bring this action on behalf of the Estate of Walker McKnight, and on behalf of themselves, individually, as the surviving parents.

14.     Walker McKnight began using JUUL Products in September 2017 at the age of eighteen (18) years old.

15.     At all relevant times, Walker McKnight was a resident of the State of Florida. Walker McKnight became a regular JUUL user in September 2017. Walker McKnight's JUUL use increased rapidly over time to the point that he was using two (2) or three (3) JUUL Pods per day, and he was using his JUUL device all day every day, seven (7) days a week. Walker McKnight used JUUL Products until March 2019.

16.     Walker McKnight was in excellent health prior to February 2019. Walker first presented to Boca Raton Regional Hospital Emergency Department on February 23, 2019.  His health improved and he resumed normal activities.  However, Walker, who was continuing his JUUL use, soon developed shortness of breath, fever, chills, night sweats, diarrhea, and joint pains.

17.     Walker McKnight was taken to Oveido Medical Center ED on March 8, 2019.  He was transferred to Orlando Regional Hospital on March 16, 2019, and then to Advent Orlando Hospital for ECMO (Extracorporeal Membrane Oxygenation).

18.     Upon arrival at Advent Orlando Hospital, Walker continued on maximum ventilator support. He continued to decompensate and a large bore ECMO catheter was placed into the right internal jugular vein and ECMO was initiated on March 17, 2019.

19.     While on the ECMO and mechanical ventilation, Walker was maintained in a deep sedation and intermittently medically paralyzed to reduce oxygen consumption and maximize

[PROPOSED] SECOND AMENDED COMPLAINT - 7

ventilation. A permanent hemodialysis catheter and left chest tube were placed on April 12, 2019. Walker was on ECMO through May 19, 2019, and was discharged on July 16, 2019.  Walker was diagnosed with the following illnesses and injuries, among others: Acute hypoxic and hypercapnic respiratory failure with chronic hypoxic respiratory failure; septic shock; renal failure; critical illness myopathy and deconditioning.

20.    Walker was referred to the Mayo Clinic Jacksonville in October of 2021 to be evaluated for Bilateral Lung Transplant and Kidney Transplant. After an extensive pre-transplant evaluation, Walker received a Double Lung Transplant via a midline incision and a right lower abdominal Kidney Transplant on April 6, 2022.

21.    Unfortunately, by May of 2023, Walker's body ultimately rejected his lung implants, and Walker succumbed to his lung injuries of 2019 and their sequalae, and died on December 31, 2024.

22.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

23.    Upon information and belief, Walker McKnight's JUUL use caused or substantially contributed to cause his death.

24.     As set forth herein, Walker McKnight's initiation to JUUL and sustained JUUL usage, and the resultant injuries suffered from JUUL usage were all caused by Defendants' conduct, as further described herein.

**Defendants**

**(JUUL Defendants)**

25.     Defendant JUUL Labs, Inc. ("JLI") is a Delaware corporation, with its principal place of business in San Francisco, California. Ploom, Inc., a predecessor company to JLI, was incorporated in Delaware on March 12, 2007. In 2015, Ploom, Inc. changed its name to PAX Labs, Inc. In April 2017, PAX Labs, Inc. changed its name to JUUL Labs, Inc., and formed a new subsidiary corporation with its old name, PAX Labs, Inc. That new subsidiary, PAX Labs, Inc. ("PAX"), was incorporated in Delaware on April 21, 2017 and has its principal place of business in San Francisco, California.

26.     JLI designs, manufactures, sells, markets, advertises, promotes, and distributes JUUL e-cigarettes devices, JUUL Pods and accessories (collectively "JUUL" or JUUL Products"). Prior to the formation of separate entities—PAX Labs, Inc. and JLI in or around April 2017—JLI designed, manufactured, sold, marketed, advertised, promoted, and distributed JUUL under the name PAX Labs, Inc.

27.     Together with its predecessors, JUUL Labs Inc. is referred to herein as "JLI."

28.     Defendant Altria Group, Inc., (AGI") is a Virginia corporation, with its principal place of business in Richmond, Virginia. AGI is one of the world's largest producers and marketers of tobacco products, manufacturing and selling "traditional" cigarettes for more than a century. On December 20, 2018, AGI purchased a 35% stake in JLI. AGI and JLI executed a Services Agreement that provides that AGI, through its subsidiaries, would assist JLI in the selling, marketing, promoting, and distributing of JUUL, among other things.

29.     Defendant Philip Morris, Inc. ("Philip Morris"), is a wholly-owned subsidiary of AGI. Philip Morris is a Virginia corporation with its principal place of business in Richmond,

Virginia. Philip Morris is the largest cigarette company in the United States. Marlboro, the principal cigarette brand of Philip Morris, has been the largest selling cigarette brand in the United States for over 40 years. Philip Morris performs direct marketing support services for JLI under the Services Agreement to assist JLI in selling, marketing, and promoting JUUL Products. This has included, among other things, placing JUUL Product inserts in millions of packs of L&M, Parliament, and Marlboro cigarettes and utilizing Philip Morris's extensive consumer market database for targeted direct marketing purposes.

30.     Defendant Altria Client Services LLC ("ACS") is a wholly-owned subsidiary of AGI. ACS is a Virginia limited liability company with its principal place of business in Richmond, Virginia. ACS and JLI have executed several Statements of Work whereby ACS performs services under the Services Agreement to assist JLI in the sale, marketing, promotion, and distribution of JUUL. Such services include database support, direct marketing support, and premarket product application support.

31.     Defendant Altria Group Distribution Company ("AGDC") is a wholly-owned subsidiary of AGI. AGDC is a Virginia corporation with its principal place of business in Richmond, Virginia. AGDC and JLI have executed several Statements of Work whereby AGDC performs services under the Services Agreement to assist JLI in the sale, marketing, promotion and distribution of JUUL. Such services include JUUL-distribution support, the removal by AGDC of Nu Mark e-cigarette products (such as Green Smoke or MarkTen) and fixtures in retail stores and replacing them with JLI products and fixtures, and sales support services.

32.     Defendant Altria Enterprises LLC ("AE") is a wholly-owned subsidiary of AGI. AE is a Virginia limited liability company with its principal place of business in Richmond, Virginia. AE is a party to the Purchase Agreement between AGI and JLI. AE purchased Altria's stake in JLI on Altria's behalf.

33.     AGI, Philip Morris, ACS, AGDC, and AE are referred jointly as the "Altria Defendants" or "Altria."

[PROPOSED] SECOND AMENDED COMPLAINT - 10

34.     Upon information and belief, the Altria Defendants conducted meetings, interviews, and inspections at the JLI facilities in San Francisco and engaged in frequent communications regarding JUUL with JLI in California and elsewhere prior to, during, and subsequent to its stock purchase.

35.     JLI and the Altria Defendants are referred to jointly in the causes of action below as the "JUUL Defendants."

**(Management Defendants)**

36.     James Monsees is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Adam Bowen. Mr. Monsees served as Chief Executive Officer of JLI until October 2015. Since October 2015, Mr. Monsees has been Chief Product Officer of JLI. At all relevant times, he has been a member of the Board of Directors of JLI or its predecessors.

37.     Adam Bowen is a resident of the San Francisco Bay Area. In 2007, he co-founded Ploom with Mr. Monsees. At all relevant times, Mr. Bowen has been Chief Technology Officer and a member of the Board of Directors of JLI or its predecessors.

38.     Nicholas Pritzker is a resident of San Francisco, California, and a member of the Pritzker family, which owned the chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. Pritzker received a J.D. from the University of Chicago. He served as president of the Hyatt Hotels Corporation and was a member of its Board of Directors from 1980 to 2007. More recently, Mr. Pritzker co-founded Tao Capital, an early investor in, among other companies, Tesla Motors and Uber. In 2007, he invested in JLI.[2] He has been on the Board of Directors of JLI or its predecessors since at least June 2014.[3] And from at least October 2015 to at least August 2016, Mr. Pritzker was on the Executive Committee

---

[2]Ainsley Harris, *How JUUL went from a Stanford thesis to $16 billion startup*, Fast Company (March 8, 2020 4:11PM PST), https://www.fastcompany.com/90263212/how-JUUL-went-from-a-stanford-thesis-to-16-billion-startup.
[3]INREJUUL_00371187.

[PROPOSED] SECOND AMENDED COMPLAINT - 11

of the Board of Directors of JLI. As of November 2017, he controlled two JLI Board seats (the second of which was occupied by Hoyoung Huh, discussed next).[4]

39.     Hoyoung Huh lives and works in the Silicon Valley area. Dr. Huh holds an M.D. from Cornell and a Ph.D. in Genetics/Cell Biology from Cornell/Sloan-Kettering. He has been CEO or a board member of numerous biotechnology businesses, including Geron Corporation. Dr. Huh has been on the Board of Directors of JLI or its predecessors since at least June 2015. And from at least October 2015 to at least August 2016, he was on the Executive Committee of the Board of Directors of JLI. As of November 2017, he served as Pritzker's second seat on the Board.[5]

40.     Riaz Valani lives near San Jose and is a general partner at Global Asset Capital, a San Francisco-based private equity investment firm. He has been on the Board of Directors of JLI or its predecessors since at least May 2011. And from at least October 2015 to at least August 2016, he was on the Executive Committee of the Board of Directors of JLI. As of November 2017, he controlled two Board seats, the second of which was occupied by Zach Frankel.[6]

41.     Monsees, Bowen, Pritzker, Huh, and Valani are referred to jointly as the "Management Defendants."

### (Florida Defendants)

42.     Defendant Mega Select, Inc. is a Florida corporation with its principle place of business in Boca Raton, Florida. Mega Select, Inc. does business as The Hook Up, which is also located in Boca Raton, Florida. The Hook Up promotes, distributes, and sells JUUL. Walker McKnight purchased JUUL from The Hook Up.

---

[4] INREJUUL_00327603.
[5] *Id.*
[6] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 12

43.     Defendant XMMS LLC is a Florida corporation doing business as Climax or Climax Smoke Shop, which has various locations in Orange County, Florida. Climax promotes, distributes, and sells JUUL. Walker McKnight purchased JUUL from Climax.

44.     Defendant Wawa, Inc. is a Pennsylvania corporation headquarted in Pennsylvania. Wawa promotes, distributes, and sells JUUL. Wawa has locations in several states including Florida. Walker McKnight purchased JUUL from Wawa in Florida.

## JURIDICTION AND VENUE

45.     This Court lacks jurisdiction pursuant to 28 U.S.C. § 1332(d) because this action does not arise out of violations of federal law, and there is not complete diversity between Plaintiffs and Defendants. Specifically, two of the Defendants—Mega Select, Inc. and XMMS LLC—are Florida citizens.[7]

## FACTUAL ALLEGATIONS

**Each Defendant Was Instrumental in Seeking to Develop and Market the Blockbuster Sequel to Combustible Cigarettes, the "Most Successful Consumer Product of All Time"**

46.     JLI's co-founder James Monsees has described the cigarette as "the most successful consumer product of all time . . . an amazing product."[8] This statement, which ignores the fact that cigarettes have caused more deaths than any other human invention, contained a kernel of truth. When U.S. smoking rates peaked in the mid-1960's, 42% of adults smoked cigarettes. Cigarettes were everywhere; people smoked on airplanes, in movie theatres, at the office, and at sports games. Movie stars and sports heroes smoked. Cigarette advertising wallpapered American life, glamorizing smoking as sophisticated, cool, and the thing to do.

---

[7] See Footnote 1.

[8] Kathleen Chaykowski, *Billionaires-to-be: Cigarette Breakers–James Monsees and Adam Bowen Have Cornered the US E-Cigarette Market with Juul. Up Next: The World*, FORBES INDIA (Sept. 27, 2018), www.forbesindia.com/article/leaderboard/billionairestobe-cigarette-breakers/51425/1.

[PROPOSED] SECOND AMENDED COMPLAINT - 13

47.    But in reality, of course, this "successful" product has long been the world's leading cause of preventable death.

48.    Years of anti-smoking campaigns, including work by local government public health departments and school-based anti-tobacco programs, have made great strides towards de-normalizing cigarette smoking. But where public health officials and schools saw progress, others saw an opportunity.

49.    Citing "some problems" inherent in the cigarette, Monsees and JLI co-founder Adam Bowen set out to "deliver solutions that refresh the magic and luxury of the tobacco category."[9] Monsees saw "a huge opportunity for products that speak directly to those consumers who aren't perfectly aligned with traditional tobacco products."[10] Successfully capitalizing on this opportunity would mean not only billions of dollars in short-term revenue, but lucrative acquisition by a cigarette industry power player.

50.    Bowen and Monsees took the first major step toward realizing their vision by deliberately creating an extremely potent nicotine product that looked nothing like a cigarette. But achieving widespread adoption of their highly addictive product required resources and expertise beyond those possessed by Bowen, Monsees or others at JLI.

51.    When it became clear that Bowen and Monsees could not achieve their vision of growing the number of nicotine-addicted e-cigarette users to ensure a base of customers for life through JLI by themselves, the Management Defendants planned a fundamental shift in roles to allow Pritzker, Huh, and Valani to direct and take control of JLI and use it to commit the Defendants' unlawful acts.

---

[9]Josh Mings, *Ploom Model Two Slays Smoking With Slick Design and Heated Tobacco Pods*, SOLID SMACK (Apr. 23, 2014), www.solidsmack.com/ design/ploom-modeltwo-slick-design-tobacco-pods.
[10]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 14

52.     Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani, and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL Products, including to youth.

53.     Prior to the installation of Tyler Goldman as JLI's new CEO in August 2016, Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand the number of addicted e-cigarette users through fraudulent advertising and representations to the public. They overrode other board members' arguments that JLI's youth-oriented marketing campaign should be abandoned or scaled back, directed the continuation of the marketing campaign that they knew was actively targeting youth, and cleaned house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[11] Once their leadership was secure, Defendants Pritzker, Valani, and Huh pressed for even "more aggressive rollout and [marketing]."[12]

54.     Defendants Bowen, Monsees, Pritzker, Valani, and Huh thus, and as further set forth in this Amended Complaint, controlled JLI and used it to make fraudulent misrepresentations or omissions regarding JUUL's intentional addictiveness and method of nicotine delivery, combined with the intent, contrary to public statements, to grow the market for nicotine-addicted individuals for their own financial gain.

55.     And, as set forth in this Amended Complaint, Defendants Bowen, Monsees, Pritzker, Huh, and Valani sought to personally profit from their unlawful acts, using their control of JLI to position the company for acquisition. ████████████████████████████

████████████████████████████████████████████

---

[11] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. TIMES (Nov. 23, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
[12] INREJUUL_00278359.

[PROPOSED] SECOND AMENDED COMPLAINT - 15

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████,"[13]

56.    By no later than August 2015, Defendants Bowen, Pritzker, Valani, and Huh joined in on the discussions of a potential acquisition by a major cigarette company,[14] ████████

████████████████████████████████████████████████

███████████████"

57.    Unable to secure an early acquisition, the Management Defendants knew that their desire to monetize a massive new market for JUUL would be aided if they could convert Altria, a competitor through its e-cigarette subsidiary Nu Mark LLC and an experienced cigarette company with a history of marketing to youth and covering it up, into an ally and eventual purchaser. They began that effort as late as the Spring of 2017. While Defendants JLI, Bowen, Monsees, Valani, and Huh are relative newcomers to the tobacco industry, Altria has been manufacturing and selling "combustible" cigarettes for more than a century.

58.    Altria, for its part, desperately sought a replenishing customer base. Cigarette companies have long known that profitable growth requires a pipeline of "replacement" customers. After decades of tobacco litigation and regulation, Altria (including through its subsidiary Philip Morris) had little ability to recruit new smokers in the ways that had driven Philip Morris's success through most of the 1900's. In 2017, Altria's combustible cigarette products (sold through Philip Morris) were facing increasing regulatory pressures. In late July 2017, Altria's stock value plummeted shortly after the FDA announced that it would reduce the

_____

[13] JLI01369437.
[14] INREJUUL_00016386 ██████████████████).

[PROPOSED] SECOND AMENDED COMPLAINT - 16

amount of nicotine allowed in cigarettes with an eye toward reaching non-addictive levels.[15] In late 2017, Altria, and other major cigarette companies, also finally complied with a consent decree from the 1990's tobacco litigation that required them to issue corrective advertising statements that highlighted the addictiveness and health impacts of smoking cigarettes.[16]

59. Due in large part to litigation and regulation, cigarette use has been declining in the United States in the last decade, especially among youth.[17] Altria estimates that the cigarette industry declined by 4% in 2017 and by 4.5% in 2018, and it predicted a continued 4% to 5% decline in the average annual U.S. cigarette industry volume for 2019 through 2023.[18] Altria later adjusted the estimated rate of decline to 4% to 6%, to reflect efforts to increase the legal age for cigarette smoking to 21.[19]

60. In the face of this continued downward trend in the traditional cigarette market, Altria had undertaken its own efforts at marketing an e-cigarette product through its subsidiary Nu Mark LLC. Altria, through Nu Mark, had launched the MarkTen product nationwide in 2014 with an aggressive marketing campaign, eclipsing the advertising expenditures for the market leader at that time, blue e-cigarettes.[20] Of the $88.1 million spent on e-cigarette advertising in 2014, nearly 40% of that was Altria's MarkTen campaign, at $35 million.[21] Altria was clear in its

---

[15] *See* Dan Caplinger, *Altria Group in 2017: The Year in Review*, The Motley Fool (Dec. 18, 2017), https://www.fool.com/investing/2017/12/18/altria-group-in-2017-the-year-in-review.aspx.
[16] https://www.law360.com/articles/1037281/tobacco-cos-settle-long-running-health-warning-dispute.
[17] *Current Cigarette Smoking Among Adults In the United States*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/adult_data/cig_smoking/index.htm (last visited February 10, 2020); *Youth and Tobacco Use*, CDC, https://www.cdc.gov/tobacco/data_statistics/fact_sheets/youth_data/tobacco_use/index.htm (last visited February 10, 2020).
[18] *Altria's Fourth-Quarter 2018 Earnings Conference Call*, Altria (Jan. 31, 2019), http://investor.altria.com/Cache/1001247877.PDF?O=PDF&T=&Y=&D=&FID=1001247877&iid=4087349.
[19] *Altria Shares Slide As Cigarette Sales Continue to Decline*, Tobacco Bus. (July 31, 2019), https://tobaccobusiness.com/altria-shares-slide-as-cigarette-sales-continue-to-decline/.
[20] Jennifer Cantrell et al., *Rapid increase in e-cigarette advertising spending as Altria's MarkTen enters the marketplace*, Tobacco Control 25 (10) (2015), http://dx.doi.org/10.1136/tobaccocontrol-2015-052532.
[21] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 17

intent to dominate the e-cigarette market as it has the combustible cigarette market: "We are the market leader today and we will continue to be," then-CEO Marty Barrington told investors at the time of MarkTen's launch.[22] The original MarkTen was a "cigalike," designed to mimic the look and feel of a combustible cigarette.

61.     Altria had also been acquiring small companies in the e-cigarette industry, starting in 2014 with Green Smoke, Inc., whose e-cigarettes were also the "cigalike" style, and were sold in flavors including "Vanilla Dreams" and "Smooth Chocolate."[23] In 2016, Altria acquired an e-cigarette product called Cync, from Vape Forward.[24] Cync is a small e-cigarette device that uses prefilled Pods in a variety of flavors, similar to the JUUL.

62.     At the same time Altria was struggling to market a successful e-cigarette product through Nu Mark, it was carefully studying JUUL. ████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ████████████████████████████████████████████████ ███████[25]

63.     In February 2017, Altria told investors at the 2017 Consumer Analyst Group of New York (CAGNY) Conference that over the past year, "Nu Mark LLC (Nu Mark) made

---

[22] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

[23] Mike Esterl, *Altria To Launch MarkTen E-Cigarette Nationally*, Wall St. J. (Feb. 19, 2014), https://www.wsj.com/articles/altria-to-launch-markten-e-cigarette-nationally-1392832378; Senator Richard J. Durbin et al., *Gateway to Addiction? A Survey of Popular Electronic Cigarette Manufacturers and Targeted Marketing to Youth* at 12 (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[24] Remarks by Jody Begley, 2017 Altria Investor Day (Nov. 2, 2017), http://media.corporate-ir.net/media_files/IROL/80/80855/2017InvestorDay/Remarks_and_Reconciliations.pdf.

[25] ALGAT0002577924.

excellent progress toward its long-term aspiration of becoming a leader in e-vapor."[26] In his remarks, AGI's then-CEO, Howard A. Willard III, said, "Nu Mark, our e-vapor company, had a very strong year. It made excellent progress toward establishing MarkTen as a leading brand in the category, continued to improve its supply chain, and took the necessary steps to comply with the deeming regulations." He noted, however, that the estimated "total 2016 e-vapor consumer spending was roughly flat compared to the prior year at approximately $2.5 billion."[27] In 2017, Altria's MarkTen e-cigarettes had a market share of only 13.7%, well behind JLI's growing market share of 40%.[28] Thus, despite its public statements to the contrary, Altria knew the popularity of JUUL stood in the way of Altria becoming the dominant force in the e-cigarette market.

64.    With smoking on the decline, litigation and regulatory controls were ramping up and threatening Altria's ability to attract new smokers, and JUUL outperforming Altria's products in the market, Altria saw a solution in JLI, with its exponential growth and large youth market. That youth market would be key to replacing Altria's lost profits for years to come. So AGI and ACS set out to court the leaders of JLI in an eighteen-month dance, all the while signaling that a massive payout would await those leaders if they maintained JLI's large youth market.

65.    Essential to maintaining JLI's large youth market, of course, was delaying or preventing regulation or public outcry that could interfere with Altria's and the Management Defendants' efforts. Altria, with its decades of experience doing just that, aided JLI and the Management Defendants these efforts along the way, ultimately attempting to deceive the public

---

[26]Remarks by Marty Barrington, Altria Group, Inc.'s (Altria) Chairman, CEO and President, and other members of Altria's senior management team 2017 Consumer Analyst Group of New York (CAGNY), (2017), http://investor.altria.com/Cache/IRCache/1ac8e46a-7eb4-5df2-843d-06673f29b6b0.PDF?O=PDF&T=&Y=&D=&FID=1ac8e46a-7eb4-5df2-843d-06673f29b6b0&iid=4087349.
[27]Id.
[28] Richard Craver, *Vuse falls further behind Juul on e-cig sales*, Winston-Salem Journal (Dec. 14, 2017), https://www.journalnow.com/business/vuse-falls-further-behind-juul-on-e-cig-sales/article_ed14c6bc-5421-5806-9d32-bba0e8f86571.html.

[PROPOSED] SECOND AMENDED COMPLAINT - 19

and the FDA itself in order to defraud consumers when the specter of regulation threatened the value of its impending investment in late 2018. Altria's best bet for maintaining its sales by increasing the number of users addicted to nicotine was to partner with JLI's leadership to: (1) maintain or increase the number of users, hooked on JUUL; and (2) to delay and prevent regulation that could interfere with this first scheme.

66.     For those reasons and others, Altria began coordinating with the Management Defendants in the Spring of 2017. And so, with Defendants Bowen, Monsees, Pritzker, Valani, and Huh looking for a big payout, and Altria looking for new customers, this group of Defendants began to work together, using JLI to further their unlawful ends, in the Spring of 2017. Of course, these Defendants were not strangers to one another. Before the Spring of 2017, Altria (through ACS) and JLI were members of at least one industry group that shared information and coordinated public statements regarding vaping,[29] and Ploom's advisory committee included Altria's former growth officer. As Howard Willard, Altria's CEO said, the company followed "JUUL's journey rather closely" from its early beginnings.[30]

67.     As discussed further below, Altria first contacted JLI's leadership, including Defendants Pritzker and Valani, about a partnership by early 2017, with "confidential discussions" beginning in the Spring of 2017.[31] JLI's pitch deck to investors at the time boasted that "Viral Marketing Wins," and that JUUL's super potent nicotine formulation was "cornering" the consumables market with the highest customer retention rate of any e-cigarette.[32]

68.     By the Fall of 2017, JLI, through its leadership including the Management Defendants, and Altria had agreed to and had taken coordinated actions to maintain and expand

_____

[29] INREJUUL_00278740.

[30] Olivia Zaleski & Ellen Huet, *Juul Expects Skyrocketing Sales of $3.4 Billion, Despite Flavored Vape Restrictions*, Bloomberg (Feb. 22, 2019), https://www.bloomberg.com/news/articles/2019-02-22/juul-expects-skyrocketing-sales-of-3-4-billion-despite-flavored-vape-ban.

[31] Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).

[32] INREJUUL_00349529.

[PROPOSED] SECOND AMENDED COMPLAINT - 20

JUUL's market share, knowing that it was based on sales to youth and fraudulent and misleading advertising to consumers of all ages.

69.    The "confidential discussions" continued, with Altria's leadership meeting regularly with Pritzker and Valani for "a period of approximately 18 months."[33] Defendants Pritzker and Valani took the lead on these discussions (together with JLI CEO Kevin Burns), working to establish the formal JLI-Altria partnership. On August 1, 2018, Pritzker, Valani, and JLI's CEO Kevin Burns met Willard and William Gifford, Altria's CFO, at the Park Hyatt Hotel in Washington, D.C., to discuss their partnership and Altria's support of JUUL's mission.

70.    During the roughly 18-month negotiating period, Pritzker, Valani, and JLI's leadership communicated regularly with Altria as they all worked together to fraudulently growth and maintain JUUL's market share. Through their control of JLI, Bowen, Monsees and also Huh remained critical to the success of these efforts. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI's leadership and Altria and Altria's investment in JLI to support JUUL's mission, would not have been possible.

71.    In December 2018, Altria decided to take the next step in its coordination with the Management Defendants and JLI's leadership by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This arrangement was profitable for Altria, as well as enormously lucrative for Defendants Monsees, Bowen, Pritzker, Valani, and Huh, as detailed below.

72.    Both before and after Altria's investment, JLI, through its employees and officers, provided Altria with critical information regarding the design and nicotine content of the JUUL Product, the labeling of the JUUL Product, and related topics including advertising, retail distribution, online sales, age verification procedures, information on underage user's flavor

---

[33]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 21

preferences, and regulatory strategies. Altria, for its part, increasingly guided and directed JLI and the Management Defendants in these areas and helped them devise and execute schemes to preserve JLI's youth appeal and market, including by deceiving consumers of all ages and regulators.

73.     JLI, the Management Defendants, and Altria worked together to implement their shared goal of growing a youth market in the image of the combustible cigarette market through a multi-pronged strategy to: (1) create an highly addictive product that consumers would not associate with cigarettes and that would appeal to the lucrative youth market; (2) deceive the public into thinking the product was a fun and safe alternative to cigarettes that would also help smokers quit; (3) actively attract young users through targeted marketing; and (4) use a variety of tools, including false and deceptive statements to the public and regulators, to delay regulation of e-cigarettes. As detailed more fully throughout this Amended Complaint, each of the Defendants played a critical role—at times overlapping and varying over time—in each of these strategies.

**Defendants' Strategy Was to Create a Nicotine Product That Would Maximize Profits Through Addiction – Defendants Understood that the "Magic" Behind Cigarettes' Stratospheric Commercial Success Was Nicotine Addiction**

74.     The first step in replicating the success of combustible cigarettes was to create a product that, like combustible cigarettes, was based on getting users addicted to the nicotine in the product. Nicotine is an alkaloid, a class of plant-derived nitrogenous compounds that is highly addictive and the key ingredient that drives addiction to cigarettes. Nicotine's addictive properties are similar to heroin and cocaine.[34]

75.     Route of administration and speed of delivery are key to understanding nicotine's addictive potential. Dr. Neal Benowitz, Scientific Editor of the 1988 Surgeon General's Report

─────────────────────

[34] *See e.g.,* U.S. Dep't of Health and Human Servs., *Nicotine Addiction: A Report of the Surgeon General*, DHHS Publication Number (CDC) 88-8406, (1988).

[PROPOSED] SECOND AMENDED COMPLAINT - 22

on nicotine addiction, wrote: "After a puff, high levels of nicotine reach the brain in 10–20 s[econds], faster than with intravenous administration, producing rapid behavioral reinforcement. The rapidity of rise in nicotine levels permits the smoker to titrate the level of nicotine and related effects during smoking, and makes smoking the most reinforcing and dependence-producing form of nicotine administration."[35]

76.    Again, according to Dr. Benowitz, "The rapid rate of delivery of nicotine by smoking … results in high levels of nicotine in the central nervous system with little time for development of tolerance. The result is a more intense pharmacologic action. The short time interval between puffing and nicotine entering the brain also allows the smoker to titrate the dose of nicotine to a desired pharmacologic effect [often subconsciously], further reinforcing drug self-administration and facilitating the development of addiction."[36]

77.    Nicotine fosters addiction through the brain's "reward" pathway. Both a stimulant and a relaxant, nicotine affects the central nervous system; increases blood pressure, pulse, and metabolic rate; constricts blood vessels of the heart and skin; and causes muscle relaxation. Long-term exposure to nicotine causes upregulation—an increase in the number of these high-affinity nicotinic receptors in the brain. When nicotine binds to these receptors it triggers a series of physiological effects in the user that are perceived as a "buzz" that includes pleasure, happiness, arousal, and relaxation of stress and anxiety. With regular nicotine use, however, these feelings diminish, and the user must consume increasing amounts of nicotine to achieve the same effects.

_____

[35]Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB. EXP. PHARMACOL. 29 (2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/.
[36]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 23

78.     Kids are particularly vulnerable to nicotine addiction, as Defendants know well. As described by the United States Surgeon General, "Tobacco use is a pediatric epidemic." Nine out of ten smokers begin by age 18, and 80% who begin as teens will smoke into adulthood.[37]

79.     The above statements apply equally, if not more so, to e-cigarettes. Further, the Surgeon General has explained how the nicotine in e-cigarettes affects the developing brain and can addict kids more easily than adults: "Until about age 25, the brain is still growing. Each time a new memory is created, or a new skill is learned, stronger connections—or synapses—are built between brain cells. Young people's brains build synapses faster than adult brains. Because addiction is a form of learning, adolescents can get addicted more easily than adults."[38] The effects of nicotine exposure on the brain of youth and young adults include not only addiction, priming for use of other addictive substances, but also reduced impulse control, deficits in attention and cognition, and mood disorders.[39] A highly addictive, psychoactive substance that targets brain areas involved in emotional and cognitive processing, nicotine poses a particularly potent threat to the adolescent brain, as it can "derange the normal course of brain maturation and have lasting consequences for cognitive ability, mental health, and even personality."[40]

80.     In 2014, the United States Surgeon General reported that nicotine addiction is the "fundamental reason" that individuals persist in using tobacco products, and this persistent tobacco use contributes to millions of needless deaths and many diseases, including diseases that affect the heart and blood vessels (cardiovascular disease), lung diseases (chronic obstructive

---

[37] *Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General* at 1 (2012), https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/index.html.

[38] *Know The Risks: E-Cigarettes & Young People* (2019), https://e-cigarettes.surgeongeneral.gov/ knowtherisks.html.

[39] Menglu Yuan et al., *Nicotine and the Adolescent Brain*, 593 J. OF PHYSIOLOGY 3397 (2015), www.ncbi.nlm.nih.gov/pmc/articles/PMC4560573/; U.S. Surgeon General and U.S. Centers for Disease Control & Prevention, Office on Smoking and Health, *Know the Risks: E-Cigarettes and Young People* (2019), https://e-cigarettes.surgeongeneral.gov/.

[40] Natalia A. Goriounova & Huibert D. Mansvelder, *Short- and Long-Term Consequences of Nicotine Exposure During Adolescence for Prefrontal Cortex Neuronal Network Function*, 2 COLD SPRING HARBOR PERSP. MED. 12 (2012), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3543069/.

pulmonary disease (COPD) and lung cancer), cancer almost anywhere in the body, and birth defects.[41]

81.     It took five decades of public health initiatives, government intervention, impact litigation, consumer education and tobacco regulation to finally see a significant drop in cigarette smoking and nicotine addiction.

82.     By 2014, the number of adults that reported using cigarettes had dropped to 18%, and the number of adult smokers who reported quitting smoking increased from 50.8% in 2005 to 59% by 2016.[42] By 2014, teen smoking also hit a record low.[43] In June 2014, the Centers for Disease Control and Prevention ("CDC") reported that "in achieving a teen smoking rate of 15.7 percent, the United States has met its national Healthy People 2020 objective of reducing adolescent cigarette use to 16 percent or less."

83.     The United States Surgeon General reported in 2014 that: "We are at a historic moment in our fight to end the epidemic of tobacco use that continues to kill more of our citizens than any other preventable cause. The good news is that we know which strategies work best. By applying these strategies more fully and more aggressively, we can move closer to our goal of making the next generation tobacco-free."[44]

_____

[41] U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.
[42] Centers for Disease Control and Prevention, U.S. Dep't of Health and Human Services, *Trends in Cigarette Smoking Among High School Students—United States*, 1991-2001, 51 MORBIDITY & MORTALITY WKLY. REP. 409 (May 17, 2002), https://www.cdc.gov/mmwr/preview/mmwrhtml/mm5119a1.htm; Teresa W. Wang et al., *Tobacco Product Use Among Adults—United States, 2017*, 67 MORBIDITY & MORTALITY WKLY. REP. 1225 (Nov. 9, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/pdfs/mm6744a2-H.pdf; U.S. Dep't of Health and Human Servs. *2014 Surgeon General's Report: The Health Consequences of Smoking—50 Years of Progress* (2014), https://www.cdc.gov/tobacco/data_statistics/sgr/50th-anniversary/index.htm#report.
[43] Press Release, Centers for Disease Control and Prevention, *Cigarette smoking among U.S. high school students at lowest level in 22 years* (June 12, 2014), https://www.cdc.gov/media/releases/2014/p0612-YRBS.html.
[44] U.S. Dep't of Health and Human Servs. *Let's Make the Next Generation Tobacco-Free: Your Guide to the 50th Anniversary Surgeon General's Report on Smoking and Health* (2014), https://www.hhs.gov/sites/default/files/consequences-smoking-consumer-guide.pdf.

84.     Where the public health community saw progress in curbing the use of cigarettes and nicotine addiction, Defendants saw an opportunity.

**Following the Cigarette Industry Playbook, Defendants Sought to Market a Product That Would Create and Sustain Nicotine Addiction, but Without the Stigma Associated with Cigarettes**

85.     Seeking to build and dominate a new market for nicotine products without the baggage of combustible cigarettes (i.e. well-established link to death and disease), JLI engineered a cool-looking e-cigarette device capable of delivering more nicotine and fueling higher levels of consumer addiction than ever before. JLI marketed that highly addictive device as healthy, safe, cool and available in kid-friendly flavors.

86.     In doing so, JLI followed the cigarette industry's playbook. Monsees admitted that when creating JLI, he and Bowen carefully studied the marketing strategies, advertisements, and product design revealed in cigarette industry documents that were uncovered through litigation and made public under the November 1998 Master Settlement Agreement between the State Attorneys General of forty-six states, five U.S. territories, the District of Columbia and the four largest cigarette manufacturers in the United States. "[Cigarette industry documents] became a very intriguing space for us to investigate because we had so much information that you wouldn't normally be able to get in most industries. And we were able to catch up, right, to a huge, huge industry in no time. And then we started building prototypes."[45]

87.     In a thesis presentation Bowen and Monsees gave in 2004, Monsees candidly admitted, "The cigarette is actually a carefully engineered product for nicotine delivery and addiction."[46] JLI researched how cigarette companies engineered their products and chemically

---

[45] Gabriel Montoya, *Pax Labs: Origins with James Monsees*, SOCIAL UNDERGROUND, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

[46] Jordan Crook, *This is the Stanford Thesis Presentation That Launched Juul*, TECH CRUNCH (Feb. 27, 2019), https://techcrunch.com/2019/02/27/this-is-the-stanford-thesis-presentation-that-launched-juul/.

manipulated nicotine to maximize delivery: "We started looking at patent literature. We are pretty fluent in 'Patentese.' And we were able to deduce what had happened historically in the tobacco industry."[47] With access to the trove of documents made public to curb youth smoking and aid research to support tobacco control efforts, JLI was able to review literature on manipulating nicotine pH to maximize its delivery in a youth-friendly vapor with minimal "throat hit."

88.    Through studying industry documents, JLI learned that the cigarette industry had tried for years to figure out ways to create and sustain addiction by delivering more nicotine in a way that would be easy to ingest—without the nausea, cough, or other aversive side effects that many new smokers experienced. In the 1970's, R.J. Reynolds scientists eventually found a solution: Combine the high-pH nicotine with a low-pH acid. The result was a neutralized compound referred to as nicotine salt. In a 1973 RJR memorandum titled "Cigarette concept to assure RJR a larger segment of the youth market," RJR highlighted that this chemical manipulation of the nicotine content was expected to give its cigarettes an "additional nicotine 'kick'" that would be more appealing and addictive. A young RJ Reynolds chemist, Thomas Perfetti, synthesized 30 different nicotine salt combinations, tested the salts' ability to dissolve into a liquid, and heated them in pursuit of the "maximum release of nicotine."[48] Pefetti published his results in a 1979 memo stamped "CONFIDENTIAL," which was found among the documents that the FDA obtained from JLI in 2018. Relying on cigarette industry research like this, and assistance from Perfetti himself, JLI developed a cartridge-based e-cigarette using nicotine salts. As described herein, JLI's use of nicotine salts, pioneered by major combustible tobacco companies, was a critical tool for addicting non-smokers, including youth.

---

[47]*Id.*
[48] Thomas A. Perfetti, *Smoking Satisfaction and Tar/Nicotine Control* (Dec. 7, 1978), https://ca-times.brightspotcdn.com/3a/12/a5ec27874843a56e26b4ecdfd221/nicotine-salts-investigation.pdf.

89.     JLI also engaged former cigarette industry researchers to consult on the design of their product. As Monsees noted in an interview with WIRED magazine: "The people who understood the science and were listed on previous patents from tobacco companies aren't at those companies anymore. If you go to Altria's R&D facility, it's empty."[49] The WIRED article stated that "[s]ome of those people are now on [PAX Lab, Inc.'s] team of advisers, helping develop J[UUL]."[50]

90.     One of the keys to JLI's success was its ability to fuse addiction and technology. The JUUL e-cigarette system is comprised of three parts: (1) the JUUL e-cigarette device (2) the JUUL Pod (with e-liquid), and (3) the Universal Serial Bus [USB] charger (collectively referred to herein as "JUUL"). The JUUL e-cigarette device is a thin, sleek rectangular e-cigarette device consisting of an aluminum shell, a battery, a magnet (for the USB-charger), a circuit board, an LED light, and a pressure sensor. JLI manufactures and distributes JUUL Pods that contain liquid that includes nicotine, flavoring, and other additives. Each JUUL Pod is a plastic enclosure containing 0.7 milliliters of JLI's patented nicotine liquid and a coil heater. When a sensor in the JUUL e-cigarette detects the movement of air caused by suction on the JUUL Pod, the battery in the JUUL e-cigarette device activates the heating element, which in turn converts the nicotine solution in the JUUL Pod into a vapor consisting of nicotine, benzoic acid, glycerin, and propylene glycol along with myriad chemical flavorings and other chemicals, many of which are recognized as toxic.[51]

---

[49]David Pierce, *This Might Just Be the First Great E-Cig*, WIRED (Apr. 21, 2015), www.wired.com/2015/04/pax-juul-ecig/.
[50]*Id.*
[51] King County & Seattle Public Health, *E-cigarettes and Vapor Products* (Dec. 30, 2019), https://www.kingcounty.gov/depts/health/tobacco/data/e-cigarettes.aspx.

[PROPOSED] SECOND AMENDED COMPLAINT - 28



91.     JLI sells the JUUL Pods in packs of two or four Pods, and until recently, in a variety of enticing flavors. Many of the flavors have no combustible cigarette analog, including "cool" cucumber, fruit medley, "cool" mint, and crème brûlée. The figure below shows the JLI device and a JLI "Starter Kit" with four flavored JUUL Pods:



92.     JLI attempted to distinguish JUUL Products from the death and disease associated with cigarettes by deliberately providing a false assurance of safety. For example, on May 8, 2018, a document titled "Letter from the CEO" appeared on JUUL's website. The document stated: "[JUUL]'s simple and convenient system incorporates temperature regulation to heat

nicotine liquid and deliver smokers the satisfaction that they want without the combustion and the harm associated with it."[52]

93.    JLI even took this message to ninth graders: in 2018, a representative from JLI spoke at a high school during a presentation for ninth graders, stating that JUUL "was much safer than cigarettes," that the JUUL was "totally safe," that the JUUL was a "safer alternative than smoking cigarettes," and that the "FDA was about to come out and say it [JUUL] was 99% safer than cigarettes . . . and that. . . would happen very soon."[53]

94.    This was not just a rogue employee. Internal messaging around JUUL, crafted by the executives, emphasized that JUUL was safer than smoking. In a "Marketing Update" presentation dated March 26, 2015, a message from then-Chief Marketing Officer Scott Dunlap stated that "[v]aporization technology is fundamentally disruptive, because it is safer, faster, more effective, and less intrusive than alternatives."[54] More than a year later, on April 28, 2016, Tim Danaher sent Tyler Goldman a slide deck aimed at investors which he said that "James [Monsees] owns" and "will pull/update the relevant slides."[55] The deck claimed that "PAX Labs' new delivery system is faster, safer, more effective, and less intrusive than[,]" among other options, "[s]moking[.]"[56] The consistency of the wording in these presentations more than a year apart shows that this was standard company language.

95.    JLI's mission was not to improve public health. Rather, JLI sought to introduce a new generation of consumers to nicotine. JLI's business model was never about reducing

---

[52] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019). https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[53] *Id.*
[54] INREJUUL_00441986 (emphasis added).
[55] JLI00373324.
[56] JLI00373328 (emphasis added).

addiction. As one JLI engineer put it: "We don't think a lot about addiction here because we're not trying to design a cessation product at all . . . anything about health is not on our mind."[57]

96.    JLI, Bowen, and Monsees achieved their vision. Pioneering a nicotine delivery technology that eliminated the harshness of traditional free-base nicotine, JLI's e-cigarette system provided consumers with palatable access to high-concentrations of nicotine like never before. Since the JUUL's launch in 2015, JLI has become the dominant e-cigarette manufacturer in the United States. Its revenues grew by 700 percent in 2017 alone. By 2019, JLI owned three-quarters of the e-cigarette market.[58]

**Defendants Sought to Position JLI for Acquisition by a Major Cigarette Company**

97.    JLI, along with the Management Defendants, worked together to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

98.    That growing customer base was crucial to JLI's and the Management Defendants' long-term objective—lucrative acquisition by another company. They recognized that JLI's product, with its potential to dominate the nicotine products market by hooking new users, would appeal to one segment of the economy in particular: the cigarette industry.

99.    JLI and the Management Defendants also recognized that their business goal— becoming part of the cigarette industry—was unlikely to endear them to the consumers that they needed to purchase their products. Years of anti-smoking campaigns have successfully stigmatized cigarette smoking. When Monsees and Bowen presented their thesis and product

---

[57] Kevin Roose, *Juul's Convenient Smoke Screen*, N.Y. TIMES (Jan. 11, 2019), https://www.nytimes.com/2019/01/11/technology/juul-cigarettes-marketing.html.
[58] Dick Durbin et al., *Durbin & Senators to JUUL: You are More Interested in Profits Than Public Health*, Durbin Newsroom (Apr. 8, 2019), https://www.durbin.senate.gov/newsroom/press-releases/durbin-and-senators-to-juul-you-are-more-interested-in-profits-than-public-health.

1   design to their classmates, they included a clip from a South Park episode showing the characters

2   assembled at the Museum of Tolerance and shaming a smoker.[59]

3

4        100.    Monsees and Bowen needed to shape social norms such that the public attitude

5   towards e-cigarettes would allow consumers to use their product without the stigma and self-

6   consciousness smokers experienced. Monsees and Bowen saw a market opportunity in a

7   generation of non-smoking consumers brought up on anti-smoking norms. In Monsees' words,

8   they wanted to redesign the cigarette "to meet the needs of people who want to enjoy tobacco but

9   don't self-identify with—or don't necessarily want to be associated with—cigarettes."[60]

10        101.    Part of this approach was consistently portraying JUUL as an enemy of the

11   cigarette industry, with a publicly announced goal of eliminating the cigarette. In an interview,

12   Bowen asserted that he and Monsees spent a lot of time talking about "the kind of typical thoughts

13   of evil Big Tobacco companies like coming down and squashing you."[61] The "Mission

14   Statement" on JLI's homepage proclaims:

15        *Our mission is to transition the world's billion adult smokers away from combustible*

16   *cigarettes, eliminate their use, and combat underage usage of our products.*

17        *We envision a world where fewer adults use cigarettes, and where adults who smoke*

18   *cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire.*[62]

19        102.    In fact, JLI's Chief Administrative Officer has publicly stated that the goal behind

20   JLI is "eliminating cigarettes."[63]

21

22

23   [59]  Gabriel   Montoya,  *Pax  Labs:  Origins  with  James  Monsees*,  SOCIAL  UNDERGROUND,
    https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees/.

24   [60]*Id.*; *see also,* INREJUUL_00064696 (May 28, 2015) (Slides describing JUUL's market overview and positioning as

25   a "tech lifestyle product with a nicotine experience that satisfies, JUUL will appeal to regular ecig users and wealthy,
    tech savvy smokers – a significant portion of the market.").

26   [61] Alison Keeley, *Vice Made Nice? A High-tech Alternative to Cigarettes*, STANFORD MAGAZINE (2012),
    https://stanfordmag.org/contents/vice-made-nice.

27   [62]JUUL Labs, *Our Mission* (2019), https://www.juul.com/mission-values.
    [63] Ashley Gould, *JUUL Labs is Committed to Eliminating Cigarettes,* CAL MATTERS (March 18, 2019),

28   https://calmatters.org/commentary/e-cigarette/.

[PROPOSED] SECOND AMENDED COMPLAINT - 32

103.    This public message of eliminating cigarettes and challenging tobacco companies stands in direct contrast with JLI's actual business and investment strategy, which involved replicating in JUUL's new market the tobacco companies' historical success in the market for cigarettes. From the beginning, Bowen and Monsees actively sought the investment and assistance of major cigarette companies.

104.    Bowen and Monsees' initial foray into the e-cigarette business, Ploom, was incorporated in 2009. From the beginning, the goal was partnership with a traditional cigarette company. ███████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████."[65]

105.    Ploom launched its e-cigarette as the ModelOne in 2010, using Pods of loose-leaf tobacco heated by butane. It did not catch on. Ploom only sold a few thousand devices. By then a company with a dozen employees, Ploom was faltering, in need of money, technological expertise, and marketing savvy.[66]

106.    Help came from Japan Tobacco International ("Japan Tobacco"), a division of Japan Tobacco Inc., the fourth-largest tobacco company in the world. In December 2011, Japan Tobacco and Ploom entered into a strategic agreement, which gave Japan Tobacco a minority stake in Ploom and made it a strategic partner. In a statement regarding the agreement, Monsees

---

[64]PERFETTI_0909.
[65]*Id*.
[66] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, Inc. https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.

[PROPOSED] SECOND AMENDED COMPLAINT - 33

said, "We are very pleased to partner with [Japan Tobacco] as their deep expertise, global distribution networks and capital resources will enable us to enter our next phase of growth and capitalize on global expansion opportunities."[67] As Bowen explained in an interview, "We were still doing a lot of our own internal product development, but now we had access to floors of scientists at [Japan Tobacco]."[68]

107.    According to internal documents, JLI (then known as Pax) entered into a "strategic partnership" with Japan Tobacco after it "evaluated all major tobacco industry companies."[69] When JLI was getting ready to launch JUUL, its business plan called for a "massive distribution for JUUL," to "be distributed by the four largest US tobacco distributors."[70] In addition, in 2015, JLI counted among its advisors Charles Blixt, the former general counsel of Reynold American, Chris Skillin, former director of corporate business development at Altria Group, Bryan Stockdale, the former SVP/President & CEO of R.J. Reynolds/American Snuff Company, and Chris Coggins, a toxicologist at Reynolds for 20 years.[71]

108.    JLI and the Management Defendants even retained the Investment Bank Stifel to help JLI "establish strong international partnerships with leading tobacco companies ("LT") to accelerate JUUL."[72] According to Stifel, "JUUL could be a multi-billion opportunity to LT [leading tobacco companies] over time," and Stifel offered to manage a process that: "Identified the best Partner(s) for JUUL"; "Best positions JUUL to each Partner"; "Creates a catalyst for [leading tobacco company] decision making"; and "drives strong economic value and terms

_____

[67]*Innovative P'ship for Ploom and Japan Tobacco Int'l JTI to Take Minority Share in Ploom*, JAPAN TOBACCO INT'L (Dec. 8, 2011), https://www.jti.com/sites/default/files/press-releases/documents/2011/innovative-partnership-for-ploom-and-japan-tobacco-international.pdf.
[68]David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, INC. MAGAZINE (2014), https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html.
[69]INREJUUL_00371423 (Pax Labs company overview, Feb. 2015).
[70]INREJUUL_00371447.
[71]INREJUUL_00371458-INREJUUL_00371459.
[72]INREJUUL_00016386 (Stifel Presentation, Aug. 2015).

[PROPOSED] SECOND AMENDED COMPLAINT - 34

through competition."[73] The end result of the process would be an exclusive agreement with the cigarette industry that would "maximize JUUL Growth Trajectory":[74]

109.    Stifel's presentation to the JLI Board of Directors, which included each of the Management Defendants, also emphasized both the stagnant and declining cigarette market, and the sharply growing e-cigarette market:[75]



110.    According to Stifel, "[s]ince 2013 [leading tobacco companies] have aggressively but unprofitably entered the vape category . . . with products that are not compelling."[76] Stifel's conclusion was that in light of the leading cigarette companies' failures to develop an appealing e-cigarette product: "JUUL Presents a Prime Opportunity for [leading tobacco companies] to

---

[73]*Id.*
[74]*Id.*
[75]INREJUUL_0016399.
[76]INREJUUL_0016400-INREJUUL_0016401.

[PROPOSED] SECOND AMENDED COMPLAINT - 35

Compete with [vaporizers, tanks and mods] in Form Factor and Dominate the E-cig Experience Through Retail Channels that Leverage its Distribution Strengths."[77]

111.    Consistent with Stifel's presentation, and the profits it was forecasting, a draft December 7, 2015 presentation to the board of directors included as a "management committee recommendation" that JLI position itself for "strategic alternatives (including licensing or sale)":[78]

**JUUL**

**Position JUUL for strategic alternatives (including licensing or sale) by EOY by strengthening the core proposition**

- Improve IRI report traction through dollar contributions and ACV
- Continue to improve repeat rates by adding more pre-qualified consumer doors
- Significantly strengthen IP portfolio
- Continue to support pillar accounts as required to preserve a strong brand reputation

**Demonstrate a path towards positive JUUL margin contribution**

- Ensure COGS improvements are realized and future improvements are clearly attainable
- Increase same store sales by focusing on high ROI doors
- Improve BDF requirements, particularly at pillar accounts, by reducing POP costs and negotiating improved sell-in cost repayment schedules.
- Reduce brand awareness and identity building programs until positive ROI is proven

112.    The presentation also made clear that the "strategic alternative" for JLI envisioned by management was its acquisition by a large cigarette company:[79]

_____

[77]INREJUUL_0016404.
[78]INREJUUL_00061757 (board meeting presentation, Dec. 7, 2015).
[79]INREJUUL_00061833.

[PROPOSED] SECOND AMENDED COMPLAINT - 36

JUUL sale considerations

113.    This goal—acquisition by a major cigarette company—was a motive that JLI and the Management Defendants would return to making decisions about the manufacture and marketing of JUUL Products. As an example, in a 2016 email exchange with JLI employees regarding potential partnerships with e-cigarette juice manufacturers, Defendant Bowen reminded the employees that "big tobacco is used to paying high multiples for brands and market share."[80] Bowen knew that to achieve the ultimate goal of acquisition, JLI and the Management Defendants would have to grow the market share of nicotine-addicted e-cigarette users, regardless of the human cost.

114.    JLI and the Management Defendants sought to grow the market share of nicotine-addicted e-cigarette users beginning by at least early 2015 through two related schemes: (1) by designing an unsafe product with a high nicotine content that was intended to addict, or exacerbate the addiction of, its users; and (2) by marketing and misbranding that potent product to the broadest possible audience of potential customers, including young people whose addiction would last the longest and be the most profitable for Defendants.

---

[80]INREJUUL_00294198.

[PROPOSED] SECOND AMENDED COMPLAINT - 37

115.    These schemes were an overwhelming success. In December 2016, Monsees observed in an email to Valani that ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████"[81] By the close of 2017, according to Nielsen data, JLI had surpassed its competitors in capturing 32.9% of the e-cigarette market, with British American Tobacco at 27.4% and Altria at 15.2%.[82] The total e-cigarette market expanded 40% to $1.16 billion.[83]

116.    By 2018, JLI represented 76.1% of the national e-cigarette market,[84] and JLI's gross profit margins were 70%.[85] In a complaint it filed in November 2018 against 24 vape companies for alleged patent infringement, JLI asserted that it was "now responsible for over 95% of the growth in the ENDS cartridge refill market in the United States" and included the following chart:[86]

### Appendix 5: U.S. ENDS Pod Market Retail Unit Sales Growth 2018

#### 4-Week Unit Sales by End Date

|  | Nielsen | | | IRI | | |
|---|---|---|---|---|---|---|
|  | Apr 21 | Sep 8 | Share of Growth | Apr 22 | Sep 9 | Share of Growth |
| Total Market | 36,002,645 | 55,773,039 | 100% | 29,546,883 | 50,793,955 | 100% |
| Juul | 22,618,886 | 41,501,172 | 95.5% | 14,964,158 | 35,166,120 | 95.1% |
| Vuse | 6,385,922 | 6,172,595 | -1.1% | 7,204,900 | 7,409,312 | 1.0% |
| MarkTen | 3,677,300 | 4,240,285 | 2.8% | 2,904,168 | 3,230,237 | 1.5% |
| Logic | 1,785,167 | 2,018,023 | 1.2% | 1,928,841 | 1,876,006 | -0.2% |
| Blu | 1,062,360 | 1,461,127 | 2.0% | 1,305,209 | 1,937,225 | 3.0% |
| Other | 473,010 | 379,837 | -0.5% | 1,239,607 | 1,175,055 | -0.3% |

---

[81] JLI00380274.

[82] Ari Levy, *E-cigarette maker Juul is raising $150 million after spinning out of vaping company*, CNBC (Dec. 20, 2017), https://www.cnbc.com/2017/12/19/juul-labs-raising-150-million-in-debt-after-spinning-out-of-pax.html.

[83] *Id.*

[84] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan. Rsch. into the Impact of Tobacco Advert. (2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[85] Dan Primack, *Scoop: The Numbers Behind Juul's Investor Appeal*, Axios (July 2, 2018), https://www.axios.com/numbers-juul-investor-appeal-vaping-22c0a2f9-beb1-4a48-acee-5da64e3e2f82.html.

[86] Verified Complaint Under Section 337 of the Tariff Act of 1930 at 6, *In the Matter of Certain Cartridges for Elec. Nicotine Delivery Sys. & Components Thereof*, Investigation No. 337-TA-1141 (USITC Nov. 19, 2018).

[PROPOSED] SECOND AMENDED COMPLAINT - 38

117.    JLI shattered previous records for reaching decacorn status, reaching valuation of over $10 billion in a matter of months—four times faster than Facebook.[87] This all came just three years after its product launch.

**JLI and Bowen Designed a Nicotine Delivery Device Intended to Create and Sustain Addiction**

118.    JLI was well-aware from the historical cigarette industry documents that the future of any nicotine-delivery business depends on snaring kids before they age beyond the window of opportunity. One memo from a Lorillard marketing manager to the company's president put it most succinctly, "[t]he base of our business is the high school student."[88] It is no surprise, then, that the industry designed products specifically to attract and addict teen smokers. Claude Teague of RJR titled one internal memo "Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market." In it he frankly observed, "Realistically, if our Company is to survive and prosper, over the long term, we must get our share of the youth market. In my opinion this will require new brands tailored to the youth market."[89] Dr. Teague noted that "learning smokers" have a low tolerance for throat irritation so the smoke should be "as bland as possible," i.e., not harsh; and he specifically recommended an acidic smoke "by holding pH down, probably below 6." As seen below, JLI heeded Dr. Teague's advice.

**JLI and Bowen Made Highly Addictive E-Cigarettes Easy for Young People and Non-Smokers to Inhale**

119.    As combustible cigarettes were on the decline, e-cigarettes were introduced to the U.S. market beginning in 2007. Over time, e-cigarettes developed a small group of regular users,

---

[87]Zack Guzman, *Juul Surpasses Facebook As Fastest Startup to Reach Decacorn Status*, YAHOO! FIN. (Oct. 9, 2018), https://finance.yahoo.com/news/juul-surpasses-facebook-fastest-startup-reach-decacorn-status-153728892.html.
[88]Internal Memo from T.L. Achey, Lorillard Tobacco Company, to Curtis Judge, Product Information (August 1978).
[89]Internal Memo from Claude Teague, R.J. Reynolds, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market* (Feb. 2, 1973).

[PROPOSED] SECOND AMENDED COMPLAINT - 39

who were primarily current or former smokers. By 2014, the e-cigarette market in the U.S. was in decline.

120.    E-cigarettes struggled to compete with combustible cigarettes, because of the technical challenge of delivering enough aerosolized nicotine to satisfy a smoker's addiction in a palatable form.[90] Before JUUL, most e-cigarettes used an alkaline form of nicotine called free-base nicotine.[91] When aerosolized and inhaled, free-base nicotine is relatively bitter, irritates the throat, and is perceived as harsh by the user.[92] This experience is often referred to as a "throat hit." The higher the concentration of free-base nicotine, the more intense the "throat hit."[93] While some "harshness" would not have much impact on seasoned cigarette smokers, it would deter newcomers, or nicotine "learners," as Claude Teague at R.J. Reynolds called young non-smokers decades ago.

121.    Before 2015, most e-liquids on the market were between 1% and 2% concentration; 3% concentrations were marketed as appropriate for consumers who were accustomed to smoking approximately forty cigarettes a day.[94] None of these e-liquids delivered as much nicotine as quickly as a combustible cigarette.

122.    Around 2013, JLI scientists developed new e-liquids and new devices to increase the amount of nicotine that e-cigarettes could deliver to users and to reduce the throat hit. JLI scientists focused on nicotine salts rather than free-base nicotine, and they tested their formulations in a variety of ways.

---

[90]Robert K. Jackler & Divya Ramamurthi, *Nicotine Arms Race: JUUL and the High-nicotine Product Market*, 28 TOBACCO CONTROL 623 (2019).
[91]*Id.*
[92]*Id.*
[93]*Id.*
[94]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 40

**JLI's Initial Experiments Measured Non-Smokers' "Buzz" Levels and Perceptions of Throat Harshness**

123.    JLI intentionally designed its product to minimize "throat hit" and maximize "buzz." JLI's first known testing of JUUL-related products occurred in 2013, when it conducted "buzz" experiments that included non-smoker participants, and measured "buzz" and throat harshness. JLI officers and directors Adam Bowen, Ari Atkins, and Gal Cohen served as the initial subjects in the "buzz" experiments. These early tests were performed with the assistance of Thomas Perfetti, the same RJR chemist who had studied nicotine salt decades ago to help RJR palatably deliver more nicotine.

124.    In these early tests, JLI's goal was to develop a "buzz-effective e-cig formulation," which would principally turn on "effectiveness (buzz, harshness)," followed by shelf life and patentability.[95] The aim was to develop a nicotine salt formulation that maximized buzz, minimized harshness. "Employees tested new liquid-nicotine formulations on themselves or on strangers taking smoke breaks on the street. Sometimes, the mix packed too much punch – enough nicotine to make some testers' hands shake or send them to the bathroom to vomit . . . ."[96]

125.    The "buzz" experiments, which used heart rate as a qualitative measurement for buzz, showed that Bowen tested a 4% benzoate (nicotine salt) solution, which caused his resting heart rate to increase by about 70% in under 2 minutes, far exceeding all other formulations JLI was considering:[97]

---

[95] INREJUUL_00002903.

[96] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

[97] INREJUUL_00002903.

[PROPOSED] SECOND AMENDED COMPLAINT - 41

126.    Because they personally consumed these formulations, Bowen, Cohen, and Atkins knew that the 4% benzoate solution delivered a strong buzz that matched or exceeded a cigarette but had minimal throat hit.

127.    A later study by Anna K. Duell et al., which examined 4% benzoate solutions—the basis for JUUL's subsequent commercial formulations—explains why there was so little throat hit. The Duell study determined that the fraction of free-base nicotine in JUUL's "Fruit Medley" flavor was 0.05 and in "Crème Brulee" was 0.07.[98] Given total nicotine content of 58 mg/ml and 56 mg/ml in each flavor, respectively, these flavors have roughly 3-4 mg/ml free-base nicotine. For comparison, "Zen" brand e-liquid contains 17 mg/ml of nicotine—less than one-third of the total nicotine content of JUUL's flavors—but has a free-base fraction of 0.84,[99] resulting in over 14 mg/ml of free-base nicotine. The Duell Study's authors found that the low free-base fraction in JUUL aerosols suggested a "decrease in the perceived harshness of the aerosol to the user and thus a greater abuse liability."[100]

---

[98]U.S. Patent No. 9,215, 895; Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 432 (Fig. 3).
[99]Anna K. Duell et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431 (*hereinafter* "Duell Study").
[100]*Id.* at 431–34.

128.    Dramatically reducing the throat hit is not necessary for a product that is aimed at smokers, who are accustomed to the harshness of cigarette smoke, but it very effectively appeals to nonsmokers, especially youths. The cigarette industry has long recognized this; a published study of industry documents concluded that "product design changes which make cigarettes more palatable, easier to smoke, or more addictive are also likely to encourage greater uptake of smoking."[101] The Duell study concluded that JLI's use of nicotine salts "may well contribute to the current use prevalence of JUUL Products among youth."[102]

129.    Reducing the harshness of nicotine also allows more frequent use of e-cigarettes, for longer periods of time, and masks the amount of nicotine being delivered. By removing the physiological drawbacks of inhaling traditional free-base nicotine, JLI's technology removes the principal barrier to nicotine consumption and addiction. The Duell study further concluded that JLI's creation of a non-irritating vapor that delivers unprecedented amounts of nicotine is "particularly problematic for public health."[103]

**JUULs Rapidly Deliver Substantially Higher Doses of Nicotine than Cigarettes**

130.    In 2014, after the "buzz" experiments, JLI engineers ran a pilot pharmacokinetic study in New Zealand, called the Phase 0 Clinical Study.[104] The participants in the study—Adam Bowen, Gal Cohen, and Ari Atkins[105]—had their blood drawn while vaping prototype JUUL aerosols. From these measurements, the scientists calculated key pharmacokinetic parameters, including maximum concentration of nicotine in the blood (Cmax) and total nicotine exposure (Area Under the Curve or AUC). JLI reported the results in U.S. Patent No. 9,215,895 (the '895

---

[101]David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.
[102]Duell Study at 433 (citing J.G. Willett, et al., *Recognition, Use and Perceptions of JUUL Among Youth and Young Adults*, TOBACCO CONTROL 054273 (2018)).
[103]*Id*. at 431.
[104]INREJUUL_00350930.
[105] *Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 43

patent), for which JLI applied on October 10, 2014,[106] and which was granted in December 2015. The named inventors on the patent were Adam Bowen and Chenyue Xing.

131.    Among the formulations was a 4% benzoate formulation, which was made with 3.8% benzoic acid and 5% nicotine, as well as propylene glycol and vegetable glycerin.[107] As a comparator, JLI also measured nicotine blood levels after smoking Pall Mall cigarettes. The Phase 0 study also tested a 2% benzoate formulation, which had a similar Cmax as a Pall Mall cigarette, and a variety of other formulations.[108] The following graph shows the pharmacokinetic results of the Phase 0 study:



132.    According to Table 1 in the patent, the Cmax (the maximum nicotine concentration in blood) for Pall Mall cigarettes was 11.65 ng/mL, and for 4% benzoate it was 15.06 ng/mL, which is nearly 30% higher. The total nicotine exposure (as measured by Area Under the Curve

_____

[106]This application was a continuation of U.S. Patent Application No. 14/271,071 (filed May 6, 2014), which claimed the benefit of U.S. Provisional Patent Application Serial No. 61/820,128, (filed May 6, 2014), and U.S. Provisional Patent Application Serial No. 61/912,507 (filed December 5, 2013).
[107]U.S. Patent No. 9,215,895, at 19:63-20:4 (filed Dec. 22, 2015).
[108]INREJUUL_00024437.

or AUC) was 367.5 ng * min/mL for Pall Mall cigarettes and 400.2 ng * min/mL for 4% benzoate, which is almost 9% higher. The 4% benzoate formulation had the highest Cmax and AUC of any of the formulations measured.

133.    Describing these results, JLI's '895 patent all but brags that it surpassed a commercially available combustible cigarette (Pall Mall) in maximum delivery and nearly rivaled it in how soon it could deliver peak nicotine. According to the '895 patent, "certain nicotine salt formulations [i.e., JLI's] provide satisfaction in an individual superior to that of free base nicotine, and more comparable to the satisfaction in an individual smoking a traditional cigarette."[109] The patent further explains that the "rate of nicotine uptake in the blood" is higher for some claimed nicotine salt formulations "than for other nicotine salt formulations aerosolized by an electronic cigarette . . . and likewise higher than nicotine free-base formulations, while the peak nicotine concentration in the blood and total amount of nicotine delivered appears comparable to a traditional cigarette."[110]

134.    In other words, JLI distinguishes itself, and established the patentability of its e-liquids, by reference to their superlative ability to deliver nicotine, both in terms of peak blood concentration and total nicotine delivery. The rate of nicotine absorption is key to providing users with the nicotine "kick"[111] that drives addiction and abuse.[112] Because "nicotine yield is strongly correlated with tobacco consumption,"[113] a JUUL Pod with more nicotine will strongly correlate

---

[109] U.S. Patent No. 9,215, 895, at 7:51-55 (filed Dec. 22, 2015) (emphasis added).

[110] *Id.* at 7:63-8:4.

[111] Internal Memo from Frank G. Colby, R.J. Reynolds, *Cigarette Concept to Assure RJR a Larger Segment of the Youth Market* (Dec. 4, 1973).

[112] As the National Institutes of Health has noted, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products." U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease, A Report of the Surgeon General* at 181 (2010), https://www.ncbi.nlm.nih.gov/books/NBK53017/pdf/Bookshelf_NBK53017.pdf.

[113] Martin J. Jarvis et al., *Nicotine Yield From Machine Smoked Cigarettes and Nicotine Intakes in Smokers: Evidence From a Representative Population Survey*, 93 NT'L CANCER INST. 134 (Jan. 17, 2001), https://academic.oup.com/jnci/article/93/2/134/2906355.

[PROPOSED] SECOND AMENDED COMPLAINT - 45

with higher rates of consumption of JUUL Pods, generating more revenue for JUUL. For example, a historic cigarette industry study that looked at smoker employees found that "the number of cigarettes the employees smoked per day was directly correlated to the nicotine levels."[114] In essence, JLI distinguished itself based on its e-liquids' extraordinary potential to addict.

135.    Another study corroborates the key result of the Phase 0 study that the 4% benzoate solution delivers more nicotine than a combustible cigarette.[115] The Reilly study tested JUUL's tobacco, crème brûlée, fruit medley, and mint flavors and found that a puff of JUUL delivered $164 \pm 41$ micrograms of nicotine per 75 mL puff. By comparison, a 2014 study using larger 100 mL puffs found that a Marlboro cigarette delivered 152-193 μg/puff.[116] Correcting to account for the different puff sizes between these two studies, this suggests that, at 75 mL/puff, a Marlboro would deliver about 114-145 μg/puff. In other words, the Reilly study suggests that JUUL delivers more nicotine per puff than a Marlboro cigarette.

136.    Additionally, depending on how the product is used, an e-cigarette with the 4% benzoate solution is capable of delivering doses that are materially higher than those seen in the Phase 0 study. As a paper published by the European Union notes: "[A]n e-cigarette with a concentration of 20 mg/ml delivers approximately 1 milligram of nicotine in five minutes (the time needed to smoke a traditional cigarette, for which the maximum allowable delivery is 1 mg of nicotine)."[117] With at least 59 mg/ml of nicotine in a salt form that increases the rate and efficiency of uptake (and even with a lower mg/ml amount), a JUUL Pod easily exceeds the

---

[114]Letter from Peggy Martin to Study Participants, *Resume of Results from Eight-Week Smoking Study*, UCSF Library 1003285443-5443 (Sept. 10, 1971).

[115]Samantha M. Reilly et al., *Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes*, 21 NICOTINE TOBACCO RESEARCH 1274 (Aug. 19, 2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584.

[116]Megan J. Schroeder & Allison C. Hoffman, *Electronic Cigarettes and Nicotine Clinical Pharmacology*, 23 TOBACCO CONTROL ii30 (May 23, 2014), www.ncbi.nlm.nih.gov/pmc/articles/PMC3995273/.

[117]E-Cigarettes, European Comm'n, https://ec.europa.eu/health/sites/health/files/tobacco/docs/fs_ecigarettes_en.pdf (citing United Kingdom Medicines and Healthcare Products Regulatory Agency and industry reports).

[PROPOSED] SECOND AMENDED COMPLAINT - 46

nicotine dose of a combustible cigarette. Not surprisingly, the European Union has banned all e-cigarette products with a nicotine concentration of more than 20 mg/ml nicotine, and other countries have considered similar regulations.[118] Around 2014, JLI engineers designed the JUUL vaping device, which also was designed for addictiveness. On average, the JUUL was engineered to deliver between four to five milligrams of aerosol per puff, which is an unusually massive puff[119]:



137.    Given the concentration of nicotine in a JUUL Pod, four to five milligrams of JUUL e-liquid contains about 200-250 micrograms (μg) of nicotine. As noted by Dan Myers, a JLI scientist, in an internal 2018 email to Adam Bowen and Ziad Rouag, a regulatory employee at JLI at the time, "much more nicotine than 150 per puff could be problematic" because, according to Myers, cigarettes deliver between around 100-150 μg of nicotine per puff.[120] In other

---

[118]Charis Girvalaki et al., *Discrepancies in Reported Versus Measured Nicotine Content of E-cigarette Refill Liquids Across Nine European Countries Before and After the Implementation of the EU Tobacco Products Directive*, 55 EUR. RESPIR. J. 1900941 (2020), https://doi.org/10.1183/13993003.00941-2019.
[119]INREJUUL_00442040-INREJUUL_00442080; INREJUUL_00442064.
[120]INREJUUL_00347306.

words, JUUL's precisely calibrated nicotine delivery system was specifically engineered to aerosolize up to 2.5 times as much nicotine per puff as a cigarette. Myers also noted that "Adam put in his recommendation of ~4mg/puff as the target" for a pharmacokinetic study.[121]

138.    JLI scientists realized in 2014 that the amount of nicotine that JUUL e-cigarettes delivered could be problematic. Chenyue Xing stated that "[y]ou hope that they get what they want, and they stop," but JLI scientists were concerned that "a Juul—unlike a cigarette—never burns out," so the device gives no signal to the user to stop. According to Xing, JLI scientists "didn't want to introduce a new product with stronger addictive power."[122] For this reason, "the company's engineers explored features to stop users from ingesting too much of the drug, too quickly. JLI's founders applied for a patent in 2014 that described methods for alerting the user or disabling the device when the dose of a drug such as nicotine exceeds a certain threshold."[123] For example, "[o]ne idea was to shut down the device for a half-hour or more after a certain number of puffs[.]"[124] But upper management rejected the concerns that the scientists raised, and "[t]he company never produced an e-cigarette that limited nicotine intake."[125]

139.    As another option, JLI could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine exceeding those of a cigarette on a per-puff basis. Instead, it programmed the device to emit puffs for up to six seconds.[126] JUUL knew from the Phase 0 pharmacokinetic study in 2014 and the CH-1702 pharmacokinetic study in 2017 that puffs of three seconds generate pharmacokinetic profiles matching that of a cigarette.[127]

---

[121] *Id.*
[122] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[123] *Id.*
[124] *Id.*
[125] *Id.*
[126] INREJUUL_00431693.
[127] INREJUUL_00351218; INREJUUL_00351239.

[PROPOSED] SECOND AMENDED COMPLAINT - 48

140.    Further warnings about the addictive power of the JUUL e-cigarette—and its appeal to youths—came from consumer research that Ploom commissioned in 2014. Ploom hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, emailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies. She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."[128] Ms. Collinsworth added that "the qualitative information suggests J1 could fit into the e-cig or vapor category for the younger group. The qualitative findings suggested this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake."[129]

141.    On October 1, 2014, Ms. Collinsworth followed up with additional comments. She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes. When they approached the product like they would a Blu or other inexpensive e-cig, they were floored by the delivery and didn't really know how to control it."[130]

142.    Survey responses showed that the least important product attribute for the adult smokers and non-smokers in that group was "buzz."[131] Comments from the study's subjects included "overwhelming when I first inhaled," "too much for me," "it was too strong," and "it caught me off-guard."[132] Comments on the device's style said JUUL "might manage to make smoking cool again"; others "thought it was a data storage device."[133]

---

[128]JLI00365905.
[129]*Id.* (emphasis added).
[130]JLI00365709.
[131]JLI00365176.
[132]INREJUUL_00058345.
[133]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 49

143.    The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees [134] and then-Chief Marketing Officer Richard Mumby.[135]

144.    In late 2014, knowing the results of the buzz tests, the Phase 0 study and the consumer research, JLI executives, including Bowen, selected the 4% benzoate formulation to serve as the model for all formulations to be used in the JUUL Product to be released in 2015. All JUUL formulations at launch used the same amount of nicotine and benzoic acid as did the formulation that resulted in the highest nicotine blood levels in the Phase 0 study. JUUL Pods were foreseeably exceptionally addictive, particularly when used by persons without prior exposure to nicotine.

**JLI, the Management Defendants, and Altria Knew That JUUL was Unnecessarily Addictive Because It Delivered More Nicotine Than Smokers Needed or Wanted**

145.    The JUUL e-cigarette launched in 2015. After the launch, JLI, the Management Defendants, and Altria continued to collect information about the addictiveness of JUUL. This information confirmed what they already knew: JUUL was exceptionally dangerous because of its addictiveness.

146.    For example, on April 22, 2017, an e-cigarette retailer emailed Gal Cohen expressing concern about the addictiveness of JLI's products. He wrote:

*I am very concerned about the JLI products. People's addiction behavior is SEVERE with this JLI device. I don't think I can justify carrying this anymore.*

*The Brooklyn store is run by someone else and he still wants to carry it. I am not really happy about this. It was a simple product for users who do not want to fill tanks and change atomizers and it was easy to sell, but I really don't feel good about selling it. I know we talked*

---

[134]JLI00364678.
[135]JLI00364487.

[PROPOSED] SECOND AMENDED COMPLAINT - 50

*about this back a few years ago before we were carrying the product, but I am curious to know what is in the liquid. I know the nicotine salts are added but I would like to know what else is in it. Do you guys have a GCMS or ingredient listing for the liquid? Are there other additives? I want to feel more comfortable so I can keep carrying these, but I have seen what it is doing to people and I am very uncomfortable with it. Last year when the news came to me and wanted me to help them with the story that teens were using JLI I shut that story down by telling them it wasn't true. It is true. kids are getting hooked on this thing and they don't even understand half the time that it has nicotine in it! Little kids.. like 14 and 15 year olds. They try to come in my shop and we tell them it is 21 and over and get them out... but it is REALLY bad!*

*I have kids calling and trying to order using delivery services as well. We will only allow pickup and delivery for regular customers whose ID we have already checked... but they TRY and that worries me.. because the smoke shops and bodegas are NOT checking that the person they are picking up for is old enough to buy the product.*

*I agree that it is certainly less hazardous than smoking...but to intentionally increase the addictiveness of nicotine seems really irresponsible and makes me feel like Big Tobacco pushing people onto a really addictive product. I just don't think that it is necessary and I don't feel good about it.*

*Anyway... if there is any info you have that might make me feel better about selling it let me know... or if you could send me ingredient listing (I know Pax applied for the patent on the liquid with the nicotine salts so it should be ok to share now?) I would appreciate it.[136]*

147.    Another example came just days later. On April 28, 2017, JLI held a science meeting discussing the scientific information in JLI's possession with outside scientists. Notes from the meeting state that "concern was raised that because the nicotine update [sic] is slightly

---

[136]INREJUUL_00264888-INREJUUL_00264890.

faster the data could be interpreted as feeding an addiction faster. Given the current climate with addictions to OxyContin how the data is presented needs to be considered carefully."[137]

148.    Additionally, Dan Myers wrote to Adam Bowen in October 2017 that "single puff data from Juul suggests that a small number of puffs, at the beginning of the Pod's lifetime, may contain 2-3X" the levels of nicotine in the puffs from the rest of the Pod, "i.e., 200-300 [µ]g/puff."[138] This is consistent with a central goal of the product's design: capturing "users with the first hit."[139]

149.    None of this information was a surprise, nor did it cause JLI or the Management Defendants to change JLI's products or marketing. In fact, they embraced it. On November 3, 2017, Steven Hong, JLI's Director of Consumer Insights, described JUUL's "design and chemical formulation (fast acting nic salts)" as JLI's "ace in the hole" over the competition.[140]

150.    The following year, JLI and the Management Defendants obtained even more evidence that the amount of nicotine in JUUL Pods was needlessly high. By no later than May of 2018, JLI had completed Phase I of "Project Bears," a JLI study of smoker and vaper nicotine strength preferences. The results showed that "[a]cross the smoker segments, product liking is very similar[,]" and the "heaviest smokers (21+ cigs) like 1.7% more than higher strengths" such as 3% and 5%.[141] Similarly, "for those who evaluated the 5% Pod, when given the choice of lower level Pod strengths, at least half would choose a lower strength Pods."[142]

151.    The same tests also showed that, contrary to JLI's expectations, smokers did not increase their use of the 1.7% formulation relative to the 5% formulation in order to achieve

---

[137]INREJUUL_00230416.
[138]INREJUUL_00434580-INREJUUL_00434590.
[139] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette.
[140]INREJUUL_00228928-INREJUUL_00228930.
[141]INREJUUL_00260068.
[142]INREJUUL_00260065.

nicotine satisfaction. "Smoking volume does seem to be a driver of vaping volume, but this does not vary much by strength within a given smoker type."[143]

152.    Thus, Project Bears revealed that 5% JUUL Pods delivered more nicotine than necessary to satisfy cigarette smokers, even those characterized as "heavy" smokers.[144]

153.    At some point during the coordination between JLI, the Management Defendants, and Altria, but no later than the due-diligence period for Altria's investment in JLI, either JLI (through its employees) or one or more of Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided Altria with a copy of the Project Bears findings.[145]

154.    Altria's experience in developing and marketing its own e-cigarette products also informed Altria that JUUL delivered far more nicotine than necessary to satisfy existing adult nicotine addicts. ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████"[147]

155.    Nonetheless, JLI, the Management Defendants, and Altria have maintained and promoted the 5% JUUL Pods as JLI's flagship offering of JUUL Pods although they knew that even current smokers prefer a lower nicotine content. They pushed the 5% JUUL Pod because it hooked users faster and kept them addicted to nicotine.[148]

156.    In addition to Project Bears, JLI and the Management Defendants (and potentially Altria) were aware of other internal studies that established that its 5% JUUL Pod product would

---

[143]INREJUUL_00244200.
[144]*Id.*
[145]*Id.*
[146]ALGAT0002744771.
[147]Willard Dep. 596:8-10, Jan. 13, 2021.
[148]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 53

not be a successful cessation tool, as it was not attractive to an audience looking to reduce cigarette consumption.[149]

**JUUL's Design Did Not Look Like a Cigarette, Making it Attractive to Non-Smokers and Easy for Young People to Use Without Detection**

157.    Not only did JUUL contain high levels of nicotine that delivered a strong "buzz" from the first puff, JLI designed its product to look appealing to youth and non-smokers. In January 2015, six months before JUUL's launch, JLI's Marketing Director, Sarah Richardson, identified "key needs" for JUUL's PR strategy, including "Establish premium positioning to entice the "masses" to follow the trend setters; own the "early adopter" /"cool kid" equity as we build out volume", and highlighted that "JUUL deliberately doesn't resemble e-cigs or cigalikes" that are "awkward" and "douche-y".[150] Instead, JUUL is "elegant" and "cool".

158.    JLI's strategy to position a nicotine-delivery device as the cool thing to do is not new. Decades before, Dr. Teague from R.J. Reynolds observed: "pre-smokers" face "psychological pressure" to smoke if their peers are doing so, "a new brand aimed at a young smoker must somehow be the 'in' brand and its promotion should emphasize togetherness, belonging and group acceptance, while at the same time emphasizing 'doing one's own thing.'"[151] Again, JUUL followed the cigarette playbook verbatim.

159.    JLI knew that among its target audience, young people, cigarette smoking had become increasingly stigmatized. JLI wanted to create a product that would create "buzz" and excitement, totally different from the image of addicted cigarette smokers huddling outside their workplaces in the cold to get their nicotine fix.

———————————————

[149]*Id.*
[150]INREJUUL_00057291 *et seq.*
[151]Internal RJR Memo, Claude Teague, *Research Planning Memorandum on Some Thoughts About New Brands of Cigarettes for the Youth Market*, (Feb. 2, 1973).

[PROPOSED] SECOND AMENDED COMPLAINT - 54

160.     Unlike the distinct smell and odor emitted from combustible cigarettes, JUUL emits a reduced aerosol with a nearly undetectable scent. And unlike other e-cigarettes, the JUUL device does not produce large plumes of smoke. Instead, the vapor cloud is very small and dissipates very quickly, allowing for concealed use. As a result, young users can, and do, use JUUL—in class or at home—without detection.

161.     The JUUL device is also designed to be small and discrete. Fully assembled, the device is just over 9.5 cm in length and 1.5 cm wide. The JUUL device resembles a memory stick and can be charged in a computer's USB drive. This design allows the device to be concealed in plain sight, camouflaged as a thumb-drive, for use in public spaces, like schools and even charged in school computers. JLI has been so successful in emulating harmless technology that its small, rectangular devices are often mistaken for—or passed off as—flash drives. According to one high school senior, "that's what people tell the teachers a lot, too, if you charge it in class, they'll just say it's my flash drive."





162.    Referred to as "the iPhone of e-cigarettes," JLI's design was also slick and high-tech, which made it appealing to youth. JLI co-founder Bowen drew on his experience as a design engineer at Apple Inc. to make JUUL resonate with Apple's popular aesthetics. This high-tech style made JUULs look "more like a cool gadget and less like a drug delivery device. This wasn't smoking or vaping, this was JUULing."[152] The evocation of technology makes JUUL familiar and desirable to the younger tech-savvy generation, particularly teenagers. According to a 19-year-old interviewed for the Vox series By Design, "our grandmas have iPhones now, normal kids have JUULs now. Because it looks so modern, we kind of trust modern stuff a little bit more so we're like, we can use it, we're not going to have any trouble with it because you can trust it."[153] A 16-year-old agreed, explaining that "the tech aspect definitely helps people get introduced to it and then once they're introduced to it, they're staying, because they are conditioned to like all these different products. And then this is another product. And it's just another product. Until you're addicted to nicotine."[154]

---

[152]*How JUUL Made Nicotine Go Viral*, Vox (Aug. 10, 2018), https://www.youtube.com/watch?v=AFOpoKBUyok.
[153]*Id.*
[154]*Id.*

1

2

3      163.    JUUL's design also included an LED light, which allowed users to active "party

4   mode," whereby the LED light would flash a rainbow of colors. "Party mode" is activated by the

5   user by waving the JUUL device back and forth until the white LED light starts flashing multiple

6   colors, so that the rainbow colors are visible while the person inhales from the JUUL device.

7   "Party mode" can also be permanently activated on the JUUL by the user quickly and firmly

8   slapping the JUUL against the palm of the hand, until the LED light starts flashing multiple colors

9   permanently. Party mode on the JUUL is described by users to be "like an Easter egg in a video

10  game" and allows for "some cool tricks that are going to drive [] friends crazy." [155] This feature

11  was another characteristic that set JUUL apart from other e-cigarettes on the market, and made it

12  even more appealing and "cool" to young users.

13



14

15

16

17

18

19      164.    According to Dr. David Kessler, a former Commissioner of the FDA and current

20  Professor of Pediatrics at the University of California, San Francisco, JUUL's "fundamental

21  design appears to ease young people into using these e-cigarettes and ultimately, addiction."[156]

22  Dr. Kessler emphasized the reduced harshness of JUUL's nicotine salt formulation, the high

23

24  _____

25

26  [155]Jon Hos, *Getting Your Juul Into Party Mode*, (Jul. 12, 2018), https://vapedrive.com/getting-your-juul-into-party-mode.

27  [156]David A. Kessler, *Juul Says It Doesn't Target Kids. But Its E-Cigarettes Pull Them In*, N.Y. TIMES (July 31, 2019), https://www.nytimes.com/2019/07/31/opinion/juul-kids.html.

28

nicotine content, discreet vapor cloud, and use of flavors as design features that appeal to youth.[157] On April 24, 2018, the FDA sent JLI a letter, based on the FDA's concern "about the popularity of JUUL Products among youth" and stated that this popularity may be related to "the product design."[158] As a result, the FDA requested documents related to product design, including its "shape or form," "nicotine salt formulation" and "nicotine concentration/content," "flavors," and "features such as: appearance, or lack thereof, or plume . . . [and] USB port rechargeability."

### JLI Enticed Newcomers to Nicotine with Kid-Friendly Flavors Without Ensuring the Flavoring Additives Were Safe for Inhalation

165.    Cigarette companies have known for decades that flavored products are key to getting young people to acclimate to nicotine. A 1972 Brown & Williamson memorandum: Youth Cigarette – New Concepts, specifically noted the "well known fact that teenagers like sweet products."[159] A 1979 Lorillard memorandum concluded that younger customers would be "attracted to products with 'less tobacco taste," and even proposed borrowing data from the "Life Savers" candy company to determine which flavors enjoyed the widest appeal among youth.[160]

166.    Altria's subsidiary U.S. Smokeless Tobacco Company (formerly called United States Tobacco Company) described the initiation of new customers through flavored products as "the graduation theory":

*New users of smokeless tobacco—attracted to the product for a variety of reasons—are most likely to begin with products that are milder tasting, more flavored, and/or easier to control*

---

[157]*Id.*

[158]Letter from Matthew R. Holman, Dir. of the Off. of Sci. at the Ctr. for Tobacco Prods., to Ziad Rouag, V.P. of Regul. & & Clinical Affairs, JUUL Labs, Inc. (Apr. 24, 2018), https://www.fda.gov/media/112339/download.

[159]Marketing Innovations, Inc., *Brown & Williamson Tobacco Corp. Project Report: Youth Cigarette—New Concepts*, U.C.S.F.    Truth    Tobacco    Indus.    Documents    (Sept.    1972), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=hzpd0040.

[160]    *Flavored    Tobacco    FAQs*,    Students    Working    Against    Tobacco, http://swatflorida.com/uploads/fightresource/Flavored%20Tobacco%20Industry%20Quotes%20and%20Facts.pdf (citing Sedgefield Idea Sessions 790606-790607 (June 8, 1979), Bates No. 81513681/3691) (last visited Nov. 12, 2020).

*in the mouth. After a period of time, there is a natural progression of product switching to brands that are more full-bodied, less flavored, have more concentrated "tobacco taste" than the entry brand.[161]*

167.    A sales manager who worked at U.S. Tobacco in the 1980s told the Wall Street Journal that "They talked about graduation all the time—in sales meetings, memos and manuals for the college program. It was a mantra."[162]

168.    A 2004 study found that seventeen-year-old smokers were more than three times as likely as those over the age of twenty-five to smoke flavored cigarettes, and they viewed flavored cigarettes as safer.[163]

169.    In June 2015, JUUL came to market in four flavors including tabaac (later renamed tobacco), fruut (later renamed fruit medley), bruulé (later renamed crème brulee), and miint (later renamed mint).

 

[161]G.N. Connolly, *The marketing of nicotine addiction by one oral snuff manufacturer*, 4 Tobacco Control 73-79 (1995), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC1759392/pdf/v004p00073.pdf.
[162]Alix Freedman, *Juiced Up: How a Tobacco Giant Doctors Snuff Brands to Boost Their 'Kick,'* Wall St. J. (Oct. 26, 1994), https://www.industrydocuments.ucsf.edu/tobacco/docs/#id=mlch0185.
[163] Gardiner Harris, *Flavors Banned From Cigarettes to Deter Youth*, N.Y. Times (Sept. 22, 2009), https://www.nytimes.com/2009/09/23/health/policy/23fda.html.

[PROPOSED] SECOND AMENDED COMPLAINT - 59

170.    JUUL later offered other kid-friendly flavors, including cool mint, cucumber, and mango.



171.    In 2009, the FDA banned flavored cigarettes (other than menthol) as its first major anti-tobacco action pursuant to its authority under the Family Smoking Prevention and Tobacco Control Act of 2009. "Flavored cigarettes attract and allure kids into addiction," Health and Human Services Assistant Secretary Howard Koh, MD, MPH, said at a news conference held to announce the ban.[164] In January 2020, the FDA banned flavored e-cigarette Pods, other than "Tobacco" and "Menthol" flavors, in response to "epidemic levels of youth use of e-cigarettes" because these products are "so appealing" to children."[165]

172.    The availability of e-liquids in flavors that appeal to youth increases rates of e-cigarette adoption by minors. A national survey found that that 81% of youth aged twelve to seventeen who had ever used e-cigarettes had used a flavored e-cigarette the first time they tried

---

[164]Daniel J. DeNoon, *FDA Bans Flavored Cigarettes: Ban Includes Cigarettes With Clove, Candy, and Fruit Flavors*, WebMD (Sept. 22, 2009), https://www.webmd.com/smoking-cessation/news/20090922/fda-bans-flavored-cigarettes#2.

[165]U.S. Food & Drug Admin., *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-cigarettes that Appeal to Children, Including Mint* (Jan. 22, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

the product, and that 85.3% of current youth e-cigarette users had used a flavored e-cigarette in the past month. Moreover, 81.5% of current youth e-cigarette users said they used e-cigarettes "because they come in flavors I like."[166]

173.    Adding flavors to e-liquids foreseeably increases the risk of nicotine addiction by making it easier and more pleasant to ingest nicotine.[167] Research has shown that adolescents whose first tobacco product was flavored are more likely to continue using tobacco products than those whose first product was not flavored.

174.    In a recent study, 74% of youth surveyed indicated that their first use of a JUUL was of a flavored JUUL Pod.[168]

175.    Research shows that when youth see advertisements for flavored e-cigarettes, they believe the advertisements and products are intended for them.[169]

176.    Flavors like mint and menthol are attractive to youth. According to Robin Koval, CEO and president of Truth Initiative, mint and menthol are among the most popular flavors for youth and that "[w]e also know, as does the tobacco industry, that menthol has been and continues to be the starter flavor of choice for young cigarette users."  According to the FDA, "younger

---

[166] See Bridget K. Ambrose et al., *Flavored Tobacco Product Use Among US Youth Aged 12-17 Years, 2013-2014*, 314 JAMA 1871 (2015). Another peer-reviewed study concluded that young adults who use electronic cigarettes are more than four times as likely to begin using regular cigarettes as their peers who have not used e-cigarettes. *See* Brian A. Primack, et al. *Initiation of Traditional Cigarette Smoking after Electronic Cigarette Use Among Tobacco-Naïve US Young Adults*, 131 AM. J. MED. 443.e1 (2018).

[167] *See* U.S. Dep't of Health & Human Servs., *How Tobacco Smoke Causes Disease: The Biology and Behavioral Basis for Smoking-Attributable Disease: A Report of the Surgeon General*, Chapter 4 (Centers for Disease Control and Prevention ed. 2010), https://www.ncbi.nlm.nih. gov/books/NBK53018/ #ch4.s92.

[168] Karma McKelvey et al., *Adolescents and Young Adults Use in Perceptions of Pod-based Electronic Cigarettes*. 1 JAMA NETWORK OPEN e183535 (2018), https:// doi:10.1001/jamanetworkopen.2018.3535.

[169] D.C. Petrescu et al., *What is the Impact of E-Cigarette Adverts on Children's Perceptions of Tobacco Smoking? An Experimental Study*, 26 TOBACCO CONTROL 421 (2016); Julia C. Chen-Sankey et al., *Perceived Ease of Flavored E-Cigarette Use and E-Cigarette Use Progression Among Youth Never Tobacco Users*, 14 PLoS ONE 1 (2019).

[PROPOSED] SECOND AMENDED COMPLAINT - 61

populations have the highest rate of smoking menthol cigarettes" and "menthol in cigarettes is likely associated with increased initiation and progression to regular [] cigarette smoking."[170]

177.    A significant majority of under-age users chose flavored e-cigarette products.[171] By at least early 2017, JLI knew that its flavors had attracted young people and non-smokers in droves.[172] Instead of taking corrective action or withdrawing the kid friendly flavors, JLI capitalized on their popularity with kids continued to promote JUUL's flavors. In a social media post from August 2017, for example, JLI tweeted "Beat The August Heat with Cool Mint" and "Crisp peppermint flavor with a pleasant aftertaste."[173] In another August 2017 tweet, JLI compared JUUL to dessert: "Do you brulée? RT [re-tweet] if you enjoy dessert without the spoon with our Creme Brulee #JUULPods."[174]

178.    JLI asserts that it did not intend its flavors to appeal to underage consumers. After eleven Senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors, JLI visited Capitol Hill and told Senators that it never intended its products to appeal to kids and did not realize they were using the products, according to a staffer for Senator Richard Durbin[175]. JLI's statements to Congress—which parallel similar protests of innocence by cigarette company executives—were false.

---

[170]*Preliminary Scientific Evaluation of the Possible Public Health Effects of Menthol Versus Nonmenthol Cigarettes,* FDA 5, https://www.fda.gov/media/86497/download (last visited Nov. 12, 2020).

[171]Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States*, 322 JAMA 2095 (2019), https://tinyurl.com/y3g75gmg ("Among current exclusive e-cigarette users, an estimated 72.2% . . . of high school students and 59.2% . . . of middle school students used flavored e-cigarettes. . . .").

[172] *See* INREJLI_00265068 ██████████████████
██████████████████████████████████████████████████
██████████████████████████████████████████████████
██████████████████████████ .").

[173]    JUUL    Labs,    Inc.    (@JUULvapor),    Twitter    (Aug.    4,    2017), http://tobacco.stanford.edu/tobacco_web/images/pod/juul/twitter/large/twitter_39.jpg.

[174]Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[175]Lorraine Woellert & Sarah Owermohle*, Juul Tries to Make Friends in Washington as Regulators Circle,* POLITICO (Dec. 28, 2018), https://www.politico.com/story/2018/12/08/juul-lobbying-washington-1052219.

179.    A former JUUL manager, who spoke to The New York Times on the condition that his name not be used, said that within months of JUUL's 2015 introduction, it became evident that teenagers were either buying JUULs online or finding others who made the purchases for them. Some people bought more JUUL kits on the company's website than they could individually use—sometimes ten or more devices at a time. "First, they just knew it was being bought for resale," said the former senior manager, who was briefed on the company's business strategy. "Then, when they saw the social media, in fall and winter of 2015, they suspected it was teens."[176]

180.    JLI's use of flavors unfairly targeted not only youth, but unsuspecting adults as well. By positioning JUUL Pods as a flavor-oriented product rather than a system for delivering a highly addictive drug, JLI deceptively led consumers to believe that JUUL Pods were not only healthy (or at least essentially harmless), but also a pleasure to be enjoyed regularly, without guilt or adverse effect.

**Defendants Developed and Promoted the Mint Flavor and Sought to Preserve its Market**

181.    While JLI and the Management Defendants were developing and marketing their flavored products to appeal to and recruit youth, Altria, recognizing the value of those young "replacement smokers" committed itself to the cause. With the shared goal to grow the number of nicotine-addicted users, and as detailed further herein, JLI's leadership, the Management Defendants, and Altria set out to do whatever was necessary to create and preserve the lucrative market for flavors. In order to maximize the value of its mint line of JUUL Pods, JLI, with the support of the Management Defendants, chemically and socially engineered its mint Pods to become the most popular "flavor" among youth, including through extensive surveillance of youth behavior and preferences, all while seeking to conceal mint's appeal to youth.

---

[176]Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. TIMES (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

182.    In July 2013, Reynolds American Inc.[177] released the Vuse, the first-known cartridge-based nicotine salt e-cigarette to reach the domestic market.[178] Altria entered the nicotine salt market one month later, with the MarkTen cig-a-like.[179] JLI would enter the market in June 2015.

183.    Though mint was one of the least popular e-cigarette flavor categories with youth in 2015, trailing the fruit and dessert categories,[180] Reynolds, Altria and JLI had all introduced mint-flavored products within a year of each company's initial release. By mid-2014, Reynolds had added "Mint, Rich Mint, Spearmint, [and] Wintergreen" to its Vuse lineup.[181] By February 2015, Altria's Nu Mark LLC, under the leadership of Joe Murillo (JLI's current regulatory head), released a Winter Mint flavor for MarkTen.

184.    Unlike Reynolds and Altria, which released mint products after first releasing a menthol variant, JLI skipped menthol and went straight to mint, adding Menthol in late 2017 around the same time it released its mango JUUL Pods.

185.    JLI's flavored JUUL Pods were particularly popular with its underage users and, when mango was introduced, it was the underage user's flavor of choice.

186.    JLI, the Management Defendants, and Altria recognized both the potential of using flavors to hook kids and the inevitability that the government would seek to regulate said flavors.

---

[177]Reynolds is now a wholly owned subsidiary of British American Tobacco.

[178]See FAQs, RJR Vapor Co., LLC, http://www.vusevapor.com/faqs/product/ ("Since Vuse's launch in 2013, all of our closed systems available for sale nationally (i.e., Vuse Solo, Vuse Ciro, Vuse Vibe, and Vuse Alto) include nicotine salts.").

[179]Additional Info, Nu Mark LLC, https://markten.com ("certain varieties" of MarkTen Original "contain … acetic acid, benzoic acid, and lactic acid.").

[180]See M.B. Harrell et al., *Flavored E-cigarette Use: Characterizing Youth, Young Adult, and Adult Users*, 5 PREVENTIVE  MEDICINE  REPS.  33-40,  §  3.3  (Mar.  2017), https://www.sciencedirect.com/science/article/pii/S2211335516301346.

[181]  *See*  Sen.  Richard  Durbin,  et  al.,  *Gateway  to  Addiction?*  (April  14,  2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 64

So, they sought to solidify the market presence of a "substitute" youth-friendly flavor—mint—which might escape regulation and preserve JLI's astronomical sales figures.

### JLI Manipulates Chemistry of Mint JUUL Pods

187.   One recent study found that JLI's mango had the lowest free-base content, making it the least harsh formula; and that mint had the highest free-base content (30% more free-base than mango), making mint the formula with the strongest nicotine impact:[182]

| | $C_{HA}/C_{Nic}$ | $\alpha_{fb}$ |
|---|---|---|
| **Benzoic acid** | | |
| JUUL 'Cool Mint' (5% nicotine) | 0.97* | 0.13 |
| JUUL 'Classic Menthol' (5% nicotine) | 0.98* | 0.13 |
| JUUL 'Crème Brûlée' (5% nicotine) | 0.97* | 0.12 |
| JUUL 'Fruit Medley' (5% nicotine) | 0.99* | 0.12 |
| JUUL 'Cool Cucumber' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Classic Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL 'Virginia Tobacco' (5% nicotine) | 1.00* | 0.11 |
| JUUL "Mango" (5% nicotine) | 0.99* | 0.09 |
| JUUL "Virginia Tobacco" (3% nicotine) | 0.94* | 0.14 |
| JUUL 'Mint' (3% nicotine) | 1.04* | 0.11 |
| Averages for JUUL | 0.99±0.03 SD | 0.12±0.01 |

188.   These findings evidence JLI, the Management Defendants, and the Altria Defendants' plan to make the flavor whose lifespan they were working hard to preserve the most potent when it got into the hands of nonsmokers, including youth.

### JLI's Youth Surveillance Programs Confirmed that Mint JUUL Pods are Preferred by Teens

189.   In January 2018, Kevin Burns, JLI's new CEO, deployed his experience as the former CEO of a yogurt company to begin developing JUUL's flavor portfolio.

---

[182]     See     Duell     AK,     et     al.     *Nicotine     in     Tobacco     Product     Aerosols:* *"It's     Déjà     vu     All     Over     Again,"*     5     TOBACCO     CONTROL     (Dec.     17,     2019), https://tobaccocontrol.bmj.com/content/tobaccocontrol/early/2019/12/16/tobaccocontrol-2019-055275.full.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 65

190.     One part of this initiative included studying consumer reactions to flavor names. By February 2018, McKinsey & Company had provided a roadmap to JLI's Consumer Insights department, which included multiple flavor studies including a flavor "likability" tests, which was carried out under JUUL's marketing and commercial department.[183]

191.     In April 2018, JLI received a document request from the FDA on April 24, 2018, seeking information about the design and marketing of JLI's products, among other things.[184]

192.     In response, JLI announced a commitment of $30 million to youth prevention efforts and began sending JLI representatives to schools to present what were essentially advertising campaigns for JUUL Products. This conduct resulted in a Warning Letter from the FDA's Center for Tobacco Products to JLI in September 2019.[185]

193.     Under the guise of this youth prevention program, JLI directly studied 13- to 17-year-old teens' e-cigarette flavor preferences.[186] These studies, undertaken at a time when JLI and Altria were coordinating their activities, asked teens to rank a variety of e-cigarette flavors in terms of appeal, and included the names of current JUUL flavors, JUUL flavors under development, and flavors offered by JLI's competitors. Though they were not made public, through document requests, two such studies have been identified from April 2018.

194.     The first study, carried out by McKinsey & Company, generated over 1,000 responses from teens aged 13 to 17 years old.[187] The second study, conducted by DB Research,

---

[183]INREJUUL_00053172.
[184]Matthew Holman, U.S. Food & Drug Admin., to Ziad Rouag, Juul Labs, Inc., *Letter from Director of Office of Science, Center for Tobacco Products* (Apr. 24, 2018), https://www.fda.gov/media/112339/download.
[185] Letter from U.S. Food & Drug Admin. to Kevin Burns, CEO of Juul Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[186]INREJUUL_00121627 (preliminary slides); INREJUUL_00124965 (data).
[187]*Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 66

appears to have gathered data from a focus group of 16 kids in Bethesda, Maryland, and Baltimore, Maryland.[188]

195.    Both studies found that teens' co-favorite JUUL flavors were mango and mint, and that teens found only one third-party flavor more desirable than mango and mint: "Cotton Candy" (McKinsey) [189] and "Fruit Loops" (DB Research).[190]

196.    Though the McKinsey study did not survey teens' preference for menthol, the DB Research study did and found that while 28% of teens found menthol appealing, 72% of teens liked mint.[191]

197.    In other words, these surveys showed that teens respond to mint the way they respond to their favorite candy flavors and respond to Menthol the way they respond to traditional tobacco flavors typically disfavored by youth. This is unsurprising, as the "Mint" flavor was designed not to taste like a Menthol cigarette. Users have described JLI's Menthol flavor as "tast[ing] like a [N]ewport" cigarette that "doesn't have that good peppermint taste like [C]ool [M]int."[192]

198.    Because of these and other studies, JLI, the Management Defendants, and the Altria Defendants knew that mint is an attractive flavor for kids. According to Siddharth Breja, who was senior vice president for global finance at JLI, after JLI pulled most flavored Pods, including mango, from the market in a purported attempt to reduce youth usage of JUUL, then-CEO Kevin Burns said that "[y]ou need to have an IQ of 5 to know that when customers don't find mango they buy mint."[193] And it was public knowledge that mint and menthol have a well-

---

[188]INREJUUL_00035325.
[189]INREJUUL_00124965.
[190]*Id.*
[191]INREJUUL_00035325.
[192]    Reddit,    *How    does    Classic    Menthol    Compare    to    Cool    Mint*, https://www.reddit.com/r/juul/comments/7wo39m/how_does_classic_menthol_compare_to_cool_mint/.
[193]Sheila Kaplan and Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. TIMES (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

[PROPOSED] SECOND AMENDED COMPLAINT - 67

documented history of facilitating youth tobacco use, as Dr. Jonathan Winickoff testified before Congress:

> *[it is] completely false to suggest that mint is not an attractive flavor to children. From candy canes to toothpaste, children are introduced to mint flavor from a young age. Not only do children enjoy mint, but it has special properties that make it an especially dangerous flavor for tobacco. Menthol's anesthetic properties cool the throat, mask the harshness of nicotine, and make it easier for children to start using and continue using tobacco products. The impact of mint and menthol flavors on increasing youth tobacco addiction is well documented.[194]*

199.    If the purpose of these youth prevention studies was to "better understand how different flavor profiles appeal to different age groups to inform youth prevention," as the McKinsey slides presenting that study's findings indicate, the lesson for JLI, the Management Defendants, and the Altria Defendants was that teens like mint as much or more than any other JUUL flavor, including mango, fruit medley, crème brulee, cucumber, and more than a dozen other candy-like flavors produced by third-parties for use with the JUUL device.

200.    With that knowledge and with no genuine interest in youth prevention, and as detailed below, JLI, the Management Defendants, and Altria committed to work to preserve mint as a flavor for as long as possible. Indeed, to further this goal, Defendants Pritzker and Valani poured additional money into JLI a mere two months later as part of a $600 million funding round.[195]

---

[194] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 3 (2019) (statement of Jonathan P. Winickoff, American Academy                                                    of                                                    Pediatrics), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/2019.07.24%20Winickoff%20AAP%20Testimony.pdf.

[195] Alex Wilheim & Jason D. Rowley, *JUUL Raises $650M Of Its $1.25B Mega-Round*, Crunchbase (Jul. 10, 2018), https://news.crunchbase.com/news/juul-raises-650m-of-its-1-25b-mega-round/.

201.    By keeping mint on the market long after other flavors were pulled, these Defendants continued to expand the number of addicted e-cigarette users.

**JLI Used Toxic Flavorings and Raw Ingredients in JUUL Pods Without Ensuring They Were Safe For Inhalation and Without Providing Warnings to Walker McKnight of the Potential Dangers**

202.    It is well-established that flavoring additives and raw ingredients used in JUUL e-liquids are known causes of lung injuries when inhaled in the workplace setting.[196]

203.    Safety and toxicity analyses in the context of flavored e-liquids have also been published in the medical and scientific literature.

204.    In 2016, Tierney, et al., performed an analysis of the ingredients in several popular flavors and brands of e-cigarettes. They found that the concentration of artificial flavor chemicals in e-cigarette fluids are sufficiently high for inhalation exposure by vaping to be of toxicological concern. Also, the researchers found that certain flavoring additives appeared to be popular across all brands such as vanillin, ethyl vanillin, maltol and ethyl maltol, benzaldehyde and benzyl alcohol, ethyl butyrate and ethyl acetate. A review of the JUUL master formulations and ingredient lists for flavored JUUL Pods identify many of these same popular toxic ingredients studied by Tierney.[197]

205.    A 2018 study examined the effect of popular e-cigarette flavoring on cells. The authors found that cell exposure to diacetyl, cinnamaldehyde, acetoin, pentanedione, o-vanillin, maltol, and coumarin without nicotine caused cytotoxicity dose-dependently. Mixing a greater

---

[196]*Flavorings-Related Lung Disease, Exposure To Flavoring Chemicals: What Are Flavorings?,* National Institute for Occupational Safety and Health (October 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/exposure.html.
[197]Peyton A Tierney, et al., *Flavour chemicals in electronic cigarette fluids*, Tob Control, 25:e10-e15 (Apr. 15, 2015).

variety of flavors resulted in an even greater cytotoxicity and cell-free ROS levels compared to treatments with individual flavors.[198]

206.     Talih, et al. analyzed the characteristics and toxicant emissions of JUUL and found that JUUL aerosol contained numerous toxic carbonyl compounds including formaldehyde, acetaldehyde and acetone, all known carcinogens.[199]

207.     Omaiye, et al. performed an analysis of the ingredients in a number of chemical flavored JUUL Pods and found that they were cytotoxic when exposed to human bronchial cells. The study found the following known harmful chemicals in the JUUL e-liquids including: 2-methoxyphenol; 2,3,5-Trimethylpyrazine; 2,5-dimethylpyrazine; isopulegol; ethyl maltol; benzaldehyde; 4-terpineol; maltol; hydrocoumarin; vanillin; ethyl vanillin; phenoethyl alcohol; benzyl alcohol; p-Cymene; corylone; and pulegone. They also found the following irritant chemicals included: p-Anisaldehyde; eucalyptol; piperidone; piperonal; linalool; methyl anthranilate; beta-Damascone; benzaldehyde PG acetal; gamma-terpinene; ethyl anthranilate; alpha-terpineol; delta-decalactone; gamma-octalatone; 3-Hecen-1-ol; ethyl isovalerate; beta-undecalactone; hexyl acetate; acetylpurazine; ethyl hexacanoate; ethyl 2-methylbutanoate; and menthol. In addition, they found the following environmentally hazardous chemicals included: thymol, ally hexanoate, alpha-pinene, beta-pinene, and limonene.[200]

208.     Another study published in 2019 examined the artificial flavoring additives in e-liquids in JUUL Pods. The authors concluded that the cumulated data suggested that artificial flavors induce oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in

---

[198]Thivanka Muthumalage, et al., *Inflammatory and Oxidative Responses Induced by Exposure to Commonly Used e-Cigarette Flavoring Chemicals and Flavored e-Liquids without Nicotine*, 8 Frontiers in Physiology 1130 (2018).
[199]Talih S, Salman R, El-Hage R, et al., *Characteristics and toxicant emissions of JUUL electronic cigarettes*, Tob Control, 28:678-680 (2019).
[200]Esther E. Omaiye, et al., *High-Nicotine Electronic Cigarette Products: Toxicity of JUUL Fluids and Aerosols Correlates Strongly with Nicotine and Some Flavor Chemical Concentrations*, Chem Res Toxicol, 32(6): 1058-69 (June 17, 2019).

lung cells. Specifically, JUUL crème brulee and cool cucumber caused epithelial barrier dysfunction in 16-HBE cells. Moreover, all flavors damaged DNA upon exposure in monocytes. The findings included increased mitochondrial superoxide generation, IL-8 inflammatory cytokine response, IL-8 inflammatory cytokine response in monocytes, and OGE2 response in monocytes. All findings are a known cause of acute and chronic lung injuries, as well as other serious and significant injuries.[201]

209.    A number of other studies have examined the effects of exposure to inhaled flavoring additives in e-liquids and determined that inhalation of flavoring additives in e-cigarette aerosol carry a significant risk of toxicity and other injuries.[202]

210.    In addition, there is evidence that combining a number of flavoring additives into an e-liquid formulation can significantly increase toxicity.[203]

211.    Despite the body of evidence demonstrating a significant risk associated with the flavoring additives used in JUUL e-liquids, Defendants failed to warn consumers or the public, including Walker McKnight of this risk thereby recklessly disregarding the safety of the millions

_____

[201]Thivanka Muthumalage, et al., *E-cigarette flavored pods induce inflammation, epithelial barrier dysfunction, and DNA damage in lung epithelial cells and monocytes*, Scientific Reports, 9:19035 (Feb. 1, 2019).

[202]Jessica L. Fetterman, et al., *Flavorings in Tobacco Products Induce Endothelial Cell Dysfunction*, Arterioscler Thromb Vasc Biol (July 2018); Isaac Sundar, et al., E-*cigarettes and flavorings induce inflammatory and prosenescence responses in oral epithelial cells and periodontal fibroblasts*, Oncotarget, 7(47): 77196-204 (Oct. 24, 2016); Hae-Ryung Park, et al., *Transcriptomic response of primary human airway epithelial cells to flavoring chemicals in electronic cigarettes*, Scientific Reports, 9:1400, (Feb. 1, 2019); Chad A. Lerner, et al., *Vapors Produced by Electronic Cigarettes and E-Juices with Flavorings Induce Toxicity,* Oxidative Stress, and *Inflammatory Response in Lung Epithelial Cells and in Mouse Lung*, PLoS ONE, 10(2): e0116732, (Feb. 6, 2015); Michael S. Werley, et al., *Toxicological assessment of a prototype e-cigaret device and three flavor formulations: a 90-day inhalation study in rats*, Inhalation Toxicology, 28(1), 22-28, (Jan. 18, 2016); Wavreil FDM, Heggland SJ, *Cinnamon-flavored electronic cigarette liquids and aerosols induce oxidative stress in human osteoblast-like MG-63 cells*, Toxicology Reports (2019), https://doi.org/10.1016/j.toxrep.2019.11.019; Behar, et al., *Analytical and toxicological evaluation of flavor chemicals in electronic cigarette refill fluids*, Scientific Reports, (May 29, 2018).

[203]Marescotti D, et al., *Systems toxicology assessment of a representative e-liquid formulation using human primary bronchial epithelial cells*, Toxicology Reports (2019), https://doi.org/10.1016/j.toxrep.2019.11.016; Temperance R. Rowell, et al., *Electronic Cigarettes: Not All Good News? Flavored e-cigarette liquids reduce proliferation and viability in the CALU3 airway epithelial cell line*, Am. J. Physiol. Lung Cell Mol. Physiol., 313:L52-L66 (Apr. 14, 2017).

[PROPOSED] SECOND AMENDED COMPLAINT - 71

of JUUL users throughout the country, including millions of teenagers and young adults who were non-smokers.

212.    Upon information and belief, Defendant JLI entered into an agreement in California with Mother Murphy's and Alternative in or around 2014 wherein in conjunction with JLI, Mother Murphy's and Alternative designed, manufactured and supplied flavoring additives and the flavored E-liquids pursuant to JLI directives and specifications derived from their patents for use in its JUUL Pods.

213.    Mother Murphy's and Alternative would use their own chemical additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JLI's responses to Congress.[204]

214.    Mother Murphy's and Alternative would report regularly to JLI as to the production processes and progress and took direction from JLI in California as to business directives, including phone calls, e-mails and regular forms of electronic communication coming from JLI in California.

215.    Upon information and belief, Mother Murphy's and Alternative performed "one-third of the final nicotine production" for JUUL Products that go into the e-liquid mix.[205]

216.    Mother Murphy's describes itself as "**an industry leader in flavor innovation.**" According to its website:

*Mother Murphy's is a food flavoring business, family-owned and operated since 1946. We ship food flavorings, flavor extracts and powered flavorings to over 30 different countries. We are very innovative, and our in-house chemists are always developing and seeking new flavor*

---

[204]Responses of JUUL LABS INC. to Questions for the Record at the July 25, 2019 Hearing before the House Committee on Oversight and Record Examining JUUL's role in the Youth Nicotine Epidemic: Part II p. 6.
[205]*Id.* at 7.

[PROPOSED] SECOND AMENDED COMPLAINT - 72

*extracts and powdered flavorings to add to our library of already more than 60,000 flavors. In fact, we say 'if you can imagine it, we can create it.'*[206]

217.    Upon information and belief, Mother Murphy's is the parent company of Alternative. Alternative's website was taken down in the Fall of 2019 when news broke that a lawsuit had been filed by a former JLI employee alleging that Alternative supplied over a million contaminated Pods which JLI sold to users, including teenagers and young adults, with reckless disregard for consumer safety.[207]

218.    A snapshot of Alternative's website from 2016 accessed through wayback.org internet archive, describes Alternative as "Established in Greensboro, North Carolina, Alternative Ingredients, Inc. was created to serve the relatively new Vaping Industry, also known as the Electronic Nicotine Delivery Systems (ENDS) industry. Our product offering include E-Flavor Concentrates, Nicotine Solutions and finished E-Liquids." It also states that:

*We emphasize that while we have sought to create a group of flavors compatible with the ENDS industry, to our knowledge, no independent studies have been conducted which document the safety of these flavors in a vaping environment or in e-cigarettes. We expect that these studies will be forthcoming, but until they are released, we make no representation or warranty as to the safety of these flavors when used in a vaping environment or in e-cigarettes.[208] (emphasis added).*

219.    However, no such warning was provided when the e-liquids were shipped and/or sold to millions of consumers throughout the United States. Defendants did not provide any reservation as to lack of safety tasting and lack of warranty as to the safety of the chemical flavoring additives to the consumers.

---

[206]Mother Murphy's, http://www.mothermurphys.com/.
[207]*See Breja v. JUUL labs, Inc.*, No. 3:19-cv-07148 (N.D. Cal. Oct. 29, 2019).
[208]   Alternative   Ingredients,   Wayback   Machine   –   Internet   Archive   (Mar.   12,   2016), https://web.archive.org/web/20160312122149/http://www.alternativeingredients.com/

220.    Defendants, in business with Mother Murphy's and Alternative, designed, manufactured, and supplied flavoring ingredients for JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. Accordingly, Defendants' design, manufacture, and supply of JUUL e-liquids was done with reckless disregard for the safety of consumers including, Walker McKnight, and millions of teenagers, young adults and older adults who unknowingly inhaled e-liquids containing flavoring additives that were never tested to determine whether they were safe for use in this manner and for which Defendants knew, or should have known, carried a severe and significant inhalation risk to the lung and other organs. Defendants used e-liquids with the full knowledge that it was unsafe for use in the manner for which it was intended. Defendants knew, or should have known, that the e-liquid they were using in JUUL Products was an inherently dangerous and toxic product which could cause the personal injuries as described herein.

221.    In fact, Alternative's internal Manufacturing Safety Data Sheet (MSDS) warned of the risk of inhalation injuries when handling its products. For example, an MSDS prepared by Alternative for the JUUL flavor "Virginia Tobacco" listed an OSHA warning that it "contains volatile flavoring chemicals; breathing these chemicals in the workplace may lead to severe lung damage."[209]

222.    Occupational safety protections pursuant to OSHA and state laws were needed to ensure that Alternative and Mother Murphy's employees were protected from the fumes from these flavoring additives, nicotine and other chemicals; the very chemicals designed to be vaporized and then inhaled by consumers.

223.    Despite the knowledge of the inhalation risks, Defendants manufactured e-liquids and placed the products into the stream of commerce for millions of people, including Walker

---

[209]INREJUUL_00338418-INREJUUL_00338422.

[PROPOSED] SECOND AMENDED COMPLAINT - 74

McKnight, to inhale without warning of any risks caused by inhalation of the ingredients contained therein.

224.    Due to the continued blockbuster success and increased demand for JUUL, as well as anticipated global expansion, JLI entered into an agreement with the Maryland based corporations TTI and Eliquitech in or around 2017 wherein TTI and Eliquitech also manufactured and supplied flavoring additives and blended the flavored e-liquids in JLI's JUUL Pods. Upon information and belief, TTI and Eliquitech continue to design, manufacture and supply flavoring additives and flavored e-liquids in conjunction with JLI for use in its JUUL Pods presently.

225.    TTI and Eliquitech would use their own chemical additives and flavorings to formulate the e-liquids but "the overall manufacturing processes are unique to the JUUL system and the formulas and chemistries for the e-liquids for the JUUL system, are proprietary to JLI" as alleged in JUUL sworn responses to Congress.[210]

226.    TTI and Eliquitech, based upon contractual relations with JLI in California, used specifications created by JLI in San Francisco, and designed, manufactured, and supplied flavoring ingredients and blended the JUUL e-liquids utilizing flavoring additives, which were never tested for safety risks associated with inhalation in e-cigarettes. Defendants used these e-liquids JUUL e-liquids into the stream of commerce with the full knowledge that it was unsafe for use in the manner for which it was intended. Defendants knew, or should have known, that the e-liquid they were designing, manufacturing, and supplying in conjunction with TTI and Eliquitech was an inherently dangerous and a toxic product which could cause the personal injuries as described herein.

227.    Neither TTI nor Eliquitech had ever tested the products for safety risks associated with utilizing the material in e-liquids. In fact, Defendants were fully aware that the Safety Data

_____

[210]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 75

Sheets prepared for each flavoring additive specifically stated that the ingredient carried inhalation health risks. Despite the knowledge of the inhalation risks, Defendants manufactured e-liquids utilizing these ingredients and placed the product into the stream of commerce for millions of people, including Walker McKnight, to inhale without warning of any risks caused by inhaling of the ingredients contained therein.

228.    The flavoring additives and raw ingredients and used in the JUUL e-liquid formulations as designed by JLI are associated with severe and significant risks of acute and chronic lung injuries, cardiovascular injuries and seizures. Defendants knew, or should have known of the risks and failed to warn Walker McKnight, and failed to warn its consumers of the risks, in reckless disregard for human safety.

**Defendants Developed and Implemented a Marketing Scheme to Mislead Consumers into Believing that JUUL Products Contained Less Nicotine Than They Actually Do and Were Healthy and Safe**

229.    Having created a product designed to hook users to its nicotine, JLI had to mislead consumers into believing JUUL was something other than what it actually was. So, the company engaged in a years' long campaign to downplay JUUL's nicotine content, nicotine delivery, and the unprecedented risks of abuse and addiction JUUL poses. Defendants devised and knowingly carried out a material scheme to defraud and addict consumers by (a) misrepresenting the nicotine content, nicotine delivery profile, and risks of JUUL Products, (b) representing to the public that JUUL was a smoking cessation tool, and (c) using third-party groups to spread false and misleading narratives about e-cigarettes, and JUUL in particular.

**The Defendants Knowingly Made False and Misleading Statements and Omissions Concerning JUUL's Nicotine Content**

230.    As part of their strategy to market to youth and nonsmokers, JLI and the Management Defendants also did not effectively inform users that JUUL Products contain

nicotine. Despite making numerous revisions to JUUL Products' packaging since 2015, JLI did not include nicotine warnings until forced to do so in August 2018.[211]

231.    Even after Defendants added a nicotine warning to JUUL Products, they continued to mislead youth and the public about the amount of nicotine in a JUUL Pod. Every 5% strength JUUL Pod package represents that one Pod is equivalent to one pack of cigarettes. This statement is deceptive, false and misleading. As JLI's regulatory head explained internally to former CEO Kevin Burns in 2018, each JUUL Pod contains "roughly twice the nicotine content of a pack of cigarettes."[212]

232.    In addition, and as JLI and the Management Defendants know, it is not just the amount of nicotine, but the efficiency with which the product delivers nicotine into the bloodstream, that determines the product's narcotic effect, risk of addiction, and therapeutic use. Most domestic cigarettes contain 10–15 mg of nicotine per cigarette[213] and each cigarette yields between 1.0 to 1.4 mg of nicotine,[214] meaning that around 10% of the nicotine in a cigarette is typically delivered to the user. JUUL e-cigarettes, on the other hand, have been found to deliver at least 82% of the nicotine contained in a JUUL Pod to the user.[215] JLI's own internal studies suggest a nicotine transfer efficiency rate of closer to 100%.[216]

---

[211]See INREJUUL_00444332 (2015 image of JLI packaging). The JLI packaging originally included such warnings about nicotine, but were removed during various rounds of revisions, see e.g., INREJUUL_00021583-586 at 583 (2014 image of JLI packaging containing handwritten revisions of the original language).
[212] INREJUUL_00279931.
[213]Neal L Benowitz & Jack E Henningfield, Reducing the Nicotine Content to Make Cigarettes less addictive, 22 TOBACCO CONTROL Supp. 1, i14-17 (2013), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC3632983/.
[214]Lynn T. Kozlowski & Janine L. Pilliteri, Compensation for Nicotine by Smokers of Lower Yield Cigarettes, 7 SMOKING    AND    TOBACCO    CONTROL    MONOGRAPH    161, 164 (1983), https://cancercontrol.cancer.gov/brp/tcrb/monographs/7/m7_12.pdf.
[215]Samantha M. Reilly et al., Free Radical, Carbonyl, and Nicotine Levels Produced by JUUL Electronic Cigarettes, 21 NICOTINE TOBACCO RESEARCH 1274 (2019), https://www.ncbi.nlm.nih.gov/pubmed/30346584 (about 82%, for averages of 164 μg per puff).
[216]See, e.g., INREJUUL_00023597 (finding 94% nicotine transfer efficiency with 4% benzoate formula).

[PROPOSED] SECOND AMENDED COMPLAINT - 77

233.    Defendants also knew that the use of benzoic acid and nicotine salts in JUUL Pods affects pH and facilitates "absorption of nicotine across biological membranes."[217] JUUL's e-liquid formulation is highly addictive not only because it contains a high concentration of nicotine, but because it contains a particularly potent form of nicotine, i.e., nicotine salts. Defendants knew this, as Adam Bowen advised the Board of Directors at an October 2015 Board meeting on JLI's "nicotine salts patent application."[218] And the Altria Defendants were aware of the research showing the potency of nicotine salts from their many years in the tobacco business.

234.    JLI and Defendant Bowen, knowing that the Phase 0 results illustrated that the nicotine content was greater than they wanted to represent, sought to engineer test results that differed from those results and were more consistent with JLI's deceptive messaging. In May 2014, within weeks of the Phase 0 study, JLI and Defendant Bowen carried out a second pharmacokinetics study in New Zealand. This study was called the CH-1401, or the "Phase 1" study. This study again examined the effects of inhaling aerosol from various 2% nicotine solutions: nicotine benzoate (blend A), nicotine malate (blend B), and free-base nicotine (blend C).[219] In a further departure from the Phase 0 study, which used experienced e-cigarette users, the Phase 1 study used subjects that had not previously ingested aerosolized nicotine vapor, and who had certainly never ingested aerosolized nicotine vapor from nicotine salts. As Defendants JLI and Bowen knew, this difference is critical. Just as first-time smokers would not inhale as much cigarette smoke as regular smokers, inexperienced (or "learning") e-cigarette users will not inhale vapor at a rate that maximizes nicotine delivery.[220] JLI's decision to omit participants with

---

[217]Neal L. Benowitz et al., *Nicotine Chemistry, Metabolism, Kinetics and Biomarkers*, 192 HANDB.EXP.PHARMACOL. 29(2010), https://www.ncbi.nlm.nih.gov/pmc/articles/PMC2953858/
[218]INREJUUL_00278408.
[219]INREJUUL_00014159-INREJUUL_00014226.
[220]INREJUUL_00002526-INREJUUL_00002625.

previous e-cigarette experience from the criteria for inclusion in CH-1401 resulted in artificially deflated Cmax results.[221]

235.    The Cmax recorded in the Phase 1 study was approximately a third of that achieved by smoking a cigarette. Specifically, e-cigarette users recorded a Cmax of approximately 12.87 ng/ml, compared with the 31.47 ng/ml Cmax resulting from smoking a Pall Mall.[222]

236.    In possession of the results from both the Phase 0 and Phase 1 studies, JLI nevertheless decided to launch a 5% nicotine salt solution as its commercial product. An internal memo explained JLI's reasoning as follows: "[s]ince the Cmax of the [2%] nicotine salt was about 1/3 that of cigarettes, we chose a concentration of 5% for our commercial product (JUUL), which should provide a Tmax and Cmax consistent with a cigarette."[223]

237.    Instead of testing a 5% solution, JLI estimated the Cmax result of a 5% nicotine solution using a model.[224] But the Phase 0 data showed that a 4% benzoic acid / 5% nicotine solution would have a higher Cmax and AUC than those of a cigarette, not one that was equal.

238.    JLI and the Management Defendants knew that JLI's studies indicated that their 5% solution product was more potent and more addictive than a typical cigarette. But JLI and the Management Defendants then used their unsupported extrapolation of their flawed studies to market JUUL as providing a nicotine experience on par with a cigarette, even though they designed JUUL to ensure that was not true. In reality, there were never any measured test results in accord with JLI's marketing to distributors, retailers, and the public at large.

239.    In the United States, the unsupported extrapolations from what appears to be the Phase 1 study were used to create charts, which JLI posted on its website, shared with journalists, sent to retailers, and distributed to third party promoters, showing that JUUL's 5% solution

---

[221]Id.
[222]Id.
[223]INREJUUL_00351717-INREJUUL_00351719.
[224]Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 79

achieved a pk profile just below that of a cigarette. For example, the following chart appeared on the online publication TechCrunch:[225]



240.    Simultaneously, while providing extrapolated data to the public, Phase 1 was used as the basis for representations to retailers that a 2% solution achieved a pk profile equaling that of a



[225]Ryan Lawler, *Vaporization Startup Pax Labs Introduces Juul, Its Next-Gen-E-Cigarette*, Tᴇᴄʜ Cʀᴜɴᴄʜ (Apr. 21, 2015), https://techcrunch.com/2015/04/21/pax-juul/.

[PROPOSED] SECOND AMENDED COMPLAINT - 80

cigarette. In a pitch deck dated March 25, 2015, and labeled as being intended for the convenience store distributor Core-Mark, JLI presented interim[226] Phase 1 data showing this equivalence:[227]

241.    These misrepresentations to the public were not accidental, nor were they the work of a rogue employee. In a June 2014 Ploom Board meeting in London, the Ploom executives' presentation to the Board, which at that time included Defendants Bowen, Monsees, Pritzker, and Valani, explained the differences between the Phase 0 and Phase 1 results as "due to averaging across more subjects with variability in puffing behavior."[228] Their explanation did not note that "variability in puffing behavior" was partly a result of the fact that participants in the Phase 0 study were experienced e-cigarette users whereas the participants in the Phase 1 study were not. Thus, Defendants Bowen, Monsees, Pritzker, and Valani were privy to both the Phase 0 and Phase 1 results. And they knew that the data JLI (then Ploom) was pushing on the public was false and misleading, but none made any efforts to correct or withdraw those false and misleading statements. Aside from submitting the testing protocol and results of the Phase 0 study with the '895 patent, JLI, Bowen, Monsees, Pritzker, and Valani otherwise ignored the Phase 0 study and omitted it from public discussion of JUUL's nicotine delivery.

**JLI, the Management Defendants, and Altria Transmitted, Promoted, and Utilized Statements Concerning JUUL's Nicotine Content that They Knew Was False and Misleading**

242.    As set forth above, the statements in JLI advertisements and on JUUL Pod packaging that each JUUL Pod contains about as much nicotine as a pack of cigarettes are deceptive, false and misleading. Defendants knew this.

---

[226]*See* JLI00363360.
[227]INREJUUL_00448896.
[228]INREJUUL_00016443-INREJUUL_00016507.

[PROPOSED] SECOND AMENDED COMPLAINT - 81

243.   JLI and the Management Defendants caused deceptive, false and misleading statements that a JUUL Pod had an equivalent amount of nicotine as one pack of cigarettes to be distributed via the wires and mails. These Defendants have thus materially misrepresented the nicotine content of JUUL Products to the consuming public including Walker McKnight, through acts of mail and wire fraud.

244.   By no later than October 30, 2016 (and likely earlier), the JLI Website—which, as discussed above, the Management Defendants on JLI's Board of Directors reviewed and approved—advertised that "[e]ach JUUL Pod contains 0.7mL with 5% nicotine by weight, approximately equivalent to 1 pack of cigarettes or 200 puffs."[229] The language on the website would later change, but still maintained the same fraudulent misrepresentation—i.e., that "[e]ach 5% JUUL Pod is roughly equivalent to one pack of cigarettes in nicotine delivery."[230]

245.   As noted above, JLI and the Management Defendants directed and approved the content of the JUUL website, and they also directed and approved the distribution channels for JUUL Pods and deceptive, misleading and fraudulent statements regarding JUUL's nicotine content. And although they knew that these statements, which they caused to be transmitted over the wires and mails, were untrue, JLI and the Management Defendants have made no effort to retract such statements or correct their lies. Moreover, by no later than July 2018, James Monsees required JLI employees to personally seek his approval for the artwork on all JUUL and JUUL Pod packaging.[231]

246.   In addition to approving the JLI website, knowing that it contained deceptive, misleading and false statements, JLI (through its employees) and the Management Defendants

---

[229]   JUUL   Pod,   JUUL   Labs,   Inc.   (Oct.   30,   2016), https://web.archive.org/web/20161030085646/https://www.juulvapor.com/shop-pods/.
[230]What is Vaping?, JUUL Labs, Inc. (July 2, 2019), https://www.JUUL.com/resources/What-is-Vaping-How-to-Vape.
[231]JLI10045538.

also were directly responsible for the interstate transport, via U.S. mail, of JUUL Pod packaging contained misrepresentations and omissions. At the same Board Meeting where Defendants Pritzker, Huh, and Valani were installed as the Executive Committee, the Board directed JLI's management on, among other things, "the need to rely on distributors and the challenges in reaching customers otherwise."[232]

247.    JUUL Pod packages that were sent via U.S. mail stated that a single Juul Pod is "approximately equivalent to about 1 pack of cigarettes."[233] These statements, as well as the statements on the JLI website, are false and misleading.

248.    The statement on the JLI website, and in its advertisements and packaging, that each JUUL Pod contains 5% nicotine and is approximately equivalent to a pack of cigarettes is false and likely to deceive and mislead, because the actual amount of nicotine contained in a JUUL Pod is as much as twice as high as that in a pack of cigarettes.

249.    AGDC and Altria Client Services greatly expanded the reach of this fraud by providing their retail and distribution might for JLI products, causing millions of JUUL Pods to be sent via U.S. mail with packaging stating that JUUL Pods contain only 5% nicotine by weight and are "approximately equivalent to about 1 pack of cigarettes."[234] JLI, the Management Defendants, and the Altria Defendants knew that these statements were false and misleading, but nevertheless utilized JUUL Product packing, marketing and advertising to maintain their fraud.

250.    The Altria Defendants knew in 2017 that a JUUL Pod delivered more nicotine than one pack of cigarettes. In 2017, Altria, through its wholly owned subsidiary Nu Mark, launched its MarkTen Bold e-cigarette, a relatively high-strength 4% formulation compared to the 2.5% and 3.5% strength MarkTen products initially offered. Even though JUUL was already on store

---

[232] INREJUUL_00278408.
[233] Juul Labs, Inc., Twitter, (Feb. 14, 2018), https://twitter.com/JUULvapor/status/963844069519773698.
[234] Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 83

shelves and was rapidly gaining market share with its 5% nicotine formulation, Altria (through Nu Mark) chose to bring a less potent 4% formulation to market.

251.    According to Altria's own pharmacokinetic testing (likely conducted by Altria Client Services) as reflected in the chart below, this 4% less potent formulation was nevertheless sufficient to raise plasma nicotine to levels approaching those generated by combustible cigarettes. In other words, the Altria Defendants' own pharmacokinetic testing suggested the highly addictive nature of a 5% formulation, as such a formulation would readily equal or exceed the nicotine delivery profile of a combustible cigarette.



*Figure 1: Presented at Altria Group Inc.'s November 1, 2017 Investor Day Presentation.*

252.    Based on its own internal knowledge, the Altria Defendants knew that a 5% nicotine formulation would carry more nicotine than one pack of cigarettes. In addition to data Altria and Altria Client Services received from JLI, their due diligence undoubtedly included a careful examination of JLI's intellectual property, including the 895 patent, which provides a detailed overview of nicotine benzoate's pharmacokinetic profile.

253.    Thus, JLI, the Management Defendants, and the Altria Defendants knew that the statement on JUUL Pod packaging that each JUUL Pod contains 5% nicotine and about as much nicotine as a pack of cigarettes is literally false and they intended such statements to mislead. Neither the Altria Defendants nor JLI or the Management Defendants have made any effort to correct or retract the false and misleading statements as to the true nicotine content in JUUL Pods. Instead, they have continued to misrepresent the product's nicotine content and design, with the goal of misleading and deceiving consumers.

254.    From JUUL's pre-release announcements to this day, JLI has continuously represented that each Pod is approximately equivalent to a pack of cigarettes. These claims, which JLI repeats widely in advertisements, press releases, and its web site, have been distributed via the wires and mails and disseminated by reputable and widely reliable sources that accepted those representations as true.[235]

255.    Not only have JLI and the Management Defendants misrepresented or concealed the actual amount of nicotine consumed via JUUL Pods, but they also did not effectively or fully inform users about the risks associated with the potent dose of nicotine delivered by JLI's products. Despite going through numerous revisions since 2015, the JUUL packaging did not include nicotine addiction warnings until JLI was forced to add them in August 2018. The original JUUL Product labels had a California Proposition 65 warning indicating that the product contains

---

[235] *See* Truth Initiative, *6 Important Facts about Juul*, https://truthinitiative.org/research-resources/emerging-tobacco-products/6-important-facts-about-juul; Erin Brodwin, *An E-cigarette with Twice the Nicotine of Comparable Devices is Taking over High Schools – and Scientists are Sounding the Alarm*, BUSINESS INSIDER (Apr. 30, 2018), https://www.businessinsider.com/juul-e-cig-vaping-health-effects-2018-3; Caroline Kee, *Everything you Need to Know About the JUUL, Including the Health Effects*, BUZZFEED NEWS (Feb. 5, 2018), https://www.buzzfeednews.com/article/carolinekee/juul-ecigarette-vape-health-effects; Jan Hoffman, *The Price of Cool: A Teenager, a Juul and Nicotine Addiction*, NEW YORK TIMES, (November 16, 2018), https://www.nytimes.com/2018/11/16/health/vaping-juul-teens-addiction-nicotine.html; Sarah Milov, *Like the Tobacco Industry, E-cigarette Manufacturers are Targeting Children*, THE WASHINGTON POST, (Sept. 23, 2018) https://www.washingtonpost.com/outlook/2018/09/23/like-tobacco-industry-e-cigarette-manufacturers-are-targeting-children/; Washington State Dep't of Health, *What are Vapor Products?*, https://www.doh.wa.gov/YouandYourFamily/Tobacco/VaporProducts.

a substance known to cause cancer, and a warning to keep JUUL Pods away from children and pets, but contained no warnings specifically about the known effects, or unknown long-term effects, of nicotine or consuming e-cigarettes/inhaling nicotine salts.[236]

256.    Moreover, the form of nicotine JUUL Pods contain is particularly potent. JUUL's use of "strength" to indicate concentration by weight is also at odds with the industry standard of reporting concentration by volume,[237] leading consumers to believe it contains less nicotine than other formulations advertised as 6% nicotine, when JUUL Pods in fact contain approximately the same nicotine as a solution that is 6% nicotine by volume.

257.    The "5% strength" statement in Defendants' advertisements misrepresents the most material feature of the JUUL Product—the nicotine content—and has misled consumers to their detriment. Resellers, apparently assuming that "5% strength" means "50mg/ml" nicotine by volume, compound confusion among consumers by stating that JUUL Pods contain "50 mg/ml," which they do not.[238]

258.    If JLI and the Management Defendants did not know when JLI released JUUL Pods that the "5% strength" representation in Defendants' advertisements was misleading, they learned that there was widespread confusion about the JUUL Pods' nicotine content. By 2017,

---

[236]*See* INREJUUL_00444332 (2015 image of JLI packaging). Note that JLI packaging originally included such warnings about nicotine, but were apparently removed during various rounds of revisions, *see e.g.* INREJUUL_00021583 (2014 image of JLI packaging containing handwritten revisions of the original language.).

[237]*See, e.g.*, American E-Liquids Manufacturing Standards Association, *E-Liquids Manufacturing Standards*, § 1.05 (2017), https://www.aemsa.org/wp-content/uploads/2017/03/AEMSA-Standards-v2.3.3.pdf, (quantifying e-liquid nicotine content in terms of volume).

[238]        *See, e.g.*, Tracy Vapors, Starter Kit, http://web.archive.org/web/20190422143424/https://www.tracyvapors.com/collections/starter-kit; Lindsey Fox, *JUUL Vapor Review, E-cigarette Reviewed,* (Mar. 20, 2017), https://ecigarettereviewed.com/juul-review ("The nicotine content of the JUUL pods is always the same: 5% or 50 mg/ml"); Jason Artman, *JUUL E-Cigarette Review*, eCig One (Oct. 26, 2016) https://ecigone.com/e¬cigarette-reviews/juul-e-cigarette-review/ ("the e-liquid contains 50 mg of nicotine per ml of e-liquid"); West Coast Vape Supply, Juul Starter Kit (July 18, 2019), http://web.archive.org/web/20190718190102/https://westcoastvapesupply.com/products/juul-starter-kit ("5% . . . 50 mg"); Vapor4Life, *How Much Nicotine is In a JUUL?* (Aug. 24, 2018), https://www.vapor4life.com/blog/how-much-nicotine-is-in-a-JUUL/. "Each official JUUL pod contains a whopping 50mg of nicotine per milliliter of liquid (most other devices range from 3 to 30mg per milliliter."

[PROPOSED] SECOND AMENDED COMPLAINT - 86

studies revealed that smokers did not understand "5% strength," and some understood that phrase to mean 5% of a cigarette. Though this was identified as a "pain point" for new users,[239] JLI and the Management Defendants (and later the Altria Defendants) did nothing to stop or correct this confusion about the nicotine content.

259.    The "5% strength" statement in Defendants' advertisements is also misleading. At least two independent studies testing multiple varieties of JUUL Pods have likewise found significantly higher concentrations of nicotine than the 59 mg/mL JUUL's website represents, suggesting that the difference in the total nicotine content of a JUUL Pod vs. a pack of combustible cigarettes could be even greater.[240]

**Defendant Used Food and Coffee Themes to Give False Impression that JUUL Products Were Safe and Healthy**

260.    In late 2015, JLI and the Management Defendants employed a deceptive marketing scheme to downplay the harms of e-cigarettes with a food-based advertising campaign called "Save Room for JUUL." The campaign framed JUUL's addictive Pods as "flavors" to be paired with foods.[241] JLI described its Crème Brûlée nicotine Pods as "the perfect evening treat" that would allow users to "indulge in dessert without the spoon."[242]  In one 2016 email, JLI bluntly suggested that users satisfy their sugar cravings with JUUL's highly addictive nicotine vapor:

---

[239]INREJUUL_00123540.

[240]*See* J.F. Pankow et al., *Benzene Formation in Electronic Cigarettes*, 12 PLoS ONE 1 (2017); *See also* Anna K. Duell, et al., *Free-Base Nicotine Determination in Electronic Cigarette Liquids by 1H NMR Spectroscopy*, 31 CHEM. RES. TOXICOL. 431, 431-34 (2018).

[241]Erin Brodwin, *$15 Billion Startup JUUL Used 'Relaxation, Freedom, and Sex Appeal' to Market its Crème-brulee-flavored E-cigs on Twitter and Instagram—but its Success has Come at a Big Cost*, BUSINESS INSIDER (Oct. 26, 2018), https://www.businessinsider.com/juul-e-cig-marketing-youtube-twitter-instagram-social-media-advertising-study-2018-10.

[242]    Stanford    University,    *Research    into    the    Impact    of    Tobacco    Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img360 19.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors.

[PROPOSED] SECOND AMENDED COMPLAINT - 87

"Have a sweet tooth? Try Brulee."[243] JLI similarly promoted the fruit medley Pods using images of ripe berries.[244] JLI described its "Cool" Mint Pods as having a "crisp peppermint taste with a pleasant aftertaste" and encouraged consumers to "Beat The August Heat With Cool Mint."[245]





---

[243]    Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img360 19.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors.
[244]    Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_web/images/pod/juul/flavors/large/flavor_6.jpg.
[245]    Stanford University, *Research into the Impact of Tobacco Advertising*, http://tobacco.stanford.edu/tobacco_main/images_pods.php?token2=fm_pods_st658.php&token1=fm_pods_img360 19.php&theme_file=fm_pods_mt068.php&theme_name=JUUL&subtheme_name=Flavors.

261.    Again, none of these advertisements disclosed that JUUL was addictive and unsafe.

262.    In several caffeine-pairing advertisements, JUUL devices or Pods sit next to coffee and other caffeinated drinks, sometimes with what appear to be textbooks in the picture.[246] JLI's coffee-based advertisements suggest that JUUL should be part of a comfortable routine, like a cup of coffee.

263.    JLI's reference to coffee is no mere marketing gimmick, it reflects the larger effort to mislead customers into believing that JUUL is no more harmful than coffee, reinforcing the false and dangerous concept that if a substance is "not harmful," then addiction to that substance cannot be harmful.



---

[246]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 89

264.    Defendants knew that tying JUUL to caffeine and food would mislead their target audience—youth and non-smokers—into believing that JUUL was a healthy, safe treat.

**JLI's "Make the Switch" Campaign Intentionally Misled and Deceived Users to Believe that JUUL Is a Cessation Device**

265.    JLI, the Altria Defendants, and the Management Defendants recognized that one of the keys to growing and preserving the number of nicotine-addicted e-cigarette users (and thus JLI's staggering market share), was to mislead potential customers about the true nature of JUUL Products. Defendants knew that if it became public that JUUL was designed as a way to introduce nicotine to youth and otherwise hook new users with its potent nicotine content and delivery, it would not survive the public and regulatory backlash. Therefore, JLI (with the knowledge and support of the Management Defendants) and the Altria Defendants repeatedly made false and misleading statements to the public that JUUL was created and designed as a smoking cessation device, and falsely and misleadingly used the mails and wires to spread the subterfuge. JLI, the Management Defendants, and the Altria Defendants committed these deceptive, misleading and fraudulent acts intentionally and knowingly. In making these representations, JLI, the Management Defendants, and the Altria Defendants intended that consumers, the public, and regulators rely on misrepresentations that JUUL Products were designed to assist smoking cessation.

266.    The most blatant evidence of the cover-up scheme was the January 2019, $10 million "*Make the Switch*" television advertising campaign. This campaign, which was a continuation of JLI's web-based Switch campaign, was announced less than a month after the Altria Defendants announced Altria's investment in JLI.

267.    The "*Make the Switch*" television ads featured former smokers aged 37 to 54 discussing "how JUUL helped them quit smoking."[247] According to JLI's Vice President of Marketing, the "*Make the Switch*" campaign was "an honest, straight down the middle of the fairway, very clear communication about what we're trying to do as a company."[248] These statements were false as JUUL was not intended to be a smoking cessation device. JLI and the Management Defendants committed acts of wire fraud when they caused the "Make the Switch" campaign to air on television with the fraudulent intent of deceiving and misleading the public, the United States Congress, and government regulators into believing that JLI is and had been focused solely on targeting adult smokers. The Altria Defendants also committed acts of mail fraud when they caused tens of thousands, if not millions, of written versions of the Make the Switch campaign to be distributed with packages of Altria's combustible cigarettes.

268.    The "*Make the Switch*" campaign was fraudulent and was made to protect, maintain, and expand the tremendous market share gained by lying to consumers and hooking youth on nicotine by convincing regulators and the public that JUUL was actually as cessation device and JLI's marketing was never aimed at youth.

269.    Defendants continually and intentionally sought to frame JUUL Products as smoking cessation devices in their public statements and on their website as part of their scheme to mislead and defraud the public. Defendant Monsees explained during his testimony before Congress:

> *The history of cessation products have extremely low efficacy. That is the problem we are trying to solve here. So, if we can give consumers an alternative and market it right next to other cigarettes, then we can actually make something work.*

---

[247] Angelica LaVito, *JLI Combats Criticism with New TV Ad Campaign Featuring Adult Smokers Who Quit after Switching to E-cigarettes*, CNBC (Jan. 8, 2019), https://www.cnbc.com/2019/01/07/juul-highlights-smokers-switching-to-e-cigarettes-in-ad-campaign.html.
[248] *Id.*

*[T]raditional nicotine replacement therapies, which are generally regarded as the gold standard for tools, right, for quitting, those are nicotine in a patch or a gum form, typically, and the efficacy rates on those hover just below about a 10 percent or so. JUUL-we ran a very large study of JUUL consumers, ex-smokers who had picked up JUUL, and looked at them, looked at their usage on a longitudinal basis, which is usually the way that we want to look at this, in a sophisticated fashion ... what we found was that after 90 days, 54 percent of those smokers had stopped smoking completely, for a minimum of 30 days already. And the most interesting part of this study is that if you follow it out further, to 180 days, that number continues to go up dramatically, and that is quite the opposite of what happens with traditional nicotine replacement therapies.*[249]

270.    In response to a direct question about whether people buy JUUL to stop smoking, Defendant Monsees responded: "Yes. I would say nearly everyone uses our product as an alternative to traditional tobacco products."[250]

271.    Following Defendants Monsees' and Altria's lead, Defendants caused a number of other misleading public statements—suggesting that Juul would help existing adult smokers even though it delivered more nicotine than cigarettes and was designed to appeal to kids—to be made, including the following:

o       "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use cigarettes, and where adults who smoke cigarettes have

---

[249] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://oversight.house.gov/legislation/hearings/examining-juul-s-role-in-the-youth-nicotine-epidemic-part-ii.
[250] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 92

the tools to reduce or eliminate their consumption entirely, should they so desire." (JLI Website, April 2018 (or earlier));[251]

    o     "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." (JLI Website, September 19, 2019); and[252]

    o     "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018);[253]

    o     "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." (Altria Website, December 20, 2018);[254]

    o     "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." (Letter to FDA Commissioner Gottlieb, 10/25/18);[255]

    o     "We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction. Through Juul, we are making the biggest investment in our history toward that goal." (Altria Press Release, Dec. 20, 2018);[256]

---

[251]*Our Mission*, JUUL Labs, Inc. (2019), https://www.juul.com/mission-values.
[252]CONSUMER UPDATE: 9/19, JUUL Labs, Inc. (Sept. 19, 2019), https://newsroom.juul.com/consumer-update-9-19/.
[253] JLI Labs Action Plan, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan (statement of then-CEO Kevin Burns).
[254]*Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BUSINESSWIRE (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[255]Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 1-2 (Oct. 25, 2018).
[256]*Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, (Dec. 20. 2018), BUSINESS WIRE, https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

[PROPOSED] SECOND AMENDED COMPLAINT - 93

o    "Through JUUL, we have found a unique opportunity to not only participate meaningfully in the e-vapor category but to also support and even accelerate transition to non-combustible alternative products by adult smokers." (Altria Earning Call, January 31, 2019);[257] and

o    We expect the JUUL Product features that have driven JUUL's success in switching adult smokers in the U.S. to strongly appeal to international adult cigarette smokers. (Altria Earning Call, January 31, 2019).[258]

272.    Defendants knew that the "switch" messaging they initiated for JUUL was false, deceptive and misleading. JUUL does not have FDA approval as a cessation product. The Switch advertisements reinforced the impression left by the testimony of JLI's co-founder, clearly linking JUUL to cessation and quitting. For example:



[257]Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018, (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.
[258]Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 94

273.    Representative Rashida Tlaib, upon presenting this ad to Monsees, had the following exchange:

*Rep. Tlaib: After 30 lines, starting with "quit," the ad says "switch," followed by no further mentions of start smoking again. You were a smoker. Does this ad give a smoker hope that there might be a way to quit cigarettes for good?*

*Mr. Monsees: I think the intention of this ad is to make it very clear to consumers that there is an alternative, finally, to combustible cigarettes. I am one of those people.*[259]

274.    Defendants' tacit message in their Switch advertisements is: switch because, unlike cigarettes, JUUL is harmless to your health.

275.    Defendants' false, deceptive and misleading Switch campaign suggests that purchasing a JUUL will "switch" a smoker to a non-smoker and that it was designed to switch adult smokers off cigarettes rather than addict youth to nicotine.

276.    Defendants know that a large number of smokers who use JUUL Products do not end up switching but instead end up consuming both cigarettes and JUUL.

277.    Moreover, Defendants know that, by design, a large number of their customers are first-time youth users and that JUUL was never designed to be a cessation device.

278.    JLI has advertised cost-savings calculators as part of its Switch campaign. Those calculators assume that a smoker who switches will continue consuming the same amount of nicotine that he or she did as a smoker (i.e., a pack a day smoker is presumed to consume one JUUL Pod a day). Defendants know that the calculator is misleading because smokers who switch to JUUL frequently increase their nicotine intake.

---

[259] *Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://www.c-span.org/video/?c4811191/user-clip-wasserman-grothman-tlaib-question-monsees at 12:33-13:04.

279.    JUUL labels and advertisements also marketed the product as an "alternative" to cigarettes:



280.    Other advertisements similarly marketed the product as smoking "evolved":



281.    The goal of these advertisements was to convey the deceptive, misleading and false impression that JUUL Products could help consumers quit smoking and break nicotine addiction in a way that was healthy and safe. But, as noted above, that was simply not the case. Defendants never disclosed to consumers that JUUL e-cigarettes and JUUL Pods are at least as,

if not more, addictive than combustible cigarettes. And each of JLI, the Management Defendants, and the Altria Defendants received data to this effect, as discussed above, and were aware of this fact.

282.    In addition, the notions that JUUL Products are designed only for existing cigarette smokers, and safer than combustible cigarettes are belied by JLI's own knowledge, marketing plan and intentions on several fronts. First, Defendants sought to grow a new group of consumers of nicotine products (e.g., "vapers"), not just to market to the shrinking number of existing cigarette smokers. Second, JLI and Bowen designed the JUUL device to be easy to use for youth and others who have never smoked and to create and exacerbate nicotine addiction by encouraging ingestion of excessive amounts of nicotine. Third, as noted above, JLI's own internal testing revealed that JUUL Products were often more potent than combustible cigarette smokers prefer. Each of the Management Defendants knew this from his position on JLI's Board of Directors, and the Altria Defendants knew the same when they began to actively coordinate with JLI and the Management Defendants. Despite this knowledge, these Defendants made numerous deceptive, false and misleading public statements that JUUL was intended to be a cessation device.

283.    JUUL is not a product adults typically use to quit smoking. Researchers have found that as of 2018, only 7.9% of American adults had ever used USB shaped e-cigarette devices, like JUUL, and only 2% of adults currently used them.[260] By contrast, a recent study found that 15- to 17-year-olds are sixteen times more likely to use JUUL Products than 25 to 34-year-olds.[261]

_____

[260]Kristy L. Marynak et al., *Use and Reasons for Use of Electronic Vapour Products Shaped like USB Flash Drivers Among a National Sample of Adults*, 28 TOBACCO CONTROL 685 (Nov. 2019), https://tobaccocontrol.bmj.com/content/28/6/685.
[261]D.M. Vallone et al., Prevalence and Correlates of JLI Use Among a National Sample of Youth and Young Adults, TOBACCO CONTROL (Oct. 29, 2018), http://dx.doi.org/10.1136/tobaccocontrol-2018-054693.

[PROPOSED] SECOND AMENDED COMPLAINT - 97

284.    JLI's own marketing research indicated that JUUL was not appropriate as a cessation device for adults. In 2014, JLI, when it was called Ploom, hired the consumer research firm Tragon to do research with prototypes of the JUUL e-cigarette. On September 30, 2014, Lauren Collinsworth, a consumer researcher at Tragon, e-mailed Chelsea Kania, a marketing employee at Ploom, with some of the preliminary results from the studies. She stated that the testing showed that "the younger group is open to trying something new and liked J1 [the JUUL prototype] for being smart, new, techy, etc."[262] Ms. Collinsworth added that "The qualitative findings suggested this product isn't going to fit as well with consumers who are looking to cut back on the cigarette intake."[263] On October 1, 2014, Ms. Collinsworth followed up with additional comments. She stated that "[t]he delivery was almost too much for some smokers, especially those used to regular e-cigarettes."[264] The final results from this consumer research were distributed to upper management, including to then-CEO James Monsees[265] and then-Chief Marketing Officer Richard Mumby.[266]

285.    The deceptive, misleading and fraudulent nature of the "Make the Switch" campaign is evident when comparing the campaign's advertisements to JUUL's initial advertising, as demonstrated below. The fact that these advertisements are for the same product confirms that, notwithstanding the advice JLI and the Altria Defendants received from their media consultants, the Defendants never intended to target only adult smokers.

---

[262]JLI00365905.
[263]*Id.* (emphasis added).
[264]JLI00365709.
[265]JLI00364678.
[266]JLI00364487.

[PROPOSED] SECOND AMENDED COMPLAINT - 98









[PROPOSED] SECOND AMENDED COMPLAINT - 99

286.    Defendants ensured that JUUL was the *opposite* of a "tool[] to reduce or eliminate" nicotine consumption. According to the National Institutes of Health, the "amount and speed of nicotine delivery . . . plays a critical role in the potential for abuse of tobacco products."[267] As described above, JLI and Bowen designed the JUUL Product to deliver nicotine in larger amounts and at a faster rate than even cigarettes, and then knowingly misled the public about those facts.

287.    The *Switch* campaign also does not disclose or warn about the risks of using multiple tobacco products, "dual use" or that the JUUL is not a smoking cessation product. In addition to the heightened risks of addiction that multiple tobacco product use poses, one recent study found that persons who use e-cigarettes and smoke have blood toxin levels far higher than one would expect given the blood toxin levels that e-cigarettes and cigarettes generate individually.[268]

288.    The FDA and other government regulators, enforcing existing laws addressing e-cigarettes,[269] publicly criticized the "Make the Switch" campaign and other efforts by Defendants to depict JUUL as a smoking cessation device. Section 911(b)(2)(A)(i) of the Federal Food, Drug, and Cosmetics Act (FDCA) (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."[270]

---

[267]U.S. Dep't of Health & Human Servs., Nicotine Addiction: Past and Present, How Tobacco Smoke Causes Disease (2010), https://www.ncbi.nlm.nih.gov/books/NBK53018/#ch4.s92.
[268]Julie B. Wang  et al., *Cigarette and E-Cigarette Dual use and Risk of Cardiopulmonary Symptoms in the Health eHeart Study*, 13 PLoS ONE 1 (2018).
[269]Section 911(b)(2)(A)(i) of the FDCA (21 U.S.C. § 387k(b)(2)(A)(i)) states that when advertising or labeling of a cigarette product directly or indirectly suggests that the product has a lower risk of cigarette-related disease, is less harmful than traditional cigarettes, or is otherwise 'safer' than traditional cigarettes, then the product becomes a "modified risk tobacco product."
[270]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 100

289.    In late 2019, and in response to the House of Representatives hearings in which JLI executives testified, the FDA issued two warning letters to JLI detailing its concern that JLI was unlawfully marketing its e-cigarette products as cessation tools or as "modified risk tobacco products" within the meaning of the FDCA.[271]

290.    Then, in its September 9, 2019 letter to JLI, the FDA notified JLI that its advertising slogans such as "99% safer," "much safer," and "a safer alternative" than cigarettes was "particularly concerning because [those] statements were made directly to children in school."[272] The FDA concluded that in using advertising language that e-cigarettes were safer than cigarettes, JLI had violated Sections 902(8) and 911 by marketing JUUL Products as "modified risk tobacco products" without prior approval.[273]

291.    The September 9, 2019 letter also detailed the FDA's concerns with JLI's "Switch" marketing campaign. "[T]roubled by recent testimony" that JLI had given to the House Subcommittee on Economic and Consumer Policy of the Committee on Oversight and Reform, the FDA noted that JLI's Switch advertising campaign "may also convey that switching to JUUL is a safer alternative to cigarettes."[274]

292.    The FDA specifically highlighted the Switch campaign slogans which referenced smoking cigarettes, or attempts to quit smoking, followed by "Make the Switch." The FDA stated that JLI's campaign was in violation of multiple FDA regulations and the FDCA subsections, and that JLI's Switch campaign purported to tell the public that using e-cigarettes was an alternative to smoking, or a possible cessation tool.[275]

---

[271] Letter from U.S. Food and Drug Admin. to Kevin Burns, CEO of JUUL Labs, Inc., (Sept. 9, 2019), https://www.fda.gov/inspections-compliance-enforcement-and-criminal-investigations/warning-letters/juul-labs-inc-590950-09092019.
[272] Id.
[273] Id.
[274] Letter from U.S. Food and Drug Admin. Ctr. for Tobacco Prods. to JUUL Labs, Inc. (Sept. 9, 2019), https://www.fda.gov/media/130859/download.
[275] Id.

293.    On the same day, the FDA requested that JLI provide all documents related to its decision to market the Switch campaign to the Cheyenne River Sioux Tribe, in light of the testimony by JLI that it had taken a "public health" approach to Native American tribes, and had sought healthcare professionals to refer Native American smokers to JLI's Switching Program.[276]

294.    Perhaps unsurprisingly, the Make the Switch campaign was spearheaded by a marketing firm with long-standing ties to the cigarette industry. In particular, it was led by a subsidiary of Omnicom Group, Inc., one of the "Big Four" advertising holding companies dominating marketing and communications worldwide since the 1990s, second only to WPP. Omnicom is the parent company of Mercury Public Affairs which, by at least April 2018, counted both Altria and JLI as its clients. Mercury lobbied for Altria on tobacco regulations,[277] and helped JLI push back against negative press coverage of youth usage of its products.[278]

295.    For example, on April 2, 2018, a managing director from Mercury, Erick Mullen, emailed Defendant Valani and Daniel Cruise, Chief Public Affairs Officer at JLI, with a numbered list of actions in response to The New York Times article published that day, "'I Can't Stop': Schools Struggle With Vaping Explosion."[279] ███████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████[280]

---

[276] *Id.*
[277] Kevin McCauley, *Altria Taps Mercury For Tobacco Regulation Work*, O'DWYER'S (Jun. 4, 2018), https://www.odwyerpr.com/story/public/10754/2018-06-04/altria-taps-mercury-for-tobacco-regulation-work.html.
[278] *See, e.g.*, INREJUUL_00262168; INREJUUL_00262226-INREJUUL_00262227.
[279] *See* INREJUUL_00262168; *see also* Kate Zernike, *'I Can't Stop': Schools Struggle With Vaping Explosion*, N.Y. Times (Apr. 2, 2018), https://www.nytimes.com/2018/04/02/health/vaping-ecigarettes-addiction-teen.html.
[280] INREJUUL_00262168.

[PROPOSED] SECOND AMENDED COMPLAINT - 102

296.    Defendant Valani and Cruise each separately forwarded the email to JLI CEO Kevin Burns, with Cruise commenting, ███████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[281]

297.    ███████████████████████████████  ██████████  ██████████████

████████████████████████████████████████████████████████████████████

██████████████  ██  ██████████████████████████

**JLI, Altria, and Others in the E-Cigarette Industry Coordinated with Third-Party Groups to Mislead the Public About the Harms and Benefits of E-Cigarettes**

298.    Through a collective and parallel effort of funding, leadership, and board membership, JLI, the Altria Defendants and others in the e-cigarette industry leveraged third parties, ranging from industry-funded non-governmental organizations to online blogs more accessible to youth, to mislead the public about the impacts of consuming e-cigarettes.

299.    An assortment of lobbyists, trade associations, and online publications have coordinated with the e-cigarette industry, including JLI and the Altria Defendants, to promote a consistent message that consuming e-cigarettes is not harmful, that nicotine is not harmful, and that the impacts of e-cigarettes are greatly exaggerated. These organizations receive funding from the e-cigarette industry, feature executives on those companies' boards of directors, and in return, promote industry products, industry views, or fund "independent" studies of their own that reach the same conclusions as e-cigarette industry-funded research.

---

[281]INREJUUL_00262226-227.
[282]*See* INREJUUL_00066530-539 ████████████████████████████████
████████████████████████████████████████████).
[283]*See* INREJUUL_00074841; *see also* INREJUUL_00074842-844 at 842.

**The American Vaping Association**

300.    The American Vaping Association ("AVA") is a pro-e-cigarette lobby group founded by Greg Conley, who notably publishes articles criticizing the CDC for its stance on restricting e-cigarette use.[284] Other executive members of the AVA possess business interests in e-cigarettes; for example, Treasurer David J. Danzak Jr. is associated with an e-cigarette business called Vapornine LLC.[285] Vice-President Antoinette Lanza is an owner of an exclusively e-cigarette shop in Hoboken, New Jersey called Smokeless Image.[286] Half of the AVA's functional expenses are for lobbying efforts.[287] It lists several sponsors, all of which are e-cigarette, e-liquid, or cigarette companies.[288]

301.    Conley has a prolific social media presence and frequently appears on television and radio to tout the benefits of consuming e-cigarettes and dispute negative news. The AVA website lists "studies" which are uniformly authored by noted industry-funded or industry-friendly authors, such as Polosa and Shahab.[289] AVA lists CASAA, Not Blowing Smoke, and the VTA, all established fronts for the e-cigarette industry, as "Resources."

302.    The AVA receives its funding from sponsors, who are organized into tiers such as Platinum, Gold, Silver, Bronze, and Green.[290] Current advertised sponsors include e-cigarette distributors and retailers such as E-Cigarette Empire, and VaporBeast.[291] Prior sponsors are a

---

[284] Jeff Stier & George Conley, *The War on E-Cigarettes*, NATIONAL REVIEW (Sept. 19, 2011), https://www.nationalreview.com/2011/09/war-e-cigarettes-jeff-stier-gregory-conley/.

[285] Vapornine LLC, BUZZFILE, http://www.buzzfile.com/business/Vapornine-LLC-904-372-3244 (business information page).

[286] Stacy Jones, *Tobacco Regulators Mull More Oversight as E-cigarettes See Increased Popularity*, NJ.com (Mar. 30, 2019), https://www.nj.com/business/2013/07/tobacco_regulators_mull_more_o.html.

[287] Form 990, American Vaping Association Inc.'s Return of Organization Exempt from Income Tax ( 2018), https://apps.irs.gov/pub/epostcard/cor/464203951_201812_990O_2019122716980021.pdf.

[288] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.

[289] Research Reports, American Vaping Association, https://vaping.org/research-report/.

[290] AVA Sponsors, American Vaping Association, https://vaping.org/about-us/ava-sponsors/.

[291] *Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 104

who's who of e-cigarette retailers. In 2016, Platinum sponsors included AltSmoke and Vapor Kings, while Gold sponsors included the now defunct Smokeless Image.[292]

303.    On social media, the AVA regularly downplays the risks of consuming e-cigarettes, criticizes negative coverage as myths or exaggerations, and lauds efforts to curb any regulation of the e-cigarette industry.[293]

304.    JLI actively sought out the AVA to promote JUUL. In January 2016, e-mails between employees at JLI (then known as PAX) discussed a "list of thought leaders [JLI] can tap for stories for JUUL" which included Conley at the AVA and Satel.[294]

305.    In 2018, JLI took advantage of its coordinated efforts with the AVA to downplay the risks associated with JUUL. In an e-mail exchange between Christine Castro of JLI and a "Stratcomms" internal mailing list, Castro lamented a "testy conversation" with a USA Today reporter who pointed out that JLI's marketing and advertising appeared to feature and target minors and teenagers.[295] Castro noted that "I hit back at [the reporter] very aggressively but we can expect the usual B.S. Greg Conley is being allowed to write a 300-word rebuttal. I will email him and copy you Ashley [JLI employee] just so we can stay coordinated."[296]

306.    The AVA also coordinated with JLI on pro-e-cigarette research. In March 2018, Conley facilitated a conversation between Dr. Konstantinos Farsalinos, a researcher at the University of Patras, Greece, who regularly publishes e-cigarette industry-friendly articles, and Gal Cohen, then Director of Scientific Affairs at JLI.[297] In the e-mail, Conley asks Farsalinos to

---

[292] AVA Sponsors, American Vaping Association, Wayback Machine – Internet Archive (Aug. 14, 2017), https://web.archive.org/web/20170814221226/http://vaping.org/about-us/ava-sponsors/.
[293] American Vaping Association (@AVABoard), Twitter, https://twitter.com/AVABoard.
[294] INREJUUL_00278889.
[295] *See* INREJUUL_00173252 (Apr. 4, 2018 email).
[296] *Id.*
[297] Juul Labs, Inc*., JUUL Labs Presents Findings at the Global Forum on Nicotine 2018,* Cision PR Newswire (June 15, 2018) https://www.prnewswire.com/news-releases/juul-labs-presents-findings-at-the-global-forum-on-nicotine-2018 300666743.html.

send Cohen "some info on your flavor study" to which Farsalinos responds by sending Conley and Cohen an attachment: "USA FLAVORS SURVEY.pptx" and the note: "[A]ttached is a PowerPoint presentation about the study we proposed."[298]

307.    The proposed study was a survey aimed at determining what flavors different demographic groups preferred as e-cigarette flavors, which flavors they use frequently, and which flavors they used when they first started consuming e-cigarettes. While the study was purportedly to determine the impact of e-cigarette flavors on e-cigarette and smoking behavior, the data obtained from such a study would have allowed JLI to understand which flavors were not only the most popular, but which flavors were most popular by demographic.[299]

**Vaping360**

308.    Vaping360 is a website dedicated to news regarding the e-cigarette industry. The website boasts "40 million smokers and vaping enthusiasts reached since 2015." This entity has a big social media presence and huge publication strategy.

309.    Vaping360's main message misleads the public about the health impacts of consuming e-cigarettes. Vaping360 has published various articles, including "10 Lies and Myths About Juuling Exposed."[300] This article, published in May 9, 2018, claimed, among other things, that JUUL was not as dangerous as smoking; JUUL did not cause cancer or "popcorn lung"; JUUL was not popular among teenagers, nor did JLI sell kid-friendly flavors or flavors aimed to entice young people; and the nicotine in JUUL is "a relatively mild drug, [and] may cause dependence."[301]

---

[298]INREJUUL_0034128.
[299]*Id*.
[300] Jim McDonald, *10 Lies and Myths About Juuling Exposed*, Vaping 360 (May 9, 2018), https://vaping360.com/lifestyle/juuling/.
[301]*Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 106

310.    Vaping360 regularly published articles praising, promoting, or downplaying the risks of JUUL, including, among others: "These Scientists Want to Kill Smokers' Hope (For Vaping)"; "UK Scientists to WHO: Your Vape Report Is Junk"; "One Free Pack JUUL Coupon Codes 2019"; and an article disparaging anti-smoking advocacy group Truth Initiative by claiming that "Truth Initiative Promo Encourages Risky Teen Behavior."[302]

311.    One of the main writers at Vaping360 is Jim McDonald who aggressively attacks any negative science as fake news. For example, McDonald frequently posts on social media platforms, including on Facebook and Twitter, but also comments on others posts extensively disputing negative news about consuming e-cigarettes.[303]

312.    Vaping360 has taken funding from e-cigarette manufacturers, and in return coordinates with e-cigarette manufacturers to promote their products, while publishing favorable content. Vaping360 was paid by JLI for advertising, and was given kickbacks (referred to as commission) for every coupon used for JUUL that originated from Vaping 360's website.

313.    In March 2017, JLI (then PAX) communicated with Chris Kendell and others at Vaping360 to discuss promoting JLI's products with a 15% discount coupon on Vaping360's website.[304] JLI representative Andy Martin also noted that JLI "figured out the commission issue," and expressed excitement at JLI's new mango flavor JUUL Pod.[305] They also discussed a Facebook advertising link whereby Vaping360 could offer similar discounts for JLI products on social media.[306]

_____

[302] Jim McDonald, *Truth Initiative Promo Encourages Risky Teen Behavior*, Vaping 360 (Jan. 9, 2020), https://vaping360.com/vape-news/87705/truth-initiative-promo-encourages-risky-teen-behavior/.
[303] Jim McDonald, *Mass. Senate Passes Worst Vaping Law in the Country*, Vaping 360 (Nov. 21, 2019), https://vaping360.com/vape-news/86852/mass-senate-passes-worst-vaping-law-in-the-country/; Jim McDonald, *Meet the Rich Moms Who Want to Ban Vaping,* Vaping 360 (Oct. 8, 2018), https://vaping360.com/vape-news/71696/meet-the-rich-moms-who-want-to-ban-vaping/.
[304] INREJUUL_00143870.
[305] *Id*.
[306] *Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 107

314.    In November 2017, Martin of JLI and Rawad Nassif of Vaping360 discussed a meeting agenda, with topics such as "new affiliate commission terms," "JLI funneling [sic] project," and "exploring further opportunities."[307]

315.    In 2018, McDonald continued to write articles specifically praising JLI, such as "Coming Soon: A JUUL to Help You Quit JUULing" and "10 Lies and Myths About JUULing Exposed."[308] As of 2020, Vaping360 continues to offer discounts for JUUL Products.[309]

### Foundation for a Smoke-Free World

316.    The Foundation was founded in 2017, and presents itself as a public health organization, purportedly "advancing global progress in smoking cessation and harm reduction."[310] It is funded entirely by Philip Morris International, which in 2017 announced a $1 billion commitment to fund the Foundation.[311] The Foundation's 2018 Form 990 lists only one donor: PMI Global Services, Inc., or Philip Morris International, with a contribution of $80 million.[312]

317.    The Foundation is headed by Derek Yach, a noted advocate and promoter of e-cigarettes and consuming e-cigarettes.[313]

---

[307]INREJUUL_00139196.

[308] Jim McDonald, *Coming Soon: A JUUL to Help You Quit Juuling,* Vaping 360 (Sept. 7, 2018), https://vaping360.com/vape-news/70262/coming-soon-a-juul-to-help-you-quit-juuling/.

[309] [One FREE Pack] JUUL Coupon Codes 2019, Vaping 360 (Aug. 24, 2018) https://vaping360.com/vape-coupons/juul-coupon-promo-code/.

[310]Foundation for a Smoke-Free World (2020), https://www.smokefreeworld.org/.

[311] David Meyer, *Philip Morris Pledges Almost $1 Billion to Anti-Smoking Fight*, FORTUNE (Sept. 13, 2017), https://www.webcitation.org/6tjyBv4dA.

[312] Return of Private Foundation, Foundation for a Smoke-Free World (2018), https://web.archive.org/web/20190828104138/https://www.smokefreeworld.org/sites/default/files/uploads/documents/fsfw_2018_form_990-pf_public_inspection.pdf.

[313] *Derek Yach: Anti-smoking Advocates Should Embrace E-cigarettes*, NATIONAL POST (Aug. 26, 2015), https://nationalpost.com/opinion/derek-yach-anti-smoking-advocates-should-embrace-e-cigarettes.

[PROPOSED] SECOND AMENDED COMPLAINT - 108

318.     In 2018, the Foundation announced that it would support Centers of Excellence to conduct tobacco control research.[314] This tactic is a well-known tool of the cigarette industry, which has a history of funding "research" centers to promote industry-friendly views, such as the Center for Indoor Air Research, which promulgated industry-funded studies that sowed doubt about the addictiveness of nicotine, claimed that indoor air quality was unaffected by cigarette smoke and downplayed the harms of cigarettes broadly. Institutes such as the Center for Indoor Air Research were forced to dissolve as part of the Master Settlement Agreement in 1998.

319.     A 2017 report in The Verge detailed the e-cigarette industry's apparently coordinated efforts to use biased research to downplay the risks of consuming e-cigarettes.[315] For example, e-cigarette manufacturers routinely conduct studies focusing on the "good news" about e-cigarettes, i.e. they release less harmful aerosolized chemicals than combustible cigarettes, or that their aerosol lingers for less time indoors than combustible cigarettes.[316] Industry-funded authors then regularly cite to each other's studies in their own research.[317] On information and belief, JLI and Altria, among others in the e-cigarette industry, funnel their industry-funded

_____

[314]   Support   Global   Research,   Foundation   for   a   Smoke-Free   World   (May   31,   2018), https://web.archive.org/web/20180531105105/https://www.smokefreeworld.org/our-areas-focus/support-global-research.

[315] Liza Gross, *Vaping Companies are Using the Same Old Tricks as Big Tobacco*, THE VERGE (Nov. 16, 2017), https://www.theverge.com/2017/11/16/16658358/vape-lobby-vaping-health-risks-nicotine-big-tobacco-marketing.

[316] *See, e.g.*, J. Margham, et al., *Chemical Composition of Aerosol from an E-Cigarette: A Quantitative Comparison with Cigarette Smoke*, 29 CHEM. RES. TOXICOL. 1662 (2016); Tanvir Walele et al., *Evaluation of the Safety Profile of an Electronic Vapour Product Used for Two Years by Smokers in a Real-life Setting*, 92 REG. TOXICOL. PHARMACOL. 226 (2018); D. Martuzevicius, et al., *Characterization of the Spatial and Temporal Dispersion Differences Between Exhaled E-Cigarette Mist and Cigarette Smoke*, 21 NICOTINE & TOBACCO RES. 1371 (2019).

[317] *See, e.g.*, Gene Gillman et al., *Determining the Impact of Flavored E-liquids on Aldehyde Production During Vaping*, 112 REG. TOXICOL. PHARMACOL. 1 (2020); Colin Mendelsohn & Alex Wodak, *Legalizing Vaping in Australia*, The McKell Institute (March 2019), https://pdfs.semanticscholar.org/3e13/8e46419913a29f8fc9ddad52ec771f73fa76.pdf; Violeta Kaunelienė et al., *Impact of Using a Tobacco Heating System (THS) on Indoor Air Quality in a Nightclub*, 19 AEROSOL AND AIR QUAL. RES. 1961 (2019); Maya Mitova et al., *Human Chemical Signature: Investigation on the Influence of Human Presence and Selected Activities on Concentrations of Airborne Constituents*, 257 ENV'TL POLLUTION 1 (2020).

[PROPOSED] SECOND AMENDED COMPLAINT - 109

studies to friendly pro-industry groups knowing that those entities will misrepresent the results as evidence that e-cigarettes are safe, or not harmful.

### Vapor Technology Association

320.     The Vapor Technology Association (VTA) bills itself as a trade association and advocates for the e-cigarette industry. It was founded in January 2016, with the banner tagline on its website reading "VAPE IS HOPE."[318]

321.     In 2018, JLI, SMOK, VMR, Turning Point Brands, and Joyetech were all featured as "Platinum Members," a level of membership that required a $100,000 annual contribution. Thus, JLI paid VTA $100,000 in 2018 to become a Platinum Member, and in return, VTA offered JLI a board seat; invitations to lobbying strategy meetings; access to the FDA, other federal agencies, and members of Congress; and conference participation.[319]

322.     The VTA, like other lobbying and trade association groups in the industry, advocates for less regulation of e-cigarettes, and testifies in opposition to flavor bans.[320]

### Retailer Lobbying

323.     Retailers have also taken to creating subsidiaries or wholly owned companies whose purpose is to produce quasi-journalistic content to promote consuming e-cigarettes, discredit health initiatives, and suggest that consuming e-cigarettes has no harmful health impacts. The best example of this is the website SoupWire, which publishes articles and editorials that promote consuming e-cigarettes and criticizes studies that look at the negative impacts of consuming e-cigarettes.[321] For example, when JLI donated $7.5 million towards a study on the

---

[318]     Vape     is     Hope,     Vapor     Technology     Association     (Feb.     25,     2016), https://web.archive.org/web/20160225154600/http://www.vaportechnology.org:80/.
[319]     Some     of     Our     Members,     Vapor     Technology     Association     (Nov.     28,     2018), https://web.archive.org/web/20181128162940/https://vaportechnology.org/membership/.
[320]Vapor Technology Association, https://vaportechnology.org/.
[321]SoupWire – The Truth About Vaping, https://soupwire.com/.

[PROPOSED] SECOND AMENDED COMPLAINT - 110

impacts of consuming e-cigarettes on teens, a SoupWire report concluded that the study will likely find "nothing Earth-shattering."[322]

**Altria Falsely Stated That It Intended to Use Its Expertise in "Underage Prevention" Issues to JLI**

324.    Altria's announcement that it intended to invest in JLI came less than two months after it told the FDA that Altria "believe[s] that Pod-based products significantly contribute to the rise in youth use of e-vapor products" and that it accordingly would be removing its own Pod-based products from the market.[323] Altria made the same representations to its investors.[324]

325.    Although Altria claimed its investment in JLI had an altruistic motive—" When you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders," Altria recently confirmed that JLI has not even availed itself of that experience.[325] In Altria's October 2019 letter to Senator Richard Durbin, Altria CEO Howard Willard acknowledged that while Altria "offered to JUUL services relating to underage prevention efforts," to date "JUUL has not accepted Altria's offers of assistance in addressing underage vaping relating issues."[326] Willard has stated that the deal would allow Altria to "work[] with JUUL to accelerate its mission."[327] but as Altria knew, as

_____

[322]Jeff Hawkins, *JUUL Donates $7.5 Million to Teen Vaping Study*, SoupWire – The Truth About Vaping (July 2, 2019), https://soupwire.com/juul-donates-7-5-million-to-teen-vaping-study/.
[323]Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, 2 (October 25, 2018)
[324] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript, (October 25, 2018) https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.
[325]Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018. (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.
[326]Letter from Howard A. Willard III to Senator Richard J. Durbin (October 14, 2019) (emphasis added).
[327]Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth, Business    Wire    (Dec.    20,    2018,    7:00    AM    EST), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.

reflected in its letter to the FDA just two months prior, that mission involved had resulted in usage throughout the youth market. Altria's admission that Pod-based products contributed to underage use show that Altria knew its investment in JLI would "strengthen[] its financial profile and enhance[] future growth prospects" specifically because JLI dominated the youth market for e-cigarettes.[328]

326.    Altria recognized that JLI's market share dominance in the e-cigarette market, a share that it knew was gained via youth targeting and false and misleading advertising, was the path to Altria's continued viability and profitability. In a January 31, 2019 earnings call, Altria explained that "[w]hen you add to JUUL's already substantial capabilities, our underage tobacco prevention expertise and ability to directly connect with adult smokers, we see a compelling future with long-term benefits for both adult tobacco consumers and our shareholders. We are excited about JUUL's domestic growth and international prospects and their potential impact on our investment."[329] JUUL's growth was, as Altria well knew, due to the product's viral popularity among teens. Willard briefly acknowledged the youth vaping crisis, stating, "Briefly touching on the regulatory environment, the FDA and many others are concerned about an epidemic of youth e-vapor usage. We share those concerns. This is an issue that we and others in the industry must continue to address aggressively and promptly.[330]

327.    Altria's representations that it intended to help JUUL curb the prevalence of underage use was false and misleading. As discussed below, Altria coordinated with JUUL to capture and maintain the youth market.

_____

[328]Press Release, *Altria Makes $12.8 Billion Minority Investment In Juul To Accelerate Harm Reduction And Drive Growth*, Altria (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm.

[329]Altria Group (MO) Q4 2018 Earnings Conference Call Transcript: MO earnings call for the period ending December 31, 2018 (Jan. 31, 2019), https://www.fool.com/earnings/call-transcripts/2019/02/01/altria-group-mo-q4-2018-earnings-conference-call-t.aspx.

[330]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 112

1

2

3        **Defendants Targeted the Youth Market**

4        328.    Having created a product, like combustible cigarettes, that sought to get users

5   addicted to nicotine, and while taking steps to ensure that consumers and regulators did not

6   appreciate the true nicotine content or potential harm from using JUULs, to successfully sink their

7   high-tech nicotine hook into American consumers, JLI, Bowen, and Monsees needed investors

8   willing to adopt the tactics of the cigarette industry as their own. They found those investors in

9   Pritzker, Huh, and Valani.

10       329.    Under the leadership of the Management Defendants, JLI marketed nicotine to

11  kids. JLI and the Management Defendants deployed a sophisticated viral marketing campaign

12  that strategically laced social media with false and misleading messages to ensure their uptake

13  and distribution among young consumers. JLI and the Management Defendants' campaign was

14  wildly successful burying their hook into kids and initiating a public health crisis.

15       **JLI Emulated the Marketing of Cigarette Companies**

16       330.    As Defendants know, nearly 9 out of 10 smokers start smoking by age 18, and

17  more than 80% of underage smokers choose brands from among the top three most heavily

18  advertised.[331] The overwhelming consensus from public health authorities, independent studies,

19  and credible expert witnesses is that "marketing is a substantial contributing factor to youth

20  smoking initiation."[332]

21       331.    Struggling to define their own identities, teenagers are particularly vulnerable to

22  image-heavy advertisements that psychologically cue them on the "right" way to look and behave

23

24  _____

25

26  [331] U.S. Dep't Health & Human Servs., *Preventing Tobacco Use Among Youths, Surgeon General Fact Sheet*,
    https://www.hhs.gov/surgeongeneral/reports-and-publications/tobacco/preventing-youth-tobacco-use-
27  factsheet/index.html.
    [332] *United States v. Philip Morris*, 449 F. Supp. 2d 1, 570 (D.D.C. 2006) (J. Kessler).
28

amongst peers.[333] Advertisements that map onto adolescent aspirations and vulnerabilities drive adolescent tobacco product initiation.[334]

332.    For decades, cigarette companies spun smoking as signifier of adulthood. This turned smoking into a way for teenagers to project independence and enhance their image among their peers.[335]

333.    Youth marketing was critical to the success of cigarette companies. In the 1950s, Philip Morris—now JUUL's corporate affiliate—intentionally marketed cigarettes to young people as a pool from which to "replace smokers" to ensure the economic future of the cigarette industry.[336]

334.    Philip Morris's documents set out their youth strategy, explaining: "Today's teenager is tomorrow's potential regular customer, and the overwhelming majority of smokers first begin to smoke while still in their teens".[337]

335.    It wasn't just Philip Morris. The strategy of hooking kids was an open secret in the cigarette industry.[338]

336.    As detailed below, JLI and the Management Defendants sought to emulate this approach. Indeed, Monsees admitted to using historical cigarette ads to inform JLI's own advertising campaign.[339]

---

[333]*Id.* at 578.
[334]*Id.* at 570, 590.
[335]*Id.* at 1072.
[336]*United States. v. Philip Morris*, No. 99- 2496 (D.D.C. Aug. 17, 2006), ECF No. 5750 at 972 (Amended Final Opinion).
[337] *Tobacco Company Quotes on Marketing to Kids*, Campaign for Tobacco-Free Kids (May 14, 2001), https://www.tobaccofreekids.org/assets/factsheets/0114.pdf.
[338]C.A. Tucker, *Marketing Plans Presentation to RJRI B of D* at 2, U.C.S.F. Truth Tobacco Industry Documents (Sept. 30, 1974), https://www.industrydocumentslibrary.ucsf.edu/tobacco/docs/#id=ypmw0091 (RJ Reynolds executive explaining that the "young adult . . . market . . . represent[s] tomorrow's cigarette business. As this 14-24 age group matures, they will account for a key share of the total cigarette volume—for at least the next 25 years.").
[339]Matthew Perone & Richard Lardner, *Juul exec: Never intended electronic cigarette for teens*, AP News (July 26, 2019), https://apnews.com/4b615e5fc9a042498c619d674ed0dc33; Gabriel Montoya, *Pax Labs: Origins with James*

337.    The emulation is obvious. A side-by-side comparison of JUUL advertisements with historical cigarette advertisements reveals the appropriated pattern of focusing on imagery related to attractiveness, stylishness, sex appeal, fun, "belonging," relaxation, and sensory pleasure, including taste.[340]



338.    JLI and the Management Defendants deployed this same strategy, but adapted it to modern advertising tactics.

_____

*Monsees*, Social Underground, https://socialunderground.com/2015/01/pax-ploom-origins-future-james-monsees (last visited Apr. 3, 2020).
[340] *See* Appendix B, Ads 9-50.

[PROPOSED] SECOND AMENDED COMPLAINT - 115



**The Management Defendants Intentionally Marketed JUUL to Young People**

339.    The risk that children would use a new e-cigarette product was well known and well publicized in the months leading up to the launch of the JUUL e-cigarette. For example, in April 2015, the CDC published the results from its 2014 National Youth Tobacco Survey.[341] The CDC found that "[i]n 2014, e-cigarettes were the most commonly used tobacco product among middle (3.9%) and high (13.4%) school students."[342] Moreover, "[b]etween 2011 and 2014, statistically significant increases were observed among these students for current use of both e-cigarettes and hookahs (p<0.05), while decreases were observed for current use of more traditional products, such as cigarettes and cigars, resulting in no change in overall tobacco

---

[341]Centers for Disease Control and Prevention, *Tobacco Use Among Middle and High School Students — United States, 2011–2014*, Morbidity and Mortality Weekly Report (MMWR) 64(14);381-385 (Apr. 17, 2015). https://www.cdc.gov/mmwr/preview/mmwrhtml/mm6414a3.htm.
[342]*Id.*

use."[343] The CDC blamed e-cigarette marketing, the use of "a mixture of 'sex, free samples, [and] flavors'—the same things that were originally found to be problematic with cigarette ads."[344]

340.    Seeking to enter this nascent youth market for e-cigarettes, JLI intentionally targeted youth from its inception. In March 2015, Management Defendants supervised the advertising campaigns that would accompany the launch of JUUL.

341.    JLI knew that its initial customer base would be the key to its growth. On June 15, 2015, JLI's COO Scott Dunlap wrote on article on Entrepreneur.com called "6 Ways to Get a Fanatical Customer Base," #1 of which was "Seed your initial customer base:"

342.    Your first group of customers is the foundation of all future growth, so know who they'll be, why they'll rave and help them tell your story. They'll first act as role models and then as advocates to help spread your mission, so make locating and engaging those core customers a priority. This is especially important if you're introducing something completely new to a traditional industry.[345] Despite this professed knowledge that JLI's "first group of customers is the foundation of all future growth" and consistent with Monsees' position that he has no "qualms" with marketing to people that were not yet addicted to nicotine,[346] JLI's marketing strategy targeted people that were "flavor-seeking, social 'vapers,'" and those who "have very limited experience with traditional tobacco cigarettes."[347]

343.    JLI's first major marketing hire, Cult Collective Ltd. ("Cult Collective"), presented a pitch deck to JLI in late 2014, which defined the "target consumer" as a person "within

---

[343] *Id.*

[344] Jacob Kastrenakes, *More teens are vaping instead of smoking,* The Verge (Apr. 16, 2015), https://www.theverge.com/2015/4/16/8429639/teen-ecigarette-use-triples-vaping-beats-smoking.

[345] Scott Dunlap, *6 Ways to Get a Fanatical Customer Base*, Entrepreneur (June 17, 2015), https://www.entrepreneur.com/article/247424.

[346] David H. Freedman, *How do you Sell a Product When You Really Can't Say What it Does?*, Inc. https://www.inc.com/magazine/201405/david-freedman/james-monsees-ploom-ecigarette-company-marketing-dilemma.html (last visited Apr. 4, 2020).

[347] INREJUUL_00441209.

[PROPOSED] SECOND AMENDED COMPLAINT - 117

a life stage or mindset where they are defining their own identity."[348] The study described the "modern vaper" as "trendy, sophisticated image managers seeking to balance their desire for originality against acceptance."[349] Put differently, their target consumer was an adolescent.

344.     JLI professedly wanted kids to think JUUL was cool. In an email dated January 29, 2015, Sarah Richardson—then Director of Communications—sent a document dated December 31, 2014, to Dima Martirosyan, Director of Digital Marketing, who forwarded it to Rafael Burde, Director of Ecommerce.[350] The document stated that "[m]ost e-cigarettes to date are unsatisfying and seem 'douche-y'. The JUUL Product delivers nicotine far more effectively, and the product design is elegant and cool. We need to tell this story in a credible fashion through press, influencers and social media."[351] The document repeatedly referred to Pax Labs's plan to target the "cool kids[.]"[352] For example, it described as one of the "Key needs" to "Establish premium positioning to entice the 'masses' to follow the trend setters; own the 'early adopter' / 'cool kid' equity as we build out volume[.]"[353] The document noted that "the voices of influencers can build strong demand."[354] Messaging to media similarly focused on "coolness" and the message that "JUUL singlehandedly made e-cigarettes cool."[355]

345.     This focus on "cool kids" continued up to and after launch. On May 18, 2015, Kate Morgan, field marketing manager, emailed Richard Mumby, Chief Marketing Officer, and a variety of other marketing employees about "Some Music Options for JUUL Party" and noted that one of the options was a pair who were both "cool kids."[356] On June 7, 2015, Rafael Burde

---

[348]INREJUUL_00057298-INREJUUL_00057487.
[349]INREJUUL_00057298-INREJUUL_00057487.
[350]INREJUUL_00057289.
[351]INREJUUL_00057293.
[352]*Id.*
[353]*Id.*
[354]*Id.*
[355]INREJUUL 00441325-INREJUUL_00441326.
[356]JLI00218598.

[PROPOSED] SECOND AMENDED COMPLAINT - 118

emailed Scott Dunlap, then Chief Operating Officer, stating that the JUUL launch party "was a resounding success (at least in my mind) in terms of winning over the cool kids . . . ."[357] Pax Labs employees used similar wording regarding interest in targeting "cool kids" in an email from Sarah Richardson on August 12, 2015,[358] and emails from Ashley Marand on September 15, 2015,[359] and October 21, 2015.[360] The consistency of the language around this target demographic confirms that marketing to "cool kids" was a company policy set by the executives and the Board, particularly because, before selling the Ploom assets to JTI, James Monsees said similar things about Ploom.[361]

346.    JLI identified its competitor in this space as cigarette companies, complaining that "cigarettes continue to own the 'cool' equity," and identifying a "key pillar to go-to-market" as "win[ning] with the 'cool crowd'" away from cigarettes.[362]

347.    With this goal in mind, JLI hired the Grit Creative Group ("Grit"), which billed itself as an agency whose marketing appealed to "cool kids."[363] Grit helped JLI to "use external audiences to communicate nuanced messages around early adoption 'coolness' and product performance."[364]

348.    In short order, the phrase "it's cool to JUUL" became an anthem among kids while youth e-cigarette use skyrocketed.

_____

[357] JLI00206206.
[358] JLI00222528.
[359] JLI00461564.
[360] JLI00235965.
[361] JLI00514343 (describing Ploom as "providing optionality for distribution growth and consumer outreach to a younger, opinion leading audience").
[362] INREJUUL_00161703-INREJUUL_00161715.
[363] Id.
[364] INREJUUL_00277080-INREJUUL_00277104.

[PROPOSED] SECOND AMENDED COMPLAINT - 119

**JLI Advertising Exploited Young People's Psychological Vulnerabilities**

349.    Informed by decades of tobacco marketing, JLI ran a consistent, simple message: JUUL is used by young, popular, attractive, and stylish people.

350.    This was not the only marketing scheme JLI could have adopted. JLI had other options. In 2014, JLI engaged a Calgary-based advertising agency, Cult Collective, to complete a "diagnostic" evaluation of the JUUL brand and to make recommendations regarding the best advertising strategy to market the JUUL e-cigarette.

351.    In keeping with typical e-cigarette marketing, which messaged to existing smokers looking to quit, Cult Collective recommended that JUUL position its e-cigarette technology as the focus of its advertisements. Cult Collective presented JUUL with exemplar advertisements that used images of a boom box and a joy stick, juxtaposed against the JUUL e-cigarette, with the tag line: "Everything changes. JUUL the evolution of smoking."



352.    This campaign expressly invokes combustible cigarettes and positions the JUUL as a technological upgrade for the modern smoker.

353.    JLI rejected this approach.

[PROPOSED] SECOND AMENDED COMPLAINT - 120

354.    Instead, in June of 2015, JLI launched the "Vaporized" advertising campaign.[365] The express mission of the Vaporized campaign was to "own the 'early adopter'/'cool kid' equity."[366]

355.    Applying the template for preying on teens established by the cigarette industry, the Vaporized campaign used stylish models, bold colors, and highlighted themes of sexual attractiveness, thinness, independence, rebelliousness and being "cool."[367]

356.    The targeting of young consumers was evident in the design and implementation of the Vaporized campaign, which featured models in their 20s whose "poses were often evocative of behaviors more characteristic of underage teen than mature adults."[368]



---

[365]Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[366]INREJUUL_00057291-INREJUUL_00057295.
[367]*See* Appendix B, Advertisement 1 (example of targeting of young people).
[368]*Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University).    https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.



357.    In the months leading up to the launch of JUUL e-cigarettes, Pax Labs executives and directors discussed how to market the new product and the Board approved specific marketing materials used in JUUL's launch. On March 23, 2015,[369] there was a meeting of the Board of Directors where the upcoming advertising campaign was discussed.[370] The Board at that time had five members: Pritzker, Valani, Monsees, Bowen, and Handelsman (occupying Valani's second seat). According to Chelsea Kania, then Brand Manager at Pax Labs, prior to this meeting, she had met with the Board to discuss the models who would be used in the marketing collateral accompanying the JUUL launch. At that meeting, "there was some commentary at the youthfulness of the models[,]" but "nobody disliked them" and "everybody agreed they are pretty 'effective[.]'"[371] Ms. Kania also noted that she told the Board that ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮."[372] The Management Defendants knew that the ads targeted youth and had the authority to determine which models to use, but "Juul's board of directors signed off on the company's launch

---

[369]INREJUUL_00371285.
[370]INREJUUL_00371314.
[371]INREJUUL_00174387.
[372]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 122

plans[.]"[373] In addition, "Monsees, who was CEO at the time, personally reviewed images from the billboard photo shoot while it was in session."[374] A senior manager later told the New York Times that "he and others in the company were well aware" that the marketing campaign "could appeal to" teenagers.[375]

358.    As part of the Vaporized campaign, JLI advertised on a 12-panel display over Times Square.[376] Billboard advertising of cigarettes has for years been unlawful under the Master Settlement Agreement.



---

[373]Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?*, Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.
[374]*Id*.
[375]Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[376]  *See*  Appendix  B,  image  14;  *see also*  https://inrejuul.myportfolio.com  (also  available  at http://tobacco.stanford.edu/tobacco_main/subtheme_pods.php?token=fm_pods_ mt068.php) (last visited April 3, 2020) (additional images and videos).

[PROPOSED] SECOND AMENDED COMPLAINT - 123

359.     These ads, which ran for nearly a month, generated an estimated 1.5 million impressions per day.[377]

360.     In fact, JLI's Vaporized campaign was so effective that it gained national attention on an October 15th, 2015 episode of Late Night with Stephen Colbert, who ridiculed the notion that the young, dancing models were consistent with a target market of adult smokers. As Colbert joked after viewing the close-up video of young models dancing in place, "[y]eah! There is something about vaping that just makes me want to dance in a way that doesn't require much lung strength. . . . And it's not just ads featuring hip young triangles that appeal to the youths. . . . There is no reason to worry about the long-term effects of vaping, because e-cigarettes are so new that their long-term effects are still unknown."[378]

361.     The Vaporized campaign was not limited to the Times Square billboards however. The ads were also placed in nationally distributed magazines, and the videos were displayed on screens at the top of point-of-sale JUUL kiosks provided by JUUL to retailers across the country.

362.     To the extent that the Vaporized advertisements disclosed that JUUL contained nicotine, the warnings were in small print against low-contrast backgrounds, making them easy to overlook. By way of comparison, cigarette advertisements are required to display a health warning in high contrast black and white, covering 20% of the image.

363.     Likewise, JLI's social media ads did not disclose any health risks of using JUUL until May of 2018, when they were required to warn of addiction. But even then, JUUL placed these warnings in areas that were only viewable if the social media user clicked on the "full version" of the JLI post, which is not how teens typically engage with social media advertising.[379] Notably, on Twitter, a social media platform that is geared towards reading text, and on Facebook,

---

[377]INREJUUL_00093933-INREJUUL_00093934.
[378] *The Late Show With Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM.
[379] *Se* Appendix B, Advertisement 3.

[PROPOSED] SECOND AMENDED COMPLAINT - 124

where some users do read text, JLI typically did not include the disclaimer in its advertisements at all.[380]

**JLI Pushed the Vaporized Campaign Into Youth Targeted Channels**

364.    JLI engaged programmatic media buyers to place advertisements on websites attractive to children, adolescents in middle school and high school, and underage college students. These advertisements, which included the images of models from the Vaporized campaign, began appearing on websites as early as June 2015. The chosen websites included: nickjr.com (the website for a children's television network run by Nickelodeon Group); the Cartoon Network's website at cartoonnetwork.com; allfreekidscrafts.com; hellokids.com; and kidsgameheroes.com.

365.    A picture of the homepage of nickjr.com is below:



_____

[380] *See* Appendix B, Advertisement 65; *see also* Juul Image Galleries (2015-2018) SRITA Collection, https://inrejuul.myportfolio.com/twitter-1 (last visited Apr. 3, 2020).

[PROPOSED] SECOND AMENDED COMPLAINT - 125

366.    JLI also purchased banner advertisements on websites providing games targeted to younger girls,[381] educational websites for middle school and high school students,[382] and other teen-targeted websites.[383]

367.    JLI knew what it was doing. In May 2015, Chelsea Kania contacted Cult Collective to raise concerns about advertising on younghollywood.com. Kania explained that the website's demographics are "age 12-34 . . . and *weighing the % who could actually afford JUUL against the risk we'd run being flagged for advertising on that site* – I don't think we should do it."[384] Nevertheless, JLI continued to push its campaign on websites with young demographics.

368.    JLI promoted the Vaporized campaign on Facebook, Instagram, and Twitter.

369.    JLI could have employed age-gating on its social media accounts to prevent underage consumers from viewing its Vaporized advertisements, but chose not to do so.

370.    The Vaporized campaign included the largest e-cigarette smartphone campaign of 2015, which accounted for 74% of all such smartphone advertising that year.

371.    JLI promoted Vaporized through Vice Magazine, which bills itself as the "#1 youth media brand" in the world.[385]

372.    By 2016, an estimated 20.5 million U.S. middle and high school students were exposed to advertisements for e-cigarettes, including JUUL.[386]

---

[381]The sites included dailydressupgames.com, didigames.com, forhergames.com, games2girls.com, girlgames.com, and girlsgogames.com.

[382]*E.g.,* coolmath-games.com. JUUL also purchased advertisements on basic-mathematics.com, coolmath.com, math-aids.com, mathplayground.com, mathway.com, onlinemathlearning.com, and purplemath.com.

[383]*E.g.,* teen.com, seventeen.com, justjaredjr.com, and hireteen.com. JUUL purchased advertisements on websites for high school students hoping to attend college such as collegeconfidential.com and collegeview.com.

[384]INREJUUL_00082179-INREJUUL_00082185.

[385]Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[386]Kristy Marynak et al., *Exposure to Electronic Cigarette Advertising Among Middle and High School Students – United States, 2014-2016*, CDC: Morbidity and Mortality Weekly Report (Mar. 16, 2018), https://www.cdc.gov/mmwr/volumes/67/wr/mm6710a3.htm.

**JLI Used Influencers and Affiliates to Amplify Its Message to a Teenage Audience**

373.    JLI used "influencers" to push their product to young people. Influencers are "high-social net worth" individuals who have developed large social media followings—i.e., the "cool kids" of the social media world.[387] Influencers are prized sources of brand promotion on social media networks.

374.    Like its Vaporized campaign, JLI's influencer strategy was youth-focused, with the stated aim of "show[ing] that the tastemakers, cool kids and early adopters who consume tobacco use JUUL."[388] In keeping with this strategy, JLI targeted influencers that were young and popular with adolescents. One influencer JLI targeted was Tavi Gevinson, who was nineteen years old in the summer of 2015. The year before, Rolling Stone magazine described Gevinson as "possibly the most influential 18-year-old in America."[389]

375.    JLI contracted with Grit to enlist influencers by sending them free JUUL e-cigarettes.

376.    Grit also provided free JUULs to Luka Sabbat, known as the "the Internet's Coolest Teenager,"[390] who was 17 years old during the summer of 2015.

377.    Grit targeted celebrities with large numbers of underage fans, including Miley Cyrus, former star of "Hannah Montana," a series that aired for four seasons on the Disney Channel and won eight Teen Choice Awards.[391]

_____

[387]*See* INREJUUL_00091138 (Aug. 26, 2015 "JLI Influencer Program" defining an influencer as "individuals who have strong influence over their audience. We are aiming for influencers in popular culture with large audiences in various sectors such as music, movies, social, pop media, etc.").
[388]INREJUUL_00057293.
[389] Alex Morris, *Tavi Gevinson: A Power Teen's New Direction*, Rolling Stone (Aug. 14, 2014), https://www.rollingstone.com/culture/culture-features/tavi-gevinson-a-power-teens-new-direction-232286/.
[390] Alexis Barnett, *Who Is Luka Sabbat? Meet the Internet's Coolest Teenager*, Complex (Aug. 17, 2015), https://www.complex.com/style/luka-sabbat-interview-on-youth-kanye-west-and-fashion.
[391] *See*, INREJUUL_00091141 (Aug. 26, 2015 "JLI Influencer Seeding Chart" provided by Grit listing various celebrities and influencers, including Miley Cyrus.).

378.    JLI encouraged its distributors, wholesalers, and other resellers—either explicitly or implicitly— to hire affiliates and influencers to promote JLI's brand and products. Even if not paid directly by JLI, these influencers profited from the promotion of JUUL Products either because they were paid by JUUL resellers, JUUL accessory sellers, or sellers of JUUL-compatible products.

379.    For example, one YouTube user Donnysmokes (Donny Karle, age twenty-one) created a JUUL promotional video in 2017 that garnered roughly 52,000 views, many of which were from users under the age of eighteen.[392] Since that time, Karle has made a series of videos, including videos titled "How to hide your JUUL from your parents" and "How to HIDE & HIT Your JUUL at SCHOOL WITHOUT Getting CAUGHT."[393] Karle has admitted to earning approximately $1200 a month from unspecified sources simply from posting videos of himself consuming e-cigarettes, especially of JUUL Products online.[394]

380.    In or around 2017, JLI began using a company called Impact Radius for the management of JLI's affiliate program. Impact Radius's affiliate application stated that JLI "auto-approve[d]" applications and did not ask for or confirm the affiliate's age.[395] JLI's affiliates promoted JUUL on social media platforms including YouTube, Instagram, Facebook, Snapchat, and Twitter and routinely failed to disclose that they were being paid to promote JUUL Products.

381.    As with much of the marketing strategy for JUUL, the practices described above are prohibited by the Master Settlement Agreement.

---

[392]*Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University).    https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.
[393]*Id.*
[394] Allie Conti, *This 21-year-old is Making Thousands a Month Vaping on YouTube*, Vice (Feb. 5, 2018), https://www.vice.com/en_us/article/8xvjmk/this-21-year-old-is-making-thousands-a-month¬vaping-on-youtube.
[395] INREJUUL_00113437-INREJUUL_00113441.

[PROPOSED] SECOND AMENDED COMPLAINT - 128

**JLI Used Viral Marketing Techniques Known to Reach Young People**

382.    JLI deployed "viral marketing" techniques to great success. Viral marketing is defined as "marketing techniques that seek to exploit pre-existing social networks to produce exponential increases in brand awareness, through processes similar to the spread of an epidemic."[396] Viral marketing effectively converts customers into salespeople, who, by sharing their use of a product (on social media or otherwise), repeat a company's representations and endorse the product within their network. The success of viral marketing depends on peer-to-peer transmission. Hence, a successful viral marketing campaign looks like a series of unrelated, grassroots communications, when in fact they are the result of carefully orchestrated corporate advertising campaigns.

383.    As JLI boasted in a pitch deck to potential investors dated December 2016, "Viral Marketing Wins."[397]



---

[396] N. Deepa et al., *Viral Marketing as an On-Line Marketing Medium*, IOSR J. of Bus. & Mgmt. 18, http://www.iosrjournals.org/iosr-jbm/papers/ncibppte-volume-2/1115.pdf (last visited Apr. 3, 2020); P. R. Datta et al., *Viral Marketing: New Form of Word-of-Mouth Through Internet*, 3 The Bus. Rev. 69 (2005).
[397] INREJUUL_00349529-560 at 541.

[PROPOSED] SECOND AMENDED COMPLAINT - 129

384.    Social media platforms are the most effective way to launch viral marketing campaigns among young people. As of May 2018, among teenagers, 95% reported use of a smart phone, 85% use YouTube, 72% use Instagram, and 45% reported being online "constantly."[398]

385.    A key feature of JLI's viral marketing campaign was inviting user-generated content. This strategy revolves around prompting social media followers to provide their own JUUL-related content—e.g., post a selfie in your favorite place to use JUUL. The response provided by a user is then typically distributed—by the social media platform employed—into the user's personal network. In this way, brands can infiltrate online communities with personalized content that promotes their product (e.g. a picture of a friend using a JUUL e-cigarette ).[399]



[398]Monica Anderson & Jingjing Jiang, *Teens, Social Media & Technology 2018: Appendix A: Detailed Tables*, Pew Research Center (May 31, 2018), https://www.pewresearch.org/internet/2018/05/31/teens-technology-appendix-a-detailed-tables/.
[399]*The Rise in the Use of Juul Among Young People: The Power of Design and Social Media Marketing*, Campaign for Tobacco Free Kids, https://www.tobaccofreekids.org/assets/images/content/JUUL_Presentation.pdf. (last visited Nov. 12, 2020).

386.    Within a few months of the JLI's commercial release in June 2015, a former JLI executive reportedly told the New York Times that JLI "quickly realized that teenagers were, in fact, using [JUULs] because they posted images of themselves vaping JUULs on social media."[400]

387.    To drive consumer participation in its ad campaign, JLI peppered its advertising and social media posts with hashtags, including those referencing JLI and consuming e-cigarettes (e.g., #juul, #juulvapor, #switchtojuul, #vaporized, #juulnation, #juullife, #juulmoment); and trending topics unrelated to JUUL, as well as topics #mothersday, #goldenglobes, #nyc, etc. JLI's hashtag marketing went beyond passive posts to being "very proactive to find and reach out to people who are (or might be) interested in JUUL. This means searching hashtags to engage, using widely used hashtags, paying close attention to our followers, being responsive to posts, etc."[401]



---

[400]Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[401]INREJUUL_00093294.

388.    JLI's hashtags attracted an enormous community of youthful posts on a wide array of subjects. According to Dr. Jackler, #Juul contains literally thousands of juvenile postings, and numerous Instagram hashtags contain the JUUL brand name.[402]

389.    Just as JLI intended, JUUL users began taking photos of themselves using JUUL devices and putting them on social media with the hashtag #juul. They were creating JUUL content that looked and felt like real JUUL ads: featuring young people having fun and using JUUL. The flavor-based hashtag campaigns #MangoMonday and #coolmint generated hundreds of thousands of user-generated posts.

390.    JLI could have stepped in and attempted to stop the use of its trademark in posts directed to underage audiences, including the use of all the hashtags that contain the word "JUUL." It could have sought to shut down infringing accounts such as @doit4juul and @JUULgirls. It did not do so.

**JLI Targeted Youth Retail Locations**

391.    Studies show that tobacco use is associated with exposure to retail advertising and relative ease of in-store access to tobacco products. Some studies have shown that youth who were frequently exposed to point of sale tobacco marketing were twice as likely to try or initiate smoking than those who were not as frequently exposed.

392.    For years, JLI made it difficult for smoke shops and other age-restricted stores to carry its products, instead directing its product to gas stations and convenience stores, which historically make the most underage sales. JLI knows that nicotine-naïve young people frequent gas stations and convenience stores rather than smoke shops. By distributing in those kinds of stores, JUUL increased the likelihood that these people would purchase its product.

---

[402]Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market* at 2, STAN. RES. INTO THE IMPACT OF TOBACCO ADVERT. (2019). http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

393.    JLI marketed its products extensively in convenience stores, employing video and product displays with bright colors and young adults using and displaying the JUUL device. The retail marketing worked and, by late 2017, JUUL became the most popular e-cigarette sold in convenience stores according to Nielsen data.[403]

394.    Like all in-store cigarette advertising, JLI's point–of–sale materials played a major role in driving youth addiction. JLI actively encouraged youth to seek out these laxly regulated retail locations, sending marketing e-mails to hundreds of thousands of customers, referring them to the JUUL store locator and offering discounts. And JLI actively encouraged its retailers to leniently regulate sales to youth by providing profit margins that far exceeded any other tobacco product being sold.

395.    Before JUUL's launch in 2015, JLI and Cult Collective developed packaging and in-store displays that looked similar to iPhone packaging, which JLI knew would resonate with young people and further JLI's campaign to be the "the iPhone of e-cigarettes."

396.    As a 2015 marketing plan shows, JLI's in-store promotional content "stands out" from competing tobacco products by conveying that the "JUUL brand is colorful, approachable, and fun—core elements of trade support assets."[404]

**JLI Hosted Parties to Create a Youthful Brand and Gave Away Free Products to Get New Consumers Hooked**

397.    JLI also sponsored at least twenty-five live social events for its products in California, Florida, New York, and Nevada. The invitations to JUUL's events did not indicate that the JUUL was intended for cigarette smokers, contained nicotine, or was addictive.[405] Instead, the invitations traded on PAX Lab, Inc.'s (PAX) reputation as a manufacturer of

---

[403]Laura Bach, *JUUL and Youth: Rising E-Cigarette Popularity*, Campaign for Tobacco-Free Kids (July 6, 2018), http://www.kdheks.gov/tobacco/download/Campaign_for_tobacco-free_kids_rising_popularity_of_e-cigarettes.pdf.
[404] INREJUUL_00370796-INREJUUL_00370806, 805.
[405]*See* Appendix B, Advertisements 78-81.

[PROPOSED] SECOND AMENDED COMPLAINT - 133

marijuana vaporizers and promised attendees "free #JUUL starter kit[s]," live music, or slumber parties.[406] Photographs from these events indicate that they drew a youthful crowd. Product promotion through sponsored events was a long-standing practice for cigarette companies, but is now prohibited.



398.    At these live social events, JLI gave attendees free JUUL "Starter Kits," which contain a JUUL device and 4 JUUL Pods of various flavors. JLI gave away samples at music events without age restrictions, including Outside Lands in San Francisco's Golden Gate Park.

399.    Giving away free samples is prohibited conduct for a cigarette company under the Master Settlement Agreement.

---

[406]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 134

400.     JLI also held sampling events in stores. By September 2015, JLI was on schedule to host sampling events in more than 5,000 stores in twenty cities in twelve states.[407] Documents obtained by the New York Attorney General show that JLI recruited young "brand ambassadors" to staff these events and required a dress code that included skinny jeans, high-top sneakers or booties, and an iPhone in a JUUL-branded case.[408]



401.     Though JLI publicly acknowledged in October 2017 that it is unlawful to distribute free samples of its products at live events,[409] it continued to reach out to new users by offering samples, sometimes at $1 "demo events." Like so many of JLI's initiatives, promotions of this kind are prohibited for cigarette companies by the Master Settlement Agreement.

---

[407]INREJUUL_00160394.

[408]Jake Offenhartz, *Juul Hooked Teens Through Sick Parties and Hip Ambassadors, NY AG Says*, Gothamist (Nov. 19, 2019), https://gothamist.com/news/juul-hooked-teens-through-sick-parties-and-hip-ambassadors-ny-ag-says; Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9.

[409]     *See* Nik Davis (@bigbabynik), Twitter (Nov. 17, 2017 1:11 PM), https://twitter.com/JLIvapor/status/931630885887266816; *The Role of the Company in the Juul Teen Epidemic: Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Robert K Jackler, Professor, Stanford University).     https://docs.house.gov/meetings/GO/GO05/20190724/109844/HHRG-116-GO05-Wstate-JacklerR-20190724.pdf.

402.    The effect—and purpose—of JLI's Vaporized giveaways was to flood major cities with products that would hook thousands of new users, and to generate buzz for the brand among urban trendsetters who would then spread JLI's message to their friends via word of mouth and social media.

403.    According to BeCore, one of the firms responsible for designing and implementing JLI's live events, JLI distributed the nicotine-equivalent of approximately 500,000 packs of cigarettes at all twenty-five events.[410] And this was just to get people started.

**The Management Defendants' Direction of and Participation in JLI and in the Youth Marketing Schemes**

404.    ████████████████████████████



405.    ████████████████████████████

────────────────

[410]Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan Rsch. into the Impact of Tobacco Advert. 9 (Jan. 31, 2019). http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[411]JLI01362389 (████████████████████████████
████████████████████████
[412] JLI01426710 ████████████████████████████
[413]JLI01426164.
[414]JLI00216307; JLI01365707/.

[PROPOSED] SECOND AMENDED COMPLAINT - 136



406.

407.

408.

409.



410.

411.

[419] JLI01362388.
[420] JLI01439394.
[421] JLI01425021.
[422] JLI01440776.
[423] ALGAT0000280623.
[424] JLI01356230; JLI01356237 (Nov. 2017); JLI00417815 (Feb. 2018).
[425] JLI01385478.

[PROPOSED] SECOND AMENDED COMPLAINT - 138

███████████████████████[426] In this way, Pritzker and Valani ensured JLI would be run as they saw fit.

**Pritzker, Huh, and Valani were Active, Involved Board Members**

412. ████████████████████████████████████████████████

████████████████████████[427]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████.█[428]

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████."[429]

████████████████████████████████████████████████████████

███████████[430])

413. ████████████████████████████████████████████████

█████████████████████.█[431]

█████████████████████████████████.█[432]

████████████████████████████████████████████████████████

███████████.█[433]

████████████████████████████████████████████████████████

_____

[426]*Id.*
[427]JLI00206239.
[428]*Id.*
[429]*Id.*
[430]JLI01369470.
[431]*See, e.g.*, JLI00210436; JLI00380098.
[432]JLI00206172.
[433]INREJUUL_00174498.

[PROPOSED] SECOND AMENDED COMPLAINT - 139

████████████████████████ ,"434 ████████████████████████████████

████████████████████████████████████████████████████ ,"435

### The Management Defendants, and in Particular Bowen, Monsees, Pritzker, Valani, and Huh, Oversaw and Directed the Youth Marketing Scheme

414.    The Management Defendants were well aware that JUUL branding was oriented toward teens and duplicated earlier efforts by the cigarette industry to hook children on nicotine. The Management Defendants directed and approved JUUL branding to be oriented toward teenagers. The Management Defendants directed and participated in every marketing campaign pushing the JUUL e-cigarette, as they had "final say" overall marketing campaigns (including the Vaporized campaign and the other formal and informal marketing efforts described above),[436] and Monsees provided specific direction on the content of the website to JLI employees.

415.    James Monsees testified to Congress in 2019 that the Board of Directors had "final say" over marketing campaigns, and he was not speaking to only the current state of affairs at the time. As noted above, from 2015 on, JLI's own documents establish that the Board of Directors closely reviewed and approved marketing plans and specific marketing materials, and set the marketing strategy for the company.

416.    ████████████████████████████████████████

████████████████████████████████████████████████

█████████████████ .[437]

---

[434] JLI01356230; JLI01356237 (Nov. 2017); JLI00417815 (Feb. 2018).
[435] JLI02272904.
[436] *Examining JLI's Role in the Youth Nicotine Epidemic: Part II: Hearing Before the Subcomm. on Econ. & Consumer Policy of the Comm. on Oversight & Reform, H.R.*, 116th Cong. 70 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.).
[437] JLI01259728.

[PROPOSED] SECOND AMENDED COMPLAINT - 140

417. ██████████████████████████████████

████████████████████████. [438] ███████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████.

418. ██████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████████████████████████████████[439]

419. ██████████████████████████████████
███████████████████████████████████████,

---

[438] JLI00212009.
[439] JLI01121750.

[PROPOSED] SECOND AMENDED COMPLAINT - 141



,"440

420.    The Board also approved specific marketing materials used in JUUL's launch. In March 2015, the Board approved of the Vaporized marketing campaign despite its obvious youth appeal. The Board reviewed Vaporized marketing images and made "some commentary at the youthfulness of the models[,]" but "nobody disliked them" and "everybody agreed they are pretty 'effective[.]'"441 The Board knew that the ads targeted youth, but "Juul's board of directors signed off on the company's launch plans[.]"442

421.

422.    After launch, executives and directors discussed whether to rein in the advertising to teenagers. According to Scott Dunlap, then Chief Operating Officer, in June 2015, Nicholas

---

440JLI00216307.
441INREJUUL_00174387.
442Ainsley Harris, *How Juul, founded on a life-saving mission, became the most embattled startup of 2018: E-cigarette startup Juul Labs is valued at more than $16 billion. It's also hooking teens on nicotine and drawing scrutiny from the FDA. Can the company innovate its way out of a crisis it helped create?,* Fast Company (Nov. 19, 2018), https://www.fastcompany.com/90262821/how-juul-founded-on-a-life-saving-mission-became-the-most-embattled-startup-of-2018.

[PROPOSED] SECOND AMENDED COMPLAINT - 142

Pritzker commented that the branding "feels too young[.]"[443] At the June 17, 2015 Board meeting, the Board heard "an update on the rollout of JUUL. . . . Mr. Mumby then provided the board with his perspective on the JUUL launch and customer feedback. The Board discussed the Company's approach to advertising and marketing and portrayal of the product, which led to a discussion of the Company's longer term strategy led by Mr. Monsees."[444]

423.    According to an anonymous former company manager: "Inside the company, the first signs that Juul had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015."[445] "[E]arly signs of teenage use kicked off an internal debate . . . Some company leaders . . . argued for immediate action to curb youth sales. . . . The counter-argument came from other company directors, including healthcare entrepreneur Hoyoung Huh and other early investors"—that is, Pritzker and Valani—who "argued the company couldn't be blamed for youth nicotine addiction."[446]

424.    ████████████████████████████████████████████████ ████████████████████,"[447] ████████████████████████████████ ██████████████████████████████████████ He began by noting that "our fears around tobacco / nicotine are not going away. We will continue to have plenty of agitation if we don't come to terms with the fact that these substances are almost irretrievably connected to the shittiest companies and practices in the history of business."[448] He stated that "an approach needs to be taken that actively, if implicitly, distances us from [Big Tobacco]: what we say, the way we sell, the way we run the company, what we emphasi[z]e, who we hire, etc."[449] Referring

_____

[443] JLI00206239.
[444] JLI01426553.
[445] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, REUTERS (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[446] *Id.*
[447] JLI00214617.
[448] *Id.*
[449] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 143

to JLI's strategy to use the same marketing techniques as major tobacco companies used to market to youths, Asseily added that "[t]he trouble with just doing 'what the others do' is that we'll end up as Nick [Pritzker] rightly points out in the same ethical barrel as them, something none of us want no matter the payoff (I think)."[450] He continued that "the world is transparent and increasingly intolerant of bullshit. It's not about faking it - it's about doing it correctly....which could mean not doing a lot of things we thought we would do like putting young people in our poster ads or drafting in the wake of big players in the market."[451] ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████."[452]

425.    Pritzker, Valani, and Huh rejected this approach, opposing any actions to curb youth sales. Youth sales were a large potential source of revenue.[453] As one manager explained, perhaps "people internally had an issue" with sales of JUULs to teenagers, "[b]ut a lot of people had no problem with 500 percent year-over-year growth."[454] And company leaders understood that teenagers who were hooked on nicotine were the most likely segment to become lifelong addicts and thus were the most profitable customers to target.[455]

426.    In October 2015, the debate was resolved in favor of selling to teens. ████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

―――――――――――――――――

[450]*Id.*
[451]*Id.* (emphasis added).
[452]*Id.*
[453] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[454]*Id.*
[455]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 144

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████  Even though the directors and executives of JLI knew—and explicitly stated—that what they were doing was wrong, they pressed ahead with JUUL's youth-oriented Vaporized ad campaign through early 2016.[456]

427.    The company also implemented the Board's decision to target and sell to minors in many other ways. For example, in early October 2015, sales and marketing employees of Pax Labs noted that only 74% of users were able to pass the age gate on the website, "which is a steep decline in sales for us."[457] In mid-January 2016, a similar group of employees estimated that about 11% of those reaching the JUUL Purchase Confirmation Page on Pax Labs's own website were under 18 years old.[458] But, rather than strengthen JUUL's age verification system, Pax Labs worked to weaken it. In February 2016,[459] Pax Labs modified the age verification system so that 92% of users were able to pass the age gate.[460] By changing the age verification process so that users were more likely to pass—while knowing that some minors had already been able to pass before the change—Pax Labs deliberately chose to continue selling to underage purchasers.

428.    In July 2015, Asseily suggested "a cheeky campaign that asks existing smokers to return their unused cigarette packets (or other vaping products) to us in return for a discount on JUUL" because that would "send the only message that's needed: JUUL is a superior alternative to conventional smoking and mediocre vaping products."[461] But JLI did not run this campaign

---

[456]The Vaporized advertising campaign continued at least into early 2016. Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan Rsch. into the Impact of Tobacco Advert.7 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[457]INREJUUL_00276445.
[458]Native attachment to INREJUUL_00078494.
[459]JLI00068428.
[460]Kate Horowitz's LinkedIn profile, https://www.linkedin.com/in/k8horowitz (last visited Mar. 9, 2020).
[461]JLI00214617.

[PROPOSED] SECOND AMENDED COMPLAINT - 145

then and in fact did not begin focusing its advertising on switching from combustible cigarettes until 2018.[462]

429.    By March 2016, however, JLI employees internally recognized that JLI's efforts to market to children were too obvious. On March 2, 2016, Richard Mumby, the Chief Marketing Officer, sent a document related to JLI's branding to Hoyoung Huh and a number of other marketing employees of JLI.[463] According to Mumby, he was sending the document because Hoyoung Huh "indicated that [he] would review [JLI's] brand and collateral positioning on behalf of the board."[464] The attached document noted that "[t]he models that we used for the #Vaporized campaign appeared to be too youthful for many consumers (and the media)[.]"[465] Under a header that listed as one of JLI's "Objectives" to "Be Different & Have Integrity[,]" the document stated that "[w]e need to be sensitive to the subjectivity of youthfulness by positioning the brand to be mature and relatable."[466] On March 11, 2016, Mumby sent another version of this document to Hoyoung Huh and Zach Frankel (who was then an observer on the Board and would later become a director), and Mumby thanked them "for the support on this."[467] Around this time, Pax Labs reoriented its JUUL advertising from the explicitly youth-oriented Vaporized campaign to a more subtle approach to appeal to the young. The advertising's key themes continued to include pleasure/relaxation, socialization/romance, and flavors [468]—all of which still appealed to

---

[462]Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan Rsch. into the Impact of Tobacco          Advert.          16          (Jan. 31,          2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.
[463]INREJUUL_00178377.
[464]INREJUUL_00061469.
[465]INREJUUL_00178379.
[466]INREJUUL_00178384.
[467]INREJUUL_00061274.
[468]Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan Rsch. into the Impact of Tobacco          Advert.          9          (Jan. 31,          2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 146

teenagers, as was made clear in the previous litigation against the cigarette industry and Altria and Philip Morris in particular.

430.    Pritzker, Valani, and Huh, along with Bowen and Monsees continued to direct and approve misleading marketing campaigns long after launch. For example, JLI deceptively marketed mint to youth, through flavor-driven advertising, hashtag campaigns, and ads cross-promoting mango and mint.

431.    Notably, none of JLI's early advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed that JUUL contains high amounts of nicotine; indeed, many of those advertisements did not advertise JUUL's nicotine content whatsoever.

432.    Likewise, none of JLI's advertisements, including those of the "Vaporized" campaign and others targeted to youths, disclosed the health risks from consuming JUUL Products.

433.    JLI and the Management Defendants knew of course that JUUL contained an ultra-high concentration of nicotine, and that ultra-high concentration of nicotine was designed to addict. They also knew that e-cigarette products, including JUUL, would expose users to increased health risks, including risks to their lungs and cardiovascular system. Despite that knowledge, JLI and the Management D Defendants took affirmative actions, the natural consequence of which was the approval and transmission of these false and misleading advertisements that did not include a disclosure of JUUL's high nicotine content and concentration, nor any health risks at all.

**Pritzker, Huh, and Valani Were Able to Direct and Participate in the Youth Marketing Because They Seized Control of the JLI Board of Directors**

434.    Although Defendants Bowen and Monsees were the visionaries behind JLI and the most hands-on in its early stages, by the time JLI was pushing its marketing campaigns in early- to mid-2015, JLI (through the individuals running the company), Bowen, Monsees, Pritzker, Valani, and Huh were each intimately involved in the planning and execution of activities.

[PROPOSED] SECOND AMENDED COMPLAINT - 147

435.    For example, JLI stopped interacting with the press in the summer of 2015 while its Board of Directors, controlled by Bowen, Monsees, Pritzker, Huh, and Valani, was finalizing a "messaging framework."[469] A legitimate business enterprise would typically ramp up, rather than shut down, press outreach at the very time the company is supposed to be building awareness for its recently launched product.

436.    But the Management Defendants at this point were taking actions that went beyond the regular and legitimate business operations of JLI. At the same time JLI stopped traditional press engagement, the Board of Directors was directing and monitoring the launch plans that they had set in motion – including the launch of sponsored content on social media in July 2015 (which content did not include any warnings about JUUL's nicotine content or health risks).[470]

437.    And at the same time the Management Defendants had approved the early JLI marketing campaigns that were intentionally targeting youth, there was a fundamental shift in roles when Defendants Pritzker, Valani, and Huh took charge of the instrumentalities of JLI, including its employees and resources.

438.    Specifically, in October 2015, Monsees stepped down from his role as Chief Executive Officer of JLI (to become Chief Product Officer) and, in his stead, Pritzker, Valani, and Huh formed an Executive Committee of the JLI Board of Directors that would take charge of fraudulently marketing JUUL Products, including to youth. The Management Defendants, and in particular Huh, wanted to continue their fraudulent marketing, knowing that these ads were also targeted to youth, "argu[ing] that the company couldn't be blamed for youth nicotine addiction[.]"[471]

---

[469] INREJUUL_00056077 [Confidential].
[470] *Id.*
[471] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.

439.    Keeping the company's youth marketing on track was critical to and consistent with Pritzker, Valani, and Huh's objective of accelerating JUUL's growth and expanding its customer base—and increasing profitability. ████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
█████████████████████████████"472 ███████████████████████████████████
████████████.

440.    ███████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████
███████████████████████████████████████████"473.

441.    JLI's organizational charts later reflected the executive committee in the place of a CEO. Before late 2015, the company's organizational charts showed the CEO at the head of the company, reporting to the Board.[474]

**org chart - October 2015**



---

[472]JLI01369470.
[473]JLI00214159.
[474]*See* INREJUUL_00016456 (July 9, 2014).

[PROPOSED] SECOND AMENDED COMPLAINT - 149

442.    After Monsees was removed as CEO, the Executive Committee appeared in the place of the CEO.[475]



443.    Board minutes also illustrate how the Executive Committee of Pritzker, Valani and Huh, acted as CEO of JLI during this time period, taking direct control of the company and making critical decisions about how to market JUUL. Until late October 2015, Monsees (then the CEO) ran Board meetings.[476] In late October 2015 and thereafter, however, Huh (then Executive Chairman and member of the Executive Board) began running Board meetings.[477] Also, the late October minutes report that the "Board discussed . . . the additional responsibilities that would be assigned to Bryan White" (who was a Vice President of Engineering and Product Design at the time), and furthermore that "[a] discussion followed regarding who Bryan should report to, and it was agreed that the executive committee that had been formed since the last Board meeting,

_____

[475]INREJUUL_00278332 (Dec. 7, 2015); INREJUUL_00061420 (Apr.21, 2016).
[476]*See* INREJUUL_00278406 *et seq.* (Oct. 5, 2015); INREJUUL_00278410 *et seq.* (Sept. 24, 2015).
[477]*See* INREJUUL_00278404 *et seq.* (October 26, 2015); INREJUUL_00278402 *et seq.* (Nov. 10, 2015).

[PROPOSED] SECOND AMENDED COMPLAINT - 150

consisting of Messrs. Huh, Pritzker and Valani, would address this issue."[478] Additionally, the Board "discussed how these new roles and responsibilities would be communicated internally."[479]

██████████████████████████████████████████████████████████████████████

█████████████████████████[480]

444.    By December 2015, it was confirmed that "Hoyoung [Huh] will make decisions on behalf of the BOD [Board of Directors] Exec[utive] Comm[ittee]" and "3-4 days/week Nick [Pritzker] and/or Hoyoung [Huh] will be in the office" to "help us manage our people[.]"[481]

445.    ████████████████████████████████████████████████████████████

███████████████████████████████████████████[482]████████████████████████

██████████████████████████████████████████████████████████████████████

███████████[483]

██████████████████████████████████████████████████████████████████[484]

446.    Huh served as the Executive Chairman of the Board from October 2015 until at least May 2016, and others, particularly Monsees, deferred heavily to Huh as the decision-maker during that period. ████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████

_____

[478]INREJUUL_00278405 (Oct. 26, 2015).
[479]*Id.*

███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████████████████

[481]INREJUUL_00061856.
[482]JLI01346296.
[483]INREJUUL_00278352 – 00278359.
[484]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 151

[REDACTED] [485] [REDACTED]

[REDACTED]," [486]

447.    In December 2015, Monsees expressed concerns about JLI's marketing budget to Huh in an extremely deferential way, concluding, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]," [487]

448.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]. [488] [REDACTED]

[REDACTED]

449.    [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]," [490]

450.    Over the next year, until the installation of a new CEO in August 2016, Defendants Pritzker, Valani, and Huh used their newly formed Executive Committee to expand the number of e-cigarette users through fraudulent advertising and representations to the public. They cleaned

---

[485] JLI01363643.
[486] JLI01363649.
[487] JLI01363612.
[488] JLI01363610.
[489] JLI01369376.
[490] JLI01369407.

[PROPOSED] SECOND AMENDED COMPLAINT - 152

house at JLI by "dismiss[ing] other senior leaders and effectively tak[ing] over the company."[491] Despite any potential internal misgivings about their fraudulent conduct, notably, none of Management Defendants terminated their relationship with JLI during this time period.

### Pritzker, Valani, and Huh Continued to Exercise Control Over and Direct the Affairs of JLI Even After a New CEO was Appointed

451.    Although JLI hired a new CEO in August 2016, Pritzker, Valani, and Huh's Executive Committee does not appear to have been dissolved, and these three Defendants continued to exercise control over and direct the affairs of JLI.

452.    In 2017, the Board—controlled at that time by Pritzker, Valani, and Huh— continued to make decisions on the details of the media plans for marketing. ████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████"[492]

453.    In December 2017, Valani directed aspects of JLI's distribution and dissemination.

████████████████████████████████████████████████████████████████

████████████████████████████████████████.[493]

_____

[491] Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.
[492] INREJUUL_00100719.
[493] JLI00308379.

454.     Pritzker also controlled several aspects of JLI's branding. ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████[494]

455.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████[495]

456.     ████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████[496]

457.     Pritzker even got involved in customer service issues. ████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████[497]

458.     Pritzker and Valani were also in close control of JLI's public relations and media
strategies. ████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████[498]
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████

────────────────────────

[494]JLI01345258.
[495]JLI01345255.
[496]JLI00322485.
[497]JLI11015358.
[498]JLI00024566.

[PROPOSED] SECOND AMENDED COMPLAINT - 154

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████.[499]

459.  ███████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████.[500]

460.  After Kevin Burns replaced Tyler Goldman as JLI's CEO, Burns worked closely with Pritzker and Valani in particular, seeking their approval regularly. ███████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████.[501] ██████████████

█████████████████████████████████████████████████

████████████████.[502] █████████████████████████████

█████████████████████████████████████████████████

███████████████████.[503] ██████████████████████████

████████████████████."[504]

461.  ████████████████████████████████████████

████████████████████,[505] ████████████████████████

█████████.[506] ███████████████████████████████████

_____

[499] JLI00147328.
[500] JLI1053533.
[501] JLI10529705.
[502] JLI00151297; JLI00151298.
[503] JLI10071280.
[504] JLI10071228.
[505] JLI1007754.
[506] JLI10071922.

[PROPOSED] SECOND AMENDED COMPLAINT - 155

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████." [507]

462.    ████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████ [508] ███████████████████████

████████████████████████████████████████████

███████████████ [509]

**Pritzker And Valani Directed And Controlled JLI's Negotiations With Altria**

463.    Pritzker and Valani, along with Kevin Burns, were the lead negotiators for JLI on the Altria deal. ████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████ [510]

464.    Altria knew that when it was negotiating with JLI, Pritzker and Valani were the company. ██████████████████████████████████████

████████████████████████████████████████." [511]

_____

[507]JLI0070326.
[508]JLI10064121.
[509]JLI01144202.
[510]Willard Dep. 264:16-265:13, Jan. 13, 2021.
[511]ALGAT0002834151.

[PROPOSED] SECOND AMENDED COMPLAINT - 156

1

2

3

████████ ."[512]

4

465.   ████████████████████████████

5

████████████████████████████████

6

████████████████ .[513] ████████████

7

████████████████████████████████

8

████████████████████ ."[514]

9

10   466.   On paper, negotiations were between Willard for Altria, and Pritzker, Valani, and

11   Kevin Burns for JLI. ████████████████████████

████████████ .[515] ████████████████

12

████████████████████████████████

13

████████████████████████████████

14

████████████████████████ ."[516]

15

████████████████████████████████

16

████████ .[517]

17

18   467.   But some key discussions involved only Pritzker and Valani as the real power

19   brokers for JLI. ████████████████████

████████████████████████ .[518] ████

20

21

22

23   _____

24

[512]ALGAT0000280623.
[513]ALGAT0004031785.
[514]ALGAT0004208892.
[515]JLI10530188.
[516]JLI10530232.
[517]*See, e.g.*, JLI01389789; JLI10523767; JLI01389792; JLI10518886.
[518]ALGAT0000113109.

25

26

27

28

1

██████████████████████████████████████████████████████████

2

████████████████████. ,,519

3

468.    Pritzker and Valani worked to build a partnership with Altria. ████████████

4

██████████████████████████████████████████████████████████

5

██████████████████████████████████████████████████████████

6

██████████████████████████████████████████████████████████

7

██████████████████████████████████████████████████████████

8

██████████████████████████████████████████████████████████

9

██████████████████████████████████████████████████████████

10

██████████████████████████████████████████████████████████

11

████████████,,520

12

469.    Pritzker and Valani continued to communicate with Altria's CEO on behalf of JLI

13

after the negotiations ended. ██████████████████████████████████████████

14

██████████████████████████████████████████████████████████

15

████████████████████████████,,521

16

470.    Pritzker, Valani, Willard, and Crosthwaite coordinated a response to the Youth

17

Vaping Prevention Plan in July 2019. ████████████████████████████████████

18

██████████████████████████████████████████████████████████

19

████████████████████████████████████████████.522

20

21

22

23

24

_____

25

26

519*Id.*
520ALGAT0003889812.
27

521ALGAT0003285214.
522ALGAT0003279064.
28

[PROPOSED] SECOND AMENDED COMPLAINT - 158

**JLI And The Management Defendants Knew Their Efforts Were Wildly Successful In Building A Youth Market And Took Coordinated Action To Ensure That Youth Could Purchase JUUL Products**

471.    The Management Defendants knew that the JUUL marketing campaigns they directed and approved were successful in targeting youth. As Reuters has reported, "the first signs that JUUL had a strong appeal to young people came almost immediately after the sleek device went on sale in 2015 . . . . Employees started fielding calls from teenagers asking where they could buy more JUULs, along with the cartridge-like disposable 'Pods' that contain the liquid nicotine."[523] A former senior manager told the New York Times that "[s]ome people bought more JLI kits on the company's website than they could individually use—sometimes 10 or more devices." He added that "[f]irst, they just knew it was being bought for resale," but later "when they saw the social media, in fall and winter of 2015, they suspected it was teens."[524] Adam Bowen admitted that "he was aware early on of the risks e-cigarettes posed to teenagers[.]"[525] On January 5, 2016, Gal Cohen forwarded a presentation dated December 16, 2015, which asked the question: "If large numbers of youth are initiating tobacco use with flavored e-cigarettes, but adults [sic] smokers may benefit from completely switching to an e-cigarette, what should the market look like?"[526] It was common knowledge within JLI that JUULs were being sold to children.

472.    After the Vaporized campaign, retail stores began selling out of JUUL Products, and JLI had a difficult time trying to meet demand coming from its online ordering platform.

---

[523] Chris Kirkham, *Juul Disregarded Early Evidence it was Hooking Teens*, Reuters (Nov. 5, 2019), https://www.reuters.com/investigates/special-report/juul-ecigarette/.
[524] Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.
[525] *Id.*
[526] INREJUUL_00339938 (emphasis added).

473.     Furthermore, it was obvious to those outside the company that JLI was selling JUUL Products to children. In June 2015, reporting on the "Vaporized" campaign that accompanied the JUUL launch, AdAge reported that John Schachter, director of state communications for Campaign for Tobacco-Free Kids, "expressed concern about the JUUL campaign because of the youth of the men and women depicted in the campaign, especially when adjoined with the design" and added that there had been "obvious trends that appeal to adolescents in e-cigarette campaigns[.]"[527] Robert Jackler, a Stanford physician who investigated JLI's launch campaign, concluded that "JLI's launch campaign was patently youth-oriented." [528] JLI's commercials' attempts to appeal to teenagers were so obvious that, by October 2015, Stephen Colbert ran a satirical segment on it that noted, among other things: "And it's not just ads featuring hip young triangles that appeal to the youths; so do vape flavors like cotton candy, gummi bear, and skittles."[529]

474.     Moreover, the Management Defendants knew that kids were marketing JLI products on social media, and some even sought to take advantage of that to build the JLI brand. For example, on July 16, 2016, Adam Bowen emailed Tyler Goldman about social media posts by children about JUUL e-cigarettes, stating, "I'm astounded by this 'ad campaign' that apparently some rich east coast boarding school kids are putting on."[530] Bowen added that "Riaz [Valani] was thinking maybe we can leverage user generated content."[531]

---

[527] Declan Harty, *JUUL Hopes to Reinvent E-Cigarette Ads with 'Vaporized Campaign'*, AdAge (June 23, 2015), http://adage.com/article/cmo-strategy/juul-hopes-reinvent-e-cigarette-ads¬campaign/299142/.
[528] Erin Brodwin, *See how Juul turned teens into influencers and threw buzzy parties to fuel its rise as Silicon Valley's favorite e-cig company,* Bus. Insider (Nov 26, 2018). https://www.businessinsider.com/stanford-juul-ads-photos-teens-e-cig-vaping-2018-11.
[529] *The Late Show with Stephen Colbert*: *Vaping is So Hot Right Now*, YouTube (Oct. 7, 2015), https://www.youtube.com/watch?v=PMtGca_7leM. The "triangles" ad was a JUUL ad; the listed flavors were not, but JUUL also had flavors that appealed to children.
[530] JLI00382271.
[531] *Id*.

**JLI Closely Tracked Its Progress In Reaching Young Customers Through Social Media And Online Marketing**

475.     Tracking the behaviors and preferences of youth that are under twenty-one, and especially those under eighteen, has long been essential to the successful marketing of tobacco products. Whether the activity is called "tracking" or "targeting," the purpose has always been the same: getting young people to start smoking and keeping them as customers.

476.     As early as 1953, Philip Morris was gathering survey data on the smoking habits of "a cross section of men and women 15 years of age and over."[532] Commenting on these data, George Weissman, then-Vice President of Philip Morris, observed that "we have our greatest strength in the 15-24 age group."[533]

477.     Traditional approaches to youth tracking (e.g., interviews conducted face-to-face or over the telephone) were limited, however, in that they often failed to capture data from certain subsets of the target market. As a Philip Morris employee noted in a June 12, 1970 memorandum, Marlboro smokers were "among the types of young people our survey misses of necessity (on campus college students, those in the military and those under 18 years of age)."[534]

478.     However, modern technology has removed many of the hurdles that made youth tracking difficult in decades past. With industry connections, e-mail, social media and online forums, JLI can track, and has consistently tracked and monitored its target youth market, including those below the minimum legal age to purchase or use JUUL Products.

479.     First, JLI knew from its sales data that the large majority of its customers were under the age of 21. ███████████████████████████

███████████████████████████████████████████████

_____

[532]Philip Morris Vice President for Research and Development, Why One Smokes, First Draft, 1969, Autumn (Minnesota Trial).
[533]*United States v. Philip Morris*, 449 F. Supp. 2d 1, 581 (D.D.C. 2006).
[534]*Id*.

[PROPOSED] SECOND AMENDED COMPLAINT - 161

1    ████████████████████████████████████████████████████.'' [535]

2    ████████████████████████████████████████████████████████

3    ████████████████████████████████████████████████████████

4    ████████████████████████████████████████████████████████

5    ████████████████████████████████████████████████████████

6    ████████████████████████████████████████████████████████

7    ████████████████████████████████████████████████████████

8    ████████████████████████████████████████████.'' [536]

9    ████████████████████████████████████████████████████████

10   ████████████████████████████████████████████████████████

11   ████████████████████████

12   480.    Second, using the tools available to it, JLI would have known that its viral

13   marketing program was a resounding success, and in particular with young people.

14   481.    Between 2015 and 2017, JUUL-related posts on Twitter increased quadratically,

15   which is the exact result to be expected from an effective viral marketing campaign.[538] Its growth

16   on Instagram was likely even more rapid.

17   482.    A 2018 study of JLI's sales and presence on social media platforms found that JLI

18   grew nearly 700%, yet spent "no recorded money" in the first half of 2017 on major advertising

19   channels, and spent only $20,000 on business-to-business advertising.[539] Despite JLI's apparently

---

[535]JLI10344468.

[536]*Id.*

[537]*Id.*

[538] *See* Brittany Emelle, et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.

[539]Jidong Huang et al., *Vaping versus JUULing: how the extraordinary growth and marketing of JUUL transformed the US retail e-cigarette market*, Tobacco Control (May 31, 2018), https://tobaccocontrol.bmj.com/content/28/2/146.full.

minimal advertising spend in 2017, the study found a significant increase in JUUL-related tweets in 2017.[540]

483.    On Instagram, the study found seven JUUL-related accounts, including DoIt4JUUL and JUUL.girls, which accounted for 4,230 total JUUL-related posts and had more than 270,000 followers.[541]

484.    In addition to JUUL's explosive growth on individual social media platforms, the study found JUUL Products being marketed across platforms in an apparently coordinated fashion, including smaller targeted campaigns and affiliate marketing, all of which caused the authors to question whether JLI was paying for positive reviews and JUUL-related social media content.

485.    The lead author of the study concluded that JLI was "taking advantage" of the reach and accessibility of multiple social media platforms to "target the youth and young adults . . . because there are no restrictions," on social media advertising.[542]

486.    A separate study of e-cigarette advertising on mobile devices, where young people spend most of their day consuming media, found that 74% of total advertising impressions were for JUUL Products.[543]

487.    A 2019 study found that as much as half of JUUL's Twitter followers were aged thirteen to seventeen.[544]

---

[540]*Id.*
[541]*Id.*
[542]Laura Kelly, *JUUL Sales Among Young People Fueled by Social Media, Says Study*, The Wash. Times (June 4, 2018), https://www.washingtontimes.com/news/2018/jun/4/juul-sales-among-young-people-fueled-by-social-med/.
[543]*See* Brittany Emelle et al., *Mobile Marketing of Electronic Cigarettes in the U.S.,* Truth Imitative (May 2017), https://www.slideshare.net/YTHorg/mobile-marketing-of-electronic-cigarettes.
[544]Steven Reinberg, *Study: Half of Juul's Twitter followers are teens, young adults*, HealthDay News, (May 20, 2019) https://www.upi.com/Health_News/2019/05/20/Study-Half-of-Juuls-Twitter-followers-are-teens-young-adults/1981558384957/.

488.    A 2019 study characterizing JUUL-related Instagram posts between March and May 2018 found that among nearly 15,000 relevant posts from over 5,000 unique Instagram accounts, more than half were related to youth or youth lifestyle.[545]

489.    Some Twitter users have reported what appear to be JUUL bots.[546] Other Twitter users appear to either be bot accounts or native advertisers, in that they have a small number of followers, follow few other users, and post exclusively about JUUL content.[547]

490.    By April 2018, searching "JUUL" on YouTube yielded 137,000 videos with forty-three videos having over 100,000 views.[548] Of these, a huge number were plainly related to underage use, including: 1,730 videos on "hiding JUUL in school," 789 on "JUUL in school bathroom," 992 on "hiding JUUL at home," and 241 on "hiding JUUL in Sharpie."[549]

491.    In 2018, JLI was internally collecting hundreds of social media posts—directed at JLI—informing it of JUUL's wild popularity with young people and in many cases requesting that JLI do something to stop it.[550]

**JLI Worked With Veratad Technologies To Expand Youth Access To JUUL Products**

492.    At the same time JLI and the Management Defendants were taking coordinated actions to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base through unlawful marketing and distribution

---

[545] Lauren Czaplicki et al*., Characterising JUUL-related posts on Instagram*, Truth Initiative (Aug. 1, 2019), https://tobaccocontrol.bmj.com/content/early/2019/07/30/tobaccocontrol-2018-054824.

[546] One example of what appear to be JUUL bots in action on Twitter is available at: https://twitter.com/search?q=juul%20bot&src=typd (last visited Apr. 4, 2020).

[547] Hennrythejuul (@hennrythejuul), Twitter (Mar. 4, 2020, 9:35 am) https://twitter.com/hennrythejuul.

[548] Divya Ramamurthi et al*., JUUL and Other Stealth Vaporizers: Hiding the Habit from Parents and Teachers, Tobacco Control 2019,* Stanford Univ. (Sept. 15, 2018), https://tobaccocontrol.bmj.com/content/tobaccocontrol/28/6/610.full.pdf.

[549] *Id*.

[550] Complaint at 60, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

[PROPOSED] SECOND AMENDED COMPLAINT - 164

activities, they worked with an outside entity—Veratad Technologies LLC—to get JUULs into the hands of the largest number of consumers possible.

493.    In furtherance of JLI and the Management Defendants' efforts to secure youth sales so crucial to expanding JUUL's market share (and JLI's profits), and as detailed below, from approximately 2015 to 2018, JLI and Veratad worked together to try to pass as many people as possible through an on-line "age verification" system that users had to pass to be able to order JUUL Products.

494.    JLI's website, including its online store, was pivotal to these efforts. Early marketing documents show that JLI planned a "consumer journey" that started with a consumer being exposed to misleading JUUL marketing in stores, where JUUL's "fun" and "approachable" in-store marketing would lead consumers to JLI's website for additional misrepresentations and

**CUSTOMER JOURNEY**








**SEE JUUL AT CONVENIENCE**
Stand out as a promising next-gen version of whatever they are vaping

**ENGAGING POINT-OF-SALE**
Eye-catching video displays that inform & excite consumers of JUUL benefits

**OUT-OF-STORE MARKETING**
Word of mouth via influencers or through local promotions like direct mailers, radio and billboard

**BUY JUUL**
Available at their local smoke shop or convenience store

**BUILDING BRAND LOYALTY**
@ JUULvapor.com for reviews, informative how to' videos, organic search, online ads, engage with and form brand loyalty, gain confidence through a well-curated website as well as social media

**INFLUENTIAL REVIEWS**
Consumers will be influenced by product reviews from industry leading media partners like Gear Patrol, Wired, reddit and more

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY                                                          INREJUUL_00329660

[PROPOSED] SECOND AMENDED COMPLAINT - 165

omissions about JUUL Products, an email subscription sign-up, and purchases through JLI's ecommerce platform:[551]

495.    JLI worked with Veratad to provide age verification services for its website from 2015 to 2018. Veratad has also provided age verification services to other e-cigarette sellers, including Lorillard[552] and Altria.[553] Consistent with the claim on Veratad's website that "You can create your own verification rules," the company encouraged sellers like JLI to set the desired compliance level for age verification. As a member of a major e-cigarette trade organization, Veratad also offered insight into what competitors were doing, and offered to "guide your setup to follow industry best practices for age verification."

496.    Though it is illegal to sell and ship e-cigarettes to minors under both state and federal law, JLI and Veratad designed and implemented an age verification system designed to maximize the number of prospective purchasers who "pass" the process, rather than to minimize the number of underage sales.[554] As a result of these intentionally permissive age verification practices, JLI and Veratad used online payment systems and the US mails to ship tens of millions of dollars of JUUL Pods to unverified customers, many of whom were minors.

497.    From June 2015 through the end of 2018, the age verification process on JLI's website typically prompted prospective purchasers to submit their name, address, and date of birth, which JLI forwarded to Veratad. Veratad then attempted to match all or some limited part of the consumer's information to a person of the minimum legal sales age in its database. If Veratad was able to locate a sufficient match of the prospective purchaser to a person of the

_____

[551]INREJUUL_00329660

[552] Staff of Sen. Richard Durbin et al., 113th Cong., *Gateway to Addiction?* (Apr. 14, 2014), https://www.durbin.senate.gov/imo/media/doc/Report%20-%20E-Cigarettes%20with%20Cover.pdf.
[553]INREJUUL_00174362.
[554] Complaint at 165, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=.

minimum legal sales age in its database, then it would return a "pass" result to JLI. If Veratad was unable to make such a match, Veratad returned a "fail" result to JLI.

498.    If Veratad returned a "fail" result to JLI, rather than decline the prospective purchaser, JLI would prompt the person to enter an "alternate" address. If Veratad still could not find a match based on this alternate address, JLI would prompt the consumer to enter the last four digits of his or her social security number.

499.    If Veratad, supplied with the last four digits of a consumer's social security number, still could not match the consumer to a person of the minimum legal sales age in its database, JLI would prompt the consumer to upload an image or photograph of his or her driver's license or another governmental identification document. A JLI employee would then conduct a personal review of the image and decide whether the consumer was of the minimum legal sales age.

500.    Crucially, Veratad's age verification system was purposefully flexible, so JLI and Veratad could work together to decide just how closely a prospective purchaser's personal information had to match records in Veratad's database in order to "pass" the age verification process. JLI and Veratad could also set, or modify, the applicable minimum legal sales age to be used for verification.

501.    By the fall of 2015, JLI and Veratad knew that bulk purchases were being made for resale on JLI's website by minors and for resale to minors.[555] ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

_____

[555]Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?: The e-cigarette company says it never sought teenage users, but the F.D.A. is investigating whether Juul intentionally marketed its devices to youth*, NY Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html.

[PROPOSED] SECOND AMENDED COMPLAINT - 167

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████ [556]

502.    Internal JLI documents confirm that JLI discussed underage purchases with Veratad. ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████ ███████████████████

████████████████████████████████████████████████████

██ "[557]

503.    Nevertheless, the two companies worked together to find ways to "bump up [JLI's] rate of people who get through age verification."[558] JLI repeatedly sought, and Veratad repeatedly recommended and directed, changes to the age verification process so that more prospective JUUL purchasers would "pass." Both did so in an effort to increase direct sales of JLI's e-cigarettes without regard to whether its less stringent age verification process would permit more underage consumers to purchase them.

504.    Between June 2015 and August 2017 (and perhaps even through early 2018), JLI and Veratad tailored the age verification system to "pass" prospective purchasers even if certain portions of the purchaser's personal information—e.g., the purchaser's street address or date of

_____

[556] INREJUUL_00300253-258.
[557] INREJUUL_00209176-180.
[558] INREJUUL_00276489-INREJUUL_00276490.

[PROPOSED] SECOND AMENDED COMPLAINT - 168

birth—did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.[559]

505.    Similarly, between June 2015 and August 2017, JLI and Veratad tailored the system to "pass" a prospective purchaser under certain circumstances even when the prospective purchaser's year of birth did not match the information corresponding to a person of the minimum legal sales age in Veratad's database.

506.    JLI and Veratad sought to increase "pass" rates by modifying the age verification system to allow users multiple opportunities to change their personal information if a match was not initially found in an appropriate government database. A Veratad Performance Report from August 5, 2017 shows that, for 1,963 consumers Veratad recorded 3,794 transactions—an average of 1.93 attempts per consumer.[560] Only 966 consumers—less than half—passed age verification on the first attempt.[561] By allowing consumers to alter their personal information and attempt age verification up to three times, JLI was able to increase its database match pass rate from 49.2% to 61.2%.[562]

507.    By design, these lax requirements ensured underage consumers could "pass" JLI's age verification process and purchase JUUL e-cigarettes directly from JLI's website by using their parent's name, home address, and an approximate date of birth. JLI was aware of this fact,

_____

[559] Complaint at 43, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019), https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=. A January 29, 2018 email exchange between Tom Canfarotta, Director of Strategic Accounts & Client Quality Services at Veratad, and Annie Kennedy, JUUL's Compliance Manager, reveals this to have been the case. Kennedy asked Canfarotta why a particular customer had "passed via the address step (public record check)…but we've since learned that is not a correct address—so we're curious as to how it passed." In response, Canfarotta wrote, "Your current rule set does not require a full address match." He went on to explain that approval of the customer was not an anomaly or a mistake; instead, Veratad's age verification system was working exactly the way it was designed.
[560] Id.
[561] Id.
[562] Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 169

1

2    as evidenced by the multiple complaints it received from parents who alleged their children did

3    just that.[563]

4        508.    JLI directed and approved the system it had implemented with Veratad that caused

5    accounts with "bad info" to be "AV approved" but, as a Senior Business Systems Manager at JLI

6    commented, "if [v]eratad passed it [then] it's not on us."

7        509.    JLI customer service representatives even encouraged those who failed age

8    verification to "make multiple accounts in order to pass AV [age verification]."[564] Customer

9    service representatives would go as far as to alter identifying information for them; a Slack chat

10   among customer service representatives confirmed that representatives were authorized to "adjust

11   the street address, apartment number, or zip code" associated with shipment.[565]

12       510.    The age verification procedures designed by JLI and Veratad have allowed

13   hundreds of thousands of e-cigarette products to be sold and/or delivered to fictitious individuals

14   at fictitious addresses.[566] Many of these improper sales may have been made to underage

15   purchasers or to resellers who sold the products to underage consumers on the grey market.[567]

16       511.    By divorcing the address from the other customer data in the age verification

17   process, JLI and Veratad allowed consumers to request that tobacco products be sent to locations

18   other than their permanent legal residences.[568] For example, JLI sent thousands of orders to

19   commercial high rises and office parks.[569] It is unlikely these orders would have been approved

20   had JUUL and Veratad required that addresses provided by users match information in an

21

22   _____

23

24   [563]INREJUUL_00184119.

25   [564]INREJUUL_00215324-INREJUUL_00215325.
     [565]Complaint at 168, People v. JUUL Labs, Inc., No. RG19043543 (Super. Ct. of Cal. Nov. 18, 2019),

26   https://oag.ca.gov/system/files/attachments/press-docs/91186258.pdf.=..
     [566]Id. at 138.

27   [567]Id.
     [568]Id. at 146.

28   [569]Id. at 147.

     [PROPOSED] SECOND AMENDED COMPLAINT - 170

appropriate government database and followed the requirement that the shipping address and billing address be the same.[570]

512.    The failure of the JLI/Veratad age verification procedure was intentional.[571] And despite JLI's concerted effort to enable the sale of federally regulated tobacco products to minors, JLI nevertheless publicly touted Veratad as the "gold standard" of age verification services. For example, ███████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████,"[572] ████████████████████

████████████████████████████████████████████████████████.[573] Similarly, a JLI spokesperson told a reporter at a New York newspaper, ANMY, that JLI uses "industry-leading ID match and age verification technology to ensure that customers" are over twenty-one years of age and that the "information is verified against multiple databases."[574]

513.    In August 2017, JLI responded to public scrutiny by publicly stating that it would increase the purchase age on its website to 21+ by August 23, 2017. In the weeks leading up to that date, it emailed the approximately 500,000 or more potential customers to report that customers who signed up for JLI's "auto-ship" subscription service before August 23, 2017 would not have to prove that they were 21+ for as long as they maintained the subscription to receive JUUL Pods. As discussed herein, JLI knew that these marketing emails were being sent to underage individuals, including those who failed age verification. And at the same time, JLI

_____

[570]*Id.*
[571]*Id.* at 173.
[572]INREJUUL00178123-24.
[573]INREJUUL_00264882-84.
[574]Alison Fox, *'Juul' e-cigarettes require stronger FDA regulation, Schmuer Says*, AMNY, (Oct. 15, 2017), https://www.amny.com/news/juul-e-cigarettes-fda-regulation-1-14485385/.

[PROPOSED] SECOND AMENDED COMPLAINT - 171

advertised that the most popular flavor among youth, Mango, was now available on its "auto-ship" subscription service. As a result of this scheme, JLI's subscription gains more than offset any losses from the site's heightened age verification requirements.



514.    Further underscoring JLI's purpose of growing the e-cigarette market, even if that meant selling to youth, JLI and Veratad did not require that the year of birth and last four digits of the social security number match exactly the information corresponding to a person of the minimum legal sales age in Veratad's database until August 2018.

515.    Tellingly, after JLI and Veratad implemented industry-standard age verification practices, JLI boasted to the FDA that approval rate for sales on its website had dropped to 27%.

516.    While on one hand JLI continued working with Veratad to ensure minors could purchase JUUL Products online, on the other JLI continued to make false and fraudulent statements about the strength of its age verification system. For example, on June 5, 2018, JLI tweeted about its relationship with Veratad, claiming that "We've partnered with Veratad Technologies to complete a public records search, only reporting back whether or not you are 21 years of age or older."[575] In addition, on November 13, 2018, JLI and the Managements

---

[575]    JUUL    Labs,    Inc.    (@JUULvapor),    Twitter    (June    5,    2018), https://twitter.com/juulvapor/status/1004055352692752386.

[PROPOSED] SECOND AMENDED COMPLAINT - 172

Defendants caused a post to appear on JLI's website stating that JLI was "Restricting Flavors to Adults 21+ On Our Secure Website" and that JLI's age-verification system was "an already industry-leading online sales system that is restricted to 21+ and utilizes third party verification."[576] A video accompanying this message stated "At JUUL labs we're committed to leading the industry in online age verification security to ensure that our products don't end up in the hands of underage users" and included an image of a computer with a chain wrapped around it and locked in place.[577] These statements were fraudulent because JLI and the Management Defendants were and had been coordinating with Veratad to ensure that their age verification system did not actually prevent youth from purchasing JUUL Products.

517.    Not only did JLI's efforts result in more sales to minors, JLI was also able to build a marketing email list that included minors—a data set that would prove highly valuable to Altria.

518.    In the summer of 2017, JLI engaged a company called Tower Data to determine the ages of the persons associated with email addresses on its email marketing list. According to this analysis, approximately 269,000 email addresses on JLI's email marketing list were not associated with a record of an individual who had "passed" JLI's age verification process.[578] Additionally, approximately 40,000 email addresses on JLI's email marketing list were associated with records of individuals who had "failed" JLI's own age verification process.[579] Tower Data informed JLI that 83% of the approximately 420,000 email addresses on JLI's marketing list could not be matched with the record of an individual at least eighteen years of age.[580]

---

[576] *JUUL Labs Action Plan* ("November 2018 Action Plan"), JUUL Labs, Inc. (Nov. 12, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (last visited Apr. 30, 2020).
[577] *Id.*
[578] Complaint at 121, *Commonwealth of Massachusetts v. JUUL,* et al., No. 20-00402 (Super. Ct. of Mass. Feb. 12, 2020) https://www.mass.gov/doc/juul-complaint/download; Janice Tan, *E-cigarette firm JUUL sued for using programmatic buying to target adolescents*, Marketing (Feb. 14, 2020), https://www.marketing-interactive.com/e-cigarette-firm-juul-sued-for-using-programmatic-buying-to-target-adolescents.
[579] *Id.*
[580] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 173

519.     Despite knowing that their marketing list included minors, JLI continued to use that marketing list to sell JUUL Products, and then shared that list with Altria to use for its marketing purposes.

520.     JLI and the Management Defendants knew, however, that it was not enough to disseminate advertisements and marketing materials that promote JLI to youth or to open online sales to youth, while omitting mention of JUUL's nicotine content and manipulated potency. To truly expand the nicotine market, they needed to deceive those purchasing a JUUL device and JUUL Pods as to how much nicotine they were actually consuming. And, through Pritzker, Huh, and Valani's control of JLI's Board of Directors, they did just that.

### JLI Engaged In A Sham "Youth Prevention" Campaign

521.     By April 2017, JLI had determined that the publicity around its marketing to children was a problem. Ashley Gould, the company's General Counsel and Chief Regulatory and Communications Officer, thus sought to "hire a crisis communication firm to help manage the youth interest JUUL has received[.]"[581] By June 2017, JLI began developing a "youth prevention program[.]"[582] While ostensibly aimed at reducing youth sales, JLI's youth prevention program actually served to increase, not reduce, sales to children.

522.     By December 2017, JLI's youth prevention program included extensive work with schools.[583] JLI paid schools for access to their students during school time, in summer school, and during a Saturday School Program that was billed as "an alternative to 'traditional discipline' for children caught using e-cigarettes in school."[584] JLI created the curriculum for these programs, and, like the "Think Don't Smoke" campaign by Philip Morris, which "insidiously encourage[d]

---

[581]INREJUUL_00264878; *see also* INREJUUL_00265042 (retaining Sard Verbinnen, a strategic communications firm).
[582]*See, e.g.*, INREJUUL_00211242.
[583]INREJUUL_00173409.
[584]    Subcommittee    on    Economic    and    Consumer    Policy    Memo    (July    25,    2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 174

kids to use tobacco and become addicted Philip Morris customers[,]"[585] JLI's programs were shams intended to encourage youth ee-cigarette use, not curb it. According to testimony before Congress, during at least one presentation, "[n]o parents or teachers were in the room, and JUUL's messaging was that the product was 'totally safe.' The presenter even demonstrated to the kids how to use a JUUL."[586] Furthermore, JLI "provided the children snacks" and "collect[ed] student information from the sessions."[587]

523.    The problems with JLI's youth prevention programs were widespread. According to outside analyses, "the JUUL Curriculum is not portraying the harmful details of their product, similar to how past tobacco industry curricula left out details of the health risks of cigarette use."[588] Although it is well-known that teaching children to deconstruct ads is one of the most effective prevention techniques, JLI programs entirely omitted this skill, and JLI's curriculum barely mentioned JUUL Products as among the potentially harmful products to avoid.[589] As one expert pointed out, "we know, more from anecdotal research, that [teens] may consider [JUULs] to be a vaping device, but they don't call it that. So when you say to a young person, 'Vapes or e-cigarettes are harmful,' they say, 'Oh I know, but I'm using a JUUL.'"[590]

524.    Internal emails confirm both that JLI employees knew about the similarities of JLI's "youth prevention program" to the earlier pretextual antismoking campaigns by the cigarette industry and that JLI management at the highest levels was personally involved in these efforts. In April 2018, Julie Henderson, the Youth Prevention Director, emailed school officials about

_____

[585] William V. Corr, *American Legacy Foundation Study Shows Philip Morris 'Think Don't Smoke' Youth Anti-Smoking Campaign is a Sham*, Campaign for Tobacco Free Kids (May 29, 2002), https://www.tobaccofreekids.org/press-releases/id_0499.
[586]    Subcommittee    on    Economic    and    Consumer    Policy    Memo    (July    25,    2019), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Supplemental%20Memo.pdf.
[587] *Id*.
[588] Victoria Albert, *Juul Prevention Program Didn't School Kids on Dangers, Expert Says*, The Daily Beast (Oct. 19, 2018), https://www.thedailybeast.com/juul-prevention-program-didnt-school-kids-on-dangers-expert-says.
[589] *Id*.
[590] *Id*.

"the optics of us attending a student health fair" because of "how much our efforts seem to duplicate those of big tobacco (Philip Morris attended fairs and carnivals where they distributed various branded items under the guise of 'youth prevention')."[591] She later wrote that she would "confirm our participation w[ith] Ashley & Kevin"[592]—an apparent reference to Kevin Burns, at the time the CEO of JLI, who would later personally approve JLI's involvement in school programs. In May 2018, Julie Henderson spoke with former members of Philip Morris's "youth education" team,[593] and Ashley Gould received and forwarded what was described as "the paper that ended the Think Don't Smoke campaign undertaken by Philip Morris."[594] The paper concluded that "the Philip Morris campaign had a counterproductive influence."[595]

525.    JLI also bought access to teenagers at programs outside of school. For example, JLI paid $89,000 to the Police Activities League of Richmond, California, so that all youth in the Richmond Diversion Program—which targeted "youth, aged 12-17, who face suspension from school for using e-cigarettes and/or marijuana" and "juveniles who have committed misdemeanor (lesser category) offenses"—would "participate in the JUUL labs developed program, Moving Beyond" for as long as ten weeks.[596] Similarly, JLI paid $134,000 to set up a summer program for 80 students from a charter school in Baltimore, Maryland.[597] Participants were "recruited from grades 3 through 12"[598] and worked closely with teachers to develop personal health plans. JLI

---

[591]INREJUUL_00197608.
[592]INREJUUL_00197607.
[593]INREJUUL_00196624.
[594]INREJUUL_00265202.
[595]Matthew C. Farrelly et al., *Getting to the Truth: Evaluating National Tobacco Countermarketing Campaigns*, 92 Am. J. Public Health 901 (2002).
[596]JLI-HOR-00002181 – 00002182.
[597]INREJUUL_00194247; Invoice to JUUL Labs from The Freedom & Democracy Schools, Inc. for $134,000, dated June 21, 2018, https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00003711.pdf.
[598]INREJUUL_0019428.

[PROPOSED] SECOND AMENDED COMPLAINT - 176

paid nearly 70% of the cost of hiring eight teachers, eight instructional aides, and three other support personnel for the program.[599]

526.    JLI was aware that these out-of-school programs were, in the words of Julie Henderson, "eerily similar" to the tactics of the tobacco industry.[600] In June 2018, Ms. Henderson described "current

**The FDA Warned JUUL And Others That Their Conduct Is Unlawful**

527.    Throughout 2018, the FDA put JLI and others in the e-cigarette industry on notice that their practices of marketing to minors needed to stop. It issued a series of warnings letters and enforcement actions:

528.    On February 24, 2018, the FDA sent a letter to JLI expressing concern about the popularity of its products among youth and demanding that JLI produce documents regarding its marketing practices.[601]

529.    In April 2018, the FDA conducted an undercover enforcement effort, which resulted in fifty-six warning letters issued to online retailers, and six civil money complaints to retail establishments, all of which were related to the illegal sale of e-cigarettes to minors.[602] Manufacturers such as JLI were also sent letters requesting documents regarding their marketing and sales methods.[603]

---

[599]The Freedom & Democracy Schools, Inc., *Proposal to JUUL Labs for Funding the Healthy Life Adventures Summer Pilot* (June 9, 2018), https://oversight.house.gov/sites/democrats.oversight.house.gov/files/JLI-HOR-00002789_Redacted.pdf.
[600]INREJUUL_00194646.
[601]Matthew Holman, *Letter from Director of Office of Science, Center for Tobacco Products, to Zaid Rouag, at JUUL Labs, Inc.*, U.S. FDA (Apr. 24, 2018), https://www.fda.gov/media/112339/download.
[602]*Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[603]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 177

530.     In May 2018, the FDA again issued more warning letters to manufacturers, distributors, and retailers of e-liquids for labeling and advertising violations; these labels and advertisements targeted children and resembled children's food items such as candy or cookies.[604]

o     In September 2018, the FDA engaged in several other regulatory enforcement actions, issuing over 1300 warning letters and civil money complaints to e-cigarette and e-liquid retailers and distributors.[605]

o     On September 12, 2018, the FDA sent letters to JLI and other e-cigarette manufacturers putting them on notice that their products were being used by youth at disturbing rates.[606] The FDA additionally requested manufacturers to enhance their compliance monitoring mechanisms, implement stricter age verification methods, and limit quantities and volume of e-cigarette products that could be purchased at a time.[607]

531.     Finally, in October 2018, the FDA raided JLI's headquarters and seized more than a thousand documents relating to JLI's sales and marketing practices.[608] ████████████ ████████████████████████████████████████████████████████████████████ ████████████████.[609]     Since then, the FDA, the Federal Trade Commission, multiple state attorneys general and the U.S. House of Representatives Committee on Oversight and Reform have all commenced investigations into JLI's role in the youth e-cigarette epidemic and whether JLI's marketing practices purposefully targeted youth.

---

[604]*Id.*

[605]*Id.*

[606]*Letter from US FDA to Kevin Burns*, U.S. FDA (Sept. 12, 2018), https://www.fda.gov/media/119669/download.

[607]Press Release, *FDA takes new steps to address epidemic of youth e-cigarette use, including a historic action against more than 1,300 retailers and 5 major manufacturers for their roles perpetuating youth access*, US FDA (Sept. 11, 2018), https://www.fda.gov/news-events/press-announcements/fda-takes-new-steps-address-epidemic-youth-e-cigarette-use-including-historic-action-against-more.

[608]Laurie McGinley, *FDA Seizes Juul E-Cigarette Documents in Surprise Inspection of Headquarters*, Wash. Post (Oct. 2, 2018), https://www.washingtonpost.com/health/2018/10/02/fda-seizes-juul-e-cigarette-documents-surprise-inspection-headquarters/.

[609]ALGAT0003449871.

[PROPOSED] SECOND AMENDED COMPLAINT - 178

532.    Siddharth Breja, who was senior vice president for global finance at JLI, "claims that after the F.D.A. raided Juul headquarters in October 2018, seeking internal documents, Mr. Burns instructed Mr. Breja and other executives not to put anything relating to regulatory or safety issues in writing, so that the F.D.A. could not get them in the future."[610]

**In Response To Regulatory Scrutiny, Defendants Misled The Public, Regulators, And Congress That JLI Did Not Target Youth**

533.    To shield their youth-driven success from scrutiny, Altria, JLI, and the Management Defendants' had a long-running strategy to feign ignorance over JLI and the Management Defendants' youth marketing efforts and youth access to JLI's products. They were well aware that JLI's conduct in targeting underage users was reprehensible and unlawful, and that if it became widely known that this was how JLI obtained its massive market share, there would be a public outcry and calls for stricter regulation or a ban on JLI's products. Given the increasing public and regulatory scrutiny of JLI's market share and marketing tactics, a dis-information campaign was urgently needed to protect the Defendants' bottom line. For this reason, JLI, the Management Defendants, and Altria all hid JLI's conduct by vociferously denying that JLI had marketed to and targeted youth and instead falsely claimed that JLI engaged in youth prevention. Defendants continued to make these statements while and after actively and successfully trying to market to and recruit youth non-smokers. These false statements were designed to protect JLI's market share, and Altria's investment, by concealing JLI's misconduct.

534.    For example, after 11 senators sent a letter to JLI questioning its marketing approach and kid-friendly e-cigarette flavors like Fruit Medley, Creme Brulee and mango, JLI visited Capitol Hill and told senators that it never intended its products to appeal to kids and did not realize youth were using its products, according to a staffer for Sen. Dick Durbin (D-Ill.).

---

[610]Sheila Kaplan & Jan Hoffman, *Juul Knowingly Sold Tainted Nicotine Pods, Former Executive Say*, N.Y. Times (Nov. 20, 2019), https://www.nytimes.com/2019/10/30/health/juul-pods-contaminated.html.

JLI's statements to Congress—which parallel similar protests of innocence by tobacco company executives—were false.

535.    Defendants also caused JLI to make public statements seeking to disavow the notion that it had targeted and sought to addict teens:

o    "It's a really, really important issue. We don't want kids using our products." (CNBC Interview of JLI's Chief Administrative Officer, December 14, 2017)[611]

o    "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." (JLI Social Media Post, March 14, 2018)[612]

o    "Our company's mission is to eliminate cigarettes and help the more than one billion smokers worldwide switch to a better alternative," said JUUL Labs Chief Executive Officer Kevin Burns. "We are already seeing success in our efforts to enable adult smokers to transition away from cigarettes and believe our products have the potential over the long-term to contribute meaningfully to public health in the U.S. and around the world. At the same time, we are committed to deterring young people, as well as adults who do not currently smoke, from using our products. We cannot be more emphatic on this point: No young person or non-nicotine user should ever try JUUL." (JLI Press Release, April 25, 2018);[613]

o    "Our objective is to provide the 38 million American adult smokers with meaningful alternatives to cigarettes while also ensuring that individuals who are not already

---

[611] Angelica LaVito, *Nearly one-quarter of teens are using pot*, CNBC (Dec. 14, 2017), https://www.cnbc.com/2017/12/13/marijuana-and-nicotine-vaping-popular-among-teens-according-to-study.html (Interview with Ashely Gould, JUUL Chief Administrative Officer) (emphasis added).
[612] Robert K. Jackler et al., *JUUL Advertising Over Its First Three Years on the Market*, Stan Rsch. into the Impact of Tobacco Advert. 15 (Jan. 31, 2019), http://tobacco.stanford.edu/tobacco_main/publications/JUUL_Marketing_Stanford.pdf (citing a JUUL social media post from March 14, 2018) (emphasis added).
[613] JUUL Labs, Inc., *JUUL Labs Announces Comprehensive Strategy to Combat Underage Use*, MarketWatch (Apr. 25, 2018), https://www.marketwatch.com/press-release/juul-labs-announces-comprehensive-strategy-to-combat-underage-use-2018-04-25 (emphasis added).

[PROPOSED] SECOND AMENDED COMPLAINT - 180

smokers, particularly young people, are not attracted to nicotine products such as JUUL," said JUUL Labs Chief Administrative Officer Ashley Gould, who heads the company's regulatory, scientific and youth education and prevention programs. "We want to be a leader in seeking solutions, and are actively engaged with, and listening to, community leaders, educators and lawmakers on how best to effectively keep young people away from JUUL." (JLI Press Release, April 25, 2018);[614]

 o "Of course, we understand that parents and lawmakers are concerned about underage use of JUUL. As are we. We can't restate this enough. As an independent company that is not big tobacco, we are driven by our mission and commitment to adult smokers." (JLI CEO Kevin Burns Letter to JUUL Community on Reddit, July 18, 2018)[615]

 o "We welcome the opportunity to work with the Massachusetts Attorney General because, we too, are committed to preventing underage use of JUUL. We utilize stringent online tools to block attempts by those under the age of 21 from purchasing our products, including unique ID match and age verification technology. Furthermore, we have never marketed to anyone underage. Like many Silicon Valley technology startups, our growth is not the result of marketing but rather a superior product disrupting an archaic industry. When adult smokers find an effective alternative to cigarettes, they tell other adult smokers. That's how we've gained 70% of the market share. . . Our ecommerce platform utilizes unique ID match and age verification technology to make sure minors are not able to access and purchase our products online." (Statement from Matt David, JLI Chief Communications Officer, July 24, 2018);[616]

---

[614]*Id* (emphasis added).

[615] *A Letter to the JUUL Community from CEO Kevin Burns*, Reddit (July 18, 2018), https://www.reddit.com/r/juul/comments/8zvlbh/a_letter_to_the_juul_community_from_ceo_kevin/ (emphasis added).

[616]*Statement Regarding The Press Conference Held By The Massachusetts Attorney General*, JUUL Labs, Inc. (July 24, 2018), https://newsroom.juul.com/statement-regarding-the-press-conference-held-by-the-massachusetts-attorney-general/ (emphasis added).

o    "We did not create JUUL to undermine years of effective tobacco control, and we do not want to see a new generation of smokers. . . . We want to be part of the solution to end combustible smoking, not part of a problem to attract youth, never smokers, or former smokers to nicotine products. . . .We adhere to strict guidelines to ensure that our marketing is directed towards existing adult smokers."." (JLI's website as of July 26, 2018);[617]

o    "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL Products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL Products." (JLI Website, November 12, 2018)[618]

o    "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." (JLI Website, November 13, 2018)[619]

o    "Any underage consumers using this product are absolutely a negative for our business. We don't want them. We will never market to them. We never have." (James Monsees, quoted in *Forbes*, November 16, 2018);[620]

o    "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a

_____

[617]    *Our Responsibility*, JUUL Labs, Inc. (July 26, 2018), https://web.archive.org/web/20180726021743/https://www.juul.com/our-responsibility (last visited Mar. 29, 2020) (emphasis added).

[618]*JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/ (statement of Ken Burns, former CEO of JUUL) (emphasis added).

[619]*Id.* (emphasis added).

[620]Kathleen Chaykowski, *The Disturbing Focus of Juul's Early Marketing Campaigns*, Forbes (Nov. 16, 2018 2:38 PM), https://www.forbes.com/sites/kathleenchaykowski/2018/11/16/the-disturbing-focus-of-juuls-early-marketing-campaigns/#3da1e11b14f9 (emphasis added) (statement of James Monsees).

[PROPOSED] SECOND AMENDED COMPLAINT - 182

parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." (CNBC Interview of JLI CEO, July 13, 2019)[621]

o    "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." (JLI Website, August 29, 2019)[622]

o    James Monsees, one of the company's co-founders, said selling JUUL Products to youth was "antithetical to the company's mission."(James Monsees' Statement to New York Times, August 27, 2019)[623]

o    Adam Bowen, one of the company's co-founders, said he was aware early on of the risks e-cigarettes posed to teenagers, and the company had tried to make JUUL "as adult-oriented as possible."(Adam Bowen's Statement to the New York Times, August 27, 2019);[624]

o    "We have never marketed to youth and we never will."(JLI Statement to Los Angeles Times, September 24, 2019);[625]

o    "I have long believed in a future where adult smokers overwhelmingly choose alternative products like JUUL. That has been this company's mission since it was founded, and it has taken great strides in that direction." (JLI's CEO K.C. Crosthwaite, September 25, 2019);[626]

---

[621]Angelica LaVito, *As JLI grapples with teen vaping 'epidemic,' CEO tells parent 'I'm sorry'*, CNBC (July 13, 2019), https://www.cnbc.com/2019/07/13/as-juul-deals-with-teen-vaping-epidemic-ceo-tells-parents-im-sorry.html (emphasis added).

[622]*Our Actions to Combat Underage Use*, JUUL Labs, Inc. (Aug. 29, 2019), https://newsroom.juul.com/our-actions-to-combat-underage-use/ (JUUL statement in response to lawsuits) (emphasis added).

[623]Matt Richtel & Sheila Kaplan, *Did Juul Lure Teenagers and Get 'Customers for Life'?*, N.Y. Times (Aug. 27, 2018), https://www.nytimes.com/2018/08/27/science/juul-vaping-teen-marketing.html (emphasis added).

[624]*Id* (emphasis added).

[625]Michael Hiltzik, *Column: Studies show how JLI exploited social media to get teens to start vaping*, L.A. Times (Sept. 24, 2019), https://www.latimes.com/business/story/2019-09-24/hiltzik-juul-target-teens (statement made on behalf of JUUL) (emphasis added).

[626]Juul Labs Names New Leadership, Outlines Changes to Policy and Marketing Efforts, JUUL Labs, Inc. (Sept. 25, 2019), https://newsroom.juul.com/juul-labs-names-new-leadership-outlines-changes-to-policy-and-marketing-efforts/ (emphasis added) (statement by K.C. Crosthwaite).

o    "As scientists, product designers and engineers, we believe that vaping can have a positive impact when used by adult smokers, and can have a negative impact when used by nonsmokers. Our goal is to maximize the positive and reduce the negative." (JLI Website, March 6, 2020);[627]

o    "JUUL was designed with adult smokers in mind." (JLI Website, last visited March 29, 2020).[628]

536.    Defendants either made these statements directly or caused them to be transmitted as a part of their schemes to defraud the public about what they were selling and to whom.

537.    Altria also engaged in wire fraud when it made public statements seeking to disavow the notion that JLI had targeted and sought to addict teens:

o    "Altria and JUUL are committed to preventing kids from using any tobacco products. As recent studies have made clear, youth vaping is a serious problem, which both Altria and JUUL are committed to solve. As JUUL previously said, 'Our intent was never to have youth use JUUL Products.'" (Altria News Release, December 20, 2018).[629]

538.    However, JLI, the Management Defendants, and Altria realized that attempting to shift public opinion through fraudulent statements was not enough to achieve their goal of staving off regulation. To accomplish this goal, they would also need to deceive the FDA and Congress. And so they set out to do just that through statements and testimony by JLI representatives. These include, but are not limited to, the following:

_____

[627]*Our Mission*, JUUL LABS (2019), https://www.juul.com/mission-values (last visited Apr. 4, 2020) (emphasis added).
[628]JUUL Labs, Inc., https://www.juul.com/ (last visited Mar. 29, 2020) (emphasis added).
[629]Altria Group, Inc., *Altria Makes $12.8 Billion Minority Investment to Accelerate Harm Reduction and Drive Growth* ("Altria Minority Investment") (Form 8-K), Ex. 99.1 (Dec. 20, 2018), https://www.sec.gov/Archives/edgar/data/764180/000119312518353970/d660871dex991.htm (emphasis added).

*Statements By JLI To The FDA:*

o    "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." (Letter to FDA, June 15, 2018).[630]

o    "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." (Letter to FDA, June 15, 2018).[631]

*Statements By Altria To The FDA:*

o    "[W]e do not believe we have a current issue with youth access to or use of our Pod-based products, we do not want to risk contributing to the issue." (Letter from Altria CEO to FDA Commissioner Scott Gottlieb, October 25, 2018).[632]

o    "We believe e-vapor products present an important opportunity to adult smokers to switch from combustible cigarettes." (Letter to FDA Commissioner Gottlieb, 10/25/18)

*Statements By JLI To Congress*:

o    "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority than combatting underage use." (Testimony of James Monsees, July 25, 2019).[633]

o    "Our product is intended to help smokers stop smoking combustible cigarettes." (Ashley Gould, JLI Chief Administrative Officer, Testimony before House Committee on Oversight and Reform, July 25, 2019).[634]

---

[630]Letter from JUUL's Counsel at Sidley Austin to Dr. Matthew Holman, FDA at 2 (June 15, 2018) (emphasis added).
[631]*Id.* at 3 (emphasis added).
[632]Letter from Altria CEO Howard Willard to Dr. Scott Gottlieb, FDA at 2 (October 25, 2018) (emphasis added).
[633]*Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. 1 (2019) (statement of James Monsees, Co-Founder, JUUL Labs, Inc.)., https://docs.house.gov/meetings/GO/GO05/20190725/109846/HHRG-116-GO05-Wstate-MONSEESJ-20190725.pdf.
[634]*Examining Juul's Role in the Youth Nicotine Epidemic*, *Hearing Before the H. Comm. on Oversight and Reform, Subcomm. on Econ. and Consumer Policy*, 116th Cong. (2019) (statement of Ashley Gould, Chief Administrative

*Statements By Altria To Congress:*

o        "In late 2017 and into early 2018, we saw that the previously flat e-vapor category had begun to grow rapidly. JUUL was responsible for much of the category growth and had quickly become a very compelling product among adult vapers. We decided to pursue an economic interest in JUUL, believing that an investment would significantly improve our ability to bring adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." (Letter from Altria CEO to Senator Durbin, October 14, 2019).[635]

539.    Each of the foregoing statements constitutes an act of wire fraud. JLI, Monsees, and Altria made these statements, knowing they would be transmitted via wire, with the intent to deceive the public, the FDA, and Congress as to the Defendants' true intentions of hooking underage users.

540.    Their disinformation scheme was successful. While certain groups such as the American Medical Association were calling for a "sweeping ban on vaping products,"[636] no such ban has been implemented to date. Accordingly, JLI's highly addictive products remain on the market and available to underage users.

**Altria Knew JLI Was Targeting Youth And, Together With The Management Defendants, Exercised Control Over JLI To Protect And Expand Youth Sales And Defraud The Public About Their Actions**

541.    Altria was directly informed as early as 2015 that a youth addiction crisis was on the horizon. ██████████████████████████████████████████████

_____

Officer, JUUL Labs, Inc. )., https://www.c-span.org/video/?462992-1/hearing-cigarettes-teen-usage-day-2&start=6431 at 01:53:25 (emphasis added).

[635]Letter from Howard A. Willard III, Altria to Senator Richard J. Durbin, 6 (October 14, 2019) (emphasis added).

[636]Karen Zraick, *A.M.A. Urges Ban on Vaping Products as JLI is Sued by More States*, N.Y. Times (Nov. 19, 2019), https://www.nytimes.com/2019/11/19/health/juul-lawsuit-ny-california.html.

1

2

███████████████████████████████████████████████████████

███████████████████████████████████████.”[637]  ███████

3

███████████████████████████████████████████████████████

4

███████████████████████████████████████████████████████

5

███████████████████████████████████████████████████████

6

███████████████████████████████████████████████████████

7

███████████████████████████████████████████.[638]

8       542.    As stated above, according to Howard Willard, Altria first contacted JLI about a

9   commercial relationship in early 2017, with "confidential discussions" spearheaded by Pritzker

10  and Valani, on the one hand, and senior executives of Altria and Altria Client Services on the

11  other, beginning in the Spring of 2017.[639]  These continued for eighteen months, culminating in

12  Altria's December 2018 equity investment in JLI. Discussions before, during, and after the deal

13  was formalized often took place in California, where JUUL was based.[640]  At all times until its

14  purported 2020 headquarters move to Washington, D.C., the JUUL founders, key executives, key

15  employees, and early investors were—and mostly still are—in the San Francisco Bay Area.

16      543.    While at first blush, these meetings between Altria and Altria Client Services and

17  Pritzker and Valani about potential investment—described in detail below—might seem like

18  ordinary business activity, they were anything but. For nearly 18 months, Altria and Altria Client

19  Services dangled the carrot of a multi-billion dollar payout in front of Pritzker and Valani—

20  months in which Pritzker, Valani, and the other Management Defendants committed numerous

21  acts of fraud to grow the business of JLI in order to satisfy Altria's expectations. And at the same

22

23  _____

24  [637]ALGAT0000088472.
    [638]*Id.*

25  [639]Altria's October 14, 2019 letter to Senator Durbin, et. al., by Howard Willard III (2019).
    [640]ALGAT0003366194 █████████████████████████████████

26  ███████████████████████████████████████████████████████

27  ███████████████████████████████████████████████████████

28  █████████

[PROPOSED] SECOND AMENDED COMPLAINT - 187

time, Altria and Altria Client Services were actively courting Pritzker and Valani with that promised payout, they were gathering information on JLI that confirmed Altria would be purchasing a company with a proven track-record of sales to youths.

544. Even before 2017, Altria and Altria Client Services—as with anyone paying attention to the e-vapor industry at the time—were well aware that JLI had been targeting kids with its youthful marketing. As noted above, JLI's "Vaporized" campaign had made its way into the national zeitgeist, with Stephen Colbert noting that the advertising appealed "to the youths." So, not only did Altria and Altria Client Services know JLI was targeting kids at the time it reached out to begin negotiations, it also knew that such targeting was highly successful. ████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████.[641]

545. ██████████████████████████████████████████████

████████████████████████████████████████████████████████

██████[642] ██████████████████████████████████████████

████████████████████████████████████████████████████████

██[643]███████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████[644]

546. ██████████████████████████████████████████████

████████████████████████████████████████████████████████,

_____

[641]ALGAT0002412177.
[642]ALGAT0003012781.
[643]Id.
[644]Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 188

█████████████████████████████████████████████████

████████████████████████████ ██ [645] ███████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████

547.    █████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████████████████████████████████████████

548.    █████████████████████████████████████████

███ ," [646] ████████████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████████ ,[647] ██████████████

█████████████████████████████████████████████████

███████████████████████████████ ," [648]

_____

[645] As discussed below, JLI had a partnership with Avail Vapor in which Avail gathered detailed data on the sale of JUUL products. Also discussed below, Altria was a minority owner of Avail at the time.
[646] ALGAT0003359749.
[647] *Id.*
[648] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 189

549.  ████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████.

**Altria Worked With Pritzker And Valani To Secure Control Of JLI And To Exploit JLI**

**For Their Mutual Benefit**

550.  The initial discussions between Altria (and Altria Client Services) and JLI's
leadership ████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████████████,"[649]

551.  Internal documents from the time show that Altria was eyeing JLI as an acquisition
target. ████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
████████████████████████████.,"[650]██████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

---

[649]JLI01369848.
[650]ALGAT0002412177.

[PROPOSED] SECOND AMENDED COMPLAINT - 190

552. ████████████████████████████████████████████████████████████[651]

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████."[652]

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████████████████

553. From the very beginning of their negotiations, it was clear to Altria and Altria Client Services that they were operating within a closing window in which JLI's sales to youths could continue unabated. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

---

[651] INREJUUL_00349529.
[652] ALGAT0002412181.

██████████████████████████████████████████████.[653] And as set forth below, Altria and Altria Client Services were well aware of the public scrutiny of JLI's youth marketing efforts, which could only lead to unfavorable regulatory action. Altria and Altria Client Services had to convince Pritzker and Valani to let Altria acquire or buy into JLI before it was too late.

554.    ████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

████  ████  ████  ██  ████  ████  ██  ██  ████  ████  ████

████████"[654] ████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████."[655]

555.    From the very beginning of their relationship, Altria and Altria Client Services communicated to Pritzker and Valani—who, in turn, communicated to Defendants Bowen, Monsees, and Huh—that they would profit handsomely by accepting Altria's investment and

_____

[653]*Id.*
[654]ALGAT0002834151.
[655]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 192

following its lead in growing the business of JLI. Of course, and as set forth herein, this growth would be pursued through fraud and deceit to both the public and regulators.

556.    ████████████████████████████████, Pritzker and Valani were the perfect choice to liaise with Altria and Altria Client Services on behalf of the Management Defendants. Pritzker has been long familiar with the tobacco industry from his family's ownership of chewing-tobacco giant Conwood before selling it to Reynolds American, Inc., a subsidiary of British American Tobacco. And Valani, for his part, was intimately familiar with the business of JLI. He was the company's first "angel investor" and was a regular presence within the halls of JLI (then Pax Labs) well before the company even had a working product.[656] Notably, Pritzker and Valani are the only Defendants who have admitted to using non-discoverable messaging services to communicate regarding JLI business. █████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████.[658]

557.    Altria was an ideal model for growing JLI. Altria, including through its subsidiaries, has decades of experience targeting kids through youth-appealing marketing images and themes.[659] It also had decades of experience using flavors to hook kids, and still does so in many international markets.[660] And Altria has decades of experience misleading and lying to the

_____

[656]Alex Norcia, JUUL Founders' First Marketing Boos Told Us the Vape Giant's Strange, Messy Origins, VICE (Nov. 5, 2019), https://www.vice.com/en/article/43kmwm/juul-founders-first-marketing-boss-told-us-the-vape-giants-strange-messy-origins.

[657]Riaz Valani's Responses and Objections to Plaintiffs' First Set of Interrogatories; Nicholas Pritzker's Responses and Objections to Plaintiffs' First Set of Interrogatories.

[658]Id.

[659]Hafez, N., & Ling, P. M. (2005). How Philip Morris built Marlboro into a global brand for young adults: implications for international tobacco control. Tobacco Control, 14(4), 262-271. Retrieved from https://escholarship.org/uc/item/5tp828kn.

[660]Campaign for Tobacco Free Kids, The Facts about Philip Morris International: Company Is Cause of the Tobacco Problem, Not the Solution (November 15, 2017), available at https://www.tobaccofreekids.org/assets/images/content/PMI_bad_acts.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 193

public about their efforts to target kids through marketing and flavors, and making similar fraudulent representations to regulators in order to delay or deter regulations.[661] Yet, because it was a party to the Master Settlement Agreement, many of the tactics used by JLI to target kids were unavailable to Altria. So Altria and Altria Client Services found a new way, drawing on Altria's storied history of unlawful activity to partner to the Management Defendants in JLI's fraud at every turn. The result was bundles of cash for the Management Defendants, a new generation of youth customers for Altria and its subsidiaries, and a public left reeling from a rapidly growing youth vaping epidemic.

558.



[661] *See, e.g., United States v. Philip Morris USA, Inc.*, 449 F. Supp. 2d 1 (D.D.C. 2006).
[662] JLI01129881.
[663] *Id.*
[664] *Id.*
[665] *Id.*
[666] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 194

█████████████████████████████████████████████████

████████████████████.″[667]

559.    ██████████████████████████████

██████████████████████████████.[668]██████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

██████████.[669]

560.    ██████████████████████████████

█████████████████████████████████████████████████

██████████████████████.″[670]████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████

_____

[667] *Id.*
[668] *Id.*
[669] ALGAT0000112523.
[670] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 195

561.     Communications between Altria, Altria Client Services, Pritzker, and Valani were frequent and their meetings continued at a regular pace over the next year and a half. ▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.[671]

562.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮.[672]▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮.[673]▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮."[674]▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮."[675]

563.     ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.[676]▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮

_____

[671] ALGAT0000025589; ALGAT0000041165.
[672] ALGAT0000997542.
[673] *Id.*
[674] *Id.*
[675] *Id.*
[676] ALGAT0000036407; ALGAT0000111921.

[PROPOSED] SECOND AMENDED COMPLAINT - 196

564.    Altria and Altria Client Services and Pritzker and Valani continued their correspondence between December 2017 and July 2018. ███████████

███████████████████████████████ ███. [677] █████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████"[678] ██████████

████████████████████████████████████████

███████████████████"[679] █████████████████

████████████████████████████████████████

████████████████████████████████"[680] ███████

████████████████████████████████████████

████████████████████████████████████████

██████████████". [681] ████████████████████

████████████████████████████████████████

██████████████". [682] ████████

565.    █████████████████████████████

███████. [683] ████████████████████████████

―――――――――――――――

[677] ALGAT0002817348.
[678] JLIFTC00639178.
[679] JLIFTC00638936; ALGAT0005452943.
[680] ALGAT0004031391.
[681] JLIFTC01082372.
[682] JLIFTC01082370.
[683] ALGAT0004030132.

[PROPOSED] SECOND AMENDED COMPLAINT - 197



566.

[684] ALGAT0004031645-46.
[685] Id. (emphasis added).
[686] Id.
[687] Id. (emphasis added).
[688] ALGAT0002817356.

[PROPOSED] SECOND AMENDED COMPLAINT - 198

567. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███.''[689] ████████████████████████████
██████████████████████████████████████.

568. ██████████████████████████████
████████████████████████████████████████
████████████████████████.[690] █████████
███████████████████.[691]

569. ██████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

――――――――――――――――――――



,"[692]

570.  ██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████.[693]

571.  ██████████████████████████████████████

███████████████.[694]

572.  At some point after negotiations had been ongoing between Altria, Altria Client Services, Pritzker, and Valani, Kevin Burns, then-CEO of JLI, joined the negotiations. By this point, Pritzker and Valani had already pushed Altria and Altria Client Services to offer terms highly favorable to the individual investors in JLI, regardless of the true benefit to the company. And by virtue of their control of JLI, the Management Defendants ensured that Kevin Burns went along with the deal.

573.  

—————————————

[692]*Id.*
[693]*Id.*
[694]*Id.*
[695]ALGAT0003443977.
[696]ALGAT0003352121; ALGAT0003352122.

574. ███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████,"[697]███████████████████
████████████████████████

575. ███████████████████████████████████████

███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████,"[698]███████
███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████
████████████████████████████████████████████,
███████████████████████████████████,[699]██████
███████████████████████████████████████████
███████████████████████████████████████████
████████████,[700]

_____

[697] ALGAT0003327931.
[698] JLI01389789.
[699] JLI01389792.
[700] *See also, e.g.,* ALGAT0005581879 ██████████████████████
███████████████████████████.")

576. █████████████████████████████
███████████████████████████████████████
██████████████[701]███████████████████████
███████████████████████████████████████
███████████████████████████████████████
████████[702]████████████████████████[703]████
█████████████████[704]█████

577. █████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
█████████████[705]

578. █████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████████████████████
███████████████████████[706]████████████████,

_____

[701] JLI10518738.
[702] Id.
[703] JLI10518738.
[704] ALGAT0005034057.
[705] JLIFTC00653389.
[706] JLI01374739; JLI01374736.

[PROPOSED] SECOND AMENDED COMPLAINT - 202



579.

**Altria Participated In And Directed The Fraudulent Acts Of JLI Designed To Protect The Youth Market For JUUL**

580.    Altria did not simply take in information regarding JLI's youth sales passively while it pursued ownership of JLI. It also worked to ensure that the Management Defendants would take steps to continue JUUL's exponential sales growth and to stave off any regulation that might hinder that growth.

581.    Specifically, Altria worked behind the scenes to bolster JLI's public narrative claiming that JUUL was a cessation device intended for adult smokers. Well before JLI launched the "Make the Switch" campaign in January 2019, Altria was pushing the narrative that e-vapor products could help adult smokers "switch" off of combustible cigarettes. In an October 25, 2018 letter from Howard Willard to the FDA—sent while Altria was finalizing the terms of its deal with Pritzker, Valani, and Burns—Willard touted that "We believe e-vapor products present an

---

[707] JLI01374736.
[708] 5191006003.
[709] ALGAT0003776795.

[PROPOSED] SECOND AMENDED COMPLAINT - 203

important opportunity to adult smokers to switch from combustible cigarettes."[710] As noted below, Howard Willard shared this letter with Pritzker and Valani the same day he sent it to the FDA.

582. ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

████████████████████████████████.[711]

**Altria Participated In And Directed JLI's Fraudulent Scheme To Keep Mint On The Market**

583. Altria and Altria Client Services also came to the bargaining table with Pritzker and Valani armed with important knowledge – that flavors would be crucial to JLI's continued ability to target and sell to youth users and wanting to ensure JLI proactively and fraudulently protect those flavors.

584. ████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████.[712]

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

███████████████████████████████████████████████.[713]

---

[710]Letter from Howard A. Willard III, Altria, to Dr. Scott Gottlieb, FDA, at 1 (Oct. 25, 2018) (emphasis added).
[711]JLI10071280; JLI10071228.
[712]JLI10678579.
[713]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 204

585. 

714

586.

,"715

587.

,"716

588.    The following year, 2018, when it became clear that the FDA was increasing scrutiny of the e-vapor industry, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies—which had been made available to Altria and Altria Client Services as part of due diligence for its ultimate investment in JLI—indicated that mint users are not former menthol smokers and that mint Pods were as popular with teens as Mango Pods. By fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth.

_____

714 *Id.*
715 JLI10679070.
716 ALGAT0002412177.

[PROPOSED] SECOND AMENDED COMPLAINT - 205

JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to persuade the FDA into leaving the mint flavor on the market, willingly sacrificing other flavors in the process as a purported show of commitment to youth prevention.

589.    Altria's specific fraudulent acts with regard to this fraudulent scheme are detailed further below.

### JLI, The Management Defendants And Altria Coordinated To Market JUUL In Highly Visible Retail Locations

590.    JLI, the Management Defendants, and Altria's coordination continued in other ways throughout 2018 as they prepared for Altria's equity investment in JLI.

591.    A key aspect of this early coordination was Altria's acquisition of shelf-space that it would later provide to JLI to sustain the exponential growth of underage users of JUUL Products. By acquiring shelf space, Altria took steps to ensure that JUUL Products would be placed in premium shelf space next to Marlboro brand cigarettes, the best-selling cigarette overall and by far the most popular brand among youth.[717]

592.    Altria's investment was not for its own e-cigarette products. Altria spent approximately $100 million in 2018 to secure shelf-space at retailers for e-cigarette products— purportedly for the MarkTen e-cigarette that Altria stopped manufacturing in 2018, and its Pod-based MarkTen Elite, which it launched on a small scale in only 25,000 stores.[718] By comparison, the 2014 launch of the original MarkTen resulted in product placement in 60,000 stores in the first month in the western United States alone.[719] Yet Altria's payments for shelf space were a

--------

[717]*Preventing Tobacco Use Among Youth and Adults, A Report of the Surgeon General,* Centers for Disease Control & Prevention 161, 164 (2012), https://www.ncbi.nlm.nih.gov/books/NBK99237/.
[718]Sheila Kaplan, *Altria to Stop Selling Some E-Cigarette Brands That Appeal to Youths*, N.Y. Times (Oct. 25, 2018), https://www.nytimes.com/2018/10/25/health/altria-vaping-ecigarettes.html.
[719] Melissa Kress, *MarkTen National Rollout Hits 60,000 Stores*, Convenience Store News (July 22, 2014), https://csnews.com/markten-national-rollout-hits-60000-stores.

mixture of "cash and display fixtures in exchange for a commitment that its e-cigarettes would occupy prime shelf space for at least two years."[720]

593.   In reality, Altria spent approximately $100 million on shelf-space in furtherance of expanding the e-cigarette market, including JLI's massive, ill-gotten market share. [721]

594.   When Altria later announced its $12.8 billion investment in JLI, part of the agreement between the two companies was that Altria would provide JLI with this premium shelf space.[722]

595.   Altria's purchase of shelf space in 2018 and its subsequent provision of that space to JLI shows how Altria, JLI, and the Management Defendants were coordinating even before Altria announced its investment in JLI. Altria's actions ensured that, even after public and regulatory scrutiny forced JLI to stop its youth-oriented advertising, JUUL Products would still be placed where kids are most likely to see them—next to Marlboros, the most iconic, popular brand of cigarettes among underage users—in a location they are most likely to buy them—retail establishments.[723] Altria Works with the Management Defendants to Direct JLI's Affairs and Commit Fraud.

596.   In December 2018 Altria formalized its relationship with JLI's leadership by making a $12.8 billion equity investment in JLI through Altria Group and is wholly owned subsidiary, Altria Enterprises,[724] the largest equity investment in United States history. ████

████████████████████████████████████████████████████████

    [725]████████████████████████████████████████████████████,

---

[720]Jennifer Maloney & John McKinnon, *Altria-JLI Deal Is Stuck in Antitrust Review*, Wall St. J. (Jan. 17, 2020), https://www.wsj.com/articles/altria-juul-deal-is-stuck-in-antitrust-review-11579257002.
[721]*Id.*
[722]*Id.*
[723]Laura Bach, *Where Do Youth Get Their E-Cigarettes?*, Campaign for Tobacco Free Kids (Dec. 3, 2019), https://www.tobaccofreekids.org/assets/factsheets/0403.pdf.
[724]Archive00760162.
[725]ALGAT0002850450.

[PROPOSED] SECOND AMENDED COMPLAINT - 207

1

2

3

4

5                                                              .[726]

6

7

8

9

597.    The investment also brought with it a radical shift in Altria's public stance on JUUL's responsibility for the health crisis facing the nation's youth.

[727] But one year later in October 2019, when CNBC reporter Angelica Levito asked Willard whether JUUL had mishandled the youth vaping epidemic, his response was markedly different: "You know, I would not say that. I think that when the increased youth use of e-vapor products was identified, frankly the increase started before JUUL was a very significant product in the market."[728]

598.    Altria was willing to make such a large investment in JUUL because it was under pressure to deliver returns for shareholders despite the fact that combustible cigarette sales had been steadily declining since their peak in 1981. And while the risk of unfavorable FDA regulation of tobacco products loomed large in Altria's mind,[729]

_____

[726] JLI11387060.
[727] ALGAT0004053356.
[728] https://www.youtube.com/watch?v=5kPJAYqXOYU&feature=youtu.be
[729] ALGAT0002832820

[PROPOSED] SECOND AMENDED COMPLAINT - 208

1

2

███████████████████████████████████████████████████████████████
[730]

3

599.    In July 2018, JLI's valuation was approximately $15 billion.[731] But, in December

2018, Altria's investment of $12.8 billion for a 35% stake in the company reflected a valuation

of approximately $38 billion—more than two and a half times the valuation just five months

earlier. Defendants Monsees, Bowen, Pritzker, Huh, and Valani thus saw the value of their

investments in JLI skyrocket as a result of the Altria agreement, allowing them to cash out via a

special dividend and bonus, as well as through stock sales that were not available to other of JLI's

minority shareholders.[732] ██████████████████████████████████████

██████████████████████████████████████.[733] █████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████.[734] █████████████████████████████████████

███████████████████.[735]

600.    While Pritzker, Valani, and Altria carefully structured the deal to avoid the

appearance of Altria's control of JLI, for fear of drawing regulatory and public scrutiny, the

structure does not tell the whole story. Altria and Altria Client Services had been involved in

directing the affairs of JLI indirectly long before its investment, and the Altria Defendants'

involvement was even more direct following the investment. And although Altria took only a

35% share initially, it retained the option to buy JLI outright in 2022. This promise of a future

---

[730]ALGAT0002832820.
[731]https://www.theverge.com/2018/7/3/17529442/juul-vapes-nicotine-electronic-cigarettes-addiction-funding.
[732]Tiffany Kary, *JUUL Founders Sued for Self-Dealing Over Altria's $12.8 Billion*, Bloomberg (Jan. 13, 2020), https://www.bloomberg.com/news/articles/2020-01-13/juul-founders-sued-for-self-dealing-over-altria-s-12-8-billion.
[733]JLI11387060.
[734]JLI11387060, JLI11623544
[735]JLI11623544

[PROPOSED] SECOND AMENDED COMPLAINT - 209

purchase gave it significant influence over the actions of JLI's leadership—i.e., the Management Defendants who stood to profit even more handsomely from an ultimate acquisition by Altria.

601.    While JLI and Altria remain separate corporate entities in name, following its equity investment in JLI, the Altria Defendants worked with the Management Defendants, and Pritzker and Valani in particular, to forge Altria and JLI forged even greater significant, systemic links, i.e., shared leadership, contractual relationships, financial ties, and continuing coordination of activities with JLI's leadership. Because Altria and its subsidiaries could no longer market Altria's products to children or lie to adults about the safety, addictiveness, or health effects of its own cigarettes as result of prior tobacco litigation and regulation, Altria took even greater control of JLI in order to accomplish both of these goals through that company.

602.    ████████████████████████████████████
████████████████████████████████████████
████████████████████████. [736]

**Altria Installs Its Own Executives Into Leadership Positions To Direct The Affairs Of JLI**

603.    To exercise its influence and control of JLI, Altria worked with Pritzker and Valani to install two key Altria executives into leadership positions at JLI: K.C. Crosthwaite and Joe Murillo:

*a.    K.C. Crosthwaite, who was Vice President of Altria Client Services when the company carried out a study that would later be used by Altria to shield JUUL's Mint Pods from federal regulation, is now JLI's CEO. Before joining JLI, Crosthwaite was Altria's and Altria Client Services Chief Growth Officer and played a major role in Altria's investment in JLI, and had experience in the marketing of tobacco products from his time as president of Philip Morris USA.*

---

[736]ALGAT0003889812.

[PROPOSED] SECOND AMENDED COMPLAINT - 210

*b.     Joe Murillo, who launched the MarkTen e-cigarette line at Altria (as President and General Manager of Nu Mark LLC) and more recently headed regulatory affairs for Altria (as Senior Vice President of Regulatory Affairs of Altria Client Services), is now JLI's chief regulatory officer.[737] A 24-year career Altria executive, Murillo previously ran Altria's e-cigarette business, Nu Mark, "before Altria pulled its e-cigarettes off the market as part of its deal with J[UUL]."[738]*

604.    As mentioned above, K.C. Crosthwaite played a major role in Altria's investment in JLI. Crosthwaite frequently communicated with Altria Group's senior management about Altria's investment. ███████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████.[739] ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████.[740] ███████████████████████████████████████████,[741] ██████

███████████████████████████████████████████████████████████████████████

███████.[742] ████████████████████████████████████████████████████████

████████████████████████████████████████████████████.[743]

---

[737] Jennifer Maloney, *JLI Hires Another Top Altria Executive*, Wall St. J. (Oct. 1, 2019), https://www.wsj.com/articles/juul-hires-another-top-altria-executive-11569971306. /
[738] *Id.*
[739] ALGAT0000036407; ALGAT0000111921.
[740] ALGAT0002817348.
[741] JLI01374736; JLI01416851.
[742] JLI01392046.
[743] Archive00760280.

605.    While working on this investment, Altria, and Crosthwaite himself, discussed their goal to influence and control JLI. ████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████████████████████,,,[744]

606.    ████████████████████████████████████

████████.[745]████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████[746]

607.    ████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████████████[747]

608.    Crosthwaite continue to be involved in meetings between Altria and the Management Defendants as his time as an "observer" on the JLI Board went on. ████████

██████████████████████████████████████████████

██████████████████████████████████████████████

████████.[748]

---

[744]ALGAT0003327931-33.
[745]JLI01416851.
[746]ALGAT0002856951.
[747]ALGAT0000114034.
[748]ALGAT0000080766.



1

2 ███████▊."749

3    609. ████████████████████████

4 ███████████████████████████████

5 ███████████████████████████████

6 ███████████████████████████████

7 ██████."750 ▍

8 ███████████."751 ████████████████

9 ███████████████████████████████

10 ████████████████

11    610. ████████████████████████

12 ███████████████████████████████

13 ███████████████████."752 ██████████

14 ██████████████████████████████."753

15    611.    While Altria had not yet officially installed Crosthwaite as JLI's CEO, that did not

16 prevent them from giving JLI's leadership, and specifically Pritzker and Valani, advice and

17 direction about how to run the company. ███████████████

18 ███████████████████████████████

19 ███████████████████████████████

20 ██████████████."754

21    612. ████████████████████████

22 ███████████████████████████████

23 ───────────────────

24

25 [749]ALGAT0003889812.

26 [750]JLI01416851.

27 [751]JLI01416851.
   [752]JLI01416851.

28 [753]JLI01416851.
   [754]ALGAT0003285214.



613.

614.

_____

[755] ALGAT0003279064.
[756] JLI00417815.
[757] JLI01416851.
[758] JLI01416851.
[759] JLI01416851.
[760] ALGAT0005389689.
[761] ALGAT0005389689.
[762] ALGAT0005389689; ALGAT0005389687; *see also, e.g.*, ALGAT0003360382, ALGAT0003778898.
[763] ALGAT0005410667.

615. ████████████████████████████████████

████████████████ „764

616. ████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████ „ 765 ████████

████████████████████████████████████

████████████████████████████████████

████████████████ „766 ████████████████

████████████████████████████████████

████████████████ 767

617. ████████████████████████████████████

████████████████████████████ 768 ██████

████████████████████████ 769 ██████████

████████████████████████████████ 770 ██

████████████████████████████████████

████████████████████ 771

---

[764] JLI01416851.
[765] JLI01416851.
[766] JLI01416851.
[767] JLI01416851.
[768] JLI01416851.
[769] JLI01416851.
[770] JLI01416851.
[771] JLI01416851.

[PROPOSED] SECOND AMENDED COMPLAINT - 215

618. ████████████████████████████████

████████████████.[772]

████████████████████████████████

████████████████████████████████

████████████████.[773]

███████████████.[774]

619. ████████████████████████████████

████████████████████████████████

██████.[775]████████████████████████

██████████[776]

620. ████████████████████████[777]████

████████████████████████████████

████ ████.[778] Altria's plan was a success.

**Altria Furthered The JLI Enterprise By Participating In And Directing The Marketing And Distribution Of JUUL Products**

621.    In addition to installing its own executives as senior leadership at JLI, after its investment, the Altria Defendants worked with JLI's leadership to assist JUUL's growth through marketing and distribution, despite its knowledge that JUUL's growth was based on selling to minors and lying to adults about JUUL Products. The Altria Defendants helped JUUL thrive in

---

[772]JLI01416851.
[773]JLI01416851.
[774]JLI01416851.
[775]JLI01416851. Pursuant to JLI's by-laws, the Company's CEO is automatically appointed to the Board.
[776]JLI01416851.
[777]JLI01416851.
[778]JLI01416851.

[PROPOSED] SECOND AMENDED COMPLAINT - 216

the areas of "direct marketing; sales, distribution and fixture services; and regulatory affairs."[779] This included, among other things:

a.     "Piloting a distribution program to provide long haul freight, warehouse storage and last mile freight services."

b.     "Making available [Altria's] previously contracted shelf space with certain retailers," thus allowing JUUL Products to receive prominent placement alongside a top-rated brand of combustible cigarettes, Marlboro, favored by youth.

c.     "Executing direct mail and email campaigns and related activities. . . ."

d.     "Leveraging Altria's field sales force to . . . provide services such as limited initiative selling, hanging signs, light product merchandising, and surveys of a subset of the retail stores that Altria calls upon."

e.     "Providing regulatory affairs consulting and related services to [JUUL] as it prepares its PMTA application."[780]

622.     Altria had envisioned itself providing such support since as early as 2017. ███████

██████████████████████████████████████████████████████████████

█████████████"[781]  Altria knew that its generations-old distribution network would be an enticing resource for JUUL in order to significantly expand its retail presence in the geographic markets where JUUL was not yet strongly represented.

623.     In an attempt to legitimize its support of JUUL's growth and despite public and regulatory concern, the Altria Defendants entered into a number of formal agreements with JLI. These agreements included collaboration with Defendants Altria Group Distribution Company, Altria Client Services, and Philip Morris USA, ████████████████████████████████

_____

[779]Letter from Howard Willard III, Altria Senator Durbin, et. al., at 11 (Oct. 14, 2019).
[780]*Id.* at 13.
[781]ALGAT0004996494.

[PROPOSED] SECOND AMENDED COMPLAINT - 217

████████████████████████████████████████████████████

███████████████████████████████████.″[782]

624.    In each agreement, JLI agreed ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████.″[783]

625.    In exchange, Altria Group Distribution Company agreed to distribute and sell JUUL Products across the country greatly expanding JUUL's retail footprint. While JUUL Products have typically been sold in 90,000 U.S. retail outlets, Altria's products reach 230,000 U.S. outlets. ██████████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████.″[784]

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████[785]). ████████████

████████████████████████████████████████████████████

██████.″[786] ████████████████████████████████████████

distribution services that took decades to develop and has the capabilities to distribute an expanded cigarette product to 90 percent of targeted stores in approximately three weeks."[787]

───────────────────

[782]*See, e.g.*, JLI10490204.
[783]*See, e.g.*, JLI10490204.
[784]ALGATO004055961.
[785]Nathan Bomey, *Marlboro maker Altria distances itself from vaping giant JLI amid legal scrutiny*, USA Today (Jan. 31, 2020), https://www.usatoday.com/story/money/2020/01/31/juul-altria-distances-itself-e-cigarette-maker-amid-scrutiny/4618993002/.
[786]8490000866.
[787]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 218

626. 

a.

<sup>,788</sup>

b.

<sup>,789</sup>

c.

d.

<sup>,791</sup>

e.

<sup>,792</sup>

f.

<sup>,793</sup>

---

[788] JLI10490204.
[789] JLI01339886.
[790] JLI01339886.
[791] JLI01339878.
[792] JLI01339918.
[793] JLI01339903.

[PROPOSED] SECOND AMENDED COMPLAINT - 219

1

g. 

627.    Through these distribution services, Altria Group Distribution Services, and Altria Client Services (as the "Provider Manager") used the mail and wires to transmit JUUL collateral and packaging that contained the false representation that a single JUUL Pod was equivalent to a pack of cigarettes. A representation which, as discussed above, Altria and Altria Client Services knew was false.

628.

---

[794] JLI01339937; JLI01339930; JLI01339980. The November to December 2019 agreement also included AGDC's assistance in removing the companies' "Make the Switch" campaign materials, which were the subject of a warning letter by the FDA.
[795] JLI01339973.
[796] JLI01339955.
[797] JLI01010641.

[PROPOSED] SECOND AMENDED COMPLAINT - 220



629.

630.

631.

[798] JLI01010641.
[799] ALGAT0000772561.
[800] ALGAT0000772561.
[801] JLI01392499.
[802] JLI01392499.
[803] 8490000866.
[804] ALGAT0002940950.

[PROPOSED] SECOND AMENDED COMPLAINT - 221

632. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████

633. ████████████████████████████:

 a. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████[805]

 b. ██████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████,[806]

 c. ██████████████████████████████████
████████████████████████,[807]

---

[805] JLI01339882; JLI013398976.
[806] JLI01426119
[807] JLI01426125

[PROPOSED] SECOND AMENDED COMPLAINT - 222

d. ████████████████████████████████████
██████████████████████████████████████, 808
██

e. ████████████████████████████████████
██████████████████████████████████████
████████████████████████ 809

f. ████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████, 810

g. ████████████████████████████████████
████████████, 811

h. ████████████████████████████████████
████████████████████████████, 812 ████

i. ████████████████████████████████████
██████████████████████████████████. 813

634. Altria Client Services also market JUUL Products by sending out mailers, emails, and coupons to millions of people across the United States. For example, ACS agreed to:

a. ████████████████████████████████████
██████████████████████████████████████

_____

[808] JLI01426135.
[809] JLI01426141.
[810] JLI01339943.
[811] JLI01426146.
[812] LI01426130.
[813] JLI01339988.

[PROPOSED] SECOND AMENDED COMPLAINT - 223

1    ███████████████████████████████████████████████

2    ███████████████,814

3    ;

4    b.    ███████████████████████████████

5    ███████████████████████████████████████████████

6    ███████████████████████████.815

7    635.    Altria also worked with JLI to cross-market JUUL and Marlboro cigarettes. ██

8    ███████████████████████████████████████████████

9    ███████████████████████████████████████████████

10   ███████████████████████████████████████████████

11   ███████████████████████.816



—————————————————

636.    Both the inserts distributed by Philip Morris and the mail and email advertisements sent by Altria Client Services were advertisements for JLI's fraudulent "Make the Switch" campaign described above.

637.    In order to help JUUL expand and be able to keep selling to kids and lying to adults, Altria and Altria Client Services also directed JLI in combatting legal and regulatory challenges, helping with patent infringement battles and consumer health claims and helping to navigate the regulatory waters and FDA pressure. ██████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

█████████████████████████████████████"[817]

638.    Altria also brings lobbying muscle to the table, which worked to prevent new federal or state legislation targeting JUUL or the e-cigarette category more broadly. Altria "has a potent lobbying network in Washington [D.C.] and around the country."[818] Vince Willmore, a spokesman for the Campaign for Tobacco-Free Kids, which has been involved in many state lobbying battles, said, "It's hard to say where Altria ends and JLI begins."[819] While an Altria spokesman has denied that there was any contractual services agreement for lobbying between JLI and Altria, he admitted that he did not know what informal advice and conversations Altria has had with JLI about lobbying efforts. ████████████████████████████████

███████████████████████████████████████████████).[820] And Altria installed Joe Murillo, then the head of regulatory affairs for Altria and a 24-year Altria veteran with extensive experience in e-cigarette regulations, as Chief Regulatory Officer for JLI.

---

[817]ALGAT0002856956.
[818]Shelia Kaplan, *In Washington, JLI Vows to Curb Youth Vaping. Its Lobbying in States Runs Counter to That Pledge.* N.Y. Times (Apr. 28, 2019), https://www.nytimes.com/2019/04/28/health/juul-lobbying-states-ecigarettes.html.
[819]*Id.*
[820]ALGAT0002856953.

Indeed, since Altria worked with the Management Defendants to assume some control over JLI, JLI's spending on lobbying has risen significantly. JLI spent $4.28 million on lobbying in 2019, compared to $1.64 million in 2018.[821]

639.    Contrary to public statements, Altria's investment in JLI was not only a financial contribution nor were these agreements about just "services"; rather, they were manifestations of Altria's and the Management Defendants' plan to continue selling JUUL to kids and lying to adults about JUUL Products, all while staving off regulation and public outcry. Internal documents show that Altria did not consider itself a mere non-voting minority investor or service provider. ██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

██."[822]██████████████████████████████████████████████

██████████████████████████████████████████████████."[823]

640.    The Altria Defendants' services agreements with JLI  obscured Altria's takeover of large portions of JUUL's distribution and marketing. Altria's goal was always to expand the reach and sales of JUUL Products, despite the knowledge of their lies and youth targeting.

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

█████████████████████████."[824] And importantly, as noted above, Altria gives JLI access to shelf space that it had obtained under fraudulent pretenses. This is not just any

_____

[821] *Client Profile: JUUL Labs*, Center for Responsive Politics, https://www.opensecrets.org/federal-lobbying/clients/summary?cycle=2019&id=D000070920 (last visited Apr. 4, 2020).
[822] ALGAT0002856956.
[823] ALGAT0000772561.
[824] ALGAT0002856953.

shelf space; it is space near Altria's (Philip Morris USA's) blockbuster Marlboro cigarettes, and other premium products and retail displays. The arrangement allows JLI's tobacco and menthol-based products to receive prominent placement alongside a top-rated brand of combustible cigarettes.

641.    Altria's investment and the Altria Defendants' collaboration with the Management Defendants was not just about investing in a legitimate business or selling to adult smokers. Instead, Altria used its relationship with the Management Defendant and with JLI to continue selling to youth and lying to the public, just as it had done in the past. Despite its knowledge of JUUL's youth targeting, when announcing its investment, Altria explained that its investment in JLI "enhances future growth prospects" and committed to applying "its logistics and distribution experience to help JLI expand its reach and efficiency."[825] ███████████████████████ ████████████████████████████████████████[826]. And with the help of the Management Defendants, and Pritzker and Valani in particular, the Altria Defendants have successfully ensured that JUUL would maintain and expand its market share— a market share that, based on Altria's own October 25, 2018 letter to the FDA, it believes was gained by employing marketing and advertising practices that contributed to youth e-cigarette use.

**JLI, Altria, And Others Have Successfully Caused More Young People To Start Using E-Cigarettes, Creating A Youth E-Cigarette Epidemic And Public Health Crisis**

642.    Defendants' tactics have misled the public regarding the addictiveness and safety of e-cigarettes generally, and JUUL Products specifically, resulting in an epidemic of e-cigarette use among youth in particular.

---

[825] *Altria Makes $12.8 Billion Minority Investment in JUUL to Accelerate Harm Reduction and Drive Growth*, BusinessWire (Dec. 20, 2018), https://www.businesswire.com/news/home/20181220005318/en/Altria-12.8-Billion-Minority-Investment-JUUL-Accelerate.
[826] ALGAT0004641801.

643.    Defendants' advertising and third-party strategy, as discussed above, ensured that everyone from adults to young children, would believe JUULing was a cool, fun, and safe activity.

644.    To this day, JLI has not fully disclosed the health risks associated with its products, has not recalled or modified its products despite the known risks, and continues to foster a public health crisis, placing millions of people in harm's way.

**Defendants' Scheme Caused Consumers To Be Misled Into Believing That JUUL Was Safe And Healthy**

645.    In 2016, the National Institute on Drug Abuse issued findings regarding "Teens and Cigarettes," reporting that 66% of teens believed that e-cigarettes contained only flavoring, rather than nicotine.[827]

646.    Two years later, despite the ongoing efforts of public health advocates, a 2018 study of JUUL users between the ages of fifteen and twenty-four revealed that 63% remained unaware that JUUL Products contain nicotine.[828] Further, the study found that respondents using e-cigarettes were less likely to report that e-cigarettes were harmful to their health, that people can get addicted to e-cigarettes, or that smoke from others' e-cigarettes was harmful.[829]

647.    Similarly, in 2018, a literature review of seventy-two articles published in the International Journal of Environmental Research and Public Health found that e-cigarettes were perceived by adults and youth as being healthier, safer, less addictive, safer for one's social environment, and safer to use during pregnancy than combustible cigarettes.[830] Further, researchers found that specific flavors (including dessert and fruit flavors) were perceived to be

_____

[827] *Teens and E-cigarettes*, Nat'l Inst. on Drug Abuse, https://www.drugabuse.gov/related-topics/trends-statistics/infographics/teens-e-cigarettes (last visited Apr. 4, 2020).
[828] Jeffrey G. Willett et al. *Recognition, Use and Perceptions of Juul Among Youth and Young Adults,* 28 Tobacco Control 054273 (2019).
[829] *Id.*
[830] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 228

less harmful than tobacco flavors among adult and youth e-cigarette users.[831] In addition, researchers found that youth e-cigarette users perceived e-cigarettes as safe to use and fashionable.[832]

648.    In 2019, a study published in Pediatrics found that 40% of participants reported using nicotine-free e-cigarette products, when in fact the products they were using contained significant levels of nicotine.[833]

649.    In 2019, a study published in the British Medical Journal Open systematically reviewed all peer-reviewed scientific literature published on e-cigarette perceptions through March 2018 which included fifty-one articles.[834] Researchers found consistent evidence showing that flavors attract both youth and young adults to use e-cigarettes.[835] In addition, among this same group, fruit and dessert flavors decrease the perception that e-cigarettes are harmful, while increasing the willingness to try e-cigarettes.[836]

### Use Of JUUL By Minors Has Skyrocketed

650.    On December 28, 2018, the University of Michigan's National Adolescent Drug Trends for 2018 reported that increases in adolescent e-cigarette use from 2017 to 2018 were the "largest ever recorded in the past 43 years for any adolescent substance use outcome in the U.S."[837]

---

[831] Kim A. G. J. Romijnders et al., *Perceptions and Reasons Regarding E-Cigarette Use Among Users and Non-Users: A Narrative Literature Review*, 15 Int'l J. of Envtl. Research & Public Health 1190 (2018), https://doi:10.3390/ijerph15061190.

[832] *Id.*

[833] Rachel Boykan et al., *Self-Reported Use of Tobacco, E-Cigarettes, and Marijuana versus Urinary Biomarkers*, 143 Pediatrics (2019), https://doi.org/10.1542/peds.2018-3531.

[834] Meernik, et al., *Impact of Non-Menthol Flavours in E-Cigarettes on Perceptions and Use: An Updated Systematic Review*, *BMJ Open*, 9:e031598 (2019), https://bmjopen.bmj.com/content/9/10/e031598.

[835] *Id.*

[836] *Id.*

[837] *National Adolescent Drug Trends in 2018*, Univ. of Mich. Inst. for Social Research (Dec. 17, 2018), http://monitoringthefuture.org/pressreleases/18drugpr.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 229

651.    The percentage of 12th grade students who reported consuming nicotine almost doubled between 2017 and 2018, rising from 11% to 20.9%.[838] This increase was "twice as large as the previous record for largest-ever increase among past 30-day outcomes in 12th grade."

652.    By 2018 approximately 3.6 million middle and high school students were consuming e-cigarettes regularly,[839] and one in five 12th graders reported used an e-cigarette containing nicotine in the last 30 days.[840] As of late 2019, 5 million students reported active use of e-cigarettes, with 27.5% of high school students and 10.5% of middle school students using them within the last thirty days and with most youth reporting JUUL as their usual brand.[841]



653.    The Secretary of the U.S. Department of Health and Human Services declared that "[w]e have never seen use of any substance by America's young people rise as rapidly as e-cigarette use [is rising]."[842] Then FDA Commissioner Dr. Gottlieb described the increase in e-

---

[838] News Release, *Teens Using Vaping Devices in Record Numbers*, Nat'l Insts. of Health (Dec. 17, 2018) https://www.nih.gov/news-events/news-releases/teens-using-vaping-devices-record-numbers.

[839] *See* Jan Hoffman, *Addicted to Vaped Nicotine, Teenagers Have no Clear Path to Quitting*, N.Y. Times (Dec. 18, 2018), https://www.nytimes.com/2018/12/18/health/vaping-nicotine-teenagers.html.

[840] *Id.*

[841] National Youth Tobacco Survey, U.S. FDA (2019), https://www.fda.gov/tobacco-products/youth-and-tobacco/youth-tobacco-use-results-national-youth-tobacco-survey; Karen Cullen et al., *e-Cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).

[842] Jan Hoffman, *Study Shows Big Rise in Teen Vaping This Year*, N.Y. Times (Dec. 17, 2018), https://www.nytimes.com/2018/12/17/health/ecigarettes-teens-nicotine-.html; Rajiv Bahl, *Teen Use of Flavored Tobacco was Down, But E-Cigarettes Are Bringing It Back Up*, Healthline (Jan. 9, 2019), https://www.healthline.com/health-news/flavored-tobacco-use-rising-again-among-teens#An-unhealthy-habit.

[PROPOSED] SECOND AMENDED COMPLAINT - 230

cigarette consumption as an "almost ubiquitous—and dangerous—trend" that is responsible for an "epidemic" of nicotine use among teenagers.[843] The rapid—indeed infectious—adoption of e-cigarettes "reverse[s] years of favorable trends in our nation's fight to prevent youth addiction to tobacco products."[844] CDC Director Robert Redfield agreed, "The skyrocketing growth of young people's e-cigarette use over the past year threatens to erase progress made in reducing tobacco use. It's putting a new generation at risk for nicotine addiction."[845] Then-Commissioner Gottlieb identified the two primary forces driving the epidemic as "youth appeal and youth access to flavored tobacco products."[846]

654.    Within days of the FDA's declaration of an epidemic, Surgeon General Dr. Jerome Adams also warned that the "epidemic of youth e-cigarette use" could condemn a generation to "a lifetime of nicotine addiction and associated health risks."[847] The Surgeon General's 2018 Advisory states that JUUL, with its combination of non-irritating vapor and potent nicotine hit, "is of particular concern for young people, because it could make it easier for them to initiate the use of nicotine . . . and also could make it easier to progress to regular e-cigarette use and nicotine dependence."[848]

655.    The JUUL youth addiction epidemic spread rapidly across high schools in the United States. JUUL surged in popularity, largely through social media networks, and created patterns of youth usage, illegal youth transactions, and addiction, that are consistent with this account from Reddit in 2017:

---

[843]News Release, *FDA Launches New, Comprehensive Campaign to Warn Kids About the Dangers of E-Cigarette Use as Part of Agency's Youth Tobacco Prevention Plan, Amid Evidence of Sharply Rising Use Among Kids,* U.S. FDA (Sept. 18, 2018), https://www.fda.gov/NewsEvents/Newsroom/PressAnnouncements/ucm620788.htm.
[844]*Id.*
[845]Amir Vera, *Texas Governor Signs Law Increasing the Age to Buy Tobacco Products to 21*, CNN (June 8, 2019), https://www-m.cnn.com/2019/06/08/health/texas-new-tobacco-law/index.html.
[846]*Id.*
[847] Surgeon General's Advisory on E-cigarette Use Among Youth (2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.
[848]*Id.* a 2.

[PROPOSED] SECOND AMENDED COMPLAINT - 231

*Between classes the big bathroom in my school averages 20-25 kids, and 5-10 JUULs. Kids usually will give you a dollar for a JUUL rip if you don't know them, if you want to buy a Pod for 5$ you just head into the bathroom after lunch. We call the kids in there between every class begging for rips 'JUUL fiends.' Pod boys are the freshman that say, 'can I put my Pod in ur juul?' and are in there every block. I myself spent about 180$ on mango Pods and bought out a store, and sold these Pods for 10$ a Pod, making myself an absolutely massive profit in literally 9 days. Given because I'm 18 with a car and that's the tobacco age around here, I always get offers to get Pod runs or juuls for kids. people even understand the best system to get a head rush in your 2 minutes between classes, is all the juuls at once. So someone yells "GIVE ME ALL THE JUULS" and 3-7 are passed around, two hits each. This saves us all juice, and gives you a massive head rush. Kids also scratch logos and words onto their juuls to make i[t] their own, every day you can find the Pod covers in my student parking lot. I know this sounds exaggerated, but with a school with 1400 kids near the city and JUULs being perceived as popular, it's truly fascinating what can happen.*[849]

656.    In response to the post above, several others reported similar experiences:

a.    "[T]his is the exact same thing that happens at my school, we call [JUUL fiends] the same thing, kind of scary how similar it is."[850]

b.    "Same thing at my school. JUUL fiend is a term too."[851]

c.    "Yeah nicotine addiction has become a huge problem in my high school because of juuls even the teachers know what they are."[852]

---

[849] *What's Juul in School*, https://www.reddit.com/r/juul/comments/61is7i/whats_juul_in_school/ (last visited Apr. 4, 2020).
[850] *Id.*
[851] *Id.*
[852] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 232

d.      "[S]ame [expletive] at my school except more secretive because it's a private school. It's crazy. Kids hit in class, we hit 3-5 at once, and everyone calls each other a juul fiend or just a fiend. Funny how similar it all is."[853]

e.      "[T]he same [expletive] is happening in my school. kids that vaped were called [expletive] for the longest time, that all changed now."[854]

f.      "Made an account to say that it's exactly the same way in my school! LOL. I'm from California and I think I know over 40 kids that have it here just in my school. We do it in the bathrooms, at lunch etc. LMAO. 'Do you have a Pod man?'"[855]

g.      "It's the same at my school and just about every other school in Colorado."[856]

h.      "2 months into this school year, my high school made a newspaper article about the 'JUUL epidemic.'"[857]

i.      "Wow do you go to high school in Kansas because this sounds EXACTLY like my school. I'll go into a different bathroom 4 times a day and there will be kids in there ripping JUUL's in every single one."[858].

j.      "At my high school towards the end of lunch everyone goes to the bathroom for what we call a 'juul party.' People bring juuls, phixes, etc. It's actually a great bonding experience because freshman can actually relate to some upperclassmen and talk about vaping."[859]

k.      "To everyone thinking that this is just in certain states, it's not. This is a nationwide trend right now. I've seen it myself. If you have one you're instantly insanely popular. Everyone from the high-achievers to the kids who use to say 'e-cigs are for [expletives]' are using the juul.

---

[853]Id.
[854]Id.
[855]Id.
[856]Id.
[857]Id. (citing *Juuls Now Rule the School as Students Frenzy Over E-cig* (Oct. 5, 2016), https://imgur.com/a/BKepw).
[858]Id.
[859]Id.

[PROPOSED] SECOND AMENDED COMPLAINT - 233

It's a craze. I love it, I've made an insane amount of money. It's something that has swept through our age group and has truly taken over. And it happened almost overnight."[860]

657.    The following graph illustrates JLI's responsibility for the nationwide youth e-cigarette epidemic. While the rest of the e-cigarette industry stagnated from 2017 through 2018, JLI experienced meteoric growth. Through that same timeframe, youth e-cigarette rates nearly doubled from more than 11% in 2017 to more than 20% in 2018. Through October 5, 2019 (the last date for which data was available), rates of youth e-cigarette use continued to increase, tracking the growth of JUUL.



658.    The unique features of the JUUL e-cigarette—high nicotine delivery, low harshness, and easy-to-conceal design—have caused patterns of addiction with no historical precedent. It is not uncommon for fifteen-year-old students, even those who live at home with their parents, to consume two or more JUUL Pods a day.

659.    The downwards trend in youth smoking that public health departments and school anti-tobacco programs worked so hard to create has completely reversed. In 2018, more than one

---

[860]*Id.* (emphasis added).

in four high school students in the United States reported using a tobacco product in the past thirty days, a dramatic increase from just one year before.[861] But there was no increase in the use of cigarettes, cigars, or hookahs during that same time period.[862] There was only increased use in a single tobacco product: e-cigarettes. While use of all other tobacco products continued to decrease as it had been for decades, e-cigarette use increased 78% in just one year.[863] This drastic reversal caused the CDC to describe youth e-cigarette use as an "epidemic."[864]

**JLI Thrived Due To Extensive Efforts To Delay Meaningful Regulation Of Its Products**

660.    One of the main reasons e-cigarettes like JUUL were so appealing from an investment and business development perspective is that, unlike combustible cigarettes, e-cigarettes were relatively unregulated. This regulatory void was not an accident; the cigarette industry, and then the e-cigarette industry, spent significant resources blocking, frustrating, and delaying government action. A 1996 article in the *Yale Law & Policy Review* detailed how cigarette companies vehemently opposed the FDA mid-1990s rules on tobacco products, using lawsuits, notice-and-comment, and arguments related to the FDA's jurisdiction to delay or undo any regulatory efforts.[865]

661.    In 2009, Congress enacted the Family Smoking Prevention and Tobacco Control Act ("TCA"). The TCA amended the Federal Food, Drug, and Cosmetic Act to allow the FDA to regulate tobacco products.

---

[861] *Progress Erased: Youth Tobacco Use Increased During 2017-2018*, CDC (Feb. 11, 2019), https://www.cdc.gov/media/releases/2019/p0211-youth-tobacco-use-increased.html.
[862] *Tobacco Use By Youth Is Rising: E-Cigarettes are the Main Reason*, CDC (Feb. 2019), https://www.cdc.gov/vitalsigns/youth-tobacco-use/index.html.
[863] Scott Gottlieb, Statement from FDA Commissioner Scott Gottlieb, M.D., on proposed new steps to protect youth by preventing access to flavored tobacco products and banning menthol in cigarettes, FDA (Nov. 15, 2018), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-proposed-new-steps-protect-youth-preventing-access.
[864] Jerome Adams, *Surgeon General's Advisory on E-cigarette Use Among Youth*, CDC (Dec. 2018), https://e-cigarettes.surgeongeneral.gov/documents/surgeon-generals-advisory-on-e-cigarette-use-among-youth-2018.pdf.
[865] Melvin Davis, *Developments in Policy: The FDA's Tobacco Regulations*, 15 Yale L. & Policy Rev. 399 (1996).

662.    Although the TCA granted the FDA immediate authority to regulate combustible cigarettes, it did not give the FDA explicit authority over all types of tobacco products—including those that had not yet been invented or were not yet popular. To "deem" a product for regulation, the FDA must issue a "deeming rule" that specifically designates a tobacco product, such as e-cigarettes, as falling within the purview of the FDA's authority under the TCA.

663.    The TCA also mandated that all "new" tobacco products (i.e., any product not on the market as of February 15, 2007) undergo a premarket authorization process before they could be sold in the United States.

664.    Four years later, on April 25, 2014, the FDA finally issued a proposed rule deeming e-cigarettes for regulation under the Tobacco Act ("2014 Proposed Rule").

665.    Once issued, the e-cigarette industry, together with its newfound allies, parent companies, and investors—the cigarette industry and pro-e-cigarette lobbyists—set to work to dilute the rule's effectiveness. For example, in comments to the 2014 Proposed Rule, companies such as Johnson Creek Enterprises (one of the first e-liquid manufacturers) stated that the "FDA [] blatantly ignored evidence that our products improve people's lives."[866]

666.    The New York Times reported that Altria was leading the effort to dilute, diminish, or remove e-cigarette regulations. Notwithstanding Altria's professed concern about flavors attracting youth customers, Altria submitted comments in August 2014 in response to the proposed rule opposing the regulation of flavors. Altria asserted that restrictions could result in more illicit sales, and that adults also liked fruity and sweet e-cigarette flavors.[867]

_____

[866]Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.
[867]Altria Client Services Inc., Comment Letter on Proposed Rule Deeming Tobacco Products to be Subject to the Federal Food, Drug, and Cosmetic Act 47-48 (Aug. 8, 2014), https://www.altria.com/-/media/Project/Altria/Altria/about-altria/federal-regulation-of-tobacco/regulatory-filings/documents/ALCS-NuMark-Comments-FDA-2014-N-0189.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 236

667.    In 2015, Altria lobbied Capitol Hill with its own draft legislation to eliminate the new requirement that most e-cigarettes already on sale in the United States be evaluated retroactively to determine if they are "appropriate for the protection of public health." In effect, Altria lobbied to "grandfather" all existing e-cigarette brands, including JUUL, into a lax regulatory regime. That proposed legislation was endorsed by R.J. Reynolds. Altria delivered its proposal, entitled "F.D.A. Deeming Clarification Act of 2015," to Representative Tom Cole of Oklahoma, who introduced the bill two weeks later using Altria's draft verbatim.[868] Seventy other representatives signed on to Altria's legislation.[869]

668.    The e-cigarette industry, along with the intertwined cigarette industry, was able to leverage support among Members of Congress such as Representative Cole and Representative Sanford Bishop of Georgia, who advocated for cigarette industry interests and opposed retroactive evaluation of e-cigarette products. Both Cole and Bishop echoed a common cigarette and e-cigarette industry refrain, that any regulations proposed by the FDA would bankrupt small businesses, even though the overwhelming majority of e-cigarettes were manufactured and distributed by large cigarette companies.

669.    Representatives Cole and Bishop received some of the largest cigarette industry contributions of any member of the U.S. House of Representatives, with Representative Bishop receiving $13,000 from Altria, and Representative Cole $10,000 from Altria in the 2015-2016 cycle.[870]

670.    By thwarting and delaying regulation, or by ensuring what regulation did pass was laced with industry-friendly components, the e-cigarette industry, including Defendants, hobbled

---

[868] Eric Lipton, *A Lobbyist Wrote the Bill. Will the Tobacco Industry Win Its E-Cigarette Fight?*, N.Y. Times (Sept. 2, 2016), https://www.nytimes.com/2016/09/03/us/politics/e-cigarettes-vaping-cigars-fda-altria.html.
[869] *Id.*
[870] *Id.*; *Rep. Tom Cole - Oklahoma District 04, Contributors 2015-16*, OpenSecrets (2017), https://www.opensecrets.org/members-of-congress/contributors?cid=N00025726&cycle=2016.

[PROPOSED] SECOND AMENDED COMPLAINT - 237

the FDA—and by extension—Congress's efforts to regulate e-cigarettes. Simultaneously, the e-cigarette industry continued to market their products to youth, and it coordinated to sow doubt and confusion about the addictiveness and health impacts of e-cigarettes.

671.    Even after the FDA issued its final deeming rule in 2016, e-cigarette industry lobbying continued to pay dividends to companies like JLI. In 2017, when Dr. Scott Gottlieb took over as the FDA Commissioner, one of his first major acts was to grant e-cigarette companies a four-year extension to comply with the deeming rule, even as data indicated sharp increases in teen e-cigarette use.[871] Gottlieb had previously served on the board of Kure, a chain of e-cigarette lounges in the United States, though he fully divested before taking the helm at the FDA.[872]

672.    The four-year extension was celebrated by e-cigarette lobbyists. Greg Conley, president of the American Vaping Association ("AVA"), stated that but for the extension, "over 99 percent of vaper products available on the market today would be banned next year."[873] Despite the minimal research publicly available on the health effect of e-cigarettes, Ray Story, who had since become commissioner of the Tobacco Vapor Electronic Cigarette Association, lauded the decision: "Absolutely, it's a good thing . . . [w]hen you look at harm reduction, it's a no brainer."[874]

## JLI, The Management Defendants, And Altria Defendants Successfully Shielded The Popular Mint Flavor From Regulation

673.    JLI, the Management Defendants, and Altria Defendants had a two-fold plan for staving off regulation: (1) ensure the FDA allowed certain flavors, namely mint, to remain on the

---

[871]Katie Thomas & Sheila Kaplan, *E-Cigarettes Went Unchecked in 10 Years of Federal Inaction*, N.Y. Times (Oct. 14, 2019), https://www.nytimes.com/2019/10/14/health/vaping-e-cigarettes-fda.html.
[872]Zeke Faux et al., *Vaping Venture Poses Potential Conflict for Trump's FDA Nominee*, Bloomberg, (Apr. 19, 2017), https://www.bloomberg.com/news/articles/2017-04-19/vaping-venture-poses-potential-conflict-for-trump-s-fda-nominee.
[873]Sheila Kaplan, *F.D.A. Delays Rules That Would Have Limited E-Cigarettes on Market*, N.Y. Times (July 28, 2017), https://www.nytimes.com/2017/07/28/health/electronic-cigarette-tobacco-nicotine-fda.html.
[874]*Id.*

market; and (2) stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth e-cigarette epidemic. These schemes involved acts of mail and wire fraud, with the intent to deceive the FDA, Congress, and the public at large.

674.    First, JLI, the Management Defendants, and Altria publicly defended mint flavoring as a substitute for menthol cigarette smokers, when in fact JLI's studies indicated that mint users are not former menthol smokers. Second, by fighting to keep mint as the last flavor on the market, the cigarette industry could continue to appeal to non-smokers, including youth. JLI and the Management Defendants coordinated with Altria to pursue a fraudulent scheme to convince the FDA into leaving the mint flavor on the market, sacrificing other flavors in the process.

675.    On August 2, 2018, JLI met with the FDA to discuss a proposed youth-behavioral study regarding the prevalence of use, perceptions of use, and intentions to use JUUL and other tobacco products among adolescents aged 13-17 years (the "Youth Prevalence Study").[875]

676.    On November 5, 2018, JLI transmitted the results of the Youth Prevalence Study to the FDA and reported that a study of over 1,000 youth had found that only 1.5% of youth had ever used a JUUL, and that only 0.8% of youth had used a JUUL in the last 30 days. And in stark contrast to the McKinsey and DB Research studies discussed above, the Youth Prevalence Study suggested that mango was four times as popular as mint.[876] Specifically, the study found that 47% of youth who reported use of a JUUL device in the last 30-days professed to using mango most often, with only about 12% reporting the same for mint.

677.    JLI's study was a sham. JLI, the Management Defendants, and Altria knew their reported data was inconsistent with the McKinsey and DB Research studies conducted just a few

---

[875]Letter from Joanna Engelke, JUUL Labs, Inc., to David Portnoy, Ph.D., M.P.H., FDA Center for Tobacco Products (Nov. 5, 2018).
[876]*Id.* at 3.

months earlier. JLI's report featured responses to a carefully selected survey question—which single flavor youth used most often?—that obscured the widespread use of mint JUUL Pods among youth.

678.    Ironically, just a few days after JLI submitted the misleading Youth Prevalence Study to the FDA, the National Youth Tobacco Survey was released. Revealing the depths of the deception of JLI's Youth Prevalence Study, which found that only 1.5% of youth were current users of e-cigarettes, the National Youth Tobacco Survey found that 20.8% of high school student were current users (i.e., consumed e-cigarettes within the last 30 days).

679.    The Youth Prevalence Study that JLI submitted to the FDA, either via U.S. mail or by electronic transmission, was false and misleading. JLI, the Management Defendants, and Altria knew as much. Indeed, they counted on it.

680.    As the e-cigarette crisis grew, on September 25, 2018, then-FDA Commissioner Scott Gottlieb sent letters to Altria, JLI and other e-cigarette manufacturers, requesting a "detailed plan, including specific timeframes, to address and mitigate widespread use by minors."[877]

681.    As evidenced by Altria's recent admission that negotiations with JLI were ongoing in late 2017,[878] Altria and JLI's responses to the FDA reflect a coordinated effort to mislead the FDA with the intention that regulators, in reliance on their statements, allow JLI to continue marketing mint JUUL Pods.[879]

682.    Defendants' plan centered on efforts to deceive the FDA that (1) mint was more akin to Tobacco and Menthol than other flavors; and (2) kids did not prefer mint.

_____

[877]Letter from Scott Gottlieb, M.D. to JUUL Labs, Inc. (Sept. 12, 2018); Letter from Scott Gottlieb, M.D. to Altria Group Inc. (Sept. 12, 2018).
[878]Letter from Howard Willard III, Altria to Senator Durbin, et. al. ( Oct. 14, 2019).
[879]*See United States v. Jones*, 712 F.2d 1316, 1320-21 (9th Cir. 1983) ("It is enough that the mails be used as part of a 'lulling' scheme by reassuring the victim that all is well and discouraging him from investigating and uncovering the fraud.").

[PROPOSED] SECOND AMENDED COMPLAINT - 240

683.    JLI took the first step in this coordinated effort to deceive the FDA. In response to then-Commissioner Gottlieb's September 12, 2018 letter, JLI prepared an "Action Plan," which it presented to the FDA at an October 16, 2018 meeting, and presented to the public on November 12, 2018. The substance of JLI's presentation to the FDA and its public-facing Action Plan were largely identical.[880] JLI purported to "share a common goal- preventing youth from initiating on nicotine."[881] As part of this plan, JLI stated that it would be "stopping flavored JUUL Pod sales to all 90,000+ retail stores."

684.    But this statement was not true. JLI was continuing retail sales of its mint JUUL Pods, which JLI categorized as a non-flavored "tobacco and menthol product."[882] In JLI's Action Plan, then-CEO Burns stated that only products that "mirror what is currently available for combustible cigarettes—tobacco and menthol-based products (menthol and mint Pods)—will be sold to retail stores."[883]

685.    In both JLI's October 2018 presentation to the FDA and JLI's Action Plan that was shared with the public, JLI and its CEO fraudulently characterized mint as a non-flavored cigarette product, akin to tobacco and menthol cigarettes, suggesting that it was a product for adult smokers. The image below was included in both the public-facing Action Plan and JLI's presentation to the FDA.

---

[880]JUUL did not include in its Action Plan a proposal for Bluetooth or Wi-Fi equipped devices that was included in JLI's October presentation.
[881]JUUL Labs, Inc. *FDA Presentation*, 2 (Oct. 16, 2018); INREJUUL_00182989.
[882]*Id.*
[883]*JUUL Labs Action Plan*, JUUL Labs, Inc. (Nov. 13, 2018), https://newsroom.juul.com/juul-labs-action-plan/.

[PROPOSED] SECOND AMENDED COMPLAINT - 241



686.    JLI knew that non-smoking youth liked mint as much as any flavor.

687.    Numerous internal studies had informed JLI that mint's success was "not because it's a menthol/a familiar tobacco flavor but because it is the best JUUL flavor profile on multiple levels."[884] Indeed, despite JLI's attempts to explicitly link mint to menthol, JLI knew there was "No Implied Relationship Between Mint & Menthol,"[885] and "menthol smokers are not the only driver behind the popularity of mint flavored JUUL Pods."[886]

688.    Most importantly, JLI knew that mint was the most popular JUUL Pod. Though other flavors might draw new customers, JLI's most addictive "flavor" predictably became its most popular.

689.    The characterization of mint as an adult tobacco product was also fraudulent because JLI knew first hand from the McKinsey and DB Research studies that teens viewed mint as favorably as mango, which implies that mango and mint were fungible goods for JLI's

---

[884]INREJUUL_00265069.
[885]INREJUUL_00079307-INREJUUL_00079409, at 395.
[886]*Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 242

underage users. The McKinsey and DB Research studies also showed that youth preferred mint over the more stereotypically youth-oriented flavors like fruit medley, crème brule, and cucumber. As alleged in a Whistleblower Complaint, JLI's then-CEO told his employees: "You need to have an IQ of 5 to know that when customers don't find mango they buy mint."[887]

690.    On October 25, 2018, less than ten days after JLI presented its fraudulent, misleading Action Plan to the FDA, Altria's CEO Howard Willard submitted a letter in response to the FDA's call to combat the youth epidemic. Willard's letter was a clear indication of Altria's willingness to continue the fraudulent scheme and deception of the FDA. While Willard's letter confirmed that Altria understood that JLI's conduct and product was addicting many children to nicotine, this letter repeated the misleading statement that mint was a "traditional tobacco flavor" despite Altria and JLI knowing it was no such thing. Willard then claimed that the youth epidemic was caused, in part, by "flavors that go beyond traditional tobacco flavors"—which, according to JLI and Altria, did not include mint—and announced that Altria would discontinue all MarkTen flavors except for "traditional tobacco, menthol and mint flavors." Willard asserted that these three flavors were essential for transitioning smokers. But Willard, and Altria, knew this was not true.[888]

691.    That same day—October 25, 2018—Altria continued its deception on an earnings call with investors. Altria fraudulently described its decision to remove its Pod-based products from the market as one intended to address the dramatic increase in youth e-cigarette use, while it was only weeks away from publicly announcing its 35% stake in JLI:

*We recently met with Commissioner Gottlieb to discuss steps that could be taken to address underage access and use. Consistent with our discussion with the FDA and because we*

---

[887]Angelica LaVito, *Former JLI executive sues over retaliation, claims company knowingly sold tainted nicotine pods*, CNBC (Oct. 30, 2019), https://www.cnbc.com/2019/10/30/former-juul-executive-sues-over-retaliation-claims-company-knowingly-sold-tainted-pods.html.
[888]Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).

*believe in the long-term promise of e-vapor products and harm reduction, we're taking immediate action to address this complex situation.*

*First, Nu Mark will remove from the market MarkTen Elite and Apex by MarkTen Pod-based products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Second, for our remaining MarkTen and Green Smoke cig-a-like products, Nu Mark will sell only tobacco, menthol and mint varieties. Nu Mark will discontinue the sale of all other flavor variants of our cig-a-like products until these products receive a market order from the FDA or the youth issue is otherwise addressed. Although we don't believe we have a current issue with youth access or use of our e-vapor products, we are taking this action, because we don't want to risk contributing to the issue.*

*After removing Nu Mark's Pod-based products and cig-a-like flavor variants, approximately 80% of Nu Mark's e-vapor volume in the third quarter of 2018 will remain on the market.* [889]

692.    Willard reiterated that "Pod-based products and flavored products" were behind the increase in youth use of e-cigarettes:

*I mean, I think the way we thought about this was that we believe e-vapor has a lot of opportunity to convert adult cigarette smokers in the short, medium and long-term, but clearly, this significant increase in youth usage of the products puts that at risk and we think rapid and significant action is necessary. And I think as we looked at the data that is available in some of the remarks from the FDA, I think we concluded that the driver of the recent increase we think is Pod-based products and flavored products and so we thought that the two actions that we took addressed the drivers of the increased youth usage here in the short run.* [890]

---

[889] Altria Group Inc (MO) Q3 2018 Earnings Conference Call Transcript MO earnings call for the period ending September 30, 2018 (Oct. 25, 2018), https://www.fool.com/earnings/call-transcripts/2018/10/25/altria-group-inc-mo-q3-2018-earnings-conference-ca.aspx.

[890] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 244

693.    Willard emphasized that Altria's withdrawal of its own Pod-based products was intended to address youth use: "[W]e really feel like in light of this dramatic increase in youth usage, withdrawing those products until the PMTA is filed is one path forward." He later said: "And frankly, the actions we took were the actions that we thought we could take that would have the biggest impact on addressing the increased use of e-vapor products by youth . . . we wanted to make a significant contribution to addressing the issue."[891] As noted above, however, it has since been reported that Altria "pulled its e-cigarettes off the market" not out of concern for the epidemic of youth nicotine addiction that JLI created, but because a non-compete clause was a "part of its deal with J[LI]."[892] ████████████████████████████████████████ ████████████████████████████████████████████.[893] Even before the investment was formalized, Altria had come to view JUUL's success as its own.

694.    Thus, while Altria publicly announced that it would pull its Pod-based products to combat youth usage, and publicly seemed to support removal of youth-friendly flavors, its defense of mint as a tobacco-analog was actually part of the scheme to protect the profits associated with JLI's mint JUUL Pods, one of JLI's strongest products with the highest nicotine content and highest popularity among non-smokers and youth.

695.    In support of his arguments to the FDA that mint was a flavor for adult smokers, Willard cited to a study that Altria Client Services had conducted and presented at a conference that JLI attended.[894] But Willard did not disclose that Altria Client Services "study" was merely

---

[891]*Id.*
[892]*Id.*
[893]ALGAT0004196774 (████████████████████████████████████████ ███████████████████████.")
[894]Jessica Parker Zdinak, Ph.D., *E-vapor Product Appeal Among Tobacco Users and Non-users and the Role of Flavor in Tobacco Harm Reduction*, 72nd Tobacco Science Research Conference (Sept. 18, 2018), https://sciences.altria.com/library/-/media/Project/Altria/Sciences/library/conferences/2018%20TSRC%20J%20Zdniak%20Presentation.pdf.

[PROPOSED] SECOND AMENDED COMPLAINT - 245

a "quasi-experimental online survey" and not a true scientific study.[895] Notably, JLI's current CEO, K.C. Crosthwaite, was the Vice President of Strategy and Business Development of Altria Client Services when it conducted Altria's mint "study" in Spring 2017, the same time that the Management Defendants and Altria and Altria Client Services began their "confidential negotiations." [896] Willard did not disclose that this study was contradicted by the "youth prevention" data provided by JLI during its acquisition due-diligence showing that mint was popular among teens.

696.    Through these letters, Altria sought to prevent the FDA—which was actively considering regulating flavors[897]—from banning JLI's mint JUUL Pods.

697.    Acting in concert, JLI and Altria committed acts of mail or wire fraud when (1) JLI transmitted its Action Plan to the FDA and the public; and (2) Altria transmitted Willard's letter to the FDA.

698.    ███████████████████████████████████████████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████████. [898]

699.    It is no surprise that Altria was coordinating with Pritzker and Valani on the scheme to protect flavors. It knew a potential ban on flavors would have a material impact on the ability of JLI to continue its youth sales, and on the value of those sales. ████████████
███████████████████████████████████████████████████████████████
███████████████████████████████████████. [899]

_____

[895]*Id.*
[896]Letter from Howard Willard III, Altria to Senator Durbin, et. al. (Oct. 14, 2019).
[897]Alex Lardieri, *FDA Considers Ban on E-Cigarette Flavors Amid 'Epidemic' Use By Teens*, U.S. News & World Report (Sept. 12, 2018), https://www.usnews.com/news/health-care-news/articles/2018-09-12/fda-considers-ban-on-e-cigarette-flavors-amid-epidemic-use-by-teens.
[898]JLIFTC00653389.
[899]ALGAT0000389729.

[PROPOSED] SECOND AMENDED COMPLAINT - 246

700.    At the heart of these acts of fraud was Defendants' characterization of mint as a tobacco product that was targeted to adult smokers. This characterization was fraudulent because Defendants knew kids prefer mint flavor and that JLI designed mint to be one of JLI's most potent products. Altria supported this plan and helped execute it. Together, these actions by JLI and Altria ensured that mint would remain available to youths for many months, furthering their efforts to maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base.

701.    The deceptive scheme worked—the FDA did not protest JLI and Altria's plan. And on December 20, 2018, one month after JLI announced its Action Plan to keep selling mint, Altria made a $12.8 billion equity investment in JLI.

702.    By February of 2019, the FDA became aware that it had been deceived by JLI and Altria. On February 6, 2019, then-FDA commissioner Gottlieb wrote JLI and Altria demanding in-person meetings, excoriating Altria for its "newly announced plans with JUUL [that] contradict the commitments you made to the FDA" in a prior meeting and Willard's October 25, 2018 letter to the FDA.[900] Gottlieb's letter to JLI alleged that JLI's conduct was "inconsistent with its previous representations to the FDA."[901]

703.    The FDA demanded Altria be prepared to explain itself regarding its "plans to stop marketing e-cigarettes and to address the crisis of youth use of e-cigarettes." Then-Commissioner Gottlieb told Altria that "deeply concerning data" shows that "youth use of JUUL represents a significant proportion of overall use of e-cigarette products by children" and despite any alleged steps the companies had taken to address the issue he "ha[d] no reason to believe these youth patterns of use are abating in the near term, and they certainly do not appear to be reversing."

---

[900]Letter from Scott Gottlieb, FDA to Howard Willard, Altria (Feb. 9, 2019).
[901]Letter from Scott Gottlieb, FDA to Kevin Burns, JUUL Labs, Inc. (Feb. 9, 2019).

[PROPOSED] SECOND AMENDED COMPLAINT - 247

704.    JLI and Altria met with Gottlieb in March 2019 in a meeting the then-Commissioner described as "difficult."[902] Gottlieb "did not come away with any evidence that public health concerns drove Altria's decision to invest in JLI, and instead said it looked like a business decision. According to reporting by the New York Times, Gottlieb angrily criticized JLI's lobbying of Congress and the White House, stating:

*We have taken your meetings, returned your calls and I had personally met with you more times than I met with any other regulated company, and yet you still tried to go around us to the Hill and White House and undermine our public health efforts. I was trying to curb the illegal use by kids of your product and you are fighting me on it.*[903]

705.    But just a week after the "difficult" meeting with JLI and Altria, Gottlieb posted a statement about the FDA's new e-cigarette policy, proposing to ban all flavors except "tobacco-, mint- and menthol-flavored products."[904] He cited the strong support of President Trump (whose administration JLI had aggressively lobbied[905]), and also cited "recent evidence indicat[ing] that mint- and menthol-flavored ENDS products are preferred more by adults than minors."[906] Just a few weeks later, Gottlieb resigned from his position as commissioner of the FDA.

706.    The scheme had succeeded in saving mint JUUL Pods, as well as each Defendant's bottom line. JLI's sale of mint JUUL Pods rose from one third of its sales in September 2018 to

---

[902]Kate Rooney & Angelica LaVito, *Altria Shares Fall After FDA's Gottlieb Describes 'Difficult' Meeting on Juul*, CNBC (Mar. 19, 2019), https://www.cnbc.com/2019/03/19/altria-shares-fall-after-fdas-gottlieb-describes-difficult-meeting-on-juul.html.

[903]Julie Creswell & Sheila Kaplan, *How Juul Hooked a Generation on Nicotine*, N.Y. Times (Nov. 24, 2019), https://www.nytimes.com/2019/11/23/health/juul-vaping-crisis.html.

[904]News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., on advancing new policies aimed at preventing youth access to, and appeal of, flavored tobacco products, including e-cigarettes and cigars*, U.S. FDA (Mar. 13, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-advancing-new-policies-aimed-preventing-youth-access.

[905]Evan Sully & Ben Brody, *JLI Spent Record $1.2 Million Lobbying as Regulators Stepped Up*, Wash. Post (Oct. 22, 2019), https://www.washingtonpost.com/business/on-small-business/juul-spent-record-12-million-lobbying-as-regulators-stepped-up/2019/10/22/2a0dbc52-f4de-11e9-b2d2-1f37c9d82dbb_story.html.

[906]*Id.*

approximately two thirds in February 2019. JLI's 2019 revenues were estimated to be between $2.36 billion and $3.4 billion, and mint JUUL Pods accounted for approximately 75% of JLI's total 2019 sales. And because mint remained on the market until JLI withdrew it in November 2019 in the face of growing scrutiny,[907] thousands, if not millions, of underage JUUL users suffered the consequences.

707.    As former New York City Mayor Mike Bloomberg stated: "JUUL's decision to keep mint- and menthol-flavored e-cigarettes on the shelves is a page right out of the tobacco industry's playbook."[908]

708.    JLI continues to sell menthol-flavored products.[909]

**In Response To The Public Health Crisis Created By JUUL, The FDA Belatedly Tried To Slow The Epidemic**

709.    In 2017, the FDA announced that it would be taking steps to regulate e-cigarette devices such as JUUL. In late 2017, the FDA initiated its investigation of e-cigarette companies' advertising and sales practices. But, as noted above, the FDA's 2017 Compliance Policy issued a four-year extension for compliance with the 2016 deeming rule, apparently to "balance between regulation and encouraging development of innovative tobacco products that may be less harmful than cigarettes."[910] In March 2018, the 2017 Compliance Policy was challenged by the American Academy of Pediatrics, along with other public health organizations concerned that a compliance extension for the e-cigarette industry would allow more e-cigarette products into the market and continue to addict thousands of youth.[911]

---

[907] Ellen Huet, *JLI Pulls Mint-Flavor Vaping Products, but Menthol Remains*, Bloomberg (Nov. 7, 2019), https://www.bloomberg.com/news/articles/2019-11-07/juul-stops-selling-mint-flavored-vaping-products.
[908] *Id.*
[909] Sheila Kaplan, *Juul Halts Sales of Mint, Its Top-Selling e-Cigarette Flavor*, N.Y. Times (Nov. 7, 2019), https://www.nytimes.com/2019/11/07/health/vaping-juul-mint-flavors.html.
[910] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[911] *Id.*

[PROPOSED] SECOND AMENDED COMPLAINT - 249

710.    In March 2019, the FDA drafted guidance that modified the 2017 Compliance Policy, but it did not go into full effect. However, on May 15, 2019, the lawsuit filed by the American Academy of Pediatrics was successful—the U.S. District Court for the District of Maryland vacated the 2017 Compliance Policy, and directed the FDA to "require that premarket authorization applications for all new deemed products" ("new" referred to any product launched after February 15, 2007 and thus would include JUUL) be submitted within ten months, by May 2020.[912]

711.    In January 2020, the FDA issued: Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization: Guidance for Industry (2020 FDA Guidance), directed at the e-cigarette industry, which detailed the FDA's plan to prioritize enforcement of regulations prohibiting the sale of flavored e-cigarette products and prohibiting the targeting of youth and minors.[913] The 2020 FDA Guidance focused on flavored e-cigarettes that appeal to children, including fruit and mint: "[C]ompanies that do not cease manufacture, distribution and sale of unauthorized flavored cartridge-based e-cigarettes . . . within 30 days risk FDA enforcement actions."[914]

**The Government's Efforts To Address The JUUL Crisis Were Too Late And The Damage Has Already Been Done**

712.    By the time the FDA acted, youth consumption of e-cigarettes had already reached an all-time high, and the e-cigarette industry's presence on social media became an unstoppable force. The 2020 FDA Guidance acknowledges that two of the largest 2019 surveys of youth

---

[912]*Id.*; *Am. Academy of Pediatrics v. FDA*, 379 F. Supp. 3d 461, 496 (D. Md. 2019).
[913]*Id.*
[914]News Release, *FDA Finalizes Enforcement Policy on Unauthorized Flavored Cartridge-Based E-Cigarettes That Appeal to Children, Including Fruit and Mint*, U.S. FDA (Jan. 2, 2020), https://www.fda.gov/news-events/press-announcements/fda-finalizes-enforcement-policy-unauthorized-flavored-cartridge-based-e-cigarettes-appeal-children.

cigarette use found that e-cigarette use had reached the highest levels ever recorded.[915] By December 2019, there were over 2,500 reported cases of e-cigarette related hospitalization for lung injury, including over fifty confirmed deaths.[916] Despite the FDA's efforts between 2017 and 2019, youth consumption of e-cigarettes doubled among middle and high school students over the same period.[917] In 2019, the total number of middle and high school students reporting current use of e-cigarettes surpassed five million for the first time in history.[918]

713.    JLI's presence on social media has also persisted, even without further initiation by JLI—the hallmark of a successful viral marketing campaign. When the "#juul" hashtag was first used on social media, it was a series of thirteen tweets on Twitter. By the time JLI announced it would shut down its Instagram account, "#juul" had been featured in over 250,000 posts on Instagram. A study by Stanford University found that in the eight months after JLI ceased all promotional postings, community posting accelerated to nearly half a million posts. Whereas before JLI exited Instagram, "#juul" appeared on average in 315 posts per day, that number tripled to 1084 posts per day after JLI shut down its Instagram account.[919]

714.    The FDA's anti-e-cigarette campaign on social media was aimed at youth and middle and high school students. The campaign used the slogan "The Real Cost" to educate youth on social media platforms about the health impacts of e-cigarette consumption—the real cost of using e-cigarettes. A recent study from the University of California Berkeley found that since September 2018, when the FDA's social media campaign began, the hashtag "#TheRealCost" was used about fifty times per month on Instagram. By comparison, e-cigarette related hashtags

---

[915] *Enforcement Priorities for Electronic Nicotine Delivery Systems (ENDS) and Other Deemed Products on the Market Without Premarket Authorization*, U.S. FDA (Jan. 2020), https://www.fda.gov/media/133880/download.
[916] Karen A. Cullen et al., *E-cigarette Use Among Youth in the United States, 2019*, 322 JAMA 2095 (2019).
[917] *Id.*
[918] *Id.*
[919] Robert K. Jackler et al., *Rapid Growth of JUUL Hashtags After the Company Ceased Social Media Promotion*, Stanford Research Into the Impact of Tobacco Advertising (July 22, 2019), http://tobacco.stanford.edu/tobacco_main/publications/Hashtag JUUL Project_7-22-19F.pdf.

were used as many as 10,000 times more often. Despite the FDA's social media intervention, the number of e-cigarette related posts, and the median number of likes (a strong metric of viewer engagement) the posts received, increased three-fold and six-fold, respectively.[920]

715.    In short, by the time the FDA reacted to the epidemic created by Defendants, millions of youth were addicted to e-cigarettes and nicotine, and were sharing e-cigarette related posts on social media on their own.

**JUUL Usage Increases The Risk Of Cardiovascular, Pulmonary, Neurological, And Other Bodily Injuries**

716.    The use of e-cigarettes, including JUUL, cause significant lung toxicity[921] and have been implicated in multiple severe pathological lung injuries.

717.    Recent studies have demonstrated that exposure to JUUL aerosol induces oxidative stress, inflammation, epithelial barrier dysfunction, and DNA damage in lung cells.[922] An impaired epithelial barrier function allows greater passage of inhaled chemicals into the body, increasing inflammation both locally in the lungs and systemically. This can lead to acute and chronic lung injury as well as exposure to, and increased susceptibility to, respiratory infections in users of e-cigarettes, including JUUL.[923]

---

[920]Julia Vassey, *#Vape: Measuring E-cigarette Influence on Instagram With Deep Learning and Text Analysis*, 4 Frontiers in Commc'n 75 (2020),https://www.frontiersin.org/articles/10.3389/fcomm.2019.00075/full.

[921]Lauren F. Chun et al., *Pulmonary Toxicity of E-cigarettes*, 313 Am. J. Physio. Lung Cell Mol. Physiol. L193 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28522559.

[922]Thivanka Muthumalage et al., *E-cigarette Flavored Pods Induce Inflammation, Epithelial Barrier Dysfunction, and DNA Damage in Lung Epithelial Cells and Monocytes*, 9 Scientific Reports 19035 (2019), https://www.nature.com/articles/s41598-019-51643-6.

[923]Laura E. Crotty Alexander et al., *Chronic Inhalation of E-cigarette Vapor Containing Nicotine Disrupts Airway Barrier Function and Induces Systemic Inflammation and Multiorgan Fibrosis in Mice*, 314 Am. J. Physiol. Regul. Comp. Physiol. R834 (2018), https://journals.physiology.org/doi/full/10.1152/ajpregu.00270.2017; Pieter S. Hiemstra et al., *The Innate Immune Function of Airway Epithelial Cells in Inflammatory Lung Disease*, 45 Eur. Respir. J. 1150 (2015), https://erj.ersjournals.com/content/45/4/1150.

[PROPOSED] SECOND AMENDED COMPLAINT - 252

718.    Research has also demonstrated that ultrafine metal particles from heating devices have been found in e-cigarette aerosol, and in e-cigarette user's lungs.[924]

719.    In addition, exposure to JUUL aerosol has been shown to significantly impair endothelial function comparable to impairment of endothelial function caused by use of combustible cigarettes.[925]

720.    It is well-established that endothelial dysfunction and injury from direct toxic effects of inhalants such as cigarette smoke, can cause lung injuries such as chronic obstructive pulmonary disease (COPD), emphysema, asthma and chronic bronchitis.[926]

721.    Recent epidemiological and toxicological studies detected links between asthma frequency and e-cigarette use in adolescents and reported that vaporized e-liquids containing the same flavor aldehydes found in JUUL induce inflammation in human respiratory epithelia.[927]

722.    A study published in December 2019, found that among individuals who never smoked combustible cigarettes, current e-cigarette use was associated with 75% higher odds of chronic bronchitis, emphysema, and COPD compared to those who never used e-cigarettes.[928]

723.    In addition, the flavoring compounds used in e-cigarettes such as JUUL, include numerous chemicals known to be toxins if inhaled, such as diacetyl, acetyl propionyl, and benzaldehyde. These chemicals are linked to serious lung disease.[929]

---

[924]Alessandra Caporale et al., *Acute Effects of Electronic Cigarette Aerosol Inhalation on Vascular Function Detected at Quantitative MRI*, 293 Radiology 97 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31429679.

[925]Poonam Rao et al., *Juul and Combusted Cigarettes Comparably Impair Endothelial Function*, 6 Tob. Regul. Sci. 30 (2020),https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6953758/.

[926]Francesca Polverino et al. *COPD as an Endothelial Disorder: Endothelial Injury Linking Lesions in the Lungs and Other Organs?*, 8 Pulm. Circ. 1 (2018), https://www.ncbi.nlm.nih.gov/pubmed/29468936.

[927]Phillip W. Clapp and Ilona Jaspers, *Electronic Cigarettes: Their Constituents and Potential Links to Asthma*, 79 Curr Allergy Asthma Rep. 17 (2017), https://www.ncbi.nlm.nih.gov/pubmed/28983782.

[928]Albert D. Osei et al., *Association Between E-Cigarette Use and Chronic Obstructive Pulmonary Disease by Smoking Status: Behavioral Risk Factor Surveillance System 2016 and 2017*, 132 Am. J. Prev. Med. 949 (2019),https://www.ncbi.nlm.nih.gov/pubmed/30853474.

[929] Centers for Disease Control & Prevention, *Flavorings-Related Lung Disease* (Oct. 3, 2017), https://www.cdc.gov/niosh/topics/flavorings/default.html; Won Hee Lee et al., *Modeling Cardiovascular Risks of E-Cigarettes with Human-Induced Pluripotent Stem Cell-Derived Endothelial Cells.* 73 J. Am. College of

724.    A multitude of published case reports have linked e-cigarette use, including JUUL, to a variety of acute inhalational lung injuries such as lipoid pneumonia, bronchiolitis obliterans (popcorn lung), alveolar hemorrhage, eosinophilic pneumonia, hypersensitivity pneumonitis, chemical pneumonitis and collapsed lungs, among others.

725.    In 2012, one article reported on the case of a 42-year-old woman admitted with a seven-month history of dyspnea, cough, and fevers that began when the patient had begun using e-cigarettes. The authors hypothesized the source of lipoid pneumonia was e-cigarette use, due to "glycerin-based oils found in e-cigarette nicotine vapor" added to "make the visual smoke when the solution is vaporized."[930]

726.    A 2014 report described a 20-year-old previously healthy U.S. active-duty male sailor who presented with a three-day history of "persistent cough, shortness of breath, and facial flushing" which began an hour after using an e-cigarette device. The patient was diagnosed with acute eosinophilic pneumonia. The patient was given prednisone and discharged after five days in the hospital, with improvement of his symptoms and significant resolution of lung opacity.[931]

727.    In 2015, Atkins and Drescher reported the case of a 60-year-old man admitted repeatedly with weakness, chills, cough, a fever, and hypoxemia, with "bilateral upper lung zone crackles." The patient revealed before each emergency room admittance he had used e-cigarettes and was diagnosed with "suspected acute hypersensitivity pneumonitis, related to ENDS" and had no further episodes with cessation of e-cigarette use.

728.    In another case in 2015, a 31-year-old woman was admitted to the hospital for dyspnea and cough. The patient "became increasingly hypoxic and was intubated due to concerns

---

Cardiology 2722 (2019), https://www.ncbi.nlm.nih.gov/pubmed/31146818; Sheila Kaplan & Matt Richtel, *Mysterious Vaping Illness That's 'Becoming an Epidemic,'* N.Y. Times (Aug. 31, 2019), https://www.nytimes.com/2019/08/31/health/vaping-marijuana-ecigarettes-sickness.html.
[930]Lindsay McCauley et al., *An Unexpected Consequence of Electronic Cigarette Use*, 141 Chest 1110 (2012).
[931]Darshan Thota & Emi Latham, *Case Report of Electronic Cigarettes Possibly Associated with Eosinophilic Pneumonitis in a Previously Healthy Active-duty Sailor*, 47 J. Emerg. Med. 15 (2014).

of acute respiratory distress syndrome." The patient was started on IV steroids and diagnosed with lipoid pneumonia, given the close temporality of her recent initiation of e-cigarettes three months prior to her onset of symptoms. The patient rapidly improved with steroids and cessation of use of e-cigarettes.[932] A different published a case report in 2015 describes bilateral pneumonia and pleural effusions associated with e-cigarette use.[933]

729.    In 2016, another case report described the case of a 27-year-old otherwise healthy man who was admitted to the hospital with dyspnea, cough, fever, and hemoptysis after increasing use of e-cigarettes for seven months prior to presentation, initiated in an effort to decrease his combustible tobacco dependence. The patient worsened and required intubation and mechanical ventilator support. There were no notable findings on microorganism workup, "making infectious etiology for his pneumonia very unlikely.".[934]

730.    Also in January 2020, another article reported on a teenager who developed acute fibrinous organizing pneumonia (AFOP) after using JUUL as well as other vaping products. AFOP presents with diffuse ground glass infiltrates and intra-alveolar fibrin balls. Subpleural sparing and pneumomediastinum described elsewhere in vaping associated lung injury were also seen. The authors noted that this patient's presentation fit with existing literature, but his young age, choice of e-cigarette, and lung pathology were considered unique. The images characterized AFOP, a newly evolving rare lung pathology, which is now associated with vaping.[935]

731.    Additional published case reports and case series were published since 2016 noting serious and significant acute lung injuries associated with vaping or e-cigarette use. Despite the

---

[932]Sujal Modi et al., *Acute Lipoid Pneumonia Secondary to E-Cigarettes Use: An Unlikely Replacement for Cigarettes*, 148 Chest 382 (2015).
[933]Kendall Moore et al., *Bilateral Pneumonia and Pleural Effusions Subsequent to Electronic Cigarette Use*, 3 Open J. of Emergency Med. 18 (2015).
[934]Ronnie D. Mantilla et al., *Vapor Lung: Bronchiolitis Obliterans Organizing Pneumonia (BOOP) in Patient with E-Cigarette Use*, 193 Am. J. of Respiratory & Critical Care Med. A6513 (2016).
[935]Monica A. Lu et al., *Vaping-related Lung Injury in an Adolescent*, 201 Am. J. of Respiratory & Critical Care Med. 481(2020).

[PROPOSED] SECOND AMENDED COMPLAINT - 255

increasing reports in the published medical literature and the widespread use of JUUL among teenagers, JLI did not take any steps to warn the public and consumers of the risks of JUUL Products.

732.    Over the summer of 2019, healthcare providers started to note an influx of acute respiratory failure and a myriad of lung injuries in patients who were using e-cigarettes. This prompted a Center for Disease Control ("CDC") investigation of an outbreak of vaping associated lung injuries. The reported injuries mirrored the injuries that had been reported in the medical literature since 2012. In October 2019, the CDC issued treatment guidelines to assist doctors in clinical practice. The CDC defined a new recognized medical condition referred to as E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI).

733.    Researchers noted that the recent proliferation of vaping-related cases, known as EVALI, demonstrated a heterogeneous collection of pneumonitis patterns that include acute eosinophilic pneumonia, organizing pneumonia, lipoid pneumonia, diffuse alveolar damage and acute respiratory distress syndrome (ARDS), diffuse alveolar hemorrhage, hypersensitivity pneumonitis, and the rare giant-cell interstitial pneumonitis. Active infection (which would include live bacterial contamination of e-cigarette fluids) did not appear to explain the clinical presentation, but acute toxic lung injury did seem to fit.[936]

734.    Further, a recent publication in 2020 noted that there were almost 2000 cases of EVALI at the time it was written. The authors further noted that Vitamin E acetate was one possible cause of the recent outbreak but there may be more than one cause and therefore, everyone should refrain from using any e-cigarette or vaping products.[937]

---

[936]David C. Christiani, *Vaping-Induced Injury*, 68 New England J. Med. 787 (2019).

[937]Sascha Ellington et al., *Update: Product, Substance-Use, and Demographic Characteristics of Hospitalized Patients in a Nationwide Outbreak of E-cigarette, or Vaping, Product Use-Associated Lung Injury—United States, August 2019–January 2020,* 69 Morbidity & Mortality Weekly Rep. 44 (2020).

735.     Another publication in January 2020 noted that there were a number of patients who were diagnosed with EVALI who reported the use of nicotine only e-cigarettes. The authors concluded that EVALI was also associated with nicotine only products.[938]

736.     In addition, multiple reports have been published in the medical literature of acute alveolar hemorrhage caused by e-cigarette use.[939] Diffuse alveolar hemorrhage (DAH) is a life-threatening disorder which refers to bleeding that originates in the pulmonary microvasculature. It often results in acute respiratory failure.[940] Hypersensitivity pneumonitis has been linked to the use of e-cigarettes, such as JUUL, since 2015.[941] In 2018, researchers published the first reported case of hypersensitivity pneumonitis and acute respiratory distress syndrome (ARDS) as a risk of e-cigarette use in an adolescent.[942] Recent case reports have also linked spontaneous pneumothorax (lung collapse) to vaping and use of e-cigarettes.[943], [944]

737.     The multiple pathological lung injuries and toxicity associated with e-cigarette use, including JUUL, can lead to acute respiratory failure, intubation with mechanic ventilation and death.

738.     It has been established that the use of e-cigarettes, including JUUL, can lead to acute and chronic lung injuries such as EVALI, lipoid pneumonia, organizing pneumonia,

---

[938]Isaac Ghinai et al., *Characteristics of Persons Who Report Using Only Nicotine-Containing Products Among Interviewed Patients with E-cigarette, or Vaping, Product Use-Associated Lung Injury - Illinois, August-December 2019*, 69 Morbidity & Mortality Weekly Rep. 84 (2020).

[939]Michael Agustin et al., *Diffuse Alveolar Hemorrhage Induced by Vaping*, 2018 Case Rep. Pulmonol. 1 (2018); Peter J. Edmonds et al., *Vaping-induced Diffuse Alveolar Hemorrhage*, 29 Respiratory Med. Case Reports 1 (2020).

[940]Brandi R. Newsome & Juan E. Morales, *Diffuse Alveolar Hemorrhage*, 104 Southern Med. J. 269 (2011).

[941]Graham Atkins et al., *Acute Inhalational Lung Injury Related to the Use of Electronic Nicotine Delivery Systems (ENDS)*, 148 Chest 83A (2015).

[942]Casey G. Sommerfield et al., *Hypersensitivity Pneumonitis and Acute Respiratory Distress Syndrome From E-Cigarette Use*, 141 Pediatrics 1 (2018).

[943]Alex Bonilla et al., *Recurrent Spontaneous Pneumothoraxes and Vaping in an 18-year-old Man: A Case Report and Review of the Literature*, 13 J. of Med. Case Reports 283 (2019), https://doi.org/10.1186/s13256-019-22154.

[944]Munish Sharma et al., *A Case Report of Secondary Spontaneous Pneumothorax Induced by Vape*, 11 Cureus e6067 (2019), https://www.cureus.com/articles/24542-a-case-report-of-secondary-spontaneous-pneumothorax-induced-by-vape.

chemical pneumonitis, alveolar hemorrhage, bronchiolitis obliterans (popcorn lung), pneumothorax, acute respiratory failure, acute respiratory distress syndrome (ARDS), asthma, emphysema and COPD. Defendants never warned the public of the risk of serious acute and chronic lung injuries that were associated with the use of e-cigarettes, including JUUL.

739.    The failure to properly and adequately test the safety of JUUL prior to marketing it to the public, including teenagers and young adults, and continuing in the face of the onslaught of publications in the medical literature demonstrating an association with e-cigarette use and significant lung injuries, amounts to a reckless disregard for public safety.

**JUUL Products Cause Cardiovascular Injuries**

740.    In addition to severe lung injuries and addiction, JUUL Products cause significant and severe risks of cardiovascular injuries. Studies have shown that use of e-cigarettes such as JUUL increase the risk of strokes and heart attacks. [945]

741.    Research has demonstrated that e-cigarettes significantly increase blood pressure and arterial stiffness, which also increases the risk of strokes and heart attacks. [946] Further, scientists have found that e-cigarettes cause oxidative stress, which leads to vascular disease and damage, known risk factors for cardiovascular injuries. [947]

---

[945] News Release, *E-cigarettes linked to higher risk of stroke, heart attack, diseased arteries,* Am. Stroke Ass'n Abstract 9, Session A2 (Jan. 30, 2019), https://newsroom.heart.org/news/e-cigarettes-linked-to-higher-risk-of-stroke-heart-attack-diseased-arteries; Mohindar R. Vindhyal et al., *Impact on Cardiovascular Outcomes Among E-cigarette Users: A Review From National Health Interview Surveys,* 73 J. of the Am. College of Cardiology Suppl. 2 (2019), www.onlinejacc.org/content/73/9_Supplement_2/11.; Paul M. Ndunda & Tabitha M. Muutu, *Electronic Cigarette Use is Associated with a Higher Risk of Stroke,* 50 Int'l Stroke Conference 2019 Oral Abstracts: Community/Risk Factors, Suppl. 1, Abst. 9, www.ahajournals.org/doi/10.1161/str.50.suppl_1.9.

[946] Charalambos Vlachopoulos et al., *Electronic Cigarette Smoking Increases Aortic Stiffness and Blood Pressure in Young Smokers,* 67 J. Am. Coll. Cardiol. (2016).

[947] Dennis Thompson, *Vaping May Hurt the Lining of Your Blood Vessels,* WebMD HealthDay Reporter (May 28, 2019),            www.webmd.com/mental-health/addiction/news/20190528/vaping-may-hurt-the-lining-of-your-blood-vessels#1; JUUL e-cigarettes and JUUL pods deliver dangerous toxins and carcinogens to users. The ingredients in JUUL pods include glycerol, propylene glycol, nicotine, benzoic acid, and flavoring chemicals. *See What Are JUULpods?,* www.juul.com/learn/pods (last visited Apr. 4, 2020).

[PROPOSED] SECOND AMENDED COMPLAINT - 258

742.     Biological and epidemiologic studies have found that significant associations exist between e-cigarette use and myocardial infarctions (heart attacks), which appear to be dose dependent. Biological investigations support this association, whereby a prothrombotic phenotype may develop after exposure to nicotine-containing e-cigarette vapors.[948]

743.     Researcher Floridan Rader and others found that chronic e-cigarette users demonstrated substantially impaired coronary microvascular endothelial function, even more pronounced than that seen in chronic tobacco cigarette users. These findings also suggested that chronic e-cigarette use leads to measurable and persistent adverse vascular effects that are not directly related to nicotine.[949]

744.     Talal Alzahrani found that daily e-cigarette use was associated with an increased risk of myocardial infarction.[950]

745.     A systematic review of the literature found that acute mainstream exposure to aerosol from JUUL, or from previous generations of e-cigarettes using free-base nicotine, impaired vascular function comparably to combusted cigarette smoke and delivered considerably more nicotine to the blood on a per puff basis.[951]

746.     The overarching conclusion from dozens of studies published in the past 8 years is that use of e-cigarettes, including JUUL, increases the risk of cardiovascular injury which can lead to strokes, heart attacks and death. JLI never warned the public or consumers of the serious and significant risk of cardiovascular injuries associated with its products.

_____

[948]Giuseppe Lippi & Emmanuel J. Favaloro, *An Update on Biological and Clinical Associations Between E-Cigarettes and Myocardial Infarction*, Semin. Thromb. Hemost. (2019), https//:doi.org/10.1055/s-0039-3402451.
[949] Florian Rader et al., *E-Cigarette Use and Subclinical Cardiac Effects*, medRxiv (preprint) (2020), https://www.medrxiv.org/content/10.1101/2020.01.16.20017780v1 .
[950]Talal Alzahrani et al., *Association Between Electronic Cigarette Use and Myocardial Infarction*, 55 Am. J. Preventive Med. 455 (2018).
[951]Nicholas Buchanan et al. *Cardiovascular Risk of Electronic Cigarettes: A Review of Preclinical and Clinical Studies,* 116 Cardiovascular Research 40 (2019).

[PROPOSED] SECOND AMENDED COMPLAINT - 259

### JUUL Products Cause And Contribute To Seizures

747.    On April 3, 2019, the FDA Center for Tobacco Products issued a Special Announcement notifying the public of an increase in reports of tobacco-related seizures, specifically relating to an increase in e-cigarette use, particularly among youth.[952]

748.    Additionally, FDA Commissioner Gottlieb and the Principal Deputy Commissioner Amy Abernethy issued a joint statement addressing the FDA's ongoing scientific investigation of seizures following e-cigarette use as a potential safety issue in youth and young adults. The statement identifies seizures following e-cigarette use as a source of concern for the FDA, adding that in addition to the 35 reported cases from 2010 to early 2019, the FDA "recognize[s] that not all of the cases may be reported" due to their voluntary nature.[953]

749.    Symptomatic nicotine toxicity is a consequence of excessive vaping.[954] As the FDA acknowledges in their statement, "seizures or convulsions are known potential side effects of nicotine toxicity."[955] It is well-documented that nicotine poisoning can cause seizures, including ingestion of e-cigarette fluid.[956] Nicotine-induced seizure has long been considered a possible side effect of long-term nicotine exposure.[957] JUUL's high nicotine content and addictive

---

[952]News Release, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. FDA (Apr. 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

[953]News Release, *Statement from FDA Commissioner Scott Gottlieb, M.D., and Principal Deputy Commissioner Amy Abernethy, M.D., Ph.D., on FDA's Ongoing Scientific Investigation of Potential Safety Issue Related to Seizures Reported Following E-cigarette Use, Particularly in Youth and Young Adults*, U.S. FDA (Apr. 3, 2019), https://www.fda.gov/news-events/press-announcements/statement-fda-commissioner-scott-gottlieb-md-and-principal-deputy-commissioner-amy-abernethy-md-phd.

[954]Adrienne Hughes et al., *An Epidemiologic and Clinical Description of E-cigarette Toxicity*, 57 Clin. Toxicol. 287 (2018), https://doi: 10.1080/15563650.2018.1510503.

[955]News Release, *Some E-cigarette Users Are Having Seizures, Most Reports Involving Youth and Young Adults*, U.S. FDA (Apr. 10, 2019), https://www.fda.gov/tobacco-products/ctp-newsroom/some-e-cigarette-users-are-having-seizures-most-reports-involving-youth-and-young-adults.

[956] Gerdinique C. Maessen et al., *Nicotine Intoxication by E-cigarette Liquids: A Study of Case Reports, Pathophysiology*, 58 Clinical Toxicology 1 (2020), https://www.tandfonline.com/doi/full/10.1080/15563650.2019.1636994.

[957] Lucinda L. Miner et al., *The Effect of Chronic Nicotine Treatment on Nicotine-induced Seizures*, 95 Psychopharmacology 52 (1988), https://doi.org/10.1007/BF00212766.

nature cause JUUL users to be highly susceptible to seizures. Moreover, it has been suggested that the use of e-cigarettes has been associated with an exacerbation of seizures in individuals who are predisposed.[958]

750.    Seizures following e-cigarette use are a significant cause for concern due to the unnecessarily high levels of nicotine delivered, by design, via JUUL. As described herein, JLI intentionally designed its products to deliver a higher amount of nicotine, particularly targeting young people, and then failed to warn of the subsequent risks. JUUL devices were deliberately designed to deliver higher concentrations of nicotine per puff as compared to cigarettes, creating the risk for addiction as well as the risk of seizure due to potentially toxic levels of nicotine exposure.

751.    JLI never warned the public or consumers of the risk of seizures associated with the use of e-cigarettes including JUUL.

**Animal Studies Demonstrate Carcinogenic Potential Of JUUL**

752.    Several studies conducted on animals show a significant likelihood that JUUL could cause cancer for users.

753.    In 2017, a report by Donatella Canistro and others found that e-cigarettes induce toxicological effects that can raise the risk of cancer.[959] Similarly, a 2018 study measured the DNA damage induced by nitrosamines in the organs (lung, bladder, and heart) of mice subjected to e-cigarette vapor and concluded that e-cigarette vapor induces DNA damage in all three organs and reduces DNA-repair functions and proteins in mouse lungs. They further found that nicotine-derived nitrosamine ketone can induce the same effects and enhance mutational susceptibility and tumorigenic transformation of cultured human bronchial epithelial and urothelial cells (leading

---

[958]Jessica D. Wharton et al., *Increased Seizure Frequency Temporally Related to Vaping: Where There's Vapor, There's Seizures?*, 104 Pediatric Neurology 66 (2020).

[959]Donatella Canistro et al., *E-cigarettes Induce Toxicological Effects That Can Raise the Cancer Risk*, 7 Sci. Reports 1 (2017).

them to believe that vaping could contribute to heart disease and lung and bladder cancer in humans).[960] And in 2019, a report by Moon-shong Tang and others found that exposure to e-cigarette vapor, induced lung adenocarcinoma and bladder urothelial hyperplasia in mice.[961]

754.    There is a likely association between e-cigarettes, including JUUL, and cancer. Long term epidemiological studies will likely reveal an increased risk of cancer among this generation of youth who were unwitting targets of JLI in complete and utter reckless disregard for their safety.

**Walker McKnight**

755.    Walker McKnight first used JUUL in or around September 2017, at eighteen (18) years old. He used it in school because everyone was using it. He dabbled to try to look cool. He was passing around with friends. He did have uptick in anxiety when he used it. He noticed that he was quicker to anger. The very first use was in the school bathroom, 3-4 guys were in there. He wanted to try it, took 2-3 hits. A day or two later, he bought his own at a gas station. He traded the other flavors away and focused on Mango and Fruit. The more stress he was under the more he would use it. He quit cold turkey in 2017.

756.    However, Walker McKnight restarted in October 2018. It was everywhere, there was no avoiding it. He restarted for social reasons. This time the ramp up was intense, within a week, he was going through a Pod a day. After that first week, he was using 250 hits per day, 7 Pods per week. However, he peaked out at about 2-3 Pods per day. He was therefore hitting his JUUL over 500 times per day, every single day.

757.    Walker McKnight was using it that heavily for four months from late October 2018 through the time of his worsening illness in February 2019. However, he continued to use a Pod

---

[960]Hyun-Wook Lee et al., *E-cigarette Smoke Damages DNA and Reduces Repair Activity in Mouse Heart, Lung, and Bladder as well as in Human Lung and Bladder Cells*, 115 PNAS E1560 (2017).
[961]Moon-shong Tang, et al., *Electronic-cigarette Smoke Induces Lung Adenocarcinoma and Bladder Urothelial Hyperplasia in Mice*, 116 PNAS 21727 (2019).

[PROPOSED] SECOND AMENDED COMPLAINT - 262

a day even while he was sick. He was still using JUUL as he was getting sicker. He was still not able to fully quit until his illness forced him to in March 2019.

758.    Walker McKnight's addiction and consumption of JUUL was unmanageable. But his reliance on nicotine came with profound side effects, including, but not limited to nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, and lack of concentration.

759.    In addition to his nicotine addiction, Walker McKnight endured catastrophic injuries as a result of his JUUL use.

760.    What had started as a simple sore throat, fever, and sinusitis, soon became much worse. He was admitted to the hospital with worsening pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, ICU admission, triple antibiotics, extracorporeal membrane oxygenation, and eventually lung and kidney transplants.

761.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septal defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

762.    Walker McKnight died on December 31, 2024.

[PROPOSED] SECOND AMENDED COMPLAINT - 263

763.    Upon information and belief, Walker McKnight's JUUL use caused or substantially contributed to cause his death.

764.    Before and during his usage of JUUL, Walker McKnight was inundated with JUUL marketing and promotional materials through social media, in and around stores, and online. He was exposed to JUUL advertisements directly from JUUL and through third-party users due to the viral nature of JUUL's marketing campaign. JUUL advertisements were ubiquitous and impossible to escape. An example of the advertisements Walker McKnight saw include, but are not limited to, the following:



[PROPOSED] SECOND AMENDED COMPLAINT - 264









[PROPOSED] SECOND AMENDED COMPLAINT - 266

























**JUUL TOOLKIT**



PROVIDED BY JUUL:

1. JUUL T-Shirt (1)
2. JUUL sampling Bag (1)
3. iPhone Case (1)
4. Sampling Devices (2)
5. Starter Kits for "TTT program" (1-3/sampling)
6. Sampling Pod Packs (2.5/sampling)
7. $15 off Coupons (25/sampling)
8. Wall to USB Charger (1)
9. Take Away Cards (25/sampling)
10. Clear bags (10-25/sampling)

PROVIDED BY MODEL:

1. Dark navy or black fitted jeans with Converse/high-top sneakers (men/women) or booties (women)
2. Iphone




## What JUUL pods are the most popular flavors to buy?

7 Min Read



765.    Prior to Walker McKnight's initiation and addiction to JUUL, none of the advertisements, in-store promotions, or labels he saw adequately disclosed the nature, addictiveness or risks of JUUL's products, the actual amount of nicotine in or delivered by JUUL's products, that the JUUL was engineered to deliver nicotine rapidly and in great quantities, or that the JUUL is capable of delivering nicotine more rapidly and in greater quantities than a cigarette, or that use of JUUL Products poses significant health risks. Nor did they indicate that the JUUL was an age-restricted product and not safe for anyone under the age of 26. Rather, the JUUL advertisements portrayed JUUL as fun, natural, desirable, trendy, and cool. The advertisements touted JUUL's appealing flavors and normalized nicotine usage by portraying JUUL in nature and with desserts and coffee, as if it were meant to be paired.

766.    Many of the JUUL advertisements Walker McKnight saw failed to provide any warnings whatsoever. Other advertisement contained warnings that were wholly inadequate to inform Walker McKnight of the dangers associated with using JUUL and were overshadowed by appealing models, images, bright colors, and scenery.

767.    When he first began "JUULing", Walker McKnight was not aware of the dangers associated with the use of nicotine or the extent and severity of addiction it would cause. In fact, he was not aware that JUUL could be addictive at all.

768.    Before trying JUUL, Walker McKnight had never consumed any form of nicotine and had no intention of ever doing so.

769.    Walker McKnight still struggles with this nicotine addiction and will continue to struggle with this addiction for the rest of his life. His nicotine addiction from JUUL permanently injured and altered his developing brain. In addition to his severe nicotine addiction and brain injury, he has suffered harm through exposure to significant toxic substances, which may cause or contribute to causing disease and future health problems.

770.    Defendants' conduct has also significantly harmed Walker McKnight emotionally and financially.

[PROPOSED] SECOND AMENDED COMPLAINT - 274

771.    Plaintiffs seeks compensatory, treble, punitive damages, medical monitoring, and all such other relief arising from their personal injuries as the Court deems just and proper. Defendants' conduct described herein, preying on youth and poisoning kids for profit, is so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency. Defendants' conduct is atrocious and utterly intolerable. Defendants' outrageous conduct caused and/or substantially contributed to Plaintiffs' injuries alleged herein, and Walker McKnight would not have purchased or started using JUUL's products if he had been adequately warned about the nicotine content and dosage, risks of addiction, and other health risks.

## CAUSES OF ACTION

### COUNT ONE

### STRICT LIABILITY - DESIGN DEFECT

### (Against All Defendants)

772.    At all relevant times, Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

773.    Defendants knew, or, by the exercise of reasonable care, should have known that JUUL's products, under ordinary use, were harmful or injurious, particularly to youths and adolescents, including Walker McKnight.

774.    JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's e-liquid solution.

775.    JUUL Products were sold in a defective condition that is unreasonably dangerous and unsafe to the consumer because Defendants failed to adequately warn about the risk of nicotine addiction and entirely failed to warn of the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects.

776.    JUUL Products as designed were unreasonably dangerous, posed a substantial likelihood of harm, and were therefore defective because of reasons including the high delivery of nicotine, the inclusion of a multitude of other harmful ingredients, the likelihood of nicotine addiction and the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects.

777.    Defendants defectively designed JUUL to specifically appeal to minors and young adults, who were particularly unable to appreciate the risks posed by JUUL.

778.    Defendants defectively designed JUUL with a pharmacokinetic profile engineered to create risks of abuse and addiction (that exceeded that of a cigarette) in that JUUL delivered more nicotine than cigarettes.

779.    Defendants defectively designed JUUL Products that are inherently dangerous because they included features making the product attractive and more palatable to youth and non-smokers. These features include but are not limited to "party mode" lights; in youth appealing colors and flavors, a sleek virtually smoke free design capable of escaping detection by adults and school authorities. In addition, Defendants increased the ease of inhalability of JUUL and the level of nicotine that is absorbed by users making the product even more addictive and dangerous.

780.    Defendants defectively designed JUUL Pods in youth appealing colors and flavors that are unsafe to inhale because the e-Liquid is dangerous and hazardous and includes constituent flavoring additives and other chemicals that carry a significant risk of toxicity and injuries that Defendants and the E-Liquid Manufacturers failed to test as to the safety of the solutions they manufactured and sold for use in JUUL.

781.    JUUL Products do not perform as safely as a reasonable and ordinary consumer would reasonably assume and reasonably expect. JUUL Products contain and deliver more nicotine than is represented, are delivered by heat vaporization inhaled into the body, and contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

[PROPOSED] SECOND AMENDED COMPLAINT - 276

782.     The risks inherent in the design of JUUL Products significantly outweigh any benefits of such design.

783.     Defendants could have utilized cost effective, reasonably feasible alternative designs to minimize these harms, such as by designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers. Defendants could also have designed the products in a way in which they would not be as appealing to minors and non-smokers by designing the device with a throat hit and only designing non-flavored E-Liquids.

784.     Defendants could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine far in excess of a cigarette on a per puff basis and could have designed the device to shut off for a period of time if excessive puffs were taken too close in time.

785.     Defendants could have used technology to enable user-level access restrictions so that use was tied to a user's identity and age verification, restricting those underage from using the JUUL Product, or other similar technology, or youth restricting features.

786.     Defendants failed to design the product with an expiration or best if "used by" date, resulting in the potential for the products' chemical properties to change in a deleterious manner.

787.     Walker McKnight used JUUL Products as intended or in reasonably foreseeable ways. Defendants specifically intended for minors to use its products, and were aware that minors were doing so.

788.     Walker McKnight's injuries were reasonably foreseeable to Defendants at the time of the products' design, manufacture, distribution, and sale.

789.     JUUL Products were defective and unreasonably dangerous when they left Defendants possession. The defects continued to exist through the products' sale to and use by

consumers, including Walker McKnight, who used the products without any substantial change in the products' condition.

790.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein.

791.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown. .

792.    As a direct and proximate result of JUUL's defective design defect and Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

793.    In the alternative, as a direct and proximate result of JUUL's defective design defect and Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited

to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT TWO

### STRICT LIABILITY - FAILURE TO WARN

### (Against All Defendants)

794.    At all relevant times, Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

795.    JUUL Products are sold in a defective condition that is unreasonably dangerous and unsafe to the consumer by failing to adequately warn about the risk of nicotine addiction and failing to warn entirely of the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein.

796.    Defendants were aware that JUUL Products posed risks that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

797.    JUUL Products are defective because, among other reasons described herein, Defendants failed to warn consumers including Walker McKnight, in JUUL's labeling, packaging and through the marketing, promotion and advertising of JUUL including that:

a.    Prior to November 2017 that JUUL Products contained nicotine;

b.      The amount of nicotine contained in a JUUL Pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c.      JUUL Products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d.      JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e.      The representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f.      JUUL was an e-cigarette intended not intended for persons under age 26;

g.      JUUL delivered more nicotine than cigarettes;

h.      JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.      JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.      Which and when medical symptoms warranted medical care; and,

k.      How many JUUL Pods are safe to consume in a day.

798.    Through its aggressive social media campaign, and in other mass marketing efforts Defendants circumvented the post-August 2018 requirement to warn of nicotine addiction by deputizing teenagers and young adults as social media influencers who failed to warn of nicotine addiction and of all the other injuries as set forth above.

799.    Defendants affirmatively encouraged new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give

up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

800.    The failure of Defendants to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

801.    Ordinary consumers would not have recognized the potential risks of JUUL Products when used in a manner reasonably foreseeable to Defendants.

802.    Defendants are strictly liable for the sale of defective JUUL Products that contained inadequate warnings.

803.    Walker McKnight could not have averted injury through the exercise of reasonable care for reasons including Defendants' concealment of the true risks posed by JUUL Products.

804.    The defects in JUUL Products, including the lack of adequate warnings and instructions, existed at the time the products left the Defendants' possession and continued to exist through the products' sale to and use by consumers, including Walker McKnight. JUUL Products were used without substantial change in their condition from the time of their manufacture or sale.

805.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

806.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein.

807.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome

(ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

808.    As a direct and proximate result of JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

809.    In the alternative, as a direct and proximate result of JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

[PROPOSED] SECOND AMENDED COMPLAINT - 282

**COUNT THREE**

**STRICT LIABILITY - MANUFACTURING DEFECT**

**(Against JUUL Defendants and Management Defendants)**

810.    At all relevant times, the JUUL Defendants and Management Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

811.    The JUUL Defendants and Management Defendants contracted with E-Liquid Manufacturers to supply, manufacture, process and blend the E- liquids and flavoring following a "menu."

812.    When JUUL Products left the control of the JUUL Defendants and Management Defendants, they were expected to, and did reach Walker McKnight without substantial change from the condition in which it left Defendants' control.

813.    Walker McKnight used JUUL Products in substantially the same condition that they were in when they left the control of the JUUL Defendants and Management Defendants, and any changes or modifications were foreseeable by these Defendants.

814.    Walker McKnight used JUUL Products in a manner intended and/or foreseeable to the JUUL Defendants and Management Defendants.

815.    JUUL Products contained manufacturing defects when they left the JUUL Defendants' and Management Defendants' control and were placed in the stream of commerce in that the products deviated from component specifications and design, posed a risk of serious injury or death, and failed to perform as safely as the intended design would have performed.

816.    Without limitation, examples of the JUUL Defendants' and Management Defendants' inadequate manufacturing, assembling, inspecting and packaging practices include:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to adequately inspect/test JUUL Products during the manufacturing process;

c.    Failure to ensure that instruments used to prepare E-Liquids for JUUL Pods were properly cleaned and sterilized to ensure there was no cross contamination between products;

d.    Failure to implement procedures that would measure and confirm the amount of nicotine in each JUUL Pod;

e.    Failure to timely establish procedures or practices to prevent JUUL Products from being contaminated on the production line or elsewhere at production facilities; and,

f.    Failure to have sanitary conditions and protocol at the facilities to avoid contamination.

817.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

818.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septal defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In

[PROPOSED] SECOND AMENDED COMPLAINT - 284

addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

819.    As a direct and proximate result of the defective manufacturing, assembling, inspecting and packaging of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

820.    In the alternative, as a direct and proximate result of defective manufacturing, assembling, inspecting and packaging of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT FOUR**

**PRODUCTS LIABILITY – NEGLIGENT DESIGN**

**(Against All Defendants)**

821.    At all relevant times, Defendants designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

822.    JUUL Products were designed and intended to be used as a method of ingesting nicotine and the other vaporized constituents of JUUL's nicotine solution.

823.    Defendants knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Walker McKnight in a reasonably foreseeable manner, particularly with minors and young adults.

824.    Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Walker McKnight would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

825.    Defendants owed a duty to all reasonably foreseeable users to design a safe product.

826.    Defendants breached their duty by failing to use reasonable care in the design of JUUL Products because the products delivered a high amount of nicotine, included other harmful ingredients, and had the likelihood of causing nicotine addiction and the risks of lung injuries, seizure, strokes, heart attacks, cardiovascular, behavioral, cognitive and mental health injuries, among other harmful effects.

827.    Defendants breached their duty by failing to use reasonable care in the design of JUUL Products by negligently designing JUUL with a pharmacokinetic profile engineered to create risks of abuse and addiction that equaled or exceeded that of a cigarette and delivered more nicotine than cigarettes.

828.    Defendants breached their duty by failing to use reasonable care in the design of JUUL Products by negligently designing JUUL Products to specifically appeal to minors, who were particularly unable to appreciate the risks posed by JUUL. These features include but are not limited to "party mode" lights; in youth appealing colors and flavors, a sleek virtually smoke free design capable of escaping detection by adults and school authorities. In addition, Defendants

increased the ease of inhalability of JUUL and the level of nicotine that is absorbed by users making the product even more addictive and dangerous.

829.    Defendants breached their duty by failing to use reasonable care in the design of JUUL Products because they designed JUUL Pods in youth appealing colors and flavors that are unsafe to inhale because the e-Liquid is dangerous and hazardous and includes constituent flavoring additives and other chemicals that carry a significant risk of toxicity and other injuries that Defendants and the E-Liquid Manufacturers failed to test as to the safety of the solutions they manufactured and sold for use in JUUL.

830.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs to minimize these harms, including but not limited to designing products that delivered less nicotine per puff, used less potent and addictive forms of nicotine (without reduction of the "throat hit"), reduced repeated exposure to toxic chemicals that do not pose substantial health risks to users while still delivering sufficient levels of nicotine to preexisting cigarette smokers.

831.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that would make the product less appealing to minors and non-smokers including but not limited to designing the device with a throat hit and only designing non-flavored E-Liquids.

832.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs that could have limited the duration of each puff to prevent the JUUL from delivering doses of nicotine far in excess of a cigarette on a per puff basis and could have designed the device to shut off for a period of time if excessive puffs were taken too close in time.

833.    Defendants breached their duty by failing to use reasonable care by in choosing to not include an expiration or best if "used by" date, resulting in the potential for the products' chemical properties to change in a deleterious manner.

[PROPOSED] SECOND AMENDED COMPLAINT - 287

834.    Defendants breached their duty by failing to use reasonable care by failing to use cost effective, reasonably feasible alternative designs utilizing technology to enable user-level access restrictions so that use was tied to a user's identity and age verification, restricting those that are underage from using the JUUL Product, or other similar technology, or youth restricting features.

835.    A reasonable company under the same or similar circumstances would have designed a safer product.

836.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

837.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

838.    As a direct and proximate result of the defective design of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in

Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

839.    In the alternative, as a direct and proximate result of defective design of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to for the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT FIVE**

**PRODUCTS LIABIITY – NEGLIGENT FAILURE TO WARN**

**(Against All Defendants)**

840.    At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

841.    Defendants knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Walker McKnight in a reasonably foreseeable manner, particularly with minors and young adults.

842.    Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Walker McKnight would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented,

contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

843.    Defendants knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

844.    Defendants owed a duty to all reasonably foreseeable users to disclose the risks associated with the use of JUUL Products.

845.    Defendants breached their duty of care by failing to use reasonable care in providing adequate warnings in JUUL's labeling and packaging and through marketing, promoting and advertising of JUUL including that:

a.    Prior to November 2017 that JUUL Products contained nicotine;

b.    The amount of nicotine contained in a JUUL Pod is as much as twice as high as that in a pack of cigarettes, and not as "approximately equivalent to a pack of cigarettes" as represented;

c.    JUUL Products cause, maintain, or aggravate nicotine addiction and subject consumers to the risks of concomitant health hazards that addictive, *i.e.,* compulsive behavior can result in, and that this danger was even greater for minors;

d.    JUUL Products cause harm by increased exposure to nicotine and other harmful, toxic ingredients as described herein;

e.    The representations about the actual nicotine content did not conform to the pharmacokinetics of JUUL use and the products' cigarette equivalence;

f.    JUUL was an e-cigarette intended not intended for persons under age 26;

g.    JUUL delivered more nicotine than cigarettes;

[PROPOSED] SECOND AMENDED COMPLAINT - 290

h.    JUUL's pharmacokinetic profile had been engineered to create risks of abuse and addiction that exceeded that of a cigarette;

i.    JUUL can be life-threatening and carries the risk of lung injuries, seizure, strokes, heart attacks and cardiovascular injuries, behavioral, cognitive and mental health injuries among other harmful effects;

j.    Which and when medical symptoms warranted medical care;

k.    How many JUUL Pods are safe to consume in a day;

l.    Urging customers to keep puffing even if they found the vapor harsh; and

m.    JUUL Products were comprised of many chemical additives and artificial flavors that are known to cause injury to exposed workers in factories.

846.    Through its aggressive social media campaign, and in other mass marketing efforts Defendants circumvented the post-August 2018 requirement to warn of nicotine addiction by deputizing teenagers and young adults as social media influencers who failed to warn of nicotine addiction and of all the other injuries as set forth above.

847.    The failure of Defendants to adequately warn about its defective products and to misleadingly advertise through conventional and social media avenues created a danger of injuries described herein that were reasonably foreseeable at the time of labeling, design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

848.    Defendants were negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

849.    At all relevant times, Defendants could have provided adequate warnings and instructions to prevent the harms and injuries set forth herein, such as providing full and accurate information about the products in advertising, at point of sale, and on the product labels.

850.    A reasonable company under the same or similar circumstances would have warned and instructed of the dangers.

851.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

852.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

853.    As a direct and proximate result of JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

854.    In the alternative, as a direct and proximate result of JUUL's lack of adequate and sufficient warnings and instructions and its inadequate and misleading advertising as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT SIX

## PRODUCTS LIABILITY – NEGLIGENT MANUFACTURING

### (Against JUUL Defendants and Management Defendants)

855.    At all relevant times, the JUUL Defendants and Management Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold the JUUL Products that Walker McKnight consumed.

856.    The JUUL Defendants and Management Defendants had a duty to use exercise reasonable care, in the manufacturing, assembling, inspecting and packaging of JUUL Products.

857.    The JUUL Defendants and Management Defendants knew or, by the exercise of reasonable care, should have known, use of JUUL Products carelessly manufactured, assembled, inspected and packaged was dangerous, harmful and injurious when used by Walker McKnight in a reasonably foreseeable manner.

858.    The JUUL Defendants and Management Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Walker McKnight would not

have realized the potential risks and dangers of JUUL Products improperly manufactured assembled, inspected and packaged.

859.    The JUUL Defendants and Management Defendants contracted with E-Liquid Manufacturers to supply, manufacture, process and blend the E- liquids and flavoring following specifications in a "menu."

860.    Without limitation, examples of the JUUL Defendants' and Management Defendants' breached their duty to exercise reasonable care in manufacturing, assembling, inspecting and packaging by their:

a.    Failure to follow Good Manufacturing Practices ("GMPs");

b.    Failure to adequately inspect/test JUUL Products during the manufacturing process;

c.    Failure to ensure that instruments used to prepare E-Liquids for JUUL Pods were properly cleaned and sterilized to ensure there was no cross contamination between products;

d.    Failure to implement procedures that would measure and confirm the amount of nicotine in each JUUL Pod:

e.    Failure to timely establish procedures or practices to prevent JUUL Products from being contaminated on the production line or elsewhere at production facilities; and,

f.    Failure to have sanitary conditions and protocol at the facilities to avoid contamination.

861.    A reasonable manufacturer under the same or similar circumstances would have implemented appropriate manufacturing procedures to better ensure the quality of their product.

862.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis,

acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

863.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

864.    As a direct and proximate result of the JUUL Defendants and Management Defendants negligent manufacturing, assembling, inspecting and packaging of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

865.    In the alternative, as a direct and proximate result of the JUUL Defendants and Management Defendants negligent manufacturing, assembling, inspecting and packaging of JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the

enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT SEVEN**

**NEGLIGENCE AND/OR GROSS NEGLIGENCE**

**(Against All Defendants)**

866.    At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

867.    JUUL Products were the types of products that could endanger others if negligently made or promoted.

868.    Defendants had a duty of reasonable care in designing, manufacturing, assembling, inspecting, testing, packaging, labeling, marketing, advertising, promoting, supplying, distributing and/or selling JUUL to avoid causing harm to those that consumed JUUL Products.

869.    Defendants knew, or should have known the exercise of reasonable care, the risks to consumers of JUUL, a powerfully addictive and dangerous nicotine-delivery device.

870.    Defendants knew, or should have known the exercise of reasonable care, that minors and young people would be attracted to these products.

871.    Defendants knew or, by the exercise of reasonable care, should have known, use of JUUL Products was dangerous, harmful and injurious when used by Walker McKnight in a reasonably foreseeable manner, particularly with minors and young adults.

872.    Defendants knew or, by the exercise of reasonable care, should have known, ordinary consumers such as Walker McKnight would not have realized the potential risks and dangers of JUUL Products. JUUL Products contain and deliver more nicotine than is represented, contain and deliver other harmful products that injure multiple organ systems, and are designed to cause nicotine addiction.

873.    Defendants knew or, by the exercise of reasonable care, should have known, that JUUL Products posed risks including the risks of addiction, lung injuries, seizure, strokes, heart attacks, cardiovascular injuries, behavioral, cognitive and mental health injuries, among other harmful effects, as described herein, that were known and knowable in light of scientific and medical knowledge that was generally accepted in the scientific community at the time of design, manufacture, distribution, and sale of JUUL devices and JUUL Pods.

874.    Defendants knew or should have known that JUUL Products needed to be researched, designed, manufactured, assembled, inspected, tested packaged, labeled, marketed, advertised, promoted, supplied, distributed, and/or sold properly, without defects and with due care to avoid needlessly causing harm.

875.    Defendants knew or should have known that its JUUL Products could cause serious risk of harm, particularly to young persons and minors.

876.    Defendants knew or should have known that adults who were encouraged to cease smoking by using JUUL as a cessation device were individuals with greater preexisting cardiovascular and other health risk factors who were at enhanced risk of harm by utilizing the misleadingly labeled JUUL Pods which misrepresented the nicotine content and failed to warn of the other chemicals' content and risks.

877.    Defendants were grossly negligent in affirmatively encouraging new users of JUUL through an instructional insert with the starter pack to "keep trying even if the JUUL feels too harsh", and "[d]on't give up, you'll find your perfect puff," essentially an anti-warning urging those who felt discomfort to disregard it and instead to keep vaping.

878.    Defendants were negligent, reckless and careless and failed to take the care and duty owed to Plaintiff, thereby causing Walker McKnight to suffer harm.

879.    The negligence and extreme carelessness of Defendants includes, but is not limited to, the following:

a.    Failure to perform adequate testing of the JUUL Products prior to marketing to ensure safety, including long-term testing of the product, and testing for injury to the brain and cardiovascular systems, respiratory, pulmonary and immune systems, and other related medical conditions, as well as its effect on mental health;

b.    Failure to warn consumers that JUUL Products had not been adequately tested or researched prior to marketing to ensure safety;

c.    Failure to take reasonable care in the design of JUUL Products;

d.    Failure to use reasonable care in the production of JUUL Products;

e.    Failure to use reasonable care in the manufacture of JUUL Products;

f.    Failure to use reasonable care in the assembly of JUUL Products;

g.    Failure to use reasonable care in supplying and distributing JUUL Products;

h.    Failure to use reasonable care in advertising, promoting, and marketing JUUL Products;

i.    Failure to use reasonable care in the sale of JUUL Products without adequate warnings; use of flavors and design to appeal to minors and young people, in that the products smell good, look cool and are easy to conceal from parents and teachers;

j.    Use of a design that maximizes nicotine delivery while minimizing "harshness," thereby easily creating and sustaining addiction;

k.    Failure to utilize proper materials, ingredients, additives and components in the design of JUUL Products to ensure they would not deliver unsafe doses of nicotine and cause other injuries from inhalation of other hazardous chemicals;

[PROPOSED] SECOND AMENDED COMPLAINT - 298

l.      Failure to inspect JUUL Products for them to operate properly and avoid delivering unsafe levels of nicotine and causing the injuries described herein;

m.      Failure to reasonably and properly test and properly analyze the testing of JUUL Products under reasonably foreseeable circumstances;

n.      Failure to warn consumers about the dangers associated with use of JUUL Products, in that it was unsafe, significantly increases blood pressure, causes vascular and pulmonary damage, causes seizures, carries risks of stroke, heart attacks, and pulmonary and cardiovascular events, is powerfully addictive, can cause permanent brain changes, mood disorders, and impairment of thinking and cognition;

o.      Failure to warn consumers of negative health consequences associated with exposure to nicotine and other harmful and toxic ingredients contained with JUUL Products;

p.      Failure to warn consumers of the actual nicotine content, JUUL Products' cigarette equivalence and the pharmacokinetics of JUUL use;

q.      Misleadingly stating the amount of nicotine in JUUL Pods is "approximately equivalent to a pack of cigarettes," when the amount of nicotine contained in a JUUL Pod is as much as twice as high as that in a pack of cigarettes;

r.      Failure to provide any instructions regarding a safe amount of JUUL Pods to consume in a day;

s.      Failure to take necessary steps to modify JUUL Products to avoid delivering high doses of nicotine and repeatedly exposing them to toxic chemicals;

t.      Failure to recall JUUL Products;

u.      Shipping JUUL Products to retail locations with actual or constructive knowledge that retailers were not utilizing age verification procedures resulting in unlawful sales to minors; and,

v.      All other failures, acts and omissions set forth herein.

[PROPOSED] SECOND AMENDED COMPLAINT - 299

880.    Defendants' acts and omissions constitute gross negligence, because they constitute a total lack of care and an extreme departure from what a reasonably careful company would do in the same situation to prevent foreseeable harm to Walker McKnight.

881.    Defendants acted and/or failed to act willfully, and with conscious and reckless disregard for the rights and interests of Walker McKnight, and their acts and omissions had a great probability of causing significant harm and in fact resulted in such harm to Walker McKnight.

882.    Based on their strategic and intentional promotion, advertising and marketing history, Defendants reasonably should have foreseen that young people would try JUUL Products and quickly become addicted to JUUL Products, resulting in teenagers and young adults developing lifelong addictions. After placing unnecessarily massive amounts of nicotine into their products, Defendants reasonably should have foreseen the emotional distress this would cause on the individuals who would get addicted, as well the stress this would place on their loved ones around them.

883.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

884.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus,

mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

885.    As a direct and proximate result of Defendants' negligence and/or gross negligence as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

886.    In the alternative, as a direct and proximate result of Defendants' negligence and/or gross negligence as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT EIGHT

## NEGLIGENT FAILURE TO RECALL/ RETROFIT

### (Against JUUL Defendants and Management Defendants)

887.    At all relevant times, the JUUL Defendants and Management Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed,

advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

888.    The JUUL Defendants and Management Defendants knew or reasonably should have known that JUUL Products were dangerous or were likely to be dangerous when used in a reasonably foreseeable manner, particularly with minors and young adults.

889.    The JUUL Defendants and Management Defendants knew that its flavors had attracted young people and non-smokers, yet instead of withdrawing flavored JUUL Pods, these Pods remained available for purchase online until October 2019 and JUUL continued to offer mint-flavored JUUL Pods until November 2019. However, to date, menthol-flavored JUUL Pods are still available for purchase online and in retail stores which are still regularly consumed by minors and young adults suffering from addiction.

890.    Additionally, JUUL Defendants and Management Defendants were aware of growing reports of E-cigarette, or Vaping, Product Use Associated Lung Injury illnesses (EVALI) and other injuries related to vaping, yet continue to sell JUUL Products.

891.    The JUUL Defendants and Management Defendants could have retrofitted the JUUL devices with a kill switch or locking component.

892.    Despite the JUUL Defendants' and Management Defendants' knowledge and awareness of defects in JUUL Products causing injuries to Walker McKnight, these Defendants failed to retrofit their products and delayed withdrawal of flavored JUUL Pods from the market.

893.    The JUUL Defendants and Management Defendants continue to market and sell JUUL Products without adequate warnings to advise consumers of these dangers.

894.    A reasonable company under the same or similar circumstances would have recalled or retrofitted the products and/or provided revised warnings.

895.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as

described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

896.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septal defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

897.    As a direct and proximate result of Defendants' negligent failure to recall and/or retrofit JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

898.    In the alternative, as a direct and proximate result of Defendants' negligent failure to recall and/or retrofit JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker

McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT NINE

## NEGLIGENT MISREPRESENTATION

### (Against All Defendants)

899.   At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

900.   Defendants were negligent, reckless and careless and owed a duty to Walker McKnight to make accurate and truthful representations regarding JUUL Products, Defendants breached their duty, thereby causing Walker McKnight to suffer harm.

901.   Defendants represented to Walker McKnight via the media, advertising, website, social media, packaging, and promotions, among other misrepresentations described herein that:

a.   JUUL Products were safe, were safer than cigarettes and were not harmful;

b.   That one JUUL Pod is "approximately equivalent to about 1 pack of cigarettes;"

c.   An inaccurate and misleading portrayal of JUUL Pods nicotine content; and,

d.   That the flavored mango, cool cucumber and crème brulee were naturally flavored derived from such foods instead of labelling them as artificially flavored as they would be required to under food labelling rules.

[PROPOSED] SECOND AMENDED COMPLAINT - 304

902.     These representations were false. JUUL is unsafe for anyone under age 26, especially minors as well as older users. The amount of nicotine consumed from one JUUL Pod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes, and not one pack as represented.

903.     Defendants knew or should have known these representations were false and negligently made them without regard for their truth.

904.     Defendants had a duty to accurately provide this information to Walker McKnight. In concealing this information from Walker McKnight, Defendants breached their duty. Defendants also gained financially from, and as a result of their breach.

905.     Defendant intended for Walker McKnight to rely on these representations.

906.     Each of these misrepresentations were material at the time they were made. In particular, each of the misrepresentations concerned material facts that were essential to the analysis undertaken by Walker McKnight as to whether to purchase or consume JUUL Products.

907.     Defendants have yet to disclose correct these misrepresentations about JUUL Products.

908.     Walker McKnight reasonably relied on these representations and were harmed as described herein. Walker McKnight's reliance on Defendants' representation was a substantial factor in causing his harms. Had Defendants told Walker McKnight the truth about the safety and composition of JUUL's products, he would not have consumed or purchased them.

909.     Defendants' acts and omissions as described herein were committed in reckless disregard of Walker McKnight's rights, interests, and well-being to enrich Defendants.

910.     Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

[PROPOSED] SECOND AMENDED COMPLAINT - 305

911.     As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

912.     As a direct and proximate result of Defendants' negligent misrepresentations regarding JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

913.     In the alternative, as a direct and proximate result of Defendants' negligent misrepresentations regarding JUUL Products as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT TEN

## FRAUD

### (Against All Defendants)

914.   At all relevant times, Defendants named herein designed, manufactured, assembled, processed, blended, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

915.   Defendants created and implemented a plan to generate a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, based in part on food flavors while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, flavoring content and safety.

916.   Defendants' marketing, promotions and advertisements contained deceptive statements that JUUL e-cigarettes were reasonable alternatives to combustible cigarettes and that they contained nicotine "approximately equivalent to a pack of cigarettes", when in fact the amount of nicotine in a JUUL Pod is as much as twice as high as that in a pack of cigarettes, higher than what Defendants represented.

917.   Defendants' marketing, promotions and advertisements failed to disclose that JUUL e-cigarettes were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, contained nicotine levels higher than "approximately

equivalent to a pack of cigarettes", and posed significant risks of substantial physical injury resulting from the use of the products.

918.    The labels and packaging of the JUUL Products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels and packaging also falsely stated that JUUL Products contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and that they were reasonable alternatives to combustible cigarettes.

919.    The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JUUL marketing, promotions and advertising its products as reasonable alternatives to cigarettes.

920.    Defendants' conduct was fraudulent and deceptive because their misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including Walker McKnight. Reasonable consumers, including Walker McKnight, would have found it material to their purchasing decisions that JUUL's products: (i) were not a reasonable alternative to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii) contained nicotine levels higher than "approximately equivalent to a pack of cigarettes," (iii) were flavored with artificial flavors, and (iv) posed unreasonable risks of substantial bodily injury including addiction resulting from the use of the products. Knowledge of these facts would have been a substantial factor in Walker McKnight's decision to purchase and consume JUUL Products.

921.    Additionally, consumers including teenagers and are accustomed to seeing food products labelled with the term "artificial flavors" when the flavoring is not natural. 21 CFR Section 101.22, Subpart B--Specific Food Labeling Requirements governs food for human consumption and expressly requires that if a product's label makes a prominent representation with respect to a primary recognizable flavor, then that flavor is deemed to be a "characterizing flavor" and must be declared on the principle display panel (PDP). If the product contains any

artificial flavor that simulates, resembles, or reinforces the characterizing flavor, the name of the food on the PDP must be accompanied by the name of the characterizing flavor with the words "artificial" or "artificially flavored."

922.    While JUUL Pods were not regulated as food, the use of food flavors in the marketing and packaging of these products was misleading. Marketing "Crème Brulee" JUUL with a picture next to coffee, suggesting it was a sweet dessert-like product (without the calories), and without referencing the fact the flavoring contained many artificial flavors and chemicals, misleadingly suggested to the consumer that the flavors were indeed natural. Similarly, the cucumber product did not contain cucumber and all of the flavorings were replete with artificial flavorings and chemicals.

923.    Defendants owed Walker McKnight a duty to disclose these facts because they were known and/or accessible exclusively to Defendants, who have had exclusive and superior knowledge of the facts; because the facts would be materials to reasonable consumers; because JUUL's products pose an unreasonable risk of substantial bodily injury; and because JUUL made partial representations concerning the same subject matter as the omitted facts.

924.    Walker McKnight reasonably and justifiably relied on the misrepresentations and/or omissions. Reasonable consumers would have been expected to have relied on JUUL's misrepresentations and omissions.

925.    Defendants knew, should have known, that its misrepresentations and/or omissions were false and misleading, and intended for consumers to rely on such misrepresentations and omissions. Alternatively, Defendants made the misrepresentations recklessly or without belief or regard for its truth.

926.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome,

collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

927.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

928.    As a direct and proximate result of Defendants' misrepresentations and/or omissions as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

929.    In the alternative, as a direct and proximate result of Defendants' misrepresentations and/or omissions as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the

capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT ELEVEN**

**FRAUDULENT CONCEALMENT**

**(Against All Defendants)**

930. At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

931. Defendants had a duty to disclose material facts about JUUL Products to Walker McKnight.

932. Defendants fraudulently and deceptively marketed JUUL Products to Walker McKnight as safe, healthful, or not harmful, when Defendants knew it to be untrue.

933. Defendants fraudulently and deceptively downplayed or minimized any risk associated with e-cigarettes generally, including promoting the "Make the Switch" campaign which suggests to the average consumer that unlike cigarettes, JUUL is harmless to one's health. Defendants and others worked together to pitch news stories or other media content designed to downplay the risks of e-cigarettes, suggesting that any concern was overblown, or a panic. These tactics mimic those used by the tobacco industry to sow seeds of doubt and confusion among the public, to initiate new users, to keep customers buying JUUL Products, and to avoid regulation or legislative efforts to control sales.

934.    Defendants fraudulently and deceptively concealed that JUUL Products can cause physical injuries such as seizures, acute and chronic respiratory injuries, heart attacks, strokes and other cardiovascular injuries, addiction, behavioral, cognitive and mental health injuries and significant exposure to toxic substances, which may cause or contribute to additional disease.

935.    Defendants fraudulently and deceptively concealed they had not adequately researched or tested JUUL and the E-Liquids to assess its safety before placing it on the market and promoting it to young people and older adults.

936.    Defendants fraudulently and deceptively concealed JUUL was powerfully addictive and that its design inherently demanded dependency.

937.    Defendants further failed to disclose to Walker McKnight that JUUL is designed to create and sustain an addiction to nicotine. Defendants also manipulated the formulations of JUUL devices and JUUL Pods in ways that could and would impact their potency and addictiveness, and Defendants did so without notifying Walker McKnight. Defendants actively concealed the nicotine content and nicotine potency of JUUL Products.

938.    Defendants fraudulently concealed to users the amount of nicotine consumed by using JUUL. As previously explained, Defendants claim that one JUUL Pod is "approximately equivalent to about 1 pack of cigarettes," but that is false and misleading. The amount of nicotine consumed from one JUUL Pod is actually equivalent to the amount of nicotine consumed through at least two packs of combustible cigarettes.

939.    Defendants fraudulently represented that the mango, cool cucumber and crème brulee were food derived when instead they were based upon artificial flavors.

940.    Each of these misrepresentations and omissions were material at the time they were made. Each of the misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Walker McKnight as to whether to purchase or consume JUUL Products.

[PROPOSED] SECOND AMENDED COMPLAINT - 312

941.    Walker McKnight did not know of the facts that Defendants concealed, and could not have discovered the facts concealed despite exercising reasonable care and diligence.

942.    Defendants intended to deceive Walker McKnight and the public by concealing these facts.

943.    Defendants had a duty to accurately provide this information to Walker McKnight. In concealing this information from Walker McKnight, Defendants breached their duty. Defendants also gained financially from, and as a result of their breach.

944.    Defendants had ample opportunities to disclose these facts to Walker McKnight, through packaging, advertising, retail outlets, on its website, and on social media. Defendants concealed material information at all relevant times, through today. Defendants have yet to disclose the truth about JUUL Products.

945.    Walker McKnight relied to his detriment on Defendants' fraudulent omissions. Had Walker McKnight been adequately informed of the material facts concealed from him regarding the safety of JUUL, and not intentionally deceived by Defendants, he would not have purchased or used JUUL Products.

946.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

947.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory

insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

948.   As a direct and proximate result of Defendants' fraudulent concealment as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

949.   In the alternative, as a direct and proximate result of Defendants' fraudulent concealment as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT TWELVE

## CONSPIRACY TO COMMIT FRAUD

### (Against JUUL Defendants and Conspiracy Defendants)

950.   This claim is brought by Plaintiff against the JUUL Defendants, Altria, Monsees, Bowen, Pritzker, Huh, Valani ("Conspiracy Defendants"). For ease of reference, Defendants JLI,

Monsees, Bowen, Pritzker, Huh, and Valani are referred to below as the "Early Conspiracy Defendants."

951.    All Conspiracy Defendants entered into an agreement to advance their financial interests by injuring Walker McKnight. Specifically, the Conspiracy Defendants worked in concert to maintain and expand the number of nicotine-addicted e-cigarette users to ensure a steady and growing customer base. This included protecting and expanding JLI's massive, ill-gotten, share of the e-cigarette market. For ease of reference, this conspiracy is referred to below as the "Nicotine Market Expansion Conspiracy" or "the Conspiracy."

952.    The Conspiracy Defendants sought to accomplish this objective by (1) designing a product that delivered nicotine in a manner and in doses that were intended to addict or exacerbate the nicotine addiction of its users; (2) marketing, advertising, promoting and misbranding that potent product to consumers, including the vulnerable youth market; and (3) defrauding regulators and the public to advance their interests.

953.    Walker McKnight's addiction to nicotine was a primary object of the Conspiracy. Conspiracy Defendants orchestrated efforts with a unity of purpose to addict this new generation of teenagers and young adults to nicotine by way of unlawful conduct in marketing, promoting, manufacturing, designing, and selling JUUL Products that substantially contributed to Walker McKnight's injuries as alleged herein.

954.    Defendants further conspired with one another by setting out to entice and lure new users of tobacco as a wrongful, unlawful and tortious means to make a profit.

955.    Walker McKnight demands the applicable relief set forth in the Prayer for Relief below.

**Description of the Nicotine Market Expansion Conspiracy**

956.    The Nicotine Market Expansion Conspiracy exists separately from the otherwise legitimate business operations of The JUUL Defendants, or the investment companies with which Defendants Pritzker, Huh, and Valani are affiliated.

957. The Early Conspiracy Defendants formed the Nicotine Market Expansion Conspiracy by at least 2015, when they prepared to launch the JUUL e-cigarette and capture and grow a market of nicotine-addicted users that would serve as customers for life.

958. As tobacco companies have long known, profitable growth requires a pipeline of "replacement smokers" or e-cigarette users. For that reason and others, Altria joined the Nicotine Market Expansion Conspiracy in the Spring of 2017. The Early Conspiracy Defendants, for their part, eagerly invited Altria into the fold—they needed allies and resources to further their Conspiracy, and, despite their public statements to the contrary, sought to be a part of the tobacco industry.

959. When Altria joined the Nicotine Market Expansion Conspiracy, it shared the Early Conspiracy Defendants' common purpose: maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Among Altria's motivations for pursuing this common purpose was access to JLI's customer base that would serve as Altria's pipeline of "replacement smokers" or e-cigarette users.

960. The Nicotine Market Expansion Conspiracy involved a growing membership and changed its shape to fit its needs, adding members when necessary and eliminating them when they became obsolete. From 2015 through 2017, the Conspiracy consisted of the Early Conspiracy Defendants and non-defendant Veratad Technologies LLC. In the Spring of 2017, Altria joined the Nicotine Market Expansion Conspiracy. Non-defendant member Veratad would leave the Conspiracy sometime in 2018 when it stopped coordinating with JLI. Each Early Conspiracy Defendants is liable for the predicate acts of the Conspiracy committed no later than its formation in 2015, and Altria is liable for the predicate acts of the Conspiracy committed no later than when it joined the Conspiracy in Spring 2017.

961. As described above, the Early Conspiracy Defendants established an ongoing relationship through, among other connections, Defendants' Pritzker, Huh, and Valani's investment in JLI; Defendants' Bowen, Monsees, Pritzker, Huh, and Valani's control of the JLI

Board of Directors; the Early Conspiracy Defendants' assumption of "final say" on all marketing for JLI products, including fraudulent advertising; and the Early Conspiracy Defendants' coordination on ensuring broad access to JLI products, including underage access, with non-defendant Conspiracy member Veratad. And the Early Conspiracy Defendants and Altria established an ongoing relationship through, among other connections, Altria's equity investment in JLI, the many informal and formal agreements between these two Defendants and their coordinated activities in furtherance of the common purpose of the Nicotine Market Expansion Conspiracy, and the overlap between JLI Executives, leadership, and Altria.

962.    The Conspiracy Defendants formed the Nicotine Market Expansion Conspiracy to engage in a collaborative scheme to defraud and injure. As described above, the Nicotine Market Expansion Conspiracy Defendants shared and acted on a common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market.

963.    The Nicotine Market Expansion Conspiracy has been in existence for almost five years and continues to operate to this day.

**Conduct of the Nicotine Market Expansion Conspiracy**

964.    As described above, each Conspiracy Defendant participated in the operation or management of the Nicotine Market Expansion Conspiracy. Illustrative but non-exhaustive examples include the following:

**EARLY Leadership**

965.    As described in sections IV (A)-(D), Defendants Bowen and Monsees were the visionaries behind the Conspiracy and would lead it in its EARLY days.

**Fraudulent Marketing Scheme**

966.    As described in sections IV (D)-(F), JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused false

and misleading advertisements that omitted any references to JUUL's nicotine content to be transmitted, including the Vaporized campaign.

## Youth Access Scheme

967.    As described in section IV (E), Defendant JLI (through its employees) coordinated with non-Defendant member Veratad on behalf of the other Early Conspiracy Defendants to expand youth access to JUUL Products.

968.    As reflected in section IV (E), Veratad was a key player in the Nicotine Market Expansion Conspiracy. And while each member of the Conspiracy was not involved in every scheme (Veratad, for example, did not transmit the advertisements or packaging containing misrepresentations regarding JLI's nicotine content), each worked in furtherance of the same common purpose and was aware of the other members' participation in the Conspiracy. Moreover, each scheme was integral to the Conspiracy's success in maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Veratad shared this common purpose, and its motivation for doing so was to maintain a lucrative client – one of several clients who relied on Veratad for intentionally ineffective age verification services.

## Co-opting JLI's Board of Directors

969.    As described in section IV (E), Defendants Pritzker, Huh, and Valani took control of the JLI Board of Directors in October 2015, so they could use the Board as an instrumentality to effectuate fraudulent schemes in furtherance of the Nicotine Market Expansion Conspiracy 's common purpose. In doing so, leadership of the Conspiracy transitioned from Bowen and Monsees to Pritzker, Huh, and Valani.

## Coordinating Activities of JLI and Altria

970.    By August 2016, Defendants Pritzker, Huh, and Valani had ceded executive leadership at JLI to a new CEO, Goldman. Thus, when these parties started to coordinate with Altria, it was JLI (through its executives and employees – including Goldman and his successors)

and Altria (through its executives and employees) that primarily directed the affairs of the Conspiracy, although Defendants Bowen, Monsees, Pritzker, Huh, and Valani remained critical to the success of the Conspiracy's common purpose. Without their control of the JLI Board of Directors and prior fraudulent conduct, the close coordination between JLI and Altria, and Altria's investment in JLI, would not have been possible.

971.    As described in sections IV (F)-(I), the Early Conspiracy Defendants and Altria began to actively coordinate their activities in 2017 and each took actions that would further the Conspiracy's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by maintaining and expanding JLI's massive, and ill-gotten, share of the e-cigarette market. For example:

a.    As EARLY as 2017, the Early Conspiracy Defendants and Altria shared data and strategy to support their common purpose, through a conduit, Avail Vapor.

b.    By 2018, Altria was taking actions to ensure JLI's products had access to prime shelf space in retail locations.

c.    By 2018, Altria was distributing and marketing JLI's products to its wider base of retailers.

d.    In December 2018, Altria decided to cash in on its role in the Nicotine Market Expansion Conspiracy by making a $12.8 billion equity investment in JLI, the largest equity investment in United States history. This investment would give Altria three seats on the JLI Board of Directors, and thus allow it to assert greater control over both JLI and the Nicotine Market Expansion Conspiracy, which used the instrumentalities of JLI to effectuate many of its fraudulent schemes.

e.    As part of this deal, Altria agreed not to compete with JLI and to withdraw from the e-cigarette market entirely. Ceding its market share to JLI, while obtaining creeping control, Altria agreed to act as one with JLI to monopolize the e-cigarette market in furtherance of the Nicotine Market Expansion Conspiracy.

[PROPOSED] SECOND AMENDED COMPLAINT - 319

**Nicotine Content Misrepresentation Scheme**

972.    As described in sections IV (F)-(I), the Early Conspiracy Defendants and Altria caused thousands, if not millions, of JUUL Pod packages to be distributed to consumers with false and misleading information regarding the JUUL Pods' nicotine content. The Early Conspiracy Defendants also caused the same false and misleading information to be distributed via JLI's website.

**Nicotine Content Misrepresentation Scheme**

973.    As described in sections IV (F)-(I), the Early Conspiracy Defendants and Altria worked in concert to defraud the public and regulators in order to prevent regulation that would have impeded their plan to: maintain and expand the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base. Specifically, they worked to ensure the FDA allowed certain flavors, namely mint, to remain on the market.

**Cover-up Scheme**

974.    The Conspiracy Defendants were not only concerned with protecting flavors, however. In light of growing public scrutiny of JLI's role in the youth vaping crisis, these Defendants continued their scheme to prevent a complete ban on JUUL Products.

975.    As described in sections IV (F)-(I), JLI provided false information on its website pages about the addictive potential of its products and denied that JLI marketed to youth, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani provided direct input as to the content of the JLI website and had "final say" over JLI's marketing messaging.

976.    As described in sections IV (D)-(E), JLI, and Defendants Bowen, Monsees, Pritzker, Huh, and Valani (through their "final say" on all of JLI's marketing efforts) caused deceptive, false and misleading marketing, promotions and advertising to be distributed over television, radio and the internet and through other mass media channels in order to give the impression that JLI's product was a smoking cessation device and that JLI never marketed to youth. As described in sections IV (D)-(F), Defendant Altria continued this scheme by

transmitting the fraudulent "Make the Switch" advertisements in packs of its combustible cigarettes.

977.    As described in sections IV (H)-(I), beginning in October 2018, both Altria and JLI were transmitting deceptive, false and misleading communications to the public and the government in an attempt to stave off regulation.

978.    And no later than December 2018, Altria began providing even more services to the Nicotine Market Expansion Conspiracy, as described in sections IV (G)-(H).

### Pattern of Fraud in Furtherance of the Conspiracy

979.    The Conspiracy Defendants advanced the Conspiracy's objectives through common deceptions, fraud, misrepresentations, concealments, and material omissions.

980.    In devising and executing the objectives of the Nicotine Market Expansion Conspiracy, the Conspiracy Defendants devised and knowingly carried out material schemes and/or artifices to defraud the public, including Walker McKnight, and regulators by (1) transmitting marketing, promotional materials and advertisements that fraudulently and deceptively omitted any reference to JUUL's nicotine content (or any meaningful reference, where one was made); (2) causing false and misleading statements regarding the nicotine content of JUUL Pods to be posted on the JLI website; (3) causing thousands, if not millions, of JUUL Pod packages containing false and misleading statements regarding the nicotine content of JUUL Pods to be transmitted; (4) representing to consumers, including Walker McKnight, and the public-at-large that JUUL was created and designed as a smoking cessation device, and by misrepresenting the nicotine content and addictive potential of its products; (5) making fraudulent statements to the FDA to convince the FDA to allow certain flavors, namely mint, to remain on the market; and (6) making fraudulent statements to the public (including through advertising), the FDA, and Congress to stave off a total prohibition on JUUL that was being contemplated in light of JLI's role in the youth vaping epidemic.

[PROPOSED] SECOND AMENDED COMPLAINT - 321

981.    For the purpose of furthering the Conspiracy's common purpose of maintaining and expanding the number of nicotine-addicted e-cigarette users in order to ensure a steady and growing customer base, including by preserving and increasing JLI's market share, even at the expense of exposing and addicting children to nicotine, Altria made fraudulent statements that it was withdrawing from the e-cigarette market to cease contributing to the youth epidemic. In reality, Altria was withdrawing from the e-cigarette market pursuant to their agreement to join forces with JLI to expand the nicotine market and exploit their dominant position within it.

982.    Illustrative and non-exhaustive examples include the following:

| From | To | Date | Description |
|------|-----|------|-------------|
| *Fraudulent Statements Omitting Reference To JUUL's Nicotine Content (See Sec. IV(E)(3)-(4)* | | | |
| All Early Conspiracy Defendants | Public (via television, internet, and mail) | 2015 | "Vaporized" Campaign |
| *Fraudulent Statements That JUUL Is A Cessation Device (See Sec. IV(D)(4)* | | | |
| All Early Conspiracy Defendants | Public (via internet – JLI Website) | April 25, 2018 (or earlier) to Present | "JUUL Labs was founded by former smokers, James and Adam, with the goal of improving the lives of the world's one billion adult smokers by eliminating cigarettes. We envision a world where fewer adults use |

| | | | |
|---|---|---|---|
| | | | cigarettes, and where adults who smoke cigarettes have the tools to reduce or eliminate their consumption entirely, should they so desire." |
| Kevin Burns (Former JLI CEO) | Public (via internet – JLI Website) | November 13, 2018 | "To paraphrase Commissioner Gottlieb, we want to be the offramp for adult smokers to switch from cigarettes, not an on-ramp for America's youth to initiate on nicotine." |
| All Early Conspiracy Defendants | Public (via internet – JLI Website) | September 19, 2019 | "JUUL Labs, which exists to help adult smokers switch off of combustible cigarettes." |
| Howard Willard (Altria CEO) | Public (via internet – Altria website) | December 20, 2018 | "We are taking significant action to prepare for a future where adult smokers overwhelmingly choose non-combustible products over cigarettes by investing $12.8 billion in JUUL, a world leader in |

[PROPOSED] SECOND AMENDED COMPLAINT - 323

|  |  |  | switching adult smokers . . . . We have long said that providing adult smokers with superior, satisfying products with the potential to reduce harm is the best way to achieve tobacco harm reduction." |
| --- | --- | --- | --- |
| Howard Willard | FDA | October 25, 2018 | "We believe e-cigarette products present an important opportunity to adult smokers to switch from combustible cigarettes." |
| **Fraudulent Statements Regarding Nicotine Content In JUUL Pods (See Sec. IV(D)(2))** | | | |
| All Early Conspiracy Defendants | Public (via internet – JLI website) | July 2, 2019 (or earlier) to Present | "Each 5% JUUL Pod is roughly equivalent to one pack of cigarettes in nicotine delivery." |
| All Early Conspiracy Defendants | Public (via internet – JLI website) | April 21, 2017 | "JUUL Pod is designed to contain approximately 0.7mL with 5% nicotine by weight at time of manufacture which is approximately |

| | | | equivalent to 1 pack of cigarettes or 200 puffs." |
|---|---|---|---|
| All Conspiracy Defendants | Public | 2015 to Present | JUUL Pod packages (1) claiming a 5% nicotine strength; (2) stating that a JUUL Pod is "approximately equivalent to about 1 pack of cigarettes." |
| ***Fraudulent Youth Prevention Study (See Sec. IV(H)(2))*** | | | |
| JLI | FDA (via U.S. mail or electronic transmission) | November 5, 2018 | Fraudulent youth prevalence study transmitted by JLI to the FDA. |
| ***Fraudulent Statements To Prevent Regulation Of Mint Flavor (See Sec. IV(H)(2))*** | | | |
| JLI | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA) November 12, 2018 (Public) | JLI's Action Plan that fraudulently characterizes mint as a non-flavored tobacco and menthol product, suggesting that it was a product for adult smokers. |
| Howard Willard (Altria CEO) | FDA (via U.S. mail or electronic transmission of letter to | October 25, 2018 | Letter from H. Willard to FDA fraudulently representing mint as a non-flavored tobacco and |

| | Commissioner Gottlieb) | | menthol product, suggesting that it was a product for adult smokers. |
|---|---|---|---|
| ***Fraudulent Statements To Prevent Ban On JUUL Products (See Sec. IV(D)-(F))*** | | | |
| All Early Conspiracy Defendants | Public (via Television) | January 2019 | $10 million "Make the Switch" advertising campaign for the purpose of deceiving the public and regulators that JLI was only targeting adult smokers with its advertising and product and that JUUL was a cessation product. |
| Altria | Public (via inserts in combustible cigarette packs) | March 2019 | "Make the Switch" advertising campaign for the purpose of deceiving smokers that JUUL was a cessation product. |
| Ashely Gould, JLI Chief Administrative Officer | Public (via interview with CNBC, later posted on internet) | December 14, 2017 | "It's a really, really important issue. We don't want kids using our products." |

| JLI | Public (via internet -social media) | March 14, 2018 | "We market our products responsibly, following strict guidelines to have material directly exclusively toward adult smokers and never to youth audiences." |
| Kevin Burns | FDA (via U.S. mail or electronic transmission); Public (via internet – JLI website) | October 16, 2018 (FDA)<br><br>November 12, 2018 (Public) | JLI's Action Plan that fraudulently states: "We don't want anyone who doesn't smoke, or already use nicotine, to use JUUL Products. We certainly don't want youth using the product. It is bad for public health, and it is bad for our mission. JUUL Labs and FDA share a common goal – preventing youth from initiating on nicotine. . . . Our intent was never to have youth use JUUL Products." |

[PROPOSED] SECOND AMENDED COMPLAINT - 327

| Kevin Burns | Public (via interview with CNBC – later posted on internet) | July 13, 2019 | "First of all, I'd tell them that I'm sorry that their child's using the product. It's not intended for them. I hope there was nothing that we did that made it appealing to them. As a parent of a 16-year-old, I'm sorry for them, and I have empathy for them, in terms of what the challenges they're going through." |
| --- | --- | --- | --- |
| All Early Conspiracy Defendants | Public (via internet - JLI website) | August 29, 2019 | "We have no higher priority than to prevent youth usage of our products which is why we have taken aggressive, industry leading actions to combat youth usage." |
| Monsees | Public (via statement to New York Times – later posted on internet) | August 27, 2019 | Monsees said selling JUUL Products to youth was "antithetical to the company's mission." |
| JLI | Public (via statement to Los Angeles Times – later posted on internet) | September 24, 2019 | "We have never marketed to youth and we never will." |

[PROPOSED] SECOND AMENDED COMPLAINT - 328

| JLI (Via Counsel) | FDA (via U.S. mail or electronic transmission to Dr. Matthew Holman) | June 15, 2018 | Letter from JLI's Counsel at Sidley Austin to Dr. Matthew Holman, FDA, stating: "JUUL was not designed for youth, nor has any marketing or research effort since the product's inception been targeted to youth." and "With this response, the Company hopes FDA comes to appreciate why the product was developed and how JUUL has been marketed — to provide a viable alternative to cigarettes for adult smokers." |
| Monsees | Congress (via U.S. mail or electronic transmission of written testimony) | July 25, 2019 | Written Testimony of J. Monsees provided to Congress, stating "We never wanted any non-nicotine user, and certainly nobody under the legal age of purchase, to ever use JLI products. . . .That is a serious problem. Our company has no higher priority |

[PROPOSED] SECOND AMENDED COMPLAINT - 329

| | | | than combatting underage use." |
|---|---|---|---|
| Howard Willard | FDA (via U.S. mail or electronic transmission of letter to Commissioner Gottlieb) | October 25, 2018 | "[W]e do not believe we have a current issue with youth access to or use of our Pod-based products, we do not want to risk contributing to the issue." |
| Howard Willard | Congress (via U.S. mail or electronic transmission of letter to Senator Durbin) | October 14, 2019 | "In late 2017 and into EARLY 2018, we saw that the previously flat e-cigarette category had begun to grow rapidly. JUUL was responsible for much of the category growth and **had quickly become a very compelling product among adult vapers**. We decided to pursue an economic interest in JUUL, believing that an investment would **significantly improve our ability to bring** |

| | | | adult smokers a leading portfolio of non-combustible products and strengthen our competitive position with regards to potentially reduced risk products." |
|---|---|---|---|
| ***Fraudulent Statements Concerning Altria's Withdrawal From The Market (See Section IV.I.)*** | | | |
| Altria | Public and FDA (via U.S. Mail and/or electronic transmission) | October 25, 2018 | Altria stated that it was withdrawing its e-cigarette product because it did not want to "risk contributing to the issue" of youth vaping, but the withdrawal was a condition of Altria's investment in JLI. |

983.    As described above, the Nicotine Market Expansion Conspiracy had a scheme to defraud the public and regulators in order to continue selling nicotine products to youth, and to protect their market share, by denying that JLI marketed to youth and claiming that JUUL was actually created and designed as a smoking cessation device or mitigated risk product.

984.    The Conspiracy Defendants had a specific intent to defraud regulators and the public. For example, as alleged above, the members of the Nicotine Market Expansion Conspiracy

made repeated and unequivocal statements that they were not marketing to children and that their product was designed for adult smokers. As even the evidence pre-discovery shows, this is not true. The authors of these fraudulent statements are high level executives at each of the Defendant companies who would reasonably be expected to have knowledge of the company's internal research, public positions, and long-term strategies. Because these high-level executives made statements inconsistent with the internal knowledge and practice of the corporations, it would be absurd to believe that these highly ranked-representatives and agents of these corporations had no knowledge that their public statements were false and fraudulent. The Conspiracy Defendants intended the public and regulators to rely on these false transmissions and this scheme was therefore reasonably calculated to deceive persons of ordinary prudence and comprehension.

985.    The public and government regulators relied on the Nicotine Market Expansion Conspiracy's fraudulent misstatements. For example, the regulators, including the FDA, relied on the Nicotine Market Expansion Conspiracy's statements that mint was not a popular flavor in allowing mint JUUL Pods to remain on the market and relied on the Nicotine Market Expansion Conspiracy's statements that it did not market to youth in allowing the Conspiracy Defendants to continue marketing and selling JUUL. Congress likewise relied on the Conspiracy's statements in not bringing legislation to recall or ban e-cigarettes, despite the calls of members of both parties to do just that. And the public relied on statements that were transmitted by the Conspiracy Defendants regarding the nicotine content in JUUL Pods in deciding to purchase JUUL Products.

**Harm and Injuries to Walker McKnight**

986.    Walker McKnight was injured—as set forth herein—by the Conspiracy and such injury would not have occurred but for the predicate acts of the Conspiracy Defendants. The combined effect of the Conspiracy Defendants' fraudulent acts were: (1) inducing Walker McKnight to purchase JUUL Products that he would not have purchased had he known that JUUL Products were not cessation products or if he had known of the addictive and toxic nicotine in said products; (2) lulling the FDA into allowing the continued sale of JLI's mint Pods, which

[PROPOSED] SECOND AMENDED COMPLAINT - 332

allowed Walker McKnight to purchase mint Pods he would not have purchased; and (3) lulling Congress and the FDA into allowing JUUL Products to remain on the market, which allowed Walker McKnight to purchase JUUL Products he would not have purchased absent the Conspiracy Defendants' schemes to preserve JLI's ill-gotten market share.

987.    Defendants' conduct violated numerous states' laws and constituted a conspiracy to harm Walker McKnight. Walker McKnight brings a cause of action for conspiracy to commit fraud under applicable state statutory and common law.

988.    Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

989.    As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septal defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

990.    As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful

Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

991.   In the alternative, as a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT THIRTEEN**

**VIOLATION OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA STAT. § 501.203**

**(Against All Defendants)**

992.   At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

993.   The express purpose of FDUTPA is to "protect the consuming public…form those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce." §501.202(2).

[PROPOSED] SECOND AMENDED COMPLAINT - 334

994.    FDUTPA §501.204(1) declares unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce."

995.    Manufacturing, selling, and promoting JUUL Products in interstate commerce are "consumer transaction[s]" within the scope and meaning of FDUTPA.

996.    Walker McKnight is a "consumer" as defined by FDUTPA §501.203.

997.    Defendants' unfair and deceptive practices are likely to mislead – and have misled reasonable customers, such as Walker McKnight, by:

a.    Representing that goods or services have approval, characteristics, uses, or benefits that they do not have;

b.    Advertising goods or service with the intent not to sell them as advertised; and

c.    Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion.

998.    Defendants have engaged and continue to engage in unfair, unlawful, and deceptive trade practices in Florida as outlined herein. In particular, Defendants have knowingly developed, sold, and/or promoted a product that contained nicotine levels in excess of cigarettes with the intention of creating and fostering long-term addiction to JUUL Products for minors to continue that addition into adulthood; selling a product that aggravates nicotine addiction; and creating advertising to target youth into using JUUL.

999.    Walker McKnight was injured by Defendants' unlawful conduct, which was intended to through a pervasive pattern of false and misleading statements and omissions by targeting minors and portraying JUUL Products as cool and safe alternatives to combustible cigarettes while misrepresenting or omitting concerns about their nicotine content, addictiveness, and safety.

1000.   Walker McKnight relied to his detriment on Defendants' misrepresentations and omissions in deciding to purchase and use JUUL Products.

[PROPOSED] SECOND AMENDED COMPLAINT - 335

1001.    By reason of the fraudulent and unlawful acts engaged in by Defendants, and as a direct and proximate result thereof, Walker McKnight has sustained economic losses and other damages and are entitled to statutory and compensatory damages in an amount to be proven at trial.

1002.    As a direct and proximate result of the fraudulent and unlawful acts engaged in by Defendants as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1003.    In the alternative, as a direct and proximate result of the fraudulent and unlawful acts engaged in by Defendants as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT FOURTEEN**

**UNJUST ENRICHMENT**

**(Against All Defendants)**

1004.    At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce,

and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

1005.   Defendants created and implemented a plan to create a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, and safety.

1006.   Defendants were unjustly enriched as a result of their wrongful conduct, including through the false and misleading marketing, promotions and advertisements that included the following non-exhaustive list of omissions regarding: (i) whether JUUL Products are reasonable alternatives to cigarettes, (ii) were extremely potent nicotine-delivery mechanisms, (iii) contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and (iv) posed unreasonable risks of substantial bodily injury resulting from the use of the products.

1007.   Defendants requested and received a measurable benefit at the expense of Walker McKnight in the form of payment for JUUL Products.

1008.   Defendants appreciated, recognized, and chose to accept the monetary benefits Walker McKnight conferred onto Defendants at Walker McKnight's detriment. These benefits were the expected result of Defendants acting in their pecuniary interests at the expense of its customers.

1009.   There is no justification for Defendants' enrichment. It would be inequitable, unconscionable, and unjust for Defendants to be permitted to retain these benefits because the benefits were procured as a result of their wrongful conduct.

1010.   Defendants wrongfully obfuscated the harm caused be their conduct. Thus, Walker McKnight, who mistakenly enriched Defendants by relying on Defendants' fraudulent

[PROPOSED] SECOND AMENDED COMPLAINT - 337

representations, could not and did not know the effect that using JUUL Products would have on Walker McKnight's health.

1011.   Acceptance of the benefit by Defendants under these circumstances would be inequitable.

1012.   Walker McKnight is entitled to restitution of the benefits Defendants unjustly retained and/or any amounts necessary to return Walker McKnight to the position he occupied prior to dealing with Defendants. Due to the sprawling, decades-long tobacco litigations and other notice they have received as a result of lawsuits filed against them, Defendants are reasonably notified that Walker McKnight would expect compensation from Defendants' unjust enrichment stemming from their wrongful actions.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT FIFTEEN**

**BREACH OF EXPRESS WARRANTY**

**(Against All Defendants)**

1013.   At all relevant times, Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

1014.   Defendants violated numerous states' laws for breach of express warranties and Walker McKnight will bring a cause of action for breach of express warranty under applicable State common law.

1015.   Defendants expressly warranted through public statements, press releases advertisements, marketing materials and descriptions that JUUL Pods and JUUL Products were

safe for their intended use and that they were a safer alternative to traditional combustible cigarettes.

1016.   Defendants expressly warranted to Walker McKnight through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising, and its packaging materials that "JUUL Pod contains ~.7 ml with 5% nicotine by weight" and is "approximately equivalent to about 1 pack of cigarettes."

1017.   Defendants expressly warranted to Walker McKnight through written statements, descriptions, and affirmations of fact on its website, print advertising, marketing materials, point-of-sale marketing and advertising and its packaging materials that "JUUL Pod contains ~.7 ml with 3% nicotine by weight."

1018.   Defendants also expressly warranted that JUUL Pods are "5% Strength" as stated on the front of JUUL's product packaging and that one JUUL Pod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials including point-of-sale marketing and advertising.

1019.   Defendants expressly warranted that JUUL use causes less, or at least no more, nicotine to enter the bloodstream than a cigarette and that one JUUL Pod is equivalent to "1 pack of cigarette or 200 puffs" as stated on JUUL's website and marketing materials, including, point-of-sale marketing and advertising.

1020.   These affirmations of fact became the basis of the bargain between Defendants and Walker McKnight, thereby creating express warranties that JUUL Products would conform to JUUL's affirmations of fact, representations, promises, and descriptions.

1021.   As described herein, JUUL Pods actually contain more nicotine than as advertised, and JUUL delivers more nicotine per puff than a combustible cigarette and JUUL Pods contain significantly more nicotine than one pack of cigarettes.

1022.   These express communications contained misrepresentations and failed to warn of the serious and known risks of JUUL Products as alleged herein.

1023. When Defendants made these express warranties, they knew the intended purposes of the JUUL Products and warranted the product to be, in all respects, safe and proper for such purposes.

1024. Defendants authored the documents and/or made the statements upon which these warranty claims were based and, in doing so, defined the terms of those warranties. The JUUL Products sold by Defendants did not conform to Defendants' promises, descriptions or affirmations and were not adequately packaged, labeled, promoted and/or fit for the ordinary purposes for which they were intended.

1025. All of the aforementioned written materials are known to Defendants and in their possession, and it is Walker McKnight's belief that these materials shall be produced by Defendants and made part of the record once discovery is completed.

1026. Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

1027. As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus, mycoplasma, multiple organ failure, atrial septal defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In

addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

1028.   As a direct and proximate result of Defendants' breach of these warranties as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1029.   In the alternative, as a direct and proximate result of Defendants' breach of these warranties as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

### COUNT SIXTEEN

### BREACH OF AN IMPLIED WARRANTY OF MERCHANTABILITY

### (Against JUUL Defendants and Management Defendants)

1030.   At all relevant times, the JUUL Defendants and Management Defendants named herein designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

1031.   The JUUL Defendants and Management Defendants at all times were merchants with respect to JUUL Products sold to Walker McKnight and were in the business of selling such products.

1032.   Each JUUL Product sold comes with an implied warranty that it will be merchantable and fit for the ordinary purpose for which it would be used.

1033.   The ordinary intended purposes of JUUL's products—and the purpose for which they are marketed, promoted, and sold—is to serve as a safe alternative to cigarettes or a smoking cessation device. For example, the "Make the Switch" campaign reinforces the impression that JUUL is linked to cessation and quitting and that JUUL is less harmful to one's health.

1034.   JUUL's products are not fit for that use—or any other use—because they are an unreasonably potent nicotine-delivery mechanism, contain nicotine levels higher than "approximately equivalent to a pack of cigarettes" in contrast to their warranties, and pose significant risks of substantial physical injury resulting from the use of the products. When used as intended or reasonably foreseeable, JUUL Products worsen or aggravate users' underlying nicotine addiction. Furthermore, by worsening users' addiction, JUUL Products have served as a gateway to increased cigarette use.

1035.   Due to these and other features, JUUL's products are not fit for their ordinary, intended use as either cigarette replacement devices or recreation smoking devices and JUUL Products are in fact defective and fail to conform to JUUL's implied warranties.

1036.   The JUUL Defendants' and Management Defendants' breach of their implied warranties violated numerous statutes, including but not limited to Tenn. Code Ann. §§ 47-2-314 et seq.

1037.   The JUUL Defendants and Management Defendants have breached JUUL's implied warranty of merchantability because JUUL Products were not in merchantable condition when sold, were defective when sold, and do not possess even the most basic degree of fitness for ordinary use.

1038. Despite having received notice of these defects, the JUUL Defendants, and Management Defendants continue to misrepresent the nature of its products and breach its implied warranties.

1039. Walker McKnight has had sufficient direct dealings with the JUUL Defendants and/or Management Defendants via its website or through retailers acting as its agents authorized to sell and distribute JUUL Products and to establish privity of contract between JUUL.

1040. Further, Walker McKnight was a third-party beneficiary of JUUL's agreements with its distributors, dealers, and sellers for the distribution, dealing, and sale of JUUL Products to consumers. Specifically, Walker McKnight is the intended beneficiary of JUUL's implied warranties. JUUL's products are manufactured with the express purpose an intent of being sold to consumers.

1041. Walker McKnight would not have used or purchased JUUL Products, or would not have purchased the products on the same terms, had they known the facts these Defendants failed to disclose.

1042. Walker McKnight was injured as a direct and proximate result of Defendants' conduct as described herein, including but not limited to catastrophic personal injuries as described herein, including but not limited to pneumonia, acute respiratory distress syndrome, collapsed lung, requiring chest tubes, extracorporeal membrane oxygenation, lung and kidney transplants, which caused or substantially contributed to cause his death.

1043. As a result of Walker McKnight's use of JUUL, he suffered catastrophic personal injuries, including but not limited to addiction, nicotine poisoning, irritability, mood swings, anger/outbursts, suicidal thoughts, anxiety, Attention Deficit Disorder, lack of concentration, orthostatic hypotension, tachycardia, acute pneumonia, acute respiratory distress syndrome (ARDS), chronic lung problems, e-cigarette or vaping use associated lung injury (EVALI), sepsis, acute kidney failure, acute respiratory failure, pleural effusion, acute hypoxic respiratory insufficiency, parapneumonic effusion, left pneumothorax, exudative effusion, EBV, adenovirus,

mycoplasma, multiple organ failure, atrial septic defect, end-stage renal disease (ESRD), pulmonary fibrosis, pulmonary edema, hypertension, bronchiectasis, recurrent pseudomonas pneumonia, and peritonitis, which caused or substantially contributed to cause his death. In addition to his physical injuries, Walker McKnight also incurred significant medical expenses, out of pocket expenses, and other injuries that are known and unknown.

1044.  As a direct and proximate result of Defendants' breach of implied warranties of merchantability as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1045.  In the alternative, as a direct and proximate result of Defendants' breach of implied warranties of merchantability as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

**COUNT SEVENTEEN**

**INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS**

**(Against All Defendants)**

1046.  At all relevant times, Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

1047.  Defendants acted willfully or wantonly towards Walker McKnight by the following actions, among many others mentioned and unmentioned in this Second Amended Complaint:

a.  Defendants created a product designed to addict a new generation to nicotine and implemented a plan to generate a market for e-cigarettes and substantially increase sales of JUUL through a pervasive pattern of false and misleading statements and omissions. Defendants' plan was intended to portray JUUL Products as cool and safe alternatives to combustible cigarettes, with a particular emphasis on appealing to minors, based in part on food flavors while misrepresenting or omitting key facts concerns JUUL nicotine content, addictiveness, flavoring content and safety.

b.  Because nicotine addiction forms more quickly and stronger in minors, Defendants' created a design of vape and marketing scheme intended to appeal to youth.

c.  Defendants' marketing, promotions and advertisements contained deceptive statements that JUUL e-cigarettes were reasonable alternatives to combustible cigarettes and that they contained nicotine "approximately equivalent to a pack of cigarettes", when in fact the amount of nicotine in a JUUL Pod is as much as twice as high as that in a pack of cigarettes, higher than what Defendants represented.

d.  Defendants' marketing, promotions and advertisements failed to disclose that JUUL e-cigarettes were not reasonable alternatives to combustible cigarettes, were extremely potent nicotine-delivery mechanisms, contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and posed significant risks of substantial physical injury resulting from the use of the products.

[PROPOSED] SECOND AMENDED COMPLAINT - 345

e.      The labels and packaging of the JUUL Products failed to disclose that the products posed significant risks of substantial physical injury resulting from the use of the products. The labels and packaging also falsely stated that JUUL Products contained nicotine levels higher than "approximately equivalent to a pack of cigarettes", and that they were reasonable alternatives to combustible cigarettes.

f.      The omissions were misleading and deceptive standing alone and were particularly deceptive in light of JUUL marketing, promotions and advertising its products as reasonable alternatives to cigarettes.

g.      Defendants' misrepresentations and omissions had the capacity to, were likely to, and in fact did, deceive reasonable consumers including Walker McKnight.

h.      The predatory design of JUUL Products, as provided elsewhere in this Amended Complaint, combined with Defendants' deceptive marketing and labeling scheme, caused severe injuries to a generation, including Walker McKnight.

1048.   Defendants' actions are ones which evoke outrage or revulsion in civilized society.

1049.   The acts were directed at or intended to cause harm to Walker McKnight.

1050.   Walker McKnight suffered severe emotional distress as a direct result of the acts of the Defendant; and

1051.   Such resulting emotional distress was foreseeable from the intentional acts of Defendants.

1052.   As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1053.   In the alternative, as a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT EIGHTEEN

## NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS

### (Against All Defendants)

1054.   At all relevant times, Defendants designed, manufactured, assembled, inspected, tested (or not), packaged, labeled, marketed, advertised, promoted, supplied, distributed, sold and/or otherwise placed JUUL Products into the stream of commerce, and therefore owed a duty of reasonable care to avoid causing harm to those that consumed it, such as Walker McKnight.

1055.   Walker McKnight's prior allegations regarding the five elements of ordinary negligence are incorporated here.

1056.   Walker McKnight has suffered a serious and severe emotional injury as proximately caused by Defendants' conduct, including but not limited to anger/outbursts, mood swings, irritability, depression, and anxiety.

1057.   As a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for

pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1058.   In the alternative, as a direct and proximate result of Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## COUNT NINETEEN

## STRICT LIABILITY

### (Against The Hook Up, Climax, and Wawa)

1059.   The Hook Up, Climax and Wawa engage in the business of selling and distributing JUUL products in Florida.

1060.   The Hook Up, Climax, and Wawa directly placed JUUL products on the market with knowledge the products would be used without inspection for defects and dangers. The Hook Up, Climax and Wawa knew or should have known that the ultimate users and consumers would not and could not know that JUUL products are defective and unreasonably dangerous for Plaintiff.

1061.   For the reasons stated above, JUUL products are defective and unreasonably dangerous. JUUL products failed to be safe for regular consumer application as an ordinary consumer would expect, and the risks of regular use of JUUL products outweighed any benefits. JUUL products lacked adequate warnings or any proper documentation or notice to alert users,

particularly youth users, regarding the hazardous conditions, as stated above, involving JUUL products.

1062.   The JUUL products purchased by Plaintiff at The Hook Up, Climax, and Wawa were substantially unchanged from their condition when sold and distributed.

1063.   As a direct and proximate result of the defects of JUUL products discussed in this Complaint, as well as Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in Florida's Wrongful Death Act, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered in the past and to be suffered in the future by Plaintiffs, as the surviving parents.

1064.   In the alternative, as a direct and proximate result of the defects of JUUL products discussed in this Complaint, as well as Defendants' misconduct as set forth herein, Plaintiffs are entitled to recover all damages against Defendants specified in the Florida Survival Statute, including but not limited to the cost of medical care, hospitalization, and treatment incurred from the time of Walker McKnight's injury up and through the time of his death, and for pain and suffering and loss of the capacity for the enjoyment of life suffered by Walker McKnight from the time of injury up and through the time of his death

### COUNT TWENTY

### LOSS OF CONSORTIUM

### (Against All Defendants)

1065.   At all times relevant, Plaintiffs were and are the parents of Walker McKnight.  As such, they were and are entitled to their son's services, support, companionship, affection and consortium.

1066.   As a result of the injuries sustained by Walker McKnight as set forth herein, Plaintiffs have lost the services, support, companionship, affection and consortium of their son,

and will continue to lose said services, support, companionship, affection and consortium in the future.

**WHEREFORE**, Plaintiffs demand judgment against Defendants for compensatory and punitive damages, together with interest, costs of suit, attorneys' fees, and all such other relief as the Court deems just and proper.

## TIMELINESS AND TOLLING OF STATUTES OF LIMITATIONS

1067.   Through the exercise of reasonable diligence, Plaintiffs did not and could not have discovered that JUUL Products caused their injuries and/or sequelae thereto because, at the time of these injuries and/or sequelae thereto, the cause was unknown to Plaintiffs.

1068.   Plaintiffs did not suspect and had no reason to suspect JUUL Products caused Walker McKnight's injuries and/or sequelae thereto until less than the applicable limitations period prior to the filing of this action.

1069.   In addition, Defendants' fraudulent concealment has tolled the running of any statute of limitations. Through their affirmative misrepresentations and omissions, Defendants actively concealed from Plaintiffs the risks associated with the defects of JUUL Products and that these products caused their injuries and/or sequelae thereto. Through their ongoing affirmative misrepresentations and omissions, Defendants committed continual tortious and fraudulent acts.

1070.   As a result of Defendants' fraudulent concealment, Plaintiffs were unaware and could not have reasonably known or learned through reasonable diligence that they had been exposed to the defects and risks alleged herein and that those defects and risks were the direct and proximate result of Defendants' acts and omissions.

## PRAYER FOR RELIEF

Plaintiffs demand judgment against Defendants to the full extent of the law, including but not limited to:

A.      Judgment for Plaintiffs and against Defendants;

B.      Damages to compensate Plaintiffs as provided under the Florida Wrongful Death

Act, or alternatively, under the Florida Survival statute for injuries sustained as a result of the use of JUUL including but not limited to physical pain and suffering, mental anguish, loss of enjoyment of life, emotional distress, expenses for hospitalizations and medical treatments, other economic harm that includes but is not limited to lost earnings and loss of earning capacity; and loss of consortium

C.     Exemplary, treble, and/or punitive damages in an amount in excess of the jurisdictional limits;

D.     Attorneys' fees;

E.     Experts' fees;

F.     Costs of litigation;

G.     Pre-judgment and post-judgment interest at the lawful rate;

H.     A trial by jury on all issues of the case;

I.     Medical monitoring costs or programs; and

J.     Any other relief as this court may deem equitable and just, or that may be available.


DATED: April 11, 2025                    Respectfully submitted,

                                         */s/ Jeffrey L. Haberman*
                                         Jeffrey L. Haberman
                                         Scott P. Schlesinger
                                         Jonathan R. Gdanski
                                         **SCHLESINGER LAW OFFICES, P.A.**
                                         1212 SE Third Avenue,
                                         Fort Lauderdale, FL 33316
                                         Tel: (954) 467-8800
                                         Fax: (954) 320-9509
                                         jhaberman@schlesingerlaw.com

                                         *Attorneys for Plaintiffs*

[PROPOSED] SECOND AMENDED COMPLAINT - 351